UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN JOHNSON, ET. AL.                    CIVIL ACTION

VERSUS                                   NOS. 04-3201
                                              05-6627

BIG LOTS STORES, INC.                    SECTION "R"(1)


## ORDER AND REASONS

Before the Court is defendant's motion to decertify this
case as a collective action under § 16(b) of the Fair Labor
Standards Act (FLSA), 29 U.S.C. § 216(b). For the following
reasons, the Court DENIES defendant's motion.


**I.   BACKGROUND**

The defendant in this overtime pay action is Big Lots
Stores, Inc. Big Lots is a nationwide retailer of "closeout" and
"overstock" merchandise. It sells a wide variety of overproduced
and discontinued goods ranging from toys to furniture at more
than 1,400 stores across 46 states. Big Lots also utilizes

previously used retail space; what was once a grocery store may now be a Big Lots.

The corporation is divided into five regions and has a hierarchical management structure. A corporate vice president oversees business activities in each region. Each region consists of more than 100 districts; each district encompasses multiple stores. District managers oversee store operations within their districts. A store manager supervises business operations at each retail location. Big Lots attempts to staff each store with two assistant managers who report directly to the store manager, but some stores employ only one assistant manager.

There are two assistant manager positions at Big Lots: one for the "front end," the other for the "back end." The Assistant Manager for Operations nominally focuses on point-of-sale and related clerical matters, while the Assistant Manager for Merchandising is formally responsible for unloading freight and stocking merchandise in the store. The uniform descriptions for each position, however, contain largely identical job duties.

The plaintiffs in this case are current and former assistant store managers. They contend that Big Lots has violated the FLSA's maximum hour and overtime provision, 29 U.S.C. § 207(a)(1), by misclassifying them as exempt executive employees and not paying them overtime compensation. Under the FLSA,

2

employers do not have to pay overtime to "any employee in a *bona fide* executive . . . capacity," as defined in regulations promulgated by the Secretary of Labor. 29 U.S.C. § 213(a)(1). The plaintiffs specifically allege that Big Lots maintains a "corporate policy and practice of misclassifying Assistant Managers as exempt from the FLSA."[1] The plaintiffs contend that although Big Lots formally describes the position of assistant manager as involving exempt tasks like making personnel decisions and managing stores' financial resources, in reality their work primarily consists of non-exempt activities such as "stocking shelves, operating cash registers, unloading trucks, placing stock in the storeroom, straightening the merchandise, assisting customers with merchandise handling, and cleaning the bathroom."[2] Plaintiffs contend that their managerial duties were *de minimis* and that they are therefore non-exempt employees.

Plaintiffs further contend that Big Lots exercises corporate managerial control over retail locations and that the formal job description and job duties of assistant managers are the same from store to store.[3] Plaintiffs assert that Big Lots' "corporate payroll practices and policies . . . are applicable companywide

---

[1] *Id.* at ¶ 18, R. Doc. 1 at 5 (emphasis added).

[2] *Id.* at ¶¶ 9, 11, R. Doc. 1 at 3.

[3] *See id.* at ¶ 8, R. Doc. 1 at 3.

and are not of limited application."[4] They seek unpaid overtime compensation, liquidated damages, attorneys' fees, and all equitable relief. Neither party has requested a jury trial.

The plaintiffs brought their claims individually and on behalf of all similarly situated individuals under the FLSA's collective action provision, 29 U.S.C. § 216(b). On July 5, 2005, the Court conditionally certified this suit as a collective action and ordered the parties to provide notice of the suit to all assistant managers employed by Big Lots on or after November 23, 2001.[5] Roughly 1,200 plaintiffs have since opted into this suit.

Over the past two years, the parties have engaged in discovery. They have deposed a total of 12 plaintiffs — the three named plaintiffs and nine opt-in plaintiffs selected by plaintiffs' counsel. Plaintiffs' counsel has also collected 303 declarations from opt-in plaintiffs. Plaintiffs also deposed three corporate representatives: Big Lots' Executive Vice President for Human Resources, a Regional Vice President designated to testify about the job duties of assistant managers, and the Director of Compensation responsible for determining job classifications under the FLSA. Big Lots has produced several

---

[4] *Id.* at ¶ 19, R. Doc. 1 at 19.

[5] *See* R. Doc. 36.

corporate documents related to the position of assistant manager and the administration of its retail locations. It has also submitted declarations from current and past assistant managers that describe their employment experiences. Big Lots now moves to decertify this suit as a collective action on the ground that the plaintiffs are not similarly situated, and therefore resolution of their claims in a collective action is inappropriate.

## II.   DISCUSSION

### A.   Legal Standard for Certifying a Collective Action under § 16(b) of the FLSA

Under the FLSA, an employer may be held liable for failing to pay overtime compensation to an employee who works in excess of 40 hours per week. *See* 29 U.S.C. § 216(b). The statute also permits multiple employees to recover overtime pay by filing what courts have come to call a "collective action." Under the law, "[a]n action to recover" overtime pay "may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The collective action provision is remedial and aimed at efficient resolution of similar claims. As the Supreme Court has explained, "[a] collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate

5

rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). The Court also observed that "the broad remedial goal of the statute should be enforced to the full extent of its terms." *Id.* at 173.[6]

The FLSA does not define "similarly situated," and the Fifth Circuit has not articulated a clear test that district courts must use to determine whether the plaintiffs are similarly situated so as to warrant collective treatment. In the only case

---

[6] *Hoffman-La Roche* involved a claim of discrimination brought under the Age Discrimination in Employment Act (ADEA) and addressed the appropriate role for a district court to play in notifying potential plaintiffs of the collective action. *Hoffman-La Roche* pertains to an FLSA analysis because the ADEA expressly incorporates the collective action provision of the FLSA. *See Hoffman-La Roche*, 493 U.S. at 167–68. Many other judicial decisions interpreting the FLSA's collective action provision and the meaning of the requirement that plaintiffs be "similarly situated" are also ADEA cases. *See, e.g., Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (2001); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir. 2001); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1996). When courts confront questions about the collective action provision in FLSA cases, they regularly rely on pronouncements in these ADEA cases. *See, e.g., Lynch v. United States Auto. Ass'n*, __ F. Supp. 2d __, __, No. 07-CV-562, 2007 WL 1288582, at 10 (S.D.N.Y. April 26, 2007); *Reyes v. Texas EZPawn*, No. V-03-128, 2007 WL 101808, at *1–*2 (S.D. Tex. Jan. 8, 2007); *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1150 (2005); *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 19944286, at *1 (S.D. Tex. Aug. 17, 2005); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *3–*4 (E.D. La. July 2, 2004). This Court similarly relies on these authorities.

in which the Fifth Circuit has addressed this question, it affirmed a district court's decision to decertify a collective action based on a two-stage, fact-intensive analysis of whether plaintiffs were similarly situated. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1215 (5th Cir. 1995), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The district court in *Mooney* first conditionally certified the case as a collective action on the basis of allegations in the pleadings. After the parties completed discovery, the court conducted a second, more rigorous "similarly situated" analysis than it did at the more "lenient" notice stage because it had more information. *Id.* at 1214. It did so considering multiple factors first cataloged in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987), including: (1) the factual and employment settings of the individual plaintiffs; (2) the defenses available to the defendant that are individual to each plaintiff; and (3) general fairness and procedural considerations. *See Mooney*, 54 F.3d at 1213 n.7, 1214-15. But in affirming the district court's decision to decertify, the Fifth Circuit emphasized that "we specifically *do not* endorse the methodology employed by the district court, and *do not* sanction any particular methodology. We simply need not decide the appropriate methodology under these

7

facts, and therefore leave that inquiry for another day." *Id*. at 1216 (emphasis in original).

The Tenth and Eleventh Circuits have also addressed the issue of decertification on appeal. Although neither of these courts has explicitly held that district courts must employ one particular mode of analysis, each has approved the use of the two-stage, fact-intensive approach that originated in *Lusardi*. *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (approving of the two-stage approach and observing that the *ad hoc* approach is "arguably . . the best . . . because it is not tied to the Rule 23 standards"); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (characterizing the two-stage approach as an "effective tool for district courts to use in managing these often complex cases"). Although no circuit court has mandated the use of the *Lusardi* approach, it is the prevailing mode of analysis among district courts confronted with similarly situated questions. Since *Mooney* district courts in the Fifth Circuit have uniformly used it to determine whether a collective should be certified under the FLSA. *See, e.g., Reyes v. Texas EZPawn, Inc.*, No. V-03-128, 2007 WL 101808, at *2 (S.D. Tex. Jan. 8, 2007); *Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472, 477 (E.D. La. 2006); *Williams v. Bally's Louisiana, Inc.*, No. 05-5020, 2006 WL 1235904, at *2

(E.D. La. May 5, 2006); *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 1994286, at *1 (S.D. Tex. Aug. 17, 2005); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004); *Donohue v. Francis Servs., Inc.* No. 04-170, 2004 WL 1161366, at *1 (E.D. La. May 24, 2004). District courts in other circuits have used this approach as well. *See, e.g., Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1150 (D. Minn. 2005); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1346 (N.D. Ga. 2002). This Court takes the same approach.

The requirement that plaintiffs be "similarly situated" for collective treatment "does not mean identically situated." *Crain v. Helmerich and Payne Int'l Drilling Co.*, No. 92-0043, 1992 WL 91946, at *2 (E.D. La. Apr. 16, 1992) (Feldman, J.) (quoting *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988)); *see also, Grayson v. K Mart Corp*, 79 F.3d 1086, 1096 (11th Cir. 1996). In determining whether plaintiffs are similarly situated, the Court considers: (1) the extent to which plaintiffs' employment settings are similar; (2) the extent to which defenses available to the defendant appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See Mooney*, 54 F.3d at 1214-15 (quoting district court's analysis); *Reyes*, 2007 WL 101808, at *2. Even though it

is the defendant's motion to decertify, the plaintiffs bear the burden of demonstrating that they are similarly situated. *See Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 264 (D. Conn. 2002). Determining whether collective treatment is appropriate is within the Court's discretion. *See Mooney*, 54 F.3d at 1213.

**B.    Statutory and Regulatory Framework of the FLSA**

At this stage of the proceedings, the Court does not confront the question on the merits of whether Big Lots in fact maintains a practice of systematically misclassifying assistant managers as exempt employees. The only question before the Court is whether plaintiffs are similarly situated with respect to their job duties, both in terms of their formal job descriptions and evidence of their actual storeroom experience. Still, an overview of what constitutes an exempt executive employee will help to highlight the facts and issues material both to exempt status and similarity.

The Secretary of Labor defines an exempt executive as any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . .
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) The regulations explicitly state that "[a] job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2. An employee's status as exempt or non-exempt must be determined on the basis of whether the employee's salary and duties meet the requirements of the relevant regulations. *See id.*

Of chief concern in this overtime pay action is whether that plaintiffs' primary duties consist of exempt, managerial tasks. The Secretary of Labor has promulgated an illustrative list of exempt management activities, which includes the following functions pertinent to the retail context:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining . . . sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining techniques to be used; apportioning the work among the employees; determining the type of . . . merchandise to be bought, stocked and sold; controlling the flow and distribution of . . . merchandise . . .; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. For these activities to constitute an employee's primary duties, they must be "the principal, main,

major or most important dut[ies] that the employee performs." 29
C.F.R. § 541.700(a). The regulations further instruct that

> [d]etermination of an employee's primary duty must be based
> on all the facts in a particular case, with the major
> emphasis on the character of the employee's job as a whole.
> Factors to consider when determining the primary duty of an
> employee include, but are not limited to, the relative
> importance of the exempt duties as compared with other types
> of duties; the amount of time spent performing exempt work;
> the employee's relative freedom from direct supervision; and
> the relationship between the employee's salary and the wages
> paid to other employees for the kind of nonexempt work
> performed by the employee.

*Id.* (emphasis added).

An important, though not dispositive, factor to consider in
a primary duty analysis is the amount of time employees devote to
particular tasks. The Labor Secretary's regulations explain that
"employees who spend more than 50 percent of their time
performing exempt work will generally satisfy the primary duty
requirement." *Id.* § 541.700(b). But this calculus can cut both
ways. Employees who spend less than 50 percent of their time
performing exempt duties may nonetheless be considered
management. Indeed, the regulations explicitly state that
"assistant managers in a retail establishment who perform exempt
executive work . . . may have management as their primary duty
even if the assistant managers spend more than 50 percent of the
time performing nonexempt work." *Id.* § 541.700(c). Moreover, the
statute provides that if a retail employee devotes at least 60

percent of her time to activities directly or closely related to executive activities, then she shall not be excluded from the definition of an exempt employee solely "because of the number of hours in his workweek" devoted to nonexempt activities. 29 U.S.C. § 213(a)(1). But the regulations further provide that "if . . . assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would *not* satisfy the primary duty requirement." 29 C.F.R. § 541.700(c) (emphasis added). Therefore, as the regulations mandate, any analysis of whether a position is misclassified as exempt must focus "on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

The Secretary of Labor adopted the foregoing regulations on April 23, 2004. Because the plaintiff class includes assistant managers employed after November 23, 2001, the pre-2004 regulations are also relevant. The earlier version defined an exempt executive as any employee:

> (a) whose duty consists of the management of the enterprise in which he is employed or a customarily recognized department or subdivision thereof; and
>
> (b) who customarily and regularly directs the work of two or more other employees therein; and
>
> (c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotions or any other

change of status of other employees will be given particular
weight; and

(d) who customarily and regularly exercise discretionary
powers; and

(e) who does not devote more than 20 percent, or, in the
case of an employee in a retail or service establishment who
does not devote as much as 40 percent, of his hours of work
in the workweek to activities which are not directly and
closely related to the performance of the work described in
paragraphs (a) through (d) of this section; and

(f) who is compensated for his services on a salary basis at
a rate of not less than $155.00 per week.

29 C.F.R. § 541.1 (repealed April 23, 2004). The most significant

difference between the current regulations and the earlier rules

is the requirement of the amount of time an employee must spend

on managerial tasks in order to be exempt. Under the current

regulations, an employee may spend a majority of her time on non-

exempt tasks and still be classified as exempt, so long as the

character of her job as a whole is managerial. But under the

previous regulations, it was necessary for an employee to devote

more than 60 percent of her time to management-related tasks to

be considered exempt. Since the plaintiffs claim that Big Lots

maintains a practice of misclassifying them as exempt, the terms

of these regulations are instructive for determining whether the

plaintiffs are similarly situated.

**C.    Analysis**

**1.    The Extent to which Plaintiffs' Employment
       Settings are Similar**

The Court examines the following factors in assessing the
extent to which plaintiffs experienced similar employment
settings: job duties; supervision; geographic location; and
salary. *See Reyes*, 2007 WL 101808, at *2.

*a.    Job duties*

The plaintiffs contend that assistant managers in Big Lots
stores across the country have similar job duties. In support of
their claim, they have submitted 303 declarations from opt-in
plaintiffs in 42 states concerning their job duties. This sample
of roughly 25 percent of plaintiffs along with the 12 depositions
of plaintiffs is statistically significant. *See Reich v. So. Md.
Hosp., Inc.*, 43 F.3d 949, 952 (4th Cir. 1995) (collecting cases
on what constitutes statistically significant samples in FLSA
overtime actions).

On average, the declarants state that they spend 91.5
percent of each workweek performing non-exempt tasks, such as
unloading and stocking merchandise, arranging and straightening
store displays, putting pre-marked price tags on merchandise,
operating cash registers, assisting customers to their cars,
retrieving shopping carts from the parking lot, and cleaning. In

addition, all of the declarants are clustered within a narrow range. Each reports the he or she spent between 80 percent and 99 percent of his or her workweek on nonexempt tasks. Further still, of the 303 declarants, 85 percent state that they devoted at least 90 percent of their time to non-exempt tasks. That the declarants are grouped closely together is highly suggestive that they have had comparable employment experiences.

Another indicator of the similarity among plaintiffs is the extent to which exempt tasks do not comprise a part of their regular job duties. More than 92 percent of all declarants report that the same set of six exempt tasks — setting rates of pay, approving associate employee vacations, creating advertisements, accounting, determining a store's payroll budge, and terminating associates employment — were not a part of their regular job duties. Further, more than 82 percent stated that hiring and promoting associate employees — two functions listed as essential on the Big Lots assistant manager job description — were also not a part of their regular job duties. The data also suggest that plaintiffs are similar to the extent that their job duties included any exempt tasks on a regular basis. More than 30 percent of the declarants report that they customarily disciplined employees and ordered merchandise. The deposition testimony of 12 plaintiffs roughly parallels these declarations.

In sum, plaintiffs have submitted substantial evidence that shows assistant managers are similar to the extent that they perform non-exempt tasks, and similar to the extent they do not perform exempt tasks.

Big Lots does not dispute these statements directly. Instead, it points to anecdotal evidence that assistant managers engage in exempt activities. For instance, it focuses on the deposition testimony of some plaintiffs who stated that they were involved in the hiring process as an indication that assistant managers perform managerial functions. But Big Lots overlooks aspects of this testimony that indicates these plaintiffs were involved in hiring on only an incidental and infrequent basis. That an assistant manager may have hired someone once, and then only because his manager was not present,[7] or called references but played no role in extending a job offer,[8] or hired employees only three times over the course of eight years[9] does not show that some assistant managers were regularly engaged in the hiring process and thus demonstrate a dissimilarity among plaintiffs. This testimony is consistent with declarants who reported that they did not customarily hire new employees. Big Lots' reliance

---

[7] *See* DeLaune Dep. at 158-59, Pls.' Ex. 26.

[8] *See* Teague Dep., Def.'s Ex. M. at 33.

[9] *See* Hecker Dep., Def.'s Ex. C at 128.

on assistant managers' statements about their managerial performance contained in written self-evaluations that were part of their job performance reviews is also misplaced. The qualitative nature of these statements does not contradict declarants' statements about the frequency with which they performed exempt and non-exempt tasks.

Big Lots also argues that this case is analogous to other cases in which district courts have decertified collective actions. *See, e.g., Reyes*, 2007 WL 101808, at *1; *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144 (D. Minn. 2005). These cases, however, are not instructive. They do not constitute binding precedent on any legal principles. Moreover, they are highly fact-specific decisions concerning business and employment circumstances different from those in this case. Unlike the cases that Big Lots cites, the plaintiffs in this case have gathered substantial evidence that their job duties are largely similar from store to store. Additionally, there are analogous cases in which courts have certified collective actions. *See, e.g., Hill v. Muscogee County Sch. Dist.*, Civ. A. No. 4:03-60, 2005 WL 3526669 (M.D. Ga. Dec. 20, 2005); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261 (D. Conn. 2002); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342 (N.D. Ga. 2002). These cases demonstrate that each decision to certify is

18

intricately tied to the facts of the specific case. And in this case, the evidence shows that assistant managers have highly similar job duties.

There is a final, subsidiary question within the issue of job duties to address: whether the formally separate assistant manager positions for Operations and Merchandising are similar. Big Lots argues that they are dissimilar. The formal job descriptions indicate both types of managers are responsible for the same sort of duties, only they specify that each has that responsibility toward specific merchandising and operations functions. The submitted evidence, however, does not suggest that there is an actual difference between the Operations and Merchandising positions. The aggregate data do not indicate that the performance of certain tasks correlates with whether one holds a particular assistant manager position. Thus, the evidence shows that *all* assistant managers are similarly situated.

   b.   *The supervision of assistant managers*

Big Lots next claims that its assistant managers are dissimilar with respect to how they are supervised. It argues that the way in which assistant managers are supervised and how much discretionary authority they have and exercise depends largely on the individual management styles of their immediate supervisors, the store managers.  Big Lots corporate

19

representatives and assistant managers have stated that assistant managers are immediately supervised by store managers.[10] Although assistant managers are similarly situated within the overall management structure, they are not identical vis-à-vis their store managers. One of Big Lots' Regional Vice Presidents, William Coney, repeatedly described store managers and assistant managers as having "autonomy" to delegate responsibilities among employees and oversee store operations within the parameters of Big Lots' national business model.[11] Big Lots argues that this variation, along with the deposition testimony of a named plaintiff, Patty Hecker, that store managers' supervisory style might differ from person to person,[12] demonstrates that plaintiffs are not similarly situated in this regard.

Big Lots is correct that the plaintiffs have not had identical supervisory experiences. But they need not have in order to satisfy the similarly situated requirement of § 16(b) of the FLSA. Big Lots overlooks evidence submitted by the plaintiffs that paints a picture of a largely consistent supervisory

---

[10] *See* Coney Dep. at 77, Pls.' Ex. 77 at 20.

[11] *See* Coney Dep. at 58, 65, 69, 84, 96–97, 133, Pls.' Mem. Opp. Def.'s Mot. Decertify Ex. 9; *see also* Hecker Dep. at 118–22, 127–28, Def.s Mem. Supp. Mot. Decertify Ex. A (acknowledging managerial styles may vary from manager to manager).

[12] *See* Hecker Dep. 118-22, 127-28, Def.'s Ex. C.

practice. Coney testified that it is standard operating procedure
for managers to meet with assistant managers on a weekly basis to
give instructions about what tasks need to be accomplished in a
given week.[13] And he stated that "[t]here should not be" any
difference between regions on whether these meetings are held.[14]
Plaintiffs have also introduced various Big Lots policy and
instruction manuals, including standardized checklists that
assistant managers are expected to follow and complete in the
course of performing their job duties, standardized procedures
for unloading freight and stocking shelves, and manuals that
instruct assistant managers how to display merchandise. This
evidence suggests that assistant managers' jobs are structured
and supervised on a nationally consistent basis and that the Big
Lots' corporate policies in fact drain assistant managers of the
independent discretion they purportedly possess. Thus, with
respect to assistant managers' supervisory experiences, there is
"factual nexus which binds [them] together" that warrants
collective treatment. *Crain*, 1992 WL 91946, at *2.

    *c.   Geographic diversity of plaintiffs*

    Big Lots makes much of the fact that plaintiffs are
geographically diverse. Tables attached to the plaintiffs' brief

---

[13] Coney Dep. at 94-95, Pls.' Ex. 9 at 25.

[14] *Id.* at 95, Pls.' Ex. 9 at 25.

show that assistant managers from 49 states and the District of
Columbia have opted into the class.[15] Big Lots argues that
because of the nature of its business no two stores are alike and
the activities within a single store can vary from week to week.
Architectural diversity, Big Lots argues, means that different
stores have to employ different techniques for unloading freight,
stocking shelves, and displaying merchandise. Additionally,
individual stores do not receive standardized merchandise
shipments. Since the chain is a closeout retailer, different
stores may receive different merchandise, and the same store may
receive shipments of different goods from week to week. All these
variations also mean that stores are staffed differently; smaller
stores that have relatively low sales volume may employ fewer
staff than larger stores with high sales volume.[16]

　　None of Big Lots' arguments in this regard is persuasive.
All assistant managers, with the exception of those in
California, are subject to the same corporate policies.[17] All
assistant managers are directly supervised by store managers.[18]

---

[15] *See* Pls.' Ex. 28.

[16] *See* Def.' Mem. Supp. Mot. Decertify, R. Doc. 95-2 at 8-9.

[17] *See* Coney Dep. at 105, 122, Pls.' Ex. 46 at 27, 31. Big Lots
reclassified its assistant managers at California stores as non-
exempt in order to comply with the state's wage and hour law.

[18] *See* Coney Dep. at 77, Pls.' Ex. 46 at 20.

They are all salaried employees classified in the same labor grade.[19] Every assistant manager must receive the certification for employment skills such as cashiering and workplace safety.[20] Coney stated that his expectations for all of the stores in his region are "essentially the same."[21] And there is no regional difference with respect to assistant managers' job duties contained in formal job descriptions.[22] The evidence gathered indicates that individual Big Lots retail locations operate under uniform corporate policies. Regardless of whether someone works as an assistant manager in Indiana or Idaho, the corporation's fundamental expectations for that employee are the same.

    *d.*   *Salary*

    The base annual salary for an assistant manager is $24,000, which is equivalent to $461.54 per week. This amount is just above the regulatory requirement that exempt employees be paid at least $23,600 annually or $455 per week. Some plaintiffs testify that they receive a higher salary than others, but none contends the he or she is compensated below this base rate. All assitant mangers are classified in the same labor grade. Since all

---

[19] *See* Coney Dep. at 105, Pls.' Ex. 46 at 27.

[20] *See* Coney Dep. at 107, Pls.' Ex. 46 at 27.

[21] *See* Coney Dep. at 122, Pls.' Ex. 46 at 31.

[22] *See* Coney Dep. at 83, Pls.' Ex. 9 at 22.

plaintiffs are paid in excess of the minimum compensation requirement for exempt executives, the Court finds them similar in this regard.

The Court recognizes that there are some differences between plaintiffs' employment experiences as assistant managers. But the terms of the FLSA's collective action provision allow for differences. To pursue claims against an employer, plaintiffs must be *similarly situated*. They do not have to be *identically situated*. The plaintiffs have submitted evidence that indicates Big Lots assistant managers are all employed by one company that maintains uniform corporate policies that employees are expected to follow on a nationwide basis. They are subject to a uniform job description and directives from the corporation that suggest their jobs are drained of discretion in a way that makes the job of assistant manager more mechanical than executive. The plaintiffs have put for evidence that indicates a statistically significant proportion of the employee class devotes a super-majority of its time to non-exempt duties. Whether they are in fact misclassified as a matter of corporate policy remains an open question, but they have at least shown that their employment settings are not disparate.

**2.    The Extent to which Big Lots' Available Defenses are Individual to Each Plaintiff**

Big Lots argues that it will be able to defend itself only by inquiring into the particular experiences of individual employees.[23] Big Lots is correct that a successful defense will likely have to focus on the truth of the plaintiffs' claims about its allegedly consistent practice of misclassifying assistant managers as exempt. But it does not take into account the nature of plaintiffs' claim. The plaintiffs contend that their employment experiences are the product of a *corporate policy* of misclassification. The plaintiffs seek to prove that they were indeed misclassified by presenting statistical evidence from representative samples of the plaintiff class and anecdotal testimony from deposed plaintiffs. Big Lots can meet plaintiffs' arguments with the same type of evidence that plaintiffs will offer. It does not have to inquire into every individual plaintiff's work experiences to establish that it lacks a corporate policy aimed at deliberate misclassification. Big Lots' arguments about individual defenses go to the amount of damages due to each plaintiff for unpaid overtime. The need for this type of straightforward inquiry is not sufficient to defeat the propriety of a collective action. *See Hill*, 2005 WL 3526669, at

---

[23] *See* Def.'s Mem. Supp. Mot. Decertify, R. Doc. 95-2 at 20.

*4 (explaining that the calculation of damages should not preclude collective resolution of the issue of whether an employer maintained an improper employment practice). The record demonstrates that the plaintiffs are similarly situated with respect to their job duties. Because this is true, the less room there is for individualized defenses.

### 3.    Fairness and Procedural Considerations

Considerations of fairness also count in favor of allowing this suit to proceed as a collective action. As the Supreme Court explained in *Hoffman-La Roche*, the remedial and efficiency goals of a collective action should be fulfilled where possible. 493 U.S. at 173. Plaintiffs' claims are not individually large. If the Court were to decertify this case, then all the opt-in plaintiffs would be left to vindicate their claims individually, without the recognized benefit of pooled resources. *See id.* at 170. The Court must also consider the fairness of collective adjudication to Big Lots, which contends it faces collective liability on the basis of dissimilar, individual employment experiences. But if the plaintiffs' evidence is strong enough to show a corporate practice of misclassification, then there should not be tremendous variation between plaintiffs. Additionally, if the plaintiffs fail to carry their burden of showing that Big Lots maintains an unlawful corporate policy, then a judgment in

Big Lots favor would be binding on all opt-in plaintiffs. *See Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1136 (D. Nev. 1999) (explaining that opt-in plaintiffs to a §216(b) suit are bound by its results).

Procedurally, certification of a collective action in this Court maximizes judicial economy. The Court is already familiar with the wealth of evidence produced by the parties along with the underlying legal issues. Additionally, the Court notes that neither party has requested a jury trial. Thus, the Court is in good position to proceed adjudicate this matter collectively.

**III. CONCLUSION**

For the foregoing reasons, the Court DENIES Big Lots' motion. IT IS FURTHER ORDERED that this case is certified as a collective action.

New Orleans, Louisiana, this $\underline{21st}$ day of August 2007

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE