UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN JOHNSON, ET. AL.                    CIVIL ACTION

VERSUS                                   NO: 04-3201 c/w
                                             05-6627

BIG LOTS STORES, INC.                    SECTION: R(1)


**ORDER AND REASONS**

Before the Court is defendant's motion to exclude the report
and related testimony of plaintiffs' expert economist and
statistician, Professor Gordon Rausser, and their expert witness
on compliance with overtime exemption regulations under the Fair
Labor Standards Act (FLSA), William Cutler. Also before the Court
are plaintiffs' motions to exclude the report and related
testimony of defendant's expert economist, Jonathan Walker, Ph.
D., and defendant's FLSA compliance Expert, Dan Bremer. For the
following reasons, the Court DENIES defendant's motion concerning
Rausser and Cutler; DENIES plaintiffs' motion concerning Walker;
and GRANTS plaintiffs' motion concerning Bremer.

## I.   BACKGROUND

This case involves claims of 936 former and current assistant store managers (ASMs) of defendant Big Lots Stores, Inc. for unpaid overtimes wages under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 1001, *et seq*. The Court certified this case as a collective action under § 16(b) of the FLSA, 29 U.S.C. § 216(b). Plaintiffs contend that Big Lots has maintained a corporate policy and practice of misclassifying the ASM job position as an executive employee that is exempt from the maximum hour/overtime wage provisions of the FLSA. The facts and procedural posture of this case are well known to the parties and set forth in earlier orders of the Court. Accordingly, the Court turns to plaintiffs' and Big Lots' respective *Daubert* motions to exclude certain expert reports and related testimony.

## II.  LEGAL STANDARD

Federal Rule of Evidence 702 gives the district court considerable discretion to admit or exclude expert testimony. *See General Electric Co. v. Joiner*, 522 U.S. 136, 138-39 (1997). Rule 702 provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to

2

determine a fact in issue. Fed. R. Ev. 702. For the testimony to be admissible, Rule 702 requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. Fed. R. Ev. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 589. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id*. at 590. In assessing

3

the reliability of an expert's methodology, the Court may consider several factors, including (1) whether the expert's theory or technique can be tested, that is, whether it is falsifiable; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error in any study and the existence and maintenance of standards to control the study's operation and minimize potential errors; and (4) whether the theory or technique used is generally accepted. *See id.* at 593-94.

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. *See id.* at 591. Federal Rule of Evidence 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The Supreme Court has emphasized that a Rule 702 inquiry is "flexible" and that the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. As the Fifth Circuit has explained, the trial court's ruling should be supported by "adequately supported findings," *St. Martin v. Mobil Exploration & Producing U.S. Inc.,*

4

224 F.3d 402, 406 (5th Cir. 2000), but the court must not apply the reliability test so stringently as to "transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). Further, Federal Rule of Evidence 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." *Id.* at 595.

The Court also considers the parties' motions recognizing that this case involves a nonjury trial. In *Daubert*, the Supreme Court's overriding concern was with the problem of exposing the jury to confusing and unreliable expert testimony. *See Daubert*, 509 U.S. at 595-97. In the wake of *Daubert*, several courts have recognized that in the context of a bench trial, as is the case here, "the *Daubert* gatekeeping obligation is less pressing" because the gatekeeper and trier of fact are the same. *Volk v. United States*, 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999). *See also Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002) (explaining that in the context of a bench trial the *Daubert* standard must still be applied but the concerns about expert evidence misleading a jury "are of lesser import"); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the

safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n.10 (D.N.J. 2002) ("[W]here the court itself acts as the ultimate trier of fact at a bench trial, the Court's role as a gatekeeper is arguably less essential."); *Fierro v. Gomez*, 865 F. Supp. 1387, 1395 n.7 (N.D. Cal. 1994), *aff'd*, 77 F.3d 301 (9th Cir. 1996), *vacated and remanded on other grounds*, 519 U.S. 918 (1996), *modified on other grounds on remand*, 147 F.3d 1158 (9th Cir. 1998) (concluding that, in the context of a nonjury trial, under *Daubert* it is better to "allow 'vigorous cross-examination, presentation of contrary evidence' and careful weighing of the burden of proof to test 'shaky but admissible evidence'" than to exclude expert evidence altogether (quoting *Daubert*)). And as Judge Posner has observed: "*Daubert* requires a binary choice — admit or exclude — and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) (sitting by designation), *aff'd on other grounds,* 403 F.3d 1331 (Fed. Cir. 2005).

### III. BIG LOTS' MOTION TO EXCLUDE DR. GORDON RAUSSER AND WILLIAM CUTLER

Plaintiffs seek to admit the opinion of Gordon Rausser, a chaired Professor of Economics at the University of California, Berkeley, and the survey data on which Rausser's opinion is based. With the assistance of William Cutler, who served as a Compliance Officer in the Wage and Hour Division of the U.S. Department of Labor for roughly three decades and now runs a private consulting firm that advises employers about how to comply with the FLSA, Rausser developed a four-page questionnaire that included seven sets of questions about the nature of Big Lots ASMs' job duties and experiences. Rausser mailed surveys to all 936 opt-in ASM plaintiffs and received responses from 558 individuals or 59.6 percent of those surveyed. Based on survey respondent's answers, Rausser concluded that the reported job duties of nearly all respondents failed to include all of the kinds of the activities that Labor Department regulations require in order for an employee to qualify as a bona fide executive employee exempt from the FLSA's overtime wage provision. (*See* Rausser Report Addendum at 3, 17.)

In addition to asking respondents to provide personal contact information and indicate at which Big Lots store location and during what time period they were employed as ASMs, the four-

page survey covered seven topics about the respondents' job
duties as ASMs. First, the survey asked respondents to indicate
whether they regularly performed certain duties while employed as
ASMs (*e.g.*, whether they hired or fired employees) and if so,
whether they performed those duties without receiving directions
and instructions. Second, it asked respondents whether they were
consulted with respect to functions such as employee hiring,
approving or creating advertising, and setting merchandise prices
and if so to account for how much weight they believed that their
supervisors accorded to their views on such functions. Third,
respondents were asked to account for the percentage of time that
they spent on various tasks (*e.g.*, training employees, manually
stocking shelves, checking store inventory) and to ensure that
the total time for all of their activities totaled 100 percent.
Fourth, respondents were asked to indicate for a range of job
activities whether they were the only Big Lots employees to
perform such tasks or whether other employees also performed
those functions. Fifth, the survey asked respondents to identify
how many full-time and part-time employees they regularly
supervised and whether they shared supervisory duties with co-
workers. Sixth, the survey asked respondents to account for the
approximate number of hours per week they worked during the
holiday shopping season, a non-holiday week that involved

inventory work, and a non-holiday, non-inventory workweek. Finally, the survey asked respondents to indicate how many weeks per year they spent working inventory. Respondents were then asked to sign and date their responses under penalty of perjury.

Rausser summarized the results of his survey as follows. Rausser derived the figures discussed below after calculating the mean, standard deviation, and 95 percent confidence interval for all responses, which is an accepted technique in statistical analysis. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* at 117-21, 242-44 (2d ed. 2000). On average, respondents indicated that they spent 79.3 percent of their time on "non-management activities," for example, stocking shelves or cleaning the store. (Rausser Report Addendum at 4, 6.) Approximately two-dozen respondents reported, however, that they spent a majority of their time on management activities. With respect to recommendations that respondents made to upper management personnel on such matters as hiring or promoting employees and setting rates of pay, responding ASMs believed that 36.8 percent of their recommendations were given some weight, a large amount of weight, or were almost always followed. (*See id.* at 4, 10.) Further, 28.5 percent of respondents reported that on a regular basis they supervised at least two full-time employees or their equivalent who were not supervised by someone else. (*See*

*id.* at 4, 13.) And 52.4 percent of respondents reported that they could regularly and customarily hire or fire on an independent basis, or that their hiring and firing recommendations were given particular weight by upper management. (*See id.* at 5.) Based on the responses, Rausser concluded that only 3.6 percent of the 558 respondents (21 individuals) devoted more than 50 percent of their time to management duties, regularly and customarily supervised two or more employees who were not supervised by someone else, and regularly hired or fired employees without receiving direction from a higher authority or gave recommendations about hiring and firing that were accorded particular weight by upper management. (*See id.* at 3, 17.)

Plaintiffs also seek to introduce the report of Cutler, whom they proffer as an expert on compliance with FLSA exemption requirements. Relying on survey data gathered and compiled by Rausser, Cutler opines that survey respondents were misclassified as exempt executive employees.

Big Lots now moves to exclude the survey data and the reports and related testimony of both Rausser and Cutler. Big Lots contends that Rausser's conclusions are invalid and the methodology that he employed in surveying opt-in plaintiffs about their job experiences is unreliable because the survey responses are hearsay and the survey format was flawed. It also argues that

10

the surveys and Rausser's opinion are irrelevant because they concern the statements of only opt-in ASMs and not the broader group of ASMs who were eligible to opt into this lawsuit. Becuase Cutler's report was based on Rausser's research, Big Lots maintains that it, too, is unreliable and should be excluded.

The Court rejects Big Lots' contention that Rausser's survey is unreliable and irrelevant. Courts have long applied the basic *Daubert* standard to survey evidence: it is admissible at trial when there is a showing of reliability. The Fifth Circuit has instructed in the context of consumer confusion that surveys "are admissible, if they are pertinent to the inquiry, upon a showing that the poll is reliable and was compiled in accordance with accepted survey methods." *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054 (5th Cir. 1981) (internal citations omitted). *See also Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir. 1980) (explaining that survey reliability is determined according to (1) whether the survey was "conducted in accordance with generally accepted scientific principles" and (2) whether "the results [were] used in a statistically correct manner"). The *May* court also indicated that technical inadequacies in a survey, such as the format of the question or the manner in which the survey was taken, do not affect admissibility, but rather bear on the weight that the factfinder, in this case the Court, should

11

accord the data. *See id.* at 1055 n.10. In addition, under Federal Rule of Evidence 703, the surveys facts and data need not be independently admissible at trial for an expert to testify as to an opinion based on them, so long as the methodology is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

In determining whether a survey was conducted in accordance with "accepted survey principles," most courts look to the Federal Judicial Center's *Reference Manual on Scientific Evidence*, which identifies several reliability factors, including: (1) the survey's purposes and design: Was it designed to address relevant questions?; (2) population definition and sampling: Was an appropriate population identified?; and (3) the survey questions and structure: Were the questions framed to be clear, precise, and unbiased? Were filter questions provided to reduce guessing? What limitations are associated with the mode of questioning? *See* Federal Judicial Center, *Reference Manual on Survey Research*, 229-76 (2d ed. 2000).[1]

---

[1] The *Reference Manual* also identifies a fourth factor — the adequacy of the training of survey interviewers — that is not relevant here. Rausser conducted a mail survey, and the respondents did not have any contact with interviewers. No party raises any concerns about that adequacy of the training that Rausser's staff have in coding data. Accordingly, the Court does not examine this factor.

Big Lots' chief objection to the survey and Rausser's report
is that they are based on inadmissible hearsay. Big Lots relies
heavily on the Third Circuit's 1978 decision in *Pittsburgh Press
Club v. United States*, 579 F.2d 751, in which the court excluded
an expert report based on survey responses because of hearsay
concerns. But the current Rules of Evidence allow the admission
of opinions based on hearsay survey data. As noted, *supra*, Rule
703 provides that "[i]f of a type reasonably relied upon by
experts in the particular field in forming opinions or inferences
based upon the subject, the facts or data need not be admissible
in evidence in order for the opinion or inference to be
admitted." When Rule 703 was proposed in 1972, the Advisory
Committee observed that the rule "offers a more satisfactory
basis for ruling upon the admissibility of public opinion poll
evidence. Attention is directed to the validity of the techniques
employed rather than to relatively fruitless inquiries whether
hearsay is involved." Fed. R. Ev. 703 advisory committee's note
(1972). Rule 703 was further amended in 2000 to provide that
"[f]acts or data that are otherwise inadmissible shall not be
disclosed to the jury by the proponent of the opinion or
inference unless the court determines that their probative value
substantially outweighs their prejudicial effect." The Advisory
Committee's Note explaining the significance of the 2000

13

amendment, clarifies that

> [w]hen information is reasonably relied upon by an expert
> and yet is admissible only for the purpose of assisting the
> jury in evaluating an expert's opinion, a trial court
> applying this Rule must consider the information's probative
> value in assisting the jury to weigh the expert's opinion on
> the one hand, and the risk of prejudice resulting from the
> jury's potential misuse of the information for substantive
> purposes on the other. The information may be disclosed to
> the jury, upon objection, only if the trial court finds that
> the probative value of the information in assisting the jury
> to evaluate the expert's opinion substantially outweighs its
> prejudicial effect.
>
> . . .
>
> The amendment governs only the disclosure to the jury of
> information that is reasonably relied on by an expert, when
> that information is not admissible for substantive purposes.
> It is not intended to affect the admissibility of an
> expert's testimony. Nor does the amendment prevent an expert
> from relying on information that is inadmissible for
> substantive purposes.

Fed. R. Ev. 703 advisory committee's note (2000). It should also
be noted that the rule and the advisory committee's notes focus
on screening from the *jury*. Commentary upon which the Advisory
Committee has relied has noted that "a court sitting without a
jury will seldom hesitate to admit a survey in evidence," giving
the survey and related report whatever weight they are worth.
Hans Zeisel, *The Uniqueness of Survey Evidence*, 45 Cornell L.Q.
322, 339 (1960). Here, the survey is the foundation for Rausser's
opinion. Because the Court finds that Rausser's survey
methodology did not contain flaws that render his opinion

14

inadmissible under *Daubert*, the survey data itself is admissible for the purpose of allowing the Court to evaluate Rausser's opinion. The probative value of the survey information in assisting the Court to evaluate Rausser's opinion substantially outweighs any possible prejudicial effect. Further the Court notes that other courts have accepted survey data of employees in employment discrimination cases. *See, e.g., E.E.O.C. v. Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1308 (N.D. Ill. 1986), *aff'd*, 839 F.2d 302 (7th Cir. 1988); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 326 (N.D. Cal. 1992); *Richardson v. Quick Trip Corp.*, 591 F. Supp. 1151, 1153 (S.D. Iowa 1984). *See also Reference Manual* at 234.

First, Rausser's survey was designed to address multiple relevant issues in this case, including the ultimate issue of whether ASMs had job duties that qualified them as executive employees. Whether there is evidence of a trend of ASMs whose primary job duties entail non-management activities goes to whether their job functions satisfy the criteria for exempt executives under regulations promulgated by the Department of Labor. As discussed, *supra*, the survey consists of several questions that pertain to respondents' job experiences and duties while employed as ASMs. Therefore, the survey is relevant for the purposes of this case. Although Big Lots has challenged the

15

wording and content of particular questions, those objections are the stuff of cross-examination.

Second, Big Lots' contention that Rausser's opinion must be excluded because the survey population is fatally unrepresentative of ASMs is unavailing. Big Lots argues that the survey population is problematic because it consists entirely of ASMs who are opt-in plaintiffs and does not include ASMs who did not join this lawsuit as plaintiffs. The Court certified this matter as a collective action because the plaintiffs put forth strong evidence that they were similarly situated. Big Lots does not demonstrate that the group of over 900 opt-in ASMs is unrepresentative of the roughly 4,000 ASMs employed as a whole. No one suggests that the survey is flawed because it is skewed in terms of geography, race, gender, age, or amount of work experience. Other than its assertion of underinclusion, Big Lots offers nothing to show that the opt-in ASMs surveyed are systematically different from or unrepresentative of individuals employed as assistant managers. Big Lots' argument that the opt-in ASMs are unrepresentative is inconsistent with the position that it has taken throughout this litigation that all ASMs are subject to the same corporate policies, job descriptions, and have the same kinds of job duties. Big Lots points to nothing that suggests that the survey was skewed as to types of stores or

16

that the ASMs who were surveyed had atypical job responsibilities or that the number of individuals surveyed is in some way inadequate. Big Lots has not introduced any survey evidence that shows ASMs who are not opt-in plaintiffs respond differently to Rausser's survey questions. Big Lots makes no attempt to measure how or the degree to which Rausser's survey results are flawed because of the survey pool's composition. Big Lots' criticism of the survey pool is also insufficient to exclude Rausser's opinion in light of Big Lots' refusal to allow plaintiffs access to non-opt-in ASMs before their expert reports were due and only afer a motion to compel was granted, and in light of its refusal to participate in a joint survey of opt-in and non-opt-in ASMs. It comes with ill grace for Big Lots to withhold access to the very people who, according to Big Lots' argument, were necessary to a proper survey and then rely on the absence of data from those people as a basis for exclusion. Again, the composition of the survey population is a proper subject of cross-examination, but it does not render Rausser's opinion inadmissible.

Big Lots' related argument that the survey respondents were biased is also insufficient to exclude Rausser's report. Big Lots essentially argues that the survey respondents, because they are plaintiffs, had a self-interested motivation to lie about their work experiences or tailor their responses to support their

17

claims of misclassification. But the respondents' potential bias does not render Rausser's survey technique invalid. As he points out in his declaration in response to Big Lots' motion, statistical experts frequently employ surveys in which respondents have a potential interest in the outcome of the survey. (*See* Rausser Decl. at 9 (citing numerous academic studies relying on surveys of potentially biased respondents).) Potential bias by the survey respondents may affect the ultimate weight that should be accorded to Rausser's opinion, but it does not render his study unreliable. Big Lots does not offer a statistical analysis of the degree or extent of the potential bias. Rather, Big Lots points to Kelly Foltz, who provided inconsistent statements in his survey response and deposition, as an example that the survey responses are untrustworthy. But that is the only instance of apparent false reporting that Big Lots provides. The respondents were required to sign the surveys under penalty of perjury. One instance of inconsistent responses does not mean that there was systematic fabrication or slanting of answers that would render the survey unreliable. One data point of inconsistency does not totally taint the entire survey, especially when the survey responses are largely consistent with other depositions. In addition, the degrees of variations in responses and descriptions of job experiences undermines the idea

18

that the respondents answered the surveys in a lockstep, uniformly self-serving manner. For instance, according to Rausser, roughly a third of respondents reported that they independently hired and/or fired other employees. (*See* Rausser Report at 28.) Again, this potential bias is a fertile ground for cross-examination and may be the subject of contrary expert opinion and evidence, but it does not doom the admissibility of Rausser's testimony.

Further, Big Lots asserts that Rausser's survey is fatally flawed because it suffers from non-response bias, a situation in which only persons with a self-interested motivation in a survey's results respond, whereas persons who stand to gain nothing from a survey do not respond. Rausser has furnished evidence suggesting that the survey does not suffer from non-response bias. Rausser has attempted to account for the possibility of non-response bias by employing the academically recognized technique of filtering out the survey responses of late-respondents — persons whose surveys were received after the request deadline — and comparing them to the responses of early or on-time respondents. There were 399 early or on-time respondents and 159 late respondents. Rausser's analysis shows that the types of answers do not differ significantly between the two groups of respondents. Big Lots offers nothing in the way of

an alternative measurement or statistical analysis that shows the existence of non-response bias.

Nor does the Court find any fatal deficiency in the size of the survey population that Rausser used to conduct the survey or the response rate. Significantly, Rausser surveyed *the entire group* of opt-in ASMs. Of those surveyed, approximately 60 percent responded. Citing *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 437 (D. Del. 2003), Big Lots argues that when a survey response rate falls below 70 percent, then it is incumbent upon a survey proponent to prove the absence of a non-response bias. The *Reference Manual* provides a similar instruction and warns that survey responses with rates below 50 percent should be regarded with "significant caution" as a basis for precise quantitative conclusions about the whole. *Reference Manual* at 3040-43. As plaintiffs point out, however, the *Reference Manual* addresses the issue of non-response rates within sample populations that are smaller than the whole population about which the survey is designed to provide information. Here, Rausser mailed surveys to the *entire* group of opt-in plaintiffs, not a subset. He received responses from over 500 of the 936 persons surveyed. Rausser points out in his declaration offered in response to Big Lots' *Daubert* motion that the bright line rules in the *Reference Manual* do not apply to a survey, such as

20

Rausser's, in which the entire population is surveyed. (See Rausser Decl. at 9-10.) In addition, Rausser points to academic articles finding that most mailed surveys that are deemed acceptable under professional standards exhibit a much lower response rate than the 59.6 percent response rate here. (*See* Rausser Decl. at 11 (citing L. Carley-Baxter, *et al.*, *Changes in Response Rate Standards and reports of Response Rate over the Past Decade* (2005); D. Roe, Y. Baruch, and S. Twiddy, *Response Rate in Academic Studies — A Comparative Analysis*, 424 *Human Relations* 421 (1999); D. Asch, K. Jedriziewski, and N. Christakis, *Response Rates to Mail Surveys Published in Medical Journals*, 50 Journal Of Clinical Epidemiology 1129 (1997).) One of the considerations for determining the admissibility of an expert opinion is whether the technique employed is generally accepted by other experts in the field. The plaintiffs have provided evidence that Rausser's technique is consistent with accepted methodology for survey research. Accordingly, Rausser's survey is sufficiently broad and the responses are sufficiently high to satisfy *Daubert*.

Third, the Court finds the questions that Rausser posed to respondents sufficiently clear, precise, and unbiased for his survey and report to survive Big Lots' *Daubert* motion. Big Lots argues that the survey asked respondents a range of questions

about their job duties that Big Lots claims were not part of the consideration in determining the propriety of exemption status under the pre-2004 regulations. Big Lots also criticizes the survey's use of the term "regularly," questions about whether respondents hired or fired other employees as opposed to whether they had the authority to do so, and questions about the extent to which respondents supervised other employees. Such questions, Big Lots argues, are ambiguous and/or irrelevant to whether respondents had job duties that qualified them as exempt under administrative regulations. Potential flaws in the survey such as those are not grounds to exclude it altogether. They do present grounds, however, for vigorous cross-examination at trial. Courts have recognized that "slanted, leading, and ambiguous" survey questions pertain to the *weight* and not the admissibility of a survey, provided that the survey topic is relevant. *See, e.g., Harold Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 n.9 (10th Cir. 1996) (citing *Brunswick Corp. v. Spring Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987); *Harolds Stores*, 82 F.3d at 1544 ("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility."); *Keith v. volpe*, 858 F.2d 467, 480 99th Cir. 1988); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844-45 n.24

22

(11th cir. 1983).

Big Lots argues that the survey is inadequate because it does not take into account concurrent responsibilities. Big Lots is correct that Rausser's survey fails to account for this in a direct way. But that does not render the survey inadmissible; it goes to how much weight the Court should accord Rausser's findings. To the extent that the concept of concurrent duties, in which an employee fulfills management duties while not working exclusively on a management activity, such as by training employees by showing them an efficient way to stock shelves, is important to determining exempt status, the Court will take that into account in weighing the value of Rausser's testimony. And Big Lots may develop that criticism through cross-examination and its own questioning of witnesses.

The Court finds that plaintiffs have met their burden in establishing the reliability of Rausser's research and survey findings under *Daubert*. Further, because Big Lots' arguments concerning the reliability of Cutler's report are dependent upon a finding that Rausser's report is unreliable, the Court's finding with respect to Rausser's survey renders Big Lots' arguments about Cutler without merit. None of this is to say that Rausser's survey and his opinions are without their flaws. Nor is it necessarily the case that Rausser's survey establishes that

23

Big Lots maintained a corporate policy of misclassification. As the Court noted repeatedly here, Big Lots can attack Rausser's conclusions through "[v]igorous cross-examination [and] presentation of contrary evidence." *Daubert*, 509 U.S. at 596.

## IV.  PLAINTIFFS' MOTION TO EXCLUDE JONATHAN WALKER

Big Lots seeks to introduce the opinion and report of Jonathan L. Walker, who holds a Ph. D. in Economics from the Massachusetts Institute of Technology and currently runs a national economic consulting firm. Walker's report covers three topics: (1) whether Big Lots had a profit motive to avoid paying assistant managers overtime wages and therefore willfully misclassified the ASM position as an exempt executive; (2) alleged flaws in the design of the survey conducted by plaintiffs' economic and statistical expert, Gordon Rausser; and (3) the validity of Rausser's conclusions based on the survey responses. No one disputes Walker's qualifications. But plaintiffs seek to exclude Walker's opinion and report in their entirety on the grounds that an employer's economic motives are irrelevant to the question of willfulness and because Walker did not conduct an independent study of ASM job responsibilities and instead only criticizes Rausser's study.

24

## A.   Walker's Opinion on Big Lots' Profit Motive

Walker opines that it would be irrational, economically speaking, for Big Lots to pay ASMs as salaried employees with benefits if the primary job duties of ASMs are the same as subordinate associate employees such as stockers and cashiers. (*See* Walker Report at 4.) It would be more profitable, Walker concludes, for Big Lots just to hire associate employees. (*See id.*) Walker estimates that the value of benefits that Big Lots provides to full-time ASMs that it does not provide to part-time associate employees (*e.g.*, health insurance, dental insurance) is approximately 30 percent of cash compensation. The minimum ASM salary is $24,000 per year. Taking into account the value of employee benefits, Walker calculates that the average pay for opt-in plaintiffs who worked for the entire 2006 fiscal year is equivalent to $44,192, with a high range of $55,478. (*See id.* at 5-6.) Walker calculates that this average is more than the double the amount Big Lots pays an hourly associate at the low end of the pay scale ($5.15 per hour) who works an assumed 59 hours per week for 52 weeks after accounting for payroll taxes and other benefits: $17,475.02. (*See id.* at 6.) Given this large differential in cost to Big Lots, Walker concludes that it makes no sense for Big Lots to pay ASMs more than twice the amount that it pays hourly employees if their job functions consist primarily

25

of hourly employee tasks.

Plaintiffs argue that Big Lots' profit motive is irrelevant to whether it willfully misclassified the assistant manager position as an exempt executive employee. Plaintiffs correctly state the legal standard for determining whether an employer willfully violated the FLSA. In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), the Supreme Court explained that in order to find that an employer willfully violated the FLSA, the plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *Id.* at 133 (internal quotations omitted). *See also Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003); *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994). Willfulness in this context, the Supreme Court explained, is conduct that is "not merely negligent" but instead closer to the word's ordinary meaning: "voluntary," "deliberate," and "intentional." *Id.*

The Court does not find reason to exclude this aspect of Walker's report as irrelevant. Evidence is relevant if it has "the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Ev. 401. The plaintiffs assert at various points in their filings

26

with the Court that Big Lots is large publicly traded corporation
that employs thousands of people and does more than $5 billion in
business annually. The shear number of store locations and
employees it must hire to run its operations mean that the amount
of money devoted to employee compensation affects its
profitability. Whether Big Lots would have an incentive to short-
change a significant number of employees (there are at least
4,000 ASMs) certainly goes to whether it intentionally or
deliberately crafted a corporate policy of misclassification in
violation of the FLSA. As Big Lots' points out, whether it had a
profit incentive to misclassify the position is not dispositive
of the issue of willfulness, but it is related to whether the
corporation acted in reckless disregard of the statute.

Further, in urging that evidence about profit motives and
compensation structure is irrelevant to the issue of willfulness,
plaintiffs overlook an important factor that the Court must
consider in determining whether the ASM position was
misclassified as a matter of corporate practice and the attendant
question of willfulness. The regulations on the executive
exemption promulgated by the Department of Labor instruct that
courts should consider "the relationship between the employee's
salary and wages paid to other employees for the kind of
nonexempt work performed by the employee" in determining the

27

nature of an employee's primary duty. 29 C.F.R. § 541.700(a). Walker opines that when an ASM's benefits are considered, the rate of compensation for an ASM greatly exceeds that paid to hourly associate employees. The compensation structure for ASMs is a consideration on the issue of liability. Whether it would have been irrational for Big Lots to pay ASMs more than associate hourly employees for essentially the same work potentially bears on whether Big Lots willfully misclassified ASMs. Further, because differences in compensation for similar work is a factor to consider in determining the primary duties of an employee's job, Big Lots' decision to pay ASMs more than hourly associates might demonstrate that it was aware of its responsibilities under the FLSA and therefore did not recklessly disregard the statute and regulations. Again, the existence *vel non* of a profit motive is not dispositive, and the Court will give Walker's view on this subject no more weight than it deserves.

Finally, plaintiffs argue that Walker's comments in his report that it is more likely that the position of associate manager is misclassified as non-exempt than it is that the ASM position is misclassified as exempt are irrelevant and not based on any study of the associate manager position. Although the Court agrees that whether the position of associate manager is properly classified is not at issue, Walker's observation about

28

the associate manager position arises in the context of comparing the compensation and job functions of ASMs to the compensation of hourly employees who perform similar duties, which, as noted, the regulations identify as a factor in determining an employee's primary duty. *See* 29 C.F.R. § 541.700(a). Walker does not seek to show that the associate manager position is more properly classified as an exempt executive and therefore the ASM position, which entails greater supervisory authority, must be properly classified as exempt. Walker merely opines that the ASM position is not *necessarily* misclassified because the job duties of ASMs overlap with some of the job duties of associate managers, who might be compensated at comparatively higher hourly rate. Plaintiffs may explore the merit of Walker's opinion on cross-examination.

### B.  Walker's Criticism of the Rausser Survey and Report

Walker raises several criticisms of the Rausser survey that were discussed earlier in this opinion. Plaintiffs spill a lot ink in arguing that Walker should be excluded from testifying as to these opinions because he has not conducted an independent study and/or survey of ASM job responsibilities. In so doing, they overlook the purposes for which Big Lots seeks to introduce him as an expert witness. As an initial matter, Big Lots offers Walker to comment upon the results of the survey that Rausser

29

conducted and to critique Rausser's survey methodology and interpretation of the data. Walker, relying on the same responses that Rausser used, which plaintiffs assert elsewhere is trustworthy and accurate, analyzes the survey data in different ways from Rausser. For instance, he assesses respondents' reported job duties in light of their length of tenure and also isolates instances where individuals reported fulfilling duties in one part of the survey but denied that they completed the same tasks in others. Further, plaintiffs point to no requirement that Walker had to conduct an independent survey. He uses the data gathered by Rausser to extrapolate on different issues. If Big Lots chooses to put on its exemption defense without a survey of its own, it may certainly choose to do so. The Court finds no reliability issue with allowing Walker to attempt to show that plaintiffs' own data tends to establish that the nature of the assistant manager job qualifies as an exempt executive.

Plaintiffs also object to Walker's report and his observations about design and interpretation flaws because much of his criticisms are contingent on the existence of biases. Because Walker cannot show conclusively that such biases exist, plaintiffs argue, he should not be permitted to testify about the potential negative effects of such flaws. The Court finds, however, that Big Lots may introduce Walker for the purpose of

30

pointing out gaps in Rausser's survey design and any failure to
minimize the risk of errors. In the face of the defendant's
criticism of Rausser's work, the Court observed multiple times
here that the alleged flaws go to the ultimate weight to be
accorded to Rausser's work and that his work is properly subject
to vigorous cross-examination and Big Lots' questioning of its
own witnesses. Walker, as an MIT-educated economist, is certainly
qualified to critique survey design and data interpretation.
Whether there are severe design flaws in Rausser's survey that
undermine the credibility of his opinion is of vital importance
in this case. Walker's proffered testimony on those issues is
certainly relevant, well within his expertise, and does not
exhibit reliability problems that warrant exclusion.

   C.   **Timeliness of the Addendum to Walker's Report**

Plaintiffs also move to exclude the addendum to Walker's
report as untimely. Big Lots submitted Walker's original report
to plaintiffs on January 25, 2008 according to the scheduling
order in this case. It submitted Walker's addendum on March 31,
2008. Plaintiffs' counsel deposed Walker on April 4, 2008 after
rescheduling the deposition due to defense counsel's illness.
Walker's addendum addresses the addendum that Rausser prepared
for his report. Rausser's report was due on December 21, 2007,
and plaintiffs submitted his report in accordance with the

31

scheduling order. They submitted the addendum to Rausser's report
on January 22, 2008. Plaintiffs contend that Big Lots and Walker
had the Rausser addendum before Walker completed his original
report and that, in any event, Big Lots' counsel delayed in
asking Walker to prepare an addendum in response to Rausser's
addendum.

The Court finds no reason to exclude Walker's addendum.
Although Big Lots' counsel submitted it to plaintiffs in late
March, there is no indication that plaintiffs suffered any
prejudice because Big Lots submitted the addendum at that time.
Indeed, they do not even argue that they have suffered any
prejudice. The addendum reaches the same conclusions as the
original report. The revisions reflect the changes that Rausser
made in his addendum, namely the revision of statistical findings
in light of the late survey responses that he received.
Accordingly, Big Lots may introduce Walker's testimony reflecting
opinions contained in his original report and his addendum.

## V.   PLAINTIFFS' MOTION TO EXCLUDE DAN BREMER

Big Lots also seeks to introduce the opinion and report of
Dan Bremer, whom Big Lots proffers as an expert on compliance
with the executive employee exemption regulations promulgated by
the Department of Labor. Bremer opines that Big Lots ASMs are

properly classified as executive employees who are exempt from the FLSA's overtime wage provision and that even if Big Lots misclassified the ASM job position, it did not do so willfully. He bases his opinion on a series of interviews that he and two other interviewers conducted with 70 ASMs who are not part of the group of opt-in plaintiffs. Bremer also criticizes the opinions and research of plaintiffs' experts, William Cutler and Professor Gordon Rausser. Plaintiffs move to exclude the opinion and testimony of Bremer on the ground that he is unqualified to offer an opinion on whether the job functions of Big Lots ASMs complied with executive exemption regulations and because Bremer's research methodology was seriously flawed rendering it unreliable.

### A.   Bremer's Report and Interviews of ASMs

In his report, Bremer summarizes the relevant executive exemption regulations promulgated by the Department of Labor and then applies those regulatory standards to the experiences of currently employed ASMs who are not plaintiffs in this lawsuit. Although Bremer does not purport to engage in a statistical analysis of the sort conducted by Professor Rausser, he does draw broad inferences about whether Big Lots has properly classified the ASM job position as an exempt executive as a matter of corporate policy. Bremer's analysis is based on a total of 70

interviews with current ASMs that he and two other researchers who worked as Labor Department Compliance Officers, Lyndel Erwin and George Holt, conducted.[2] Big Lots First tasked Erwin with the responsibility of conducting interviews, and he began interviewing current ASMs on October 7, 2007. Big Lots then retained Bremer on December 27, 2007, and contracted with Holt shortly thereafter. (*See* Bremer Dep. at 124-25.) It is undisputed that Erwin conducted almost 80 percent of the interviews on which Bremer based his report before Bremer even became involved in this case. Bremer does not know how many people Erwin interviewed, (*see* Bremer Dep. at 125-28), but judging from the dates of the interview narrative summaries on which Bremer based his report, it appears that Erwin interviewed at least 55 ASMs before Bremer entered this case as an expert and that the three researchers interviewed 15 ASMs after Big Lots retained Bremer.

---

[2] Bremer did not state in his report how many ASMs he interviewed, and he could not state the number in his deposition. The Court counted 70 individuals designated as ASMs in interview narrative summaries that Bremer attached to his report and that plaintiffs attached to their motion. Two of these individuals were recently promoted from assistant store manager to store manager. Plaintiffs also state in their motion, and Big Lots does not dispute, that Bremer interviewed an additional six to eight people but that he did not attach notes from those interviews to his report. The Court has seen notes from only the interviews of 70 ASMs and therefore examines the content of those notes and Bremer's report in evaluating the reliability of Bremer's methods.

The manner in which the interviewees and store locations
were selected is something of mystery. Bremer states in his
report that Erwin visited over 40 store locations in eight
different states. But he does not know how Erwin selected those
locations other than that Erwin visited locations where no opt-in
plaintiffs had worked. (*See* Bremer Dep. at 150.) One thing is
certain: Bremer played no role in the selection of those
interview locations. Plaintiffs have presented evidence that Big
Lots former counsel, David Scott, identified which store
locations and which individuals Erwin should interview.
Correspondence between Scott and Erwin indicates that Scott
helped set Erwin's interview schedule and that he also
interviewed ASMs in advance of Erwin. (*See* Pls.' Ex. 4.) In
addition, in some cases District Managers accompanied Erwin on
his interview visits. (*See* Pls.' Ex. 15 at 51, R. Doc. 283-10 at
5.) Bremer explains that when he became involved he sought to
interview personnel in store locations where opt-in plaintiffs
had worked. (*See* Bremer Report at 5.) But it is not clear how he
settled on the stores locations that he and the other
interviewers visited once he became responsible for overseeing
the interview process.

The manner in which interviews were conducted also varied.
Two different questionnaires, each of which covered different

ground, were used by Bremer, Erwin, and Holt.[3] Plaintiffs point to many undisputed differences in the content of the questions on these forms. For instance, the questionnaire that Erwin used before Big Lots retained Bremer included questions about whether ASMs completed new employee paperwork, handled employee complaints, directed and assigned the work of other store employees, set goals for store employees, and recommended promotion and termination, whereas the questionnaire employed after Bremer became involved did not. (*See* Pls.' Ex. 13, Qs 4, 14-16, 22, 23.)

### B. Bremer's Qualifications as an Expert

Under Federal Rule of Evidence 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion or otherwise. The Fifth Circuit has explained that a court must find "some reasonable indications of qualifications" in order to fulfill its gatekeeping function under *Daubert*. *Rushing v. Kansas City So. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds as noted in Mathis v. Exxon Corp.*, 302 F.3d 448,

---

[3] There was a third questionnaire titled "Questions for the Manager." (*See* Pls.' Ex. 30.) This form appears to have been used to interview store managers. It is not clear whether Bremer relied on answers given on this form in forming his opinion and report.

459 n.16 (5th Cir. 2002). To qualify as an expert, the witness
"must have such knowledge or experience in [his] field or calling
as to make it appear that his opinion or inference will probably
aid the trier in his search for truth." *United States v. Hicks*,
389 F.3d 514, 524 (5th Cir. 2004) (internal quotations omitted).

For 23 years between 1974 and 1997, Bremer worked in the
Wage and Hour Division of the U.S. Department of Labor between
1974 and 1997, first as a Compliance Officer (1974-1983) and
later as Assistant District Director (1983-1989), Executive
Assistant to the Regional Administrator (1989-1990), and finally
District Director (1990-1997). As a Compliance Officer, Bremer
completed approximately 50 to 60 investigations per year in the
1970s and early 1980s. (*See* Bremer Dep. at 69-71.) Some, but not
all, of those investigations involved application of the
executive exemption. (*See id.* at 71.) But Bremer could not recall
how many or specific details about such investigations. (*See id.*
at 71-73.) As Bremer was promoted to executive positions within
the Department of Labor, his firsthand investigative work
subsided, but he still remained involved in compliance
investigations in a supervisory role. As an Assistant District
Director, he supervised the work of other investigators and was
directly involved in follow-up investigations. (*See id.* at 74.)
As Executive Assistant, he handled Department of Labor personnel

matters and compiled statistics for the Regional Administrator. He was not involved in any investigations. (*See id.* at 75.) As District Director, Bremer was largely engaged in charting a plan for his district and was not involved directly in supervising investigations. But in complex or large-scale investigations, he would take more of an active role. (*See id.* at 77-78.) Bremer retired from government service in 1997 and started a series of consulting firms that have primarily advised employers in the agricultural field in obtaining work visas for seasonal workers. Bremer's current firm, Agworks, spends 90 percent of its time in servicing agricultural clients. (*See id.* at 47.).

The Court finds that Bremer is marginally qualified to offer an opinion on compliance with the executive exemption regulations. Although Bremer worked for the Department of Labor for many years, he appears to have overstated his investigative experience. While he may be literally correct that he "conducted and supervised" thousands of investigations, his description of his responsibilities as Executive Assistant and District Director indicate that his significant involvement with investigations ended in 1989. In addition, Bremer has not published any articles or presented any lectures on the executive exemption regulations. (*See id.* at 21.) Bremer's recent focus on immigration work visas is not relevant to the issues in this case. Bremer's

38

qualifications as an expert on FLSA compliance have been questioned in an earlier case. *See Davis v. City of Loganville, Ga.*, No. 3:04-CV-068 (CAR), 2006 WL 826713, at *6 (M.D. Ga. Mar. 28, 2006). But as the *Davis* court observed, questions about his experience "go to his credibility, not to the threshold issue of his qualifications." *Id. See also Rushing*, 185 F.3d at 507 n.10 (explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination). Although Bremer is removed from working closely with the FLSA regualtions, his two decades of experience with the Department of Labor "reasonably indicate" that he qualifies as an expert, albeit marginally so. The reliability of Bremer's opinion and report, however, is a different matter.

## C.   Flaws in Bremer's Research Methodology

Under Rule 702, *Daubert*, and *Kumho Tire*, the Court still must assess the reliability of Bremer's methods and his opinion as an expert. Again, Rule 702 requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. As the 2000 advisory committee's note to Rule 702 observes, "no single factor is necessarily dispositive of the reliability

39

of a particular expert's testimony." And not all of the *Daubert* factors apply to every type of expert testimony. *See Kumho Tire*, 526 U.S. at 149; *Tyrus v. Urban Search Mgm't*, 102 F.3d 256, 263 (7th Cir. 1996) (noting, in the context of a social science expert, that *Daubert*'s basic framework applies to for all kinds of experts but that "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary.") Instead, courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. Of particular importance when a witness's expertise or testimony is based on professional experience is to ensure that the witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id. See also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (explaining the under *Daubert* the trial court must satisfy itself that the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting").

Two sources are particularly instructive on whether Bremer's opinion is based on reliable methods: the Department of Labor's *Wage and Hour Division Field Operations Handbook* and the *Reference Manual* discussed *supra*. Bremer's qualifications as an

expert rest on his investigative work with the Wage and Hour
Division of the Department of Labor. In light of the need to
ensure that Bremer employed the same level of rigor in his
research methods here as he would have in conducting
investigations for the Labor Department, the Court considers the
requirements for such investigations set forth in the *Field
Operations Handbook*. In examining the *Handbook*, the Court notes
that neither Bremer nor Big Lots points to any other set of
professional standards or methods upon which to evaluate the
reliability of Bremer's research. In addition, the Court
considers the nature of the research upon which Bremer relies in
formulating his opinion. Bremer and his co-researchers
essentially conducted a survey of current ASMs. They visited a
variety of locations and asked interviewees questions about their
job experiences and summarized the answers and descriptions in
narrative form. For simplicity, the Court refers to their effort
as the "Bremer survey." Bremer, relying on those summaries, then
drew general conclusions about what the job position of assistant
store manager entails. Although he does not purport to conduct a
statistical analysis of the data gathered in the way that Rausser
did, his research and report purport to serve the same essential
purpose: to describe the characteristics of the assistant manager
position based on data gathered from a subset of the population

41

of assistant managers. Therefore, many of the same factors that the Court considered in assessing the reliability of the techniques that Rausser used are also relevant in this context.

The main differences in concept between Rausser's survey and report and the Bremer survey and report are that Bremer's opinion is based on in-person interviews of a much smaller sample size of the population of ASMs, the responses of which were converted into narrative summaries, whereas Rausser extrapolated about job duties based on raw data gathered through a mail survey. Considering the nature of the Bremer survey, the factors to consider in assessing its reliability as outlined by the *Reference Manual* include: (1) the purpose and design of the survey; (2) population definition and sampling; (3) survey questions and structure;(4) the role that the interviewers played; and (5) the process of recording the data gathered.

First, the role that Big Lots' former counsel played in directing how the interviews were conducted casts doubt on the reliability of the interviews and the gathered data. As discussed, *supra*, plaintiffs have submitted unrebutted evidence that Big Lots' attorney identified individual employees to whom Erwin (who conducted the lion's share of interviews) spoke, and the attorney actually interviewed those individuals before Erwin questioned them. The Court recognizes that some attorney

42

involvement in the design of an interview questionnaire may be necessary to ensure that the questions asked cover facts pertinent to the legal issues involved in the case. Attorney involvement in the "carrying out of the survey," however, should be avoided. *Reference Manual* at 237. *See also Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1958); *Upjohn Co. v. Am. Home Prods. Corp.*, 1996 WL 33322175, at *14 (W.D. Mich. Apr. 5, 1996); *Boerhinger Ingelheim G.mb.H. v. Pharmadyne Lab*, 532 F. Supp. 1040, 1058 (D.N.J. 1980). The Court also recognizes that Rausser mailed his survey under the cover of a letter signed by plaintiffs' counsel explaining that the survey was part of the litigation effort and requesting that individuals respond in a timely manner. But that is all that letter said. There is no suggestion that plaintiffs' counsel hand-picked or pre-screened the individuals that Rausser surveyed. Indeed, Rausser mailed surveys to all 936 opt-in plaintiffs. In the case of the Bremer survey, however, the evidence suggests that Big Lots' counsel had deeper contact than merely informing the chosen ASMs that someone would be coming to speak with them. The burden of demonstrating reliability of an expert's methodology lies with the party seeking to admit an expert opinion, and here Big Lots has not even addressed the role that counsel played in identifying interviewees or the contact that he had with them.

43

Second, the relatively small size of the population interviewed detracts from the reliability of Bremer's methods. The *Reference Manual* recognizes that in-person interviews can make probability sample surveys — a survey in which the sample population size is selected so that every element of the population (*e.g.*, race, geographic location, age) has some chance of being included in the sample — prohibitively expensive and that nonprobability samples can still be meritorious. *Reference Manual* at 244. But when an expert opinion is based on a nonprobability sample survey, "[s]pecial precautions are required to reduce the likelihood of biased samples." *Id*. Here, Bremer's opinion about the job duties of a position held by approximately 4,000 persons is based on interviews of 70 respondents or 1.75 percent of the total population of ASMs. (By contrast, the number of respondents to the Rausser survey, 558, equals approximately 14 percent of the total population.) Courts have rejected the use of statements from such a low proportion of the overall population as representative evidence. *See, e.g., Reich v. So. Md. Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995) (rejecting testimony from only 1.6 percent of the total employee population in overtime pay case as insufficient). That case involved the propriety of drawing an inference about the amount of overtime pay due based on the trial testimony of only 54 witnesses out of

44

3,368 employees about how many overtime hours they worked. The
Court recognizes that Bremer's survey does not involve trial
testimony, but he draws conclusions about a large group based on
a similarly small proportion of statements from the relevant
universe.

Even more problematic than the small number of individuals,
however, is the lack of any professionally identifiable standard
by which the ASMs interviewed were identified. This Court has
recognized that the nature of plaintiffs' claim — that Big Lots
has maintained a corporate practice of misclassification — makes
the experiences of non-opt-in ASMs who hold the same job position
as plaintiffs relevant to the issue of misclassification.
Therefore, the responses of non-opt-in ASMs to the questions in
the Bremer survey are relevant, but neither Bremer nor Big Lots
has demonstrated that the survey population was selected to
reduce the likelihood of a biased sample. As explained, *supra*, 55
of the 70 interviews on which Bremer bases his opinion were
conducted by Erwin before Big Lots retained Bremer. All Bremer
states about the selection process for those interviews is that
Erwin spoke to people at store locations where opt-in plaintiffs
had not worked. (Bremer Report at 3.) There is no identifiable
method by which the stores were selected, and the only thing that
is clear is that Big Lots' counsel played some role in

identifying store locations and individuals that Erwin
interviewed. Interviewing a hand-picked, pre-screened, minuscule
subset of a relatively large population of employees hardly
constitutes a reliable method for gathering representative data.
Big Lots, as a large corporate employer, certainly had the
capacity to conduct a wider-reaching survey of its employees, and
it could have done so either by telephone or by using a mailed
questionnaire or even an Internet survey. Big Lots' decision not
to conduct a larger survey means that it has to live with the
legal consequences of the slipshod work done by Bremer and its
own decision to unduly enmesh its lawyer in the survey process.

        Third, the lack of assurance that Bremer, Erwin, and Holt
interviewed assistant managers in essentially the same manner and
under conditions to ensure candor and consistency across
interviews renders Bremer's opinion unreliable. The *Reference
Manual* emphasizes that survey respondents should be "asked the
same set of questions," *Reference Manual* at 236, and that survey
data are trustworthy only if gathered through "sound interview
procedures [that] were followed by competent interviewers." *Id.*
(quoting *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.
Supp. 1189, 1205 (E.D.N.Y. 1983)). Bremer's late entry into the
litigation, well after Erwin conducted the bulk of the interviews
that serve as the basis for his opinion, poses an acute problem.

46

The *Reference Manual* stresses that "[p]roperly trained
interviewers [must] receive detailed written instructions on
everything that they are to say to respondents." *Reference Manual*
at 264. Plaintiffs have also pointed to another generally used
text, the *Handbook of Interview Research*, that outlines
procedures to ensure the reliability of data gathered from a
large number of in-person interviews conducted by multiple
interviewers. The *Handbook* states that the "supervisor's role
involves three interrelated sets of activities: managing the work
of the interviewers, monitoring interviewer performance, and
administering quality control procedures." Royce A. Singleton,
Jr. and Bruce C. Straits, "Survey Interviewing" in Jaber F.
Gubrium and James. A. Holstein, *Handbook of Interview Research:
Context & Method*, 76 (Sage Publications: 2001). In addition, the
*Reference Manual* recommends that the research supervisor should
monitor interviews to ensure consistency between interviews and
verify that interviews took place. *See Reference Manual* at 267.
Such validation is especially important when interviews are
"conducted at the request of a party for litigation rather than
in the normal course of business." *Id.* Here, Big Lots does not
dispute that Bremer failed to take quality control steps, such as
discussing the content of the questionnaires and the format for
interviewing before the interviews took place, sitting in on

interviews conducted by Erwin and Holt, or interviewing some of
the same individuals that Holt and Erwin interviewed to see if
those persons gave the same responses in different interviews.
Instead, Bremer relied heavily on responses to a questionnaire
that he did not design and that was used in interviews that he
did not supervise. At a minimum Erwin interviewed 55 ASMs before
Bremer entered this case as an expert. But it is also not clear
whether Erwin accounted for, or provided information from, all
the interviews that he conducted. Bremer offers no verification
whatsoever. Bremer repeatedly states in his report that he
supervised the research of Erwin and Holt. But those statements
are false or grossly exaggerated in light of the fact that he was
hired after Erwin completed most of the research that serves as
the foundation of Bremer's opinion. Bremer's flagrant
mischaracterization of his supervision over the entire interview
process and the work of Erwin and Holt seriously undermines the
reliability of his methods.

    Further, Bremer concedes that the questionnaires used were
not standardized and did not include the same questions for each
interviewee. (*See* Bremer Dep. at 187-88.) Bremer offers broad
conclusions about the job duties and experiences of the
individuals that Holt, Erwin, and he interviewed, but he does not
know whether all interviewees were asked questions on the same

topics. Several of the interview narratives are silent on topics such as interviewing and/or hiring new employees, an important management function under the regulations. (*See* Bremer Dep. at 174, 179.) As plaintiffs point out, when in-person interviews are conducted, it is imperative "to expose each respondent to the same interview experience, so that any difference in recorded answers can be assumed to be due to differences among respondents rather than differences in the process that produced the answer." *Handbook of Interview Research* at 69 (internal quotations omitted). The Court takes care not to overstate the dissimilarity between the questionnaires used; they do cover much of the same ground. But Bremer does not indicate that he based his opinion on only the questions that were common to each form. Here, it is undisputed that Bremer used data collected from different questionnaires to draw conclusions about the universe as a whole. Bremer's reliance on interviews that employed different questionnaires makes it impossible to determine whether his conclusions about the ASM job position are based on interviews in which only a particular questionnaire was used, which then raises a question about the sufficiency of that sample group, or, worse, whether he made assumptions about how other respondents would have answered or imputed answers from other respondents into those interviews. The cumulative effect of such deficiencies

49

compound the unreliability of Bremer's methods.

The location of the interviews also casts doubt on the reliability of Bremer's investigative methods. The Department of Labor *Field Operations Handbook* provides that employees "must be given the opportunity to be interviewed under conditions which assure privacy" and identifies a series of suitable, neutral locations off the employment premises to conduct interviews. (*See* Pls.' Ex. 29.) Bremer relies on his experience with the Labor Department as the basis for his qualifications and the investigative techniques that he used. Yet there is no indication on any of the questionnaires or on the narrative summaries that interviewees were ever given the option of being interviewed in a location other than a Big Lots store. Also, plaintiffs point to the presence of the District Manager at some interview locations and that some interviews were conducted in the district manager's office. Although the Court does not jump to the conclusion that ASMs interviewed were coerced during their interviews, Bremer provides no explanation or assurance that the interviews were conducted under conditions in which interviewees would feel at ease to give candid responses.

Plaintiffs also object that the interviewers did not disclose to the interviewees the purpose of the interviews as an information-gathering exercise for this litigation. The

50

Department of Labor's *Field Operations Handbook* requires investigators to disclose the purpose of any interviews, but the *Reference Manual* provides a survey's objectivity may be maintained by not disclosing the survey's purpose to the respondents. *Compare* Pls.' Ex. 31 *with Reference Manual* at 266. Regardless of whether the interviewers should have disclosed to respondents their connection with this litigation, the interviewers were inconsistent in how they introduced themselves to respondents. Plaintiffs have submitted evidence, and Big Lots does not deny, that individuals interviewed by Erwin were told that he was an "efficiency expert." (*See* McCloy Dep. at 53.) At the suggestion of Big Lots' counsel, Bremer — the individual responsible for constructing and carrying out the interviews — told people he interviewed that he was a "consultant." (Bremer Dep. at 138-39.) He also stated that it would be inappropriate for an interviewer to tell the ASMs interviewed in this context that he was an "efficiency expert." This variation between interviews is yet another example of Bremer's failure to control the quality of the bulk of the interviews that inform his opinion.

Finally, the way in which data are compiled and results interpreted is important. *See Reference Manual* at 268. Bremer draws sweeping yet indeterminate conclusions about the nature of

ASMs' job experiences, using terms such as "many," "most," "usually," and "a majority." He acknowledged in his deposition that he made no attempt to determine what percentage of the ASMs interviewed performed certain job functions. The terms that Bremer uses are vague and, in some instances, downright misleading. For instance, as plaintiffs point out, and Big Lots does not dispute, Bremer states in his report that "[a] few assistant managers said they did not do any hiring of employees" and that "[a]lmost all depositions and interviews and facts I reviewed showed that assistant managers have hired employees." (Bremer Report at 2, 16.) But according to the interview narrative summaries, 19 of the 70 ASMs ASMs interviewed by Bremer, Erwin, and Holt, or roughly 27 percent, did not do any hiring. Although a majority of interviewees may have had hiring responsibilities, Bremer's account of the interviews indicates that a much higher proportion of ASMs interviewed reported that they engaged in hiring than is true in reality. Nineteen, certainly when that figure constitutes more than a quarter of the whole, is not a few. Bremer has assessed the results of the interviews in such indeterminate terms that it makes it difficult to tell what the ASMs interviewed actually reported about their job experiences. That unreliability together with all of the deficiencies previously noted makes his opinion inadmissible.

The Court concludes that the flaws in Bremer's methodology are legion and cumulative, and they render his opinion inadmissible. On the whole, the Court finds Bremer's work remarkably haphazard and devoid of any systematic methodology. Notably, this is not the first time that a court has excluded Bremer's opinion because of flawed and unreliable research methodology. *See Davis*, 2006 WL 826713, at *7-*12. Indeed, similar to the situation in the *Davis* case, although Bremer might qualify as an expert, the Court's separate inquiry into the soundness of his research methodology as required by Rule 702 reveals fatal flaws. Bremer became involved at the tail end of Big Lots' investigation. He played no supervisory role in a large majority of interviews that serve as the basis of his opinion, and the selection process for those interviews is suspect. Further, the interviews that were conducted under his watch proceeded under different questionnaires from those used in the first round of interviews conducted by Erwin. There is no indication that Bremer made an effort to verify the interview responses. Bremer's late entry seriously inhibited his ability to exercise quality control over the interview process. Tellingly, Big Lots does not dispute directly most of the plaintiffs' factual assertions in plaintiffs' critique. Nor does Big Lots offer any argument that the interviews conformed to professional

interview practices. When research "is so flawed in its
methodology that [it] proves little," it should be excluded.
*Malletier v. Dooney & Bourke, Inc.*, 535 F. Supp. 2d 558, 581
(S.D.N.Y. 2007). Accordingly, the Court excludes Bremer's opinion
about whether assistant managers' job duties make them properly
classified as exempt executives.

Bremer also offers opinions criticizing the work of Rausser
and Cutler. The Court finds no basis to admit his opinions on
those matters in light of the fatally unreliable work he has done
in this case. When an expert uses his supposed expertise to serve
up such dross as Bremer has offered here, this Court is under no
obligation to entertain any of his opinions, including his views
on the interpretation of regulations that he has not regularly
worked with in ten years. Furthermore, the defendant has offered
an admissible and highly professional critique of Dr. Rausser's
work through the work of Dr. Walker. Accordingly, the Court
excludes Bremer as an expert witness altogether.

## VI.   CONCLUSION

For the foregoing reasons, the Court DENIES Big Lots' motion
concerning Dr. Gordon Rausser and William Cutler; it DENIES
plaintiffs' motion concerning Dr. Jonathan Walker; and it GRANTS
plaintiffs' motion concerning Dan Bremer.

New Orleans, Louisiana, this 29th day of April 2008.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE