UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN JOHNSON, *ET AL.*                      CIVIL ACTION

VERSUS                                      NO: 04-3201 c/w
                                                05-6627

BIG LOTS STORES, INC.                       SECTION: R(1)

## ORDER AND REASONS

From May 7-14, 2008, the Court conducted a bench trial in this overtime pay and misclassification collective action brought under § 216(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b).  After considering all the evidence presented live at trial and deposition testimony that the Court reviewed after the live trial concluded, the Court determines this matter is not fit for adjudication as a nationwide collective action.  For the following reasons, the Court DECERTIFIES this case as a collective action and DISMISSES WITHOUT PREJUDICE the claims of opt-in plaintiffs, leaving the original plaintiffs to pursue their claims individually.

I.    PROCEDURAL AND FACTUAL BACKGROUND

Defendant Big Lots Stores, Inc. is a nationwide retailer of "closeout" and "overstock" merchandise.  It operates approximately 1,400 stores in 46 states across the country.  Big Lots sells consumer goods ranging from futons to food and utilizes second- and third-generation retail space.  What was once a grocery or drug store may now be a Big Lots.

At each store, Big Lots typically employs a salaried store manager, at least one salaried assistant store manager (ASM), an hourly associate store manager, associate hourly employees such as cashiers and stockers, and an office manager or bookkeeper.  Depending on a store location's size, sales volume, number of employees, and performance history, two ASMs and only one associate manager may be employed, or the store will employ only one ASM and two associate managers.  Some stores also include furniture departments and employ a furniture sales manager.  Big Lots classifies both store managers and ASMs as exempt executive employees for purposes of the overtime pay provisions of the FLSA.

Big Lots' formal description of the ASM job position states that ASMs are responsible for interviewing and hiring hourly associate employees, supervising the work of hourly associates, and providing for the safety of persons in the store and security

2

of Big Lots' property.  Depending on whether someone is an ASM
for Merchandising or Operations, that individual is also
responsible either for overseeing freight delivery and the
unloading and stocking of merchandise known as the "Dock-to-
Stock" (DTS) process, or supervising the work of hourly
associates in the store and the cashiering operation,
respectively.  As discussed *infra*, there is significant variation
among ASMs in terms of the duties that they perform and the hours
they spend at work.  But Big Lots stores are supposed to operate
on a management model in which there is always a member of
management in the store, known as the manager on duty, and in
which the managers work in overlapping shifts.  Big Lots' model
management schedule provides that ASMs are to work a minimum of
five, nine-hour shifts per week, opening and closing the store
depending on the hours of their shifts.

On November 23, 2004, plaintiffs John Johnson and Robert
Charles Burden sued Big Lots, asserting that it misclassified
ASMs as executive employees and thereby unlawfully denied them
overtime pay in violation of § 207(a)(1) of the FLSA.  Plaintiffs
styled their complaint as a collective action under § 216(b) of
the FLSA and brought their overtime pay and misclassification
claims on behalf of themselves and all other similarly situated

individuals.[1] (*See* R. Doc. 1.)  Plaintiffs specifically contend
that although their formal job descriptions include managerial
responsibilities, their actual managerial duties were *de minimis*
and did not meet the criteria for exempt executive employees.
Plaintiffs assert that in reality they consistently work more
than 40 hours per week and that they spend the vast majority of
their time performing, under strict corporate guidelines,
nonexempt tasks that have little to do with managing the store,
such as unloading merchandise from delivery trucks, organizing
storerooms, stocking merchandise on shelves, operating cash
registers, and cleaning their respective store locations.  Or as
one plaintiff has put it, a Big Lots ASM is nothing more than a
"glorified stocker." (Goodson Dep. at 44.)

Utilizing the two-stage certification approach employed by
the majority of courts in determining whether to certify a case
as a collective action under § 216(b) of the FLSA, the Court
conditionally certified this matter as collective action on July
5, 2005. (R. Doc. 36.)  The parties then sent notices to

---

[1] A little more than a year after Johnson and Burden filed
suit, a second set of plaintiffs brought identical claims against
Big Lots in Civil Action No. 05-6627.  The plaintiffs in this
suit missed the deadline to join the initial suit as opt-in
plaintiffs.  The Court later consolidated these two actions.
This order applies to both actions, but all references are to the
record in Civil Action No. 04-3201 unless specified otherwise.

individuals employed by Big Lots as ASMs on or after November 23, 2001.  In response, roughly 1,200 plaintiffs consented to join in this litigation as opt-in plaintiffs.  The nationwide class of plaintiffs was later reduced to 936 current and former Big Lots ASMs.

A little over two years later on June 1, 2007, Big Lots moved to decertify the class.  The parties had conducted discovery over the intervening two-year period.  Big Lots based its initial motion to decertify on the depositions of 12 opt-in plaintiffs identified by plaintiffs' counsel and declarations that its counsel collected from members of the plaintiff class.  Plaintiffs countered with declarations of their own, in which large majorities of plaintiffs averred that they spent the vast majority of their time completing nonexempt tasks.  Further, the deposition testimony presented by Big Lots suggested strong similarities in job duties among those plaintiffs deposed before the decertification hearing.  Based on the evidence before it at the time and in light of plaintiffs' claim that Big Lots maintained a *de facto* policy and practice of misclassifying the ASM job position, the Court denied Big Lots' motion to decertify. (R. Doc. 113.)

After the Court denied Big Lots' initial motion to decertify, the Court issued a scheduling order governing pretrial

discovery and setting the trial date.  As the case was proceeding
as a nationwide collective action to be resolved on the basis of
representative evidence, plaintiffs retained two experts to
prepare and conduct a survey of all opt-in plaintiffs about their
job duties as Big Lots ASMs.  The Court limited the universe of
fact witnesses whom each party would be permitted to depose to 40
per side and further limited each party to presenting the
testimony of up to 20 of those fact witnesses at trial.

A nonjury trial in this matter began on May 7, 2008.  The
Court allotted 62 hours of total trial time for the parties to
present their respective claims and defenses, 31 hours on the
record to each side.  Over the course of seven days, the Court
heard 43 hours of live trial testimony and presentations from
counsel.  Each side called a full complement of 20 nonexpert
witnesses, either live or by deposition.  Big Lots called seven
witnesses live and submitted depositions of 13 more, which were
not counted against Big Lots' trial time.  Big Lots' seven live
witnesses included one of its executive vice presidents, Brad
Waite; two district managers, Jeffrey Sites and Wade Kvapil, who
were responsible for overseeing the operation of 15 stores each
in Florida and Texas, respectively; and five assistant store
managers who did not opt into this suit as plaintiffs ("non-opt-

in ASMs"),[2] Melanie Muirbrook, April Heinecke, David Lambeth, and Garret Borskey.  Big Lots also offered the deposition testimony of the following witnesses: three additional non-opt-in ASMs, Renee Anderson, Brenda Farley, and Michelle Smaloewicz; and 10 opt-in plaintiffs, Judith Cassidy, Brian Chmiola, Kelly Foltz, Armando Garcia, Patty Hecker, Louis Kruger, Carlene Pospichel, Alina Ramos, Kesha Rochelle, and Elaine Zeringue.

The plaintiffs did not call any fact witnesses live at trial.  Instead, they offered the deposition testimony of 20 individuals.  Plaintiffs introduced the depositions of Big Lots' two corporate representatives designated under Federal Rule of Civil Procedure 30(b)(6), Bill Coney and Peter Schnorf; two district managers, Bruno Lijoi and Weldon Nicholson; and 16 opt-in plaintiffs, James Alford, Kelly Arciszewski, Ken Beck, George Christian, Chad DeLaune, Lydia Fabela, Sheila Gaston, Cooper Goodson, Jeff Hull, John Johnson, John Kacmarynski, Chris Leonard, Matt McCloy, Henry Potts, and Susan Schwartz.[3]  The

---

[2] Because plaintiffs alleged that Big Lots maintained a corporate policy and practice of misclassifying the ASM job position that was applicable nationwide to all ASMs, the Court determined that evidence about the employment experiences of non-opt-in ASMs who held the same job position as the opt-in plaintiffs was relevant to the parties' claims and defenses.

[3] Big Lots did not object to plaintiffs' calling opt-in plaintiffs by deposition.

parties also submitted more than a thousand exhibits, consisting
of corporate job descriptions, store and employee manuals,
payroll records, declarations prepared by opt-in plaintiffs,
survey responses completed by opt-in plaintiffs, and employee
personnel records.

Both plaintiffs and Big Lots offered expert testimony that
centered on the results of the survey designed and conducted by
plaintiffs' experts: Bill Cutler, a retired investigator for the
Wage and Hour Division of the Department of Labor, and Gordon
Rausser, Ph. D., a chaired professor of Economics at the
University of California, Berkeley.  The "Rausser survey"
consisted of seven categories of questions, and it was mailed to
all 936 opt-in plaintiffs, 558 of whom (59.6 percent) ultimately
responded to the questionnaire.  Big Lots' expert, Jonathan L.
Walker, who holds a Ph. D. in Economics from the Massachusetts
Institute of Technology and is currently president of a national
economics consulting firm, offered alternative interpretations of
the survey responses and critiqued Rausser's methodology.

At the close of the live portion of trial, Big Lots moved
for judgment as a matter of law under Rule 52 of the Federal
Rules of Civil Procedure or, in the alternative, for the Court to
decertify this matter as a collective action.  Plaintiffs also
made their own JMOL motion.  The Court explained to the parties

that it could not rule on their motions because it had not yet
examined all the evidence.  Indeed, it still had to review the
depositions of 33 fact witnesses and dozens upon dozens of
exhibits.  In the month before trial, Big Lots had twice sought
to renew its motion for decertification in light of all of the
evidence that the parties had produced during the intense
discovery period.  The Court denied both motions as untimely.
(*See* R. Docs. 302, 343.)  With a fuller evidentiary record now
before it, however, the Court must confront once again the vexing
question of whether the opt-in-plaintiffs are sufficiently
similar such that adjudication of their claims based on
representative proof may be done in a manner that respects the
rights of both parties.

Considering Big Lots' post-trial motion and the Court's
ongoing obligation to monitor the propriety of certification in
light of factual developments, the Court finds it proper to
revisit the certification question at this stage.  The Court has
not found a case that directly addresses a court's authority to
revisit the question of decertification after the conclusion of
trial in an FLSA collective action.  But there is authority that
indicates that it is appropriate to reevaluate the propriety of
collective treatment in the context of both the FLSA and
traditional class actions under Federal Rule of Civil Procedure

23.  In *Baldridge v. SBC Communications, Inc.*, 404 F.3d 930, 931
(5th Cir. 2005), the Fifth Circuit explained that certification
of a collective action under § 216(b) of the FLSA is "subject to
revision before the district court addresses the merits."
*Baldridge* arose in a different posture from this case.  It
involved an application for an interlocutory appeal of the
conditional certification of an FLSA collective action.  The
Fifth Circuit held that it lacked jurisdiction to consider the
appeal because the class certification order was not a final
ruling.  In so ruling, the Fifth Circuit relied heavily on the
Supreme Court's reasoning in *Coopers & Lybrand v. Livesay*, 437
U.S. 463 (1978).  In that case, the Supreme Court held that
certification of a class under Federal Rule of Civil Procedure 23
does not conclusively determine the disputed question of whether
class treatment is appropriate because the district court may
revise its decision on that issue. *Id.* at 469.  *Coopers & Lybrand*
was decided before the 1998 amendment to the Federal Rules that
added Rule 23(f), which expressly makes a Rule 23 certification
order subject to permissive interlocutory appeal.  The Fifth
Circuit explained in *Baldridge* that although the enactment of
Rule 23(f) may have abrogated the specific holding of *Coopers &
Lybrand*, the Supreme Court's reasoning is "persuasive of the
method by which we should analyze . . . questions of class

10

certification in the absence of such a procedural rule or similar legislative enactment." *Baldridge*, 404 F.3d at 932.  The *Baldridge* court further observed that certification of an FLSA collective action would be subject to revision before the district court addressed the merits.  *Baldridge*, 404 F.3d at 931 (citing *Coopers & Lybrand*; *Lusardi v. Xerox Corp.*, 747, F.2d 174, 175, 177-78 (3d Cir. 1984) (involving certification of collective action under § 7(b) of the Age Discrimination in Employment Act)).

The Court takes note that unlike the situation in *Baldridge*, it has already ruled on Big Lots' initial motion to decertify. But it finds that further consideration of the certification issue is warranted in light of the more fully developed factual record presented at trial.  As the Supreme Court explained in *Coopers & Lybrand*, "class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" 437 U.S. at 469 (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)).  Here, all of the factual issues did not come to the fore until after the Court reviewed all of the evidence presented by the parties.  The Court also takes guidance from the Fifth Circuit's observation in *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983), that a district court is "charged with the duty

11

of monitoring its class decisions in light of the evidentiary development of the case.  The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."  The *Richardson* court made that observation in the context of Rule 23, but those principles are equally applicable here.  There are strong parallels between a Rule 23 class action and an FLSA collective action in that both litigation devices operate to resolve the claims of many individuals based on representative evidence.  The *Baldridge* court's reliance on the reasoning in *Coopers & Lybrand* that a district court may revisit its decertification decision is also instructive.  Further, the record developed through trial brought into clearer relief how problematic collective adjudication of this matter is, necessitating fresh consideration.  Consistent with its duty to manage this litigation according to evolving factual developments and in light of Big Lots' motion for decertification at the close of trial, the Court revisits the issue of decertification here.

## II.  CERTIFICATION OF A COLLECTIVE ACTION UNDER THE FLSA

### A.  The Similarly Situated Standard

The FLSA generally provides that employers must pay their employees one and a half times their regular rate of pay for all

hours worked in excess of 40 per week.  29 U.S.C. § 207(a)(1).
Section 216(b) provides employees who are improperly denied
overtime wages a cause of action to recoup unpaid wages,
liquidated damages, and attorney's fees from their employers.
But employers do not have to pay time-and-a-half to individuals
"employed in a *bona fide* executive, administrative, or
professional capacity." *Id.* § 213(a)(1).  The FLSA itself does
not define what it means for an employee to fall within one of
these "white-collar" exemptions.  Instead it delegates authority
to the Secretary of Labor to promulgate rules that define these
exemptions. *Id.*  The white-collar exemptions constitute
affirmative defenses to overtime pay claims.  The employer bears
the burden of proving that a plaintiff is properly classified as
an exempt employee. *See Corning Glass Works v. Brennan*, 417 U.S.
188, 196-97 (1974); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383
U.S. 190, 206 (1966); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224
(5th Cir. 1990); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d
862, 865 (N.D. Tex. 2001).

    As noted, *supra*, the FLSA allows one or more employees to
pursue an action in a representative capacity for "other
employees similarly situated." 29 U.S.C. § 216(b).  A collective
action affords plaintiffs "the advantage of lower individual
costs to vindicate rights by the pooling of resources.  The

judicial system benefits by efficient resolution in one proceeding of common issues of law and fact." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  A collective action functions like a class action under Federal Rule of Civil Procedure 23 in that it provides a judicial mechanism for the efficient resolution of the claims of multiple plaintiffs that involve common factual issues on the basis of representative proof.  Rather than trying many individual employees' claims that present common factual and legal questions separately, a court may resolve them collectively on basis of evidence that is representative of the whole. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212-14 (5th Cir. 1995) (discussing similarities between collective action under the FLSA § 216(b) standard and Rule 23 class actions), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Adams v. United States*, 44 Fed. Cl. 772, 773 (Fed. Cl. 1999) (reviewing job duty evidence of plaintiffs whom the parties stipulated were representative of the whole).  But there is an important procedural distinction between a collective action brought under § 216(b) of the FLSA and a class action under Rule 23(b)(3). Under the collective action provision of the FLSA, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is

14

filed in the court in which such action is brought." 29 U.S.C. §
216(b).  Therefore, in the FLSA context, a plaintiff must
affirmatively join the lawsuit or "opt in," whereas under Rule
23(b)(3), a claimant must affirmatively "opt out" of the class
action in order to preserve any individual claims that he or she
might have.

The FLSA does not define what it means for employees to be
"similarly situated" such that collective adjudication of their
overtime/misclassification claims is appropriate.  Courts have
utilized two methods for determining whether plaintiffs are
similarly situated.  The prevailing method is an *ad hoc*, three-
factor test first articulated in *Lusardi v. Xerox Corp.*, 118
F.R.D. 351, 359 (D.N.J. 1987), that considers: (1) the extent to
which the employment settings of employees are similar or
disparate; (2) the extent to which any defenses that an employer
might have to overtime or misclassification claims are common or
individuated; and (3) general fairness and procedural
considerations. *See, e.g., Anderson v. Cagle's, Inc.*, 488 F.3d
945, 953 (11th Cir. 2007) (affirming decertification of
collective action under FLSA); *Thiessen v. Gen. Elec. Capital
Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (reversing
decertification of collective action under the ADEA, which
explicitly incorporates the similarly situated standard and

collective action provision of the FLSA); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1349 (S.D. Fla. 2007); *Smith v. Heartland Auto Servs.,* Inc., 404 F. Supp. 2d 1144, 1150 (D. Minn. 2005); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 763 (N.D. Ill. 2004); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1346 (N.D. Ga. 2002); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000).  The more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defenses are, the less appropriate the matter is for collective treatment.  A handful of courts, however, have drawn on the elements for certification of a class action under Rule 23, in particular the predominance requirement of Rule 23(b)(3). *See, e.g., Shushan v. University of Colorado*, 132 F.R.D. 263 (D. Colo. 1990).  *Lusardi* itself, after acknowledging procedural differences between Rule 23 class actions and collective actions, noted that "[t]he various inquiries concerning a Rule 23 class . . . while not controlling or even required to be considered, are instructive and lend useful guidance in considering the similarly situated requirement of a section 216(b) class." 118 F.R.D. at 358 n.18.

In *Mooney*, the Fifth Circuit affirmed the district court's decertification decision based on the use of the three-part test,

although it did not specifically endorse it. *See Mooney*, 54 F.3d at 1215-16.  Here, the Court also employed this approach in denying Big Lots' initial motion for decertification. Accordingly, the Court reconsiders the propriety of adjudicating this matter as a collective action based on (1) the extent to which the opt-in plaintiffs' employment experiences and job duties as Big Lots ASMs are similar or disparate; (2) the extent to which Big Lots can assert its executive exemption defense on a collective or individual basis; and (3) fairness and procedural concerns, particularly whether it would be just to collectively and finally adjudicate the claims of 936 opt-in plaintiffs on the evidence before the Court.

These three factors are not mutually exclusive, and there is considerable overlap among them.  The extent to which opt-in plaintiffs' work experiences differ directly influences Big Lots' capacity to prove its statutory exemption defense.  In that sense, the first two factors are like two sides of the same coin. Further, the more dissimilar plaintiffs are and the more individuated Big Lots' defenses are, the greater doubts there are about the fairness of a ruling on the merits — for either side — that is reached on the basis of purportedly representative evidence.  The Court revisits the certification question cognizant that the similarly situated standard of § 216(b) of the

17

FLSA does not require that plaintiffs be identical. *See, e.g., Grayson v. K Mart Corp.* 79. F.3d 1086, 1096 (11th Cir. 1996). But the Court also notes that an analysis of the exemption/misclassification issue is highly fact-intensive, given the multiplicity of factors that the Department of Labor's regulations require a court to consider in determining whether an employee is properly classified in light of his or her actual job duties. *See Reyes v. Texas EZPawn,* L.P., No. Civ. A. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. 2007); *Smith v. Heartland Automotive Servs., Inc.*, 404 F. Supp. 2d 1144, 1154 (D. Minn. 2005).

**B.   The Executive Exemption**

To determine whether the opt-in plaintiffs are similarly situated for purposes of the misclassification issue, the Court must consider their job duties in light of the executive exemption criteria set forth in the Department of Labor's regulations. *See Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (explaining that whether plaintiffs are similarly situated must be "analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt").  Because the plaintiff class includes current and former ASMs employed as of November 23,

18

2001, two sets of regulations are pertinent to this case: those in effect before August 23, 2004 (the "pre-2004 regulations" or "old regulations"), and those that went into effect on August 23, 2004 (the "post-2004 regulations" or "current regulations"). Under the so-called "short test" of the old regulations, an employee who was paid a salary of at least $250 per week (which was true of all of the Big Lots' ASMs) qualified as an executive if her primary job duties (1) consisted of the management of the enterprise and (2) included the customary and regular direction of the work of two or more other employees. 29 C.F.R. 541.1(f) (pre-2004).  In 2004, the Secretary of Labor revised the criteria for the executive exemption.  Now, to qualify as an executive, an employee must (1) be paid on a salary basis at least $455 per week (which was true of all of the Big Lots ASMs); (2) have management of the enterprise as his or her primary duty; (3) "customarily and regularly" direct the work of two or more other employees; and (4) have the authority to hire or fire other employees or make recommendations about the hiring, firing, advancement, promotion or any other change of status of other employees that are given "particular weight." 29 C.F.R. § 541.100(a).

        The Secretary of Labor has also promulgated regulations that define the terms employed in the executive criteria.  The

19

definitions identify numerous, non-exclusive factors that courts
should consider in analyzing whether an employee qualifies as an
exempt executive.  Several courts have observed that any
determination about whether an employee's job duties satisfy the
regulatory criteria is a highly fact-intensive inquiry that must
be made on a case-by-case basis in light of the totality of the
circumstances. *See, e.g., Rodriguez v. Farm Stores Grocery, Inc.*,
518 F.3d 1259, 1264 (11th Cir. 2008); *Poseley v. Eckerd Corp.*,
433 F. Supp. 2d 1287, 1306 (S.D. Fla. 2006); *Holt v. Rite Aid
Corp.*, 333 F. Supp. 2d 1265, 1271-72 (M.D. Ala. 2004); *Mike v.
Safeco Ins. Co. of America*, 274 F. Supp. 2d 216, 220 (D. Conn.
2003).  As the ultimate issue here is whether plaintiffs are
misclassified, a fact-intensive inquiry into their respective
employment experiences is required.

     *1.   Management as primary duty.*

     The current regulations include the following illustrative
list of management activities:

> interviewing, selecting, and training of employees; setting
> and adjusting their rates of pay and hours of work;
> directing the work of employees; maintaining production or
> sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purposes of
> recommending promotions or other changes in status; handling
> employee complaints and grievances; disciplining employees;
> planning the work; determining the techniques to be used;
> apportioning the work among the employees; determining the
> type of materials, supplies, machinery, equipment or tools
> to be used or merchandise to be bought, stocked and sold;

> controlling the flow and distribution of materials or
> merchandise and supplies; providing for the safety and
> security of the employees or the property; planning and
> controlling the budget; and monitoring or implementing legal
> compliance measures.

29 C.F.R. § 541.102 (post-2004).  The pre-2004 regulations

contained a similar list. *See* 29 C.F.R. § 541.102(b) (pre-2004).

Under the regulations, management itself entails performing tasks

included in the other executive exemption criteria, *i.e.*,

directing the work of other employees and having the authority to

hire or fire and make influential recommendations that affect

others' employment status.

An employee's "primary duty" is management if it is the

"principal, main, major or most important duty that the employee

performs." 29 C.F.R. § 541.700(a) (post-2004).  Both the old and

the current regulations make clear that the determination of an

employee's primary duty must be based on the totality of the

circumstances.  As the current regulations put it, the

determination of an employee's primary duty "must be based on all

the facts in a particular case, with the major emphasis on the

character of the employee's job as a whole." *Id.*  *See also* 29

C.F.R. § 541.103(pre-2004).  The current regulations set forth

four non-exclusive factors to consider: "the relative importance

of the exempt duties as compared with other types of duties; the

amount of time spent performing exempt work; the employee's

relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* Both the old and current versions recognize that "the amount of time spent performing exempt work can be a useful guide in determining whether exempt work" is an employee's primary duty, and that, as a general rule, if an employee spends a majority of her time on management activities, then management is her primary duty. 29 C.F.R. § 541.700(b) (post-2004); 29 C.F.R. § 541.103 (pre-2004). But they also stress that "nothing . . . requires that exempt employees spend more than 50 percent of their time performing exempt work," 29 C.F.R. § 541.700(b)(post-2004). Rather, "[t]ime alone . . . is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." 29 C.F.R. § 541.103 (pre-2004).

The current regulations also explicitly recognize that an employee may perform exempt and nonexempt duties concurrently. Although the old regulations did not address the concept of concurrent duties specifically, courts that interpreted the earlier version acknowledged that an employee could have

22

management as her primary duty even if she concurrently performed nonexempt duties. *See, e.g., Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496 at 504-05 (6th Cir. 2007); Jones *v. Virginia Oil Co.*, 2003 WL 21699882, at *4 (4th Cir. 2003); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 617-20 (8th Cir. 1991); *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (*Burger King I*); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) (*Burger King II*).  Indeed, in the preamble to the 2004 version, the Secretary commented that the new regulations "are consistent with current case law which makes clear that the performance of both exempt and nonexempt duties concurrently or simultaneously does not preclude an employee from qualifying for the executive exemption." 69 Fed. Reg. at 22136 (Apr. 23, 2004). That view is now codified in the regulations: "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the [other regulatory criteria] are otherwise met." 29 C.F.R. § 541.106(a).

"Whether an employee meets the [executive exemption criteria] when the employee performs concurrent duties is determined on a case-by-case basis." *Id.*  The regulations distinguish between exempt and nonexempt employees who both perform nonexempt work based on whether the exempt employee retains supervisory and managerial responsibility even while

23

performing nonexempt work: "Generally, exempt executives . . .
[decide] when to perform nonexempt duties and remain responsible
for the success or failure of business operations under their
management while performing the nonexempt work.  In contrast, the
nonexempt employee generally is directed by a supervisor to
perform the exempt work or performs the exempt work for defined
periods." *Id*.  To illustrate how an employee may retain her
exempt status while concurrently performing exempt and nonexempt
duties, the regulations specifically point to the multitasking of
an assistant manager in a retail establishment.  Such an employee

> may perform work such as serving customers, cooking food,
> stocking shelves and cleaning the establishment, but
> performance of such nonexempt work does not preclude the
> exemption if the assistant manager's primary duty is
> management.  An assistant manager can supervise employees
> and serve customers at the same time without losing the
> exemption.  An exempt employee can also simultaneously
> direct the work of other employees and stock shelves.

29 C.F.R. § 541.106(b) (post-2004).  Thus, even if an assistant
retail manager might "not spend more than 50 percent of [her]
time performing exempt duties [she] may nonetheless meets the
primary duty requirement if the other factors support such a
conclusion." 29 C.F.R. § 541.700(b) (post-2004). *See also* 29
C.F.R. § 541.700(c) (post-2004) (An assistant retail manager who
"perform[s] exempt executive work such as supervising and
directing the work of other employees, ordering merchandise,

24

managing the budget and authorizing payment of bills may have management as [her] primary duty," even if a majority of her time is spent on nonexempt work). Factors to consider in determining whether management is still an employee's *primary duty* when that individual is, say, stocking shelves alongside the employees whom she simultaneously supervises include to what extent the assistant manager herself is closely supervised and what the pay difference is between the assistant manager and the nonexempt hourly employees. 29 C.F.R. § 541.700(c).

    *2. Directing the work of at least two other employees.*

    Under both the old short test and the current test, an employee must "customarily and regularly direct[ ] the work of two or more other employees" in order to qualify as an exempt executive. 29 C.F.R. 100(a)(3) (post-2004); 29 C.F.R. § 541.1(b) (pre-2004). The old regulations did not define "customarily and regularly." The current regulations explain that the phrase means "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' include work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701 (post-2004).

    Determining whether someone directs the work of at least two employees is more complicated than just counting heads. An

25

individual qualifies as an executive only if she customarily and regularly supervises the work of two or more "full-time employees or their equivalent." 29 C.F.R. § 541.104(a) (post-2004); 29 C.F.R. § 541.105(a) (pre-2004).  Of particular importance here are the terms "full-time" and "equivalent."  The regulations do not expressly define what "full-time" means.  But with certain exceptions that apply to the financial and banking industries where so-called "banker's hours" sometimes apply, full-time generally means 40 hours per week. *See Sec'y of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 787 (1st Cir. 1985), *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); *Perez v. Radioshack Corp.*, ___ F. Supp. 2d ___, ___, 2005 WL 2897378, at *5 (N.D. Ill. 2005).  The regulations also account for the supervision of full-time and part-time employees, clarifying that "[o]ne full-time and two half-time employees, for example are equivalent to two full-time employees" and that "[f]our half-time employees are also equivalent" to two full-time employees. 29 C.F.R. § 541.104(a) (post-2004). *See also* 29 C.F.R. § 541.105(a) (pre-2004).  The regulations do not require that an employee supervise the work of the same employees day in and day out to qualify as exempt, and they contemplate situations in which supervisors might share or split the supervision of subordinate employees. *See* 29 C.F.R. §

26

541.104(b) (post-2004).  But the rules prohibit double-counting
of employee-hours for supervision purposes. *See* 29 C.F.R. §
541.104(d).  Perhaps the clearest way to make sense of these
rules is the Department of Labor's "80-hour" rule, which
generally requires an exempt supervisor to "direct a total of 80
employee-hours of work each week." 69 Fed. Reg. 22135.

>    3.    *The authority to hire or fire or make recommendations*
>          *that are given particular weight.*

Whether an employer gives "particular weight" to an
employee's recommendations as to the hiring, firing, advancement,
promotion or any other change of status of other employees
depends on "whether it is part of the employee's job duties to
make such suggestions and recommendations; the frequency with
which such suggestions and recommendations are made or requested;
and the frequency with which the employee's suggestions and
recommendations are relied upon." 29 C.F.R. § 541.105 (post-
2004).  The Department of Labor further recognizes that a court's
determination as to whether a particular employee's
recommendations are given particular weight may rest on evidence
that is extrinsic to the employee's testimony.  In the Preamble
to the regulations enacted in 2004, the Secretary explained that
evidence of "particular weight" could include "witness testimony
that recommendations were made and considered; the exempt

employee's job description listing responsibilities in this area;
the exempt employee's performance reviews documenting the
employee's activities in this area; and other documents regarding
promotions, demotions or other change of status that reveal the
employee's role in this area." 69 Fed. Reg. 22135.

In general, "an executive's suggestions and recommendations
must pertain to employees whom the executive customarily and
regularly directs." 29 C.F.R. § 541.105 (post-2004).  An
"occasional suggestion" does not qualify. *Id.*  But an employee's
recommendations "may still be deemed to have 'particular weight'
even if a higher level manager's recommendation has more
importance and even if the employee does not have authority to
make the ultimate decisions as to the employee's change in
status." *Id.*

Neither the pre- nor post-2004 regulations define "change of
status."  But the Secretary of Labor explains in the Preamble
that this phrase should "be given the same meaning as that given
by the Supreme Court in defining the term 'tangible employment
action' for purposes of Title VII liability." 69 Fed. Reg. 22131.
The Supreme Court has explained that a tangible employment action
"constitutes a significant change in employment status, such as
hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing a

28

significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  And generally speaking, "only a supervisor, or other person acting with the authority of the company" can effect a tangible employment action. *Id.* at 762.  It is also recognized that an individual may still effect a tangible employment action even if the decision or recommendation is "subject to review by higher level supervisors." *Id.* (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (explaining that even if a human resources committee, not an immediate supervisor, directly fired a subordinate employee, the immediate supervisor could still have procured the discharge if the committee acted as his "cat's-paw" and was "apt to defer to the judgment of the man on the spot")).  With these regulatory criteria and illustrative, multi-factor definitions in mind, the Court now turns to analyzing whether the opt-in plaintiffs are in fact similarly situated.


**III. DISCUSSION**

Instead of buttressing the earlier showing of similarity among opt-in plaintiffs made in response to Big Lots' initial motion to decertify, the evidence of opt-in plaintiffs' job experiences presented at trial, in particular the Rausser survey results and plaintiffs' testimony, reveals substantial variations

among the opt-in plaintiffs.  At a high level of generality opt-in plaintiffs' job duties may be similar in that they are subject to a uniform job description, are required to run individual stores according to corporate policies, and are supervised by store managers.  But in terms of individual job duties, the evidence shows that the opt-in plaintiffs have different responsibilities from one another and that individuals themselves will have different duties from day-to-day and within a single day.  Such diversity in individual employment situations inhibits Big Lots from proving its statutory exemption defense as to all 936 opt-in plaintiffs on the basis of representative proof.  And, because the plaintiffs are dissimilar, the Court cannot confidently adjudicate plaintiffs' claims or Big Lots' defense on the merits.

## A.    Differences in Job Duties

According to Big Lots' uniform job description of the ASM position, ASMs are responsible for a number of duties that are managerial.  For instance, the job description indicates that interviewing, selection, hiring and training of associate hourly employees are some of an ASM's essential duties and responsibilities. (*See* ASM Job Descriptions, Pls.' Exs. 22, 23.) ASMs are also formally responsible for administering "appropriate disciplinary action to associates, including making

30

recommendations for termination, in accordance with company guidelines." (*Id.*)  The job description charges ASMs with reducing "shrink" (*i.e.*, the loss of goods due to theft, fraud, error, or faulty merchandising processes), as well as ensuring safety within the store and generally maintaining the store facility. (*See id.*)  They are also charged with maintaining a "high level of associate engagement through effective leadership." (*See id.*)  Finally, an ASM is formally responsible for all store operations when acting as manager on duty. (*See id.*)

A job title alone, however, is "insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations." 29 C.F.R. § 541.2 (post-2004). *See also Ale v. Tennessee Valley Authority*, 269 F.3d 680, 688-89 (6th Cir. 2001) (embracing principle that "courts must focus on the actual activities of the employee in order to determine whether or not he is exempt" as opposed to reviewing a "vague job description"); *Mullins v. City of New York*, 523 F. Supp. 2d 339, 351 (S.D.N.Y. 2007).  Indeed, plaintiffs maintain that it is their day-to-day responsibilities, not their job descriptions, that render them misclassified.  Therefore, the Court must look beyond the nominal

description of ASMs' job responsibilities to determine whether
plaintiffs are similarly situated with respect to their actual
job duties.

Even though plaintiffs pitched their case as involving a
uniform policy or practice of misclassifying ASMs, they produced
no direct evidence suggesting a conscious corporate intention to
deny ASMs managerial responsibilities.  Rather, they have offered
proof largely of individual employment circumstances through
survey responses and witness testimony.  The opt-in plaintiffs'
characterizations of their day-to-day work activities presented
through trial erased the Court's earlier understanding that
plaintiffs were similarly situated.  What became obvious after
the Court considered all of the evidence is that the
"representative" testimony is not representative of plaintiffs'
experiences.

The diverse responses of opt-in plaintiffs to the Rausser
questionnaire indicate that the nature of their job experiences
as Big Lots ASMs varies considerably in relevant ways.  Professor
Rausser's private consulting firm mailed the questionnaire to all
936 opt-in plaintiffs, of whom 558 or 59.6 percent responded.
Plaintiffs offered the survey results and Professor Rausser's
opinion to show that, as a class, their job duties did not
satisfy the executive exemption criteria.  The parties sharply

32

dispute the reliability and value of the survey results;
plaintiffs contend that they are reliable, whereas Big Lots
asserts that they are the products of biased respondents who have
a financial interest in the results of the survey and that the
survey was riddled with design flaws.  Pretermitting those
concerns, the survey results demonstrate that there is
significant variation in the responsibilities of opt-in ASMs.  At
trial, Professor Rausser testified about, and plaintiffs
introduced as an exhibit, the tabulations of survey data upon
which his opinion was based. (Rausser Trial Testimony; Pls.' Ex.
347.) According to Professor Rausser's tabulation of the
underlying data, 50.4 percent of the respondents regularly hired
associate employees as part of their job duties as ASMs. *Id*.
Slightly more than a quarter of respondents, 26.7 percent,
regularly terminated others' employment. (*Id.*)  Further, 61.1
percent of respondents answered that they regularly set the work
schedules of other employees. (*Id.*)  Roughly the same proportion
of respondents, 61.3 percent, stated that they also disciplined
employees for misconduct or for not following corporate policies.
(*Id.*)  One-fifth of respondents, 20.6 percent, promoted
employees, and roughly two-thirds, 66.3 percent, ordered
merchandise to be sold in their stores on a regular basis. (*Id.*)
For each of these management duties a smaller yet still sizable

33

proportion of respondents reported that they performed them
without receiving *any* direction, instructions, or guidance from
higher authorities.  For example, nearly a third of respondents
(29.2 percent) stated that they hired employees independently;
38.9 percent created work schedules on their own; and 35.7
percent disciplined subordinates without input from above. (*Id.*)

Survey evidence of whether opt-in plaintiffs directed the
work of the equivalent of at least two other employees was at
best inconclusive.  Question 5 of the Rausser survey asked
respondents a series of questions about whether and how many
full-time and part-time employees they regularly and customarily
supervised and whether anyone else supervised those employees
during the respondents' shifts.  In his analysis of the
responses, Dr. Rausser counted only those respondents who
indicated that their supervisory duties did not overlap with
anyone else's as actually having supervised the work of other
employees.  If a respondent did not answer the question about
overlapping supervision, Professor Rausser oddly treated that
person as having responded that in fact overlapping supervision
occurred.  Professor Rausser excluded those individuals who
either indicated, or were deemed to have answered, that others
simultaneously supervised employees with them from his analysis
of how many respondents customarily and regularly directed the

work of at least two other employees.  On that basis, Professor
Rausser concluded that 28.5 percent of respondents regularly
supervised the equivalent of at least two full-time employees.

   Not surprisingly, Dr. Walker offered a different
interpretation of the data.  Without discounting those who
indicated some overlap in supervision, because of evidence that
ASMs can still have management duties when there was another
manager in the store, Dr. Walker found that 85 percent of
respondents stated that they routinely supervised at least two
full-time or four part-time employees.  Although the Court is
convinced that Dr. Rausser's treatment of the data artificially
depressed the percentage of ASMs who supervised the equivalent of
at least two full-time employees,[4] and that Dr. Walker's number
is probably on the high side, there is still substantial
variation in the plaintiffs' work experiences when, at a minimum,

_____

   [4] This follows because Dr. Rausser treated a failure to
respond to the question about overlapping supervision as a "yes"
answer and then eliminated those responses from the pool of
individuals who supervised at least two full-time equivalent
employees, even if they responded that they regularly and
customarily supervised two or more full-time employees and four
or more part-time employees.  Further, the question on
overlapping supervision asked, "Did anyone else supervise these
employees during your shift?"  A literal reading of that question
would produce an affirmative response even if there were
managerial overlap on only two hours of a 10-hour shift, and the
ASM was the sole manager in the store for eight hours.  Further,
the evidence indicated that when managers overlapped, it was not
always for the whole shift.

almost 30 percent of them regularly supervise two or more full-time equivalents.

Further analysis on Question 5c performed by Dr. Walker reveals additional disparities in the supervisory responsibilities of respondents.  Question 5c asked respondents how many hours they thought they spent as the only member of management supervising employees in the store.  Question 6c asked respondents how many hours they worked in an average week. Dividing the responses to Question 5c about the amount of time that respondents spent as manager on duty by the respondents' reported average workweeks, Dr. Walker calculated that on average respondents spent 51 percent of their time as the only manager on duty. (*See* Walker Trial Testimony.)  That figure is significant because witness testimony indicated that when an ASM was the manager on duty, he or she was immediately responsible for overseeing store operations, which included directing the work of other employees, handling employee complaints, and ensuring the safety and security of store personnel, customers, and property, among other things.  All of those tasks are management duties. As a general rule, when an employee spends more than 50 percent of his or her time on management tasks, even when performed concurrently with nonexempt tasks, that person's primary duty is management. *See* 29 C.F.R. § 541.700(b) (post-2004); 29 C.F.R. §

541.103 (pre-2004).  So although the data suggest that
plaintiffs, on average, are similarly situated with respect to
spending a majority of their time as the manager on duty, Dr.
Walker's calculation does represent an average, indicating that
some spend more and some spend less than half their time as
manager on duty.  On one of the key ways to assess an
individual's primary duties, the evidence suggests that no one
plaintiff is representative of the entire class.

    Question 2 of the Rausser survey asked respondents about
whether they made recommendations about the employment status of
other employees and how much weight the individual respondents
perceived that store managers or upper-level management accorded
their recommendations.  This question essentially sought to
establish facts that are pertinent to the third element of the
current regulatory criteria for the executive exemption — whether
plaintiffs' recommendations about others' employment status are
given particular weight.  The responses are also pertinent to the
issue of whether plaintiffs are similarly situated in terms of
their primary duties because the regulations define management as
including the making of employment status recommendations.
Question 2 covered several ways of affecting an employee's status
and asked respondents if they believed that higher-level managers
consulted them at all on such issues, gave their views no weight,

gave them little weight, gave them some weight, gave them a large amount of weight, or almost always followed their suggestions. The survey did not define any of these qualitative categories, and the parties disagree about whether the question reliably captures the influence of opt-in plaintiffs on others' employment status.   Putting those issues aside and taking plaintiffs' responses at face value, the Court considers the implications of plaintiffs' responses to Question 2 on the issue of whether plaintiffs are indeed similarly situated.

Plaintiffs' responses to Question 2 show that their experiences with respect to how much weight that the corporation accords their personnel suggestions vary substantially.   On hiring decisions, 51 percent thought their supervisors gave their views little or less weight; 49 percent thought their views received some or greater weight. (Pls.' Ex. 347.)[5]   On the issue of terminating others' employment, 67 percent thought their views were of little to no importance, but 33 percent considered their opinions influential. (*Id.*)   Finally, 67 percent considered their views on promotion decisions of little significance, whereas 33 percent perceived themselves as playing an instrumental role in

---

[5] Plaintiffs' expert, Bill Cutler, testified that the relevant regulation is satisfied if the employer gives the employee's personnel recommendation at least some weight. (Cutler Trial Testimony.)

other employees' advancement within the corporation. (*Id.*)[6]

What accounts for these differences is not apparent from the responses themselves.  But Big Lots' expert, Dr. Walker opined at trial that, when he took into account the duration of the respondents' employment, the length of an employee's tenure bore significantly on whether an individual's responses suggested that he or she performed job duties that qualified that person as an executive employee. (Walker Trial Testimony.)  Dr. Walker divided survey respondents into two categories: those plaintiffs who worked three years or fewer for Big Lots and those who worked for more than three years.  Each category included roughly half of the respondents. (*Id.*)  Dr. Walker's analysis, which plaintiffs did not refute, showed that on nearly every management-related job activity, the more senior group conducted the activity more frequently or were consulted by upper management on those issues. (*Id.*)  Whether those more senior employees are properly classified is unclear.  But Dr. Walker's analysis shows that plaintiffs' employment duties vary according to how long they have been employed by Big Lots.  Those differences greatly

---

[6] In terms of disciplining other employees, 54 percent of respondents thought that they had little impact on the decision to reprimand, whereas 46 percent perceived themselves as having sway over decisions to admonish hourly employees for misconduct. (*Id.*)

complicate the use of representative proof either to prove the
correctness of the executive classification or to rebut such a
showing.

The survey responses of opt-in plaintiffs indicate that
ASMs' job responsibilities vary along the critically important
axis of exempt managerial duties recognized by the regulations.
Plaintiffs offered the survey as representative proof of the
employment experiences of the entire universe of opt-in
plaintiffs.  But when, *inter alia*, about half of respondents
report that they regularly hire subordinates or influence hiring
decisions and the other half do not, the plaintiffs' employment
experiences can hardly be said to present common issues of fact
making it appropriate to try the claims of 936 individuals
collectively.  This is especially true since about 40 percent of
the 936 opt-in class members did not even respond to the survey.
The dissimilarity among plaintiffs renders this matter unfit for
collective adjudication on the basis of representative proof.

The testimony of opt-in plaintiffs further illustrates the
variations in employment responsibilities revealed by the survey
results.  The plaintiffs' testimony on whether their primary or
most important duties entail management activities is a mixed
bag.  Several plaintiffs acknowledged that they spent substantial
amounts of time as manager on duty and that while they served as

40

manager on duty they were responsible for all activities within
their respective stores and had authority to make decisions about
how to handle immediately whatever problems arose. (*See* Cassidy
Dep. at 16:17-17:3, 195:5-15; Chmiola Dep. at 100:13-102:12,
104:14-20, 107:17-24; Foltz Dep. at 80:3-82:5; Garcia Dep. at
105:18-24, 122:5-12; Hecker Dep. at 37:17-38:1-9, 47:8-48:11;
Kruger Dep. at 139:23-141:12; Pospichel Dep. at 175:7-11, 178:10-
18, 185:20-186:5; Ramos Dep. at 92:9-93:9; Rochelle Dep. at 94:4-
96:15; Zeringue Dep. at 104:19-105:12.)  Others testified that
when they were the manager on duty they supervised the work of at
least two hourly associates in a variety of ways. (*See* Cassidy
Dep. at 108:13-22, 181:14-182:10; Chmiola Dep. at 25:24-25,
38:21-39:5, 77:5-21, 78:20-79:16, 100:25-101:12, 107:25-108:6;
Foltz Dep. at 80:17-81:3; Garcia Dep. at 141:9-143:16, 187:24-
188:14; Kruger Dep. at 25:25-26:19, 27:19-22, 29:9-24, 147:16-
149:1, 176:19-177:21; Pospichel Dep. at 28:10-24, 73:3-10, 87:13-
88:6, 181:13-21, 185:14-188:16, 218:2-220:18; Ramos Dep. at 97:7-
98:16, 128:12-18, 164:21-165:25, 167:8-168:3; Zeringue Dep. at
104:19-106:2, 135:1-143:18, 154:9-17.)  Many plaintiffs
acknowledged that they performed exempt management duties and
nonexempt duties concurrently. (*See, e.g.,* Cassidy Dep. at
123:21-125:15, 188:12-189:7; Chmiola Dep. at 129:12-25; Garcia
Dep. at 151:7-152:19, 160:1-19; Pospichel Dep. at 190:5-191:3;

41

Ramos Dep. at 95:15-97:13, 127:16-128:11; Zeringue Dep. at 172:9-
21.)  Yet, other plaintiffs stated that the vast majority of
their time was spent on nonexempt duties, and they saw their
primary focus and responsibility as accomplishing nonexempt
tasks. (*See, e.g.,* Arcizewski Dep. at 35:21-36:2, 44:4-49:10,
120:5-14; Fabela Dep. at 54; Gaston Dep. at 56-57, 73:13-21,
163:22-166:14; Johnson Dep. at 77-78, 101:5-13; Kacmarynski Dep.
at 7:25-9:16, 14:20-15:6, 26:7-27:24, 40:3-10; Potts Dep. at
26:6-27:3, 33:4-8, 52, 55, 68:18-69:20, 77:17-20, 90:5-21.)  All
of this testimony comes from opt-in plaintiffs who are supposed
to be similarly situated.  Their testimony reveals widespread
differences in the extent to which they perform exempt management
duties.

Plaintiffs' testimony also revealed significant differences
in the amount of discretion they possessed to make managerial
decisions or to delegate tasks to hourly employees.  Some
plaintiffs indicated that their store managers gave them little
or no managerial responsibilities or that corporate policies
dictated how to perform the details of their jobs. (*See, e.g.,*
Christian Dep. at 20-36, 47-50; Fabela Dep. at 27-40; Kacmarynski
Dep. at 7:25-8:20, 26:7-27:24, 28-29; Kruger Dep. at 32:12-19,
63:22-64:15, 68, 77, 79; Potts Dep. at 11-31.)  Others commented,
however, that some managers were delegators and not micromanagers

or that they could deviate from corporate guidelines in certain circumstances. (*See, e.g.*, Alford Dep. at 136; Heckler Dep. at 119-21; Ramos Dep. at *passim*; *Cf*. Zeringue Dep. at 96-97; Chmiola Dep. at 116.)  And others admitted that their managers critiqued them for *not delegating enough* or not following through on supervision. (*See, e.g.,* Fabela Dep. at 103; Garcia Dep. at 209; Arciszewski Dep. at 130; Beck Dep. at 166; Alford Dep. at 175.) Several courts have held that employees who follow detailed corporate directives and company policies are not so tightly controlled or stripped of discretion that their work does not qualify as exempt. *See, e.g., Burger King I*, 672 F.2d at 226 ("Ensuring that company policies are carried out constitutes the 'very essence of supervisory work'"); *Burger King II*, 675 F.2d at 521-22; *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (employees of insurance company qualify as exempt despite corporate system of practices and procedures); *Thomas*, 506 F.3d at 506-07 (standard operating procedures at gas station do not limit manager's day-to-day discretion); *Murray*, 50 F.3d at 570 (convenience store managers are exempt despite pervasive corporate procedures).  The analyses in those decisions also reveal, consistent with the regulations' reminders, that the determination of whether an executive employee's judgment is so constrained as to be misclassified is a highly fact-intensive and

43

nuanced inquiry into the particular circumstances of the employee's job.  Here, plaintiffs' own testimony suggests that they have different experiences in terms of how much discretion they have to make managerial decisions.

With respect to the plaintiffs' authority to hire or fire or their relative influence over decisions about others' employment status, their testimony was as diverse as it was in the context of the other pertinent factors.  Several plaintiffs confirmed that they had authority to hire new employees, even though they did not necessarily hire new associates on a regular basis. (*See, e.g.,* Chmiola Dep. at 5:1-7, 85:14-24; Hecker Dep. at 128:13-129:14; Kruger Dep. at 32:20-33:25, 39:3-8, 149:5-24; Zeringue Dep. at 24:19-23.)  Many plaintiffs also testified that even if they did not single-handedly hire new employees, their store managers generally gave weight to their hiring recommendations. (*See* Cassidy Dep. at 140:5-16; Chmiola Dep. at 5:1-7, 85:3-86:1-7; Pospichel Dep. at 57:1-58:5, 59:14-19; Ramos Dep. at 131:16-133:4, 136:1-138:13; Rochelle Dep. at 70:5-71:15; Zeringue Dep. at 168:6-17.)  And while others said that they did not have the authority to fire associate employees, they stated that their managers took seriously their recommendations about whether an employee's employment should be terminated. (*See* Chmiola Dep. at 13:10-25, 108:7-18; Garcia Dep. at 170:11-171:11; Hecker Dep. at

44

141:13-144:20; Zeringue Dep. at 107:7-15.)  In contrast, many
other plaintiffs testified that they were either not involved in
the hiring process or involved only very infrequently. (*See,
e.g.,* Arciszewski Dep. at 35:8-10; Beck Dep. at 16:6-9; Johnson
Dep. at 33:4-6; Kacmarynski Dep. at 18:24-20:6; Leonard Dep. at
29:22-24, 45:18-20, 79:18-24.)  And many testified that they
played an insignificant role, if any, in the decision-making
process to terminate associate employees. (*See, e.g.,* Arciszewski
Dep. at 35:11-13; Beck Dep. at 20:20-21:20; Johnson Dep. at 33:7-
9, 45:18-22; Kacmarynski Dep. at 50:1-12; Leonard Dep. at 29:25-
30:3.)  Again, this testimony illustrates the variegated nature
of plaintiffs' employment experiences.

     To further illustrate the differences between opt-in
plaintiffs, the Court contrasts the deposition testimony of two
of the plaintiffs.  Alina Ramos, an opt-in plaintiff whom Big
Lots called as a witness, worked as an ASM for Merchandising in
Seguin, Texas, near San Antonio.  She testified that she was
responsible for directing the process of unloading freight on a
weekly basis in the "dock to stock" (DTS) process. (*See* Ramos
Dep. at 24.)  As part of this process, she prepared work
schedules for three or four hourly associates to unload the
store's weekly shipment of goods and trained the associates on
the procedures for unloading merchandise shipments and keeping

45

track of the goods received. (*See id.* at 147-52.)  During the DTS
process, Ramos would supervise the work of three to six hourly
employees at a time. (*See id.*)  To be sure, Ramos took part in
the physical labor of unloading and stocking, but she was
responsible for supervising the work of all the employees engaged
in DTS work. (*See id.* at 152.)  Ramos also stated that on "non-
truck days" — days when there was not a delivery of freight — she
would conduct "huddle meetings" with hourly associates at which
she would assign work tasks and then would "walk the store" to
ensure that associate employees were completing their assigned
tasks. (*See id.* at 152-53.)  When pointedly asked whether it was
her job to make sure the stocking employees were doing their
assigned tasks, she answered, "Yes." (*Id.* at 168.)  She also
admitted that she spent more than 50 percent of a typical week
running the store as manager on duty. (*Id.* at 93.)

   Ramos testified that she was in a position to affect the
status of other employees.  She interviewed job applicants. (*See
id.* at 134-38.)  She conducted annual performance appraisals of
employees involved in the DTS process whose work she supervised.
(*See id.* at 46-47.)  Ramos recommended that employees whom she
evaluated receive raises, and those employees did in fact receive
raises. (*See id.* at 47.)  And Ramos acknowledged that she had
authority to write-up employees who did not adhere to company

46

policies. (*See id.* at 68.)

In contrast, opt-in plaintiff John Johnson's testimony about his work as an ASM for two-and-a-half years from July 29, 2002 to February 12, 2005 at three different stores in and around Fort Myers, Florida, revealed a different picture of his job responsibilities. Johnson testified that in any given workweek he worked between 70 and 80 hours (Johnson Dep. at 13) and that he received daily work assignments from his store managers at each of the locations at which he worked. (*Id.* at 22.) Johnson testified that he never hired or fired anyone during his time with Big Lots, or made suggestions on those subjects. (*Id.* at 33, 79.) Johnson, who was also involved in the DTS process at his store, testified that typically he would be inside the trailer unloading freight. (*Id.* at 35.) His testimony suggests, however, that he was not independently responsible for overseeing the entire DTS process as was Ramos. It was his store manager who made the decision of when hourly employees should shift their work from unloading freight to ticketing merchandise to be placed on the store floor. (*Id.* at 37-40.) Johnson also testified that he did not have a role in determining the priority of placing merchandise on the store floor but instead had to follow corporate directives, and he did not monitor the performance of store associates during DTS. (*Id.* at 39-40, 47.) Johnson further

47

testified that when he was involved in DTS, he was not responsible for managing the store and that when the store manager was on location, he or she actually oversaw the DTS process. (*Id.* at 41, 45.)

At two of the stores at which he worked, Johnson testified that he never served as the manager on duty. (*See id.* at 67, 69.) He also testified that he frequently performed nonexempt tasks such as running cash registers, cleaning the store, restocking shelves or performing recovery, and retrieving shopping carts. (*Id.* at 70-77.)   In Johnson's view, he never directed the work of any employees while working for Big Lots, was never responsible for supervising any employees other than himself, and he never conducted a huddle meeting. (*Id.* at 80-83.)

Johnson also testified that he participated in the employee appraisal process only because one of his store managers was no longer employed by Big Lots and the district manager instructed him to sign various forms.  But Johnson stated that he provided no independent or substantive input and only followed the directions of the district manager. (*Id.* at 97-98.)  And on one of his own annual performance appraisals, Johnson commented that he had come to understand that his primary job duty was simply to stock merchandise and that now that he understood his responsibilities, he could perform them more efficiently. (*Id.* at

101.)  His store manager, who also entered comments on that appraisal, did not dispute Johnson's self-assessment. (*Id.*)

These are only a couple of examples from the deposition testimony of opt-in plaintiffs submitted to the Court.  But they illustrate the wide differences in employment experiences between individual employees and the lack of common proof applicable to the class as a whole.  Employees' experiences may not need to be identical in order to for the employees to be similarly situated. But wide-ranging diversity along key criteria as is the case here makes collective adjudication imprudent.  The Court cannot reliably find for either party in light of the evident differences among the plaintiffs.

2.  *Big Lots' Individuated Defenses*

On the flipside, the dissimilarity of plaintiffs' self-reported job duties makes it exceedingly difficult for Big Lots to assert its statutory exemption defense on a collective basis. Using representative proof is problematic if for every instance in which an opt-in plaintiff reported that she hired subordinates, there is an alternative response to the contrary. Thus, Big Lots cannot prove a common defense to the claims of the class members by calling a handful of witnesses whose testimony strongly suggests that ASMs are properly classified, because there are other witnesses who will testify to the contrary.  Big

49

Lots' alternative is to pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs to prove that these ASMs are properly classified as exempt.  That exercise is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action. *See Trinh v. JP Morgan Chase & Co.*, No. 07-CV-1666 W(WMC), 2008 WL 1860161, at *4 (S.D. Cal. 2008) (refusing to certify a collective action in the absence of *common* evidence and collecting cases.)

The limitations that the collective action procedure place on defendant's ability to defend the case can be seen with respect to the issue of how much authority a store manager gave an individual ASM.  Because Big Lots could not call the managers and co-workers of the hundreds of plaintiffs to refute the individual plaintiffs' deposition or survey answers, opt-in plaintiffs could characterize their experiences without a realistic fear of direct rebuttal.  Further, on the issue of whether ASMs made meaningful recommendations about the change in status of other employees, Big Lots could not meaningfully challenge plaintiffs' characterization of the weight given their recommendations, without inquiry into the circumstances, or of the managers who received the recommendations.  The collective action device did not allow defendant to cross-examine each

plaintiff, much less to call each plaintiff's store manager as a witness.  Further, given the multiple examples of inconsistencies between plaintiffs' depositions and their survey responses, internal inconsistencies in the survey responses of the same plaintiffs, and inconsistencies between plaintiffs' depositions and affidavits, defendant's inability to cross-examine the vast majority of the opt-in plaintiffs was prejudicial. *Compare* responses to Survey Question 3 and Survey Question 5c; *see also* Rausser Trial Testimony (discussing same); Delaune Dep. at 96-97; Fabela Dep. at 69-95; Christian Dep. at 42; Def. Ex. 1300, Christian Response, Rausser Survey 601; Foltz Dep. at 64-64; Chmiola Dep. at 60-62, 67-68, 92-94, 107-08, 110; Zeringue Dep. at 92, 111-14.

Further, the 2004 amendments to the regulations present a special problem in determining liability and calculating damages. Before the amendments, the authority to hire or fire or make recommendations about another's employment status that were given particular weight was not a separate criterion for the executive exemption to apply.  Under the current regulations, however, that is a mandatory element of the exemption.  Those individuals who claim that they did no interviewing, hiring, firing, or promoting of other employees are not easily separable into pre- and post-2004 amendment groupings.

One of the purposes of trying several overtime pay claims in a collective action is to avoid the inefficiencies of conducting multiple individual trials on the same factual and legal issues. *See Hoffman-LaRoche*, 493 U.S. at 173; *Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003); *Braunstein v. Eastern Photographic Labs.*, 600 F.2d 335, 335 (2d Cir. 1979).  Those efficiency gains, however, cannot come at the expense of a defendant's ability to prove a statutory defense without raising serious concerns about due process.  Big Lots cannot be expected to come up with "representative" proof when the plaintiffs cannot reasonably be said to be representative of each other.  On the other hand, trying 936 individuated defenses was not an option in this case once it was certified as a collective action.  The collective action device does not effect its salutary purposes when it only puts the defendant between a rock and a hard place. For these reasons also, the Court finds decertification necessary in this case.

**C.   Procedural and Fairness Considerations.**

The Court regrets that it must decertify this action at this stage, after the large investment of resources by the parties. The Court comes to this decision noting that the same scope of evidence about plaintiffs' job experiences was not before it at

52

the initial decertification stage, and plaintiffs' earlier
showing entitled them to proceed with their theory of the case.
Based on what was presented at the decertification stage, the
Court expected the evidence to be more uniform and, in
particular, for plaintiffs' evidence to reflect the theory they
advanced at the outset of the lawsuit, *i.e.*, that Big Lots
maintained a uniform corporate policy and practice of
misclassifying the ASM *job position*.  But during the course of
the litigation, plaintiffs moved away from that position, as was
evidenced by their argument that consideration of evidence from
non-opt-in ASMs who hold the same ASM job position was improper
because they were unrepresentative.  At one point, plaintiffs
suggested that division of the class into subclasses might be
appropriate, but they never seriously pursued subdividing the
class and never presented anything to the Court on that front.

    After the Court considered all of the evidence that the
parties submitted, it became obvious that it could not draw any
reliable inferences about the job duties of plaintiffs as a
class.  It would be an injustice to proceed to a verdict on the
merits that results in a binding classwide ruling based on such
disparate evidence. *Cf. Sec'y of Labor v. DeSisto*, 929 F.2d 789,
794 (1st Cir. 1991) (explaining that representative testimony
must give rise to just and reasonable inferences in order for a

court to rely on it in rendering a judgment on the merits).  A
collective action is appropriate when there are common issues of
fact and common issues of law.  Thus, when there is agreement
between the parties about what employees did, or there is a
reliable showing that employees performed "substantially similar
work," a court may properly and easily try plaintiffs' claims
collectively. *DeSisto*, 929 at 793. *See also McLaughlin v. Ho Fat
Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (holding that collective
treatment on non-exempt employees' overtime claims was
appropriate because plaintiffs made prima facie showing of
overtime violations and inaccurate recordkeeping that employer
did not negate); *Donovan v. Williams Oil Co.*, 717 F.2d 503, 505
(10th Cir. 1983) (describing representative witness testimony as
consistent across witnesses in affirming judgment in favor of
plaintiffs); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468,
471-72 (11th Cir. 1982) (affirming backpay award on basis of
consistent testimony of non-exempt employees that established
employer's clear pattern and practice of overtime pay
violations).  But when there are significant differences in
employment experiences, as the evidence presented at trial shows
to be the case here, the procedural advantages of a collective
action evaporate, and the Court's confidence that a just verdict
on the merits can be rendered is seriously undermined.

After considering the full record, the Court reaches the inescapable conclusion that the all or nothing posture of this case makes ruling on the merits fundamentally unfair to both sides.  Were the Court to rule in plaintiffs' favor, it would have to do so on the basis of proof that is not representative of the whole class, and the verdict would result in liability on the defendant in a magnitude that is not likely to be warranted in reality.  The testimony of opt-in plaintiffs and their survey responses show that, in contrast to the evidence presented in the earlier stages of this litigation, there is significant diversity among plaintiffs in terms of their job experiences.  Further, Professor Rausser testified that, statistically speaking, he is certain that there are at least some plaintiffs who qualify as executives according to their responses to his survey.  The testimony of a number of ASMs likewise suggested that they could be properly classified.

On the other hand, were the Court to find that on the whole Big Lots proved its defense, then all of plaintiffs' claims would be extinguished.  The Court is not convinced, however, that Big Lots properly classified each of the 936 opt-in plaintiffs.  Dr. Walker readily admitted that some of the plaintiffs, may well have been misclassified. (Walker Trial Testimony.)  And the testimony of some of the plaintiffs together with their survey

responses suggested that they could be misclassified.  But given the posture of this case and the way it was tried, the Court cannot simply pluck out the ASMs who may have been misclassified.

Counsel for both sides presented this case with extraordinary skill and determined advocacy.  The Court does not reach the merits only because the facts do not justify collective treatment in this case.


**IV.   CONCLUSION**

For the foregoing reasons, the Court DECERTIFIES this matter as a collective action.  It DISMISSES WITHOUT PREJUDICE the claims of all opt-in plaintiffs, leaving before the Court the named plaintiffs who originated these actions.


New Orleans, Louisiana, this 20th day of June, 2008.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE