1                   UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5

   JOHN JOHNSON, et al           *         Docket 04-CV-3201-R
6                                 *            c/w 05-CV-6627-R
   versus                        *
7                                 *         New Orleans, Louisiana
   BIG LOTS STORES, INC.          *
8  * * * * * * * * * * * * * * *  *         May 12, 2008, 8:30 a.m.

9

10

11                 TESTIMONY OF JONATHAN WALKER
                BEFORE THE HONORABLE SARAH S. VANCE
12                UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

   For the Plaintiffs:           Bohrer Law Firm
16                                BY:  PHILIP BOHRER, ESQ.
                                  8712 Jefferson Highway, Suite B
17                                Baton Rouge, Louisiana 70809

18

   For the Plaintiffs:           McCranie Sistrunk Anzelmo
19                                 Hardy Maxwell & McDaniel
                                  BY:  MICHAEL T. TUSA JR., ESQ.
20                                    JAMES C. RATHER, ESQ.
                                  3445 N. Causeway Blvd., Suite 800
21                                Metairie, Louisiana 70002

22

   For the Plaintiffs:           Fibich Hampton & Leebron
23                                BY:  MICHAEL A. JOSEPHSON, ESQ.
                                  1401 McKinney, Suite 1800
24                                Houston, Texas 77010

25

1    APPEARANCES:

2
     For the Defendant:          Barrasso Usdin Kupperman
3                                  Freeman & Sarver
                                 BY:   JUDY Y. BARRASSO, ESQ.
4                                909 Poydras Street, Suite 2400
                                 New Orleans, Louisiana 70112
5
6    For the Defendant:          Schottenstein Zox & Dunn
                                 BY:   JAMES E. DAVIDSON, ESQ.
7                                      JOHN P. GILLIGAN, ESQ.
                                       PAUL L. BITTNER, ESQ.
8                                250 West Street
                                 Columbus, Ohio 43215
9
10   Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, B-406
11                               New Orleans, Louisiana 70130
                                 (504) 589-7778
12

13

14
     Proceedings recorded by mechanical stenography, transcript
15   produced by computer.

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2                                               Page

3    Jonathan Walker

4        Voir Dire                           4

5        Cross-Examination                 159

6        Redirect Examination              229

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>**EXCERPT**</u>

2                        **(May 12, 2008)**

3            (WHEREUPON **Jonathan Walker**, having been duly sworn,

4    testified as follows.)

5            **THE DEPUTY CLERK:**  Please state your full name and

6    correct spelling for the record.

7            **THE WITNESS:**  Jonathan Walker.

8                            **VOIR DIRE**

9    BY MR. GILLIGAN:

10   **Q.**   Where do you live, Dr. Walker?

11   **A.**   San Francisco, California.

12   **Q.**   Are you currently employed?

13   **A.**   Yes, I am.

14   **Q.**   In what position, sir?

15   **A.**   I'm the president of Economists, Incorporated.

16   **Q.**   What is the work of Economists, Incorporated?

17   **A.**   We conduct economic research into policy-related issues.

18   We also assist with economics-related issues that occur in

19   litigation.

20   **Q.**   How many people are employed by Economists, Incorporated?

21   **A.**   At this time of year, there's a little flux with our

22   research associates, but it's approximately 60 to 70.

23   **Q.**   How many of those are Ph.D. economists?

24   **A.**   I should know.  There are 32 professionals with graduate

25   degrees.  Most of them, over 27, have Ph.D's in economics.

1  **Q.**   Where is Economists, Incorporated located?

2  **A.**   We have offices in the San Francisco Bay area, in

3  Emeryville, California, and our headquarters are in Washington,

4  D.C.

5  **Q.**   What is your current position with Economists,

6  Incorporated?

7  **A.**   I am the president.

8  **Q.**   How long have you held that position?

9  **A.**   Since 2002.

10 **Q.**   Could you tell the Court of your educational background,

11 sir.

12 **A.**   Yes.  I have a Ph.D. in economics from MIT and a

13 bachelor's degree in economics from the University of

14 California at Berkeley.

15 **Q.**   In studying for your Ph.D. in economics from MIT, did you

16 have certain fields of concentration?

17 **A.**   Yes, I did.

18 **Q.**   What were those?

19 **A.**   Industrial organization and labor economics.  A third

20 field was economic history.

21 **Q.**   What do you mean by "industrial organization"?

22 **A.**   Industrial organization is the study of individual markets

23 and of individual firms or companies and how markets perform,

24 how companies perform within markets, what factors determine

25 whether a market will perform to maximize social welfare, what

1    motivates companies to do the things that they do.

2    **Q.**   What do you mean by the concentration in the field of

3    labor economics?  What is that?

4    **A.**   Labor economics is the study of labor markets, and it's

5    concerned with how wages are set, how employment levels are

6    reached.  It's the study of labor in particular, work in

7    particular.

8            **MR. GILLIGAN:**  Could we have Dr. Walker's CV.  If you

9    could just blow up the top of it there.

10   **BY MR. GILLIGAN:**

11   **Q.**   Dr. Walker, we have put on the screen a document.  Are you

12   able to identify, from the top of the first page, what that is,

13   sir?

14   **A.**   Yes.  That's my curriculum vitae.

15   **Q.**   Did you compose this CV?

16   **A.**   Yes, I did.

17   **Q.**   Is it accurate?

18   **A.**   Yes, it is.

19   **Q.**   Did you attach a copy of it to your report?

20   **A.**   Well, it's been updated.  Certainly, that page would have

21   been attached to my report.

22           **MR. BOHRER:**  Your Honor, we have no objection to the

23   admissibility of the CV to save some time.  I assume we'll get

24   the same courtesy.

25           **MR. GILLIGAN:**  We certainly would agree to that,

1   Your Honor.

2              THE COURT:  All right.  Then I'll admit the CV.  Does

3   it have a number on it, an exhibit number?

4              MR. GILLIGAN:  1401.

5              THE COURT:  I'm sorry.

6              MR. GILLIGAN:  There's been a correction, not to the

7   CV but to the -- it's 1433.

8              THE COURT:  Okay.

9   BY MR. GILLIGAN:

10  Q.    So could you describe to the Court your professional

11  experience since the time that you have obtained your Ph.D.

12  A.    Since obtaining my Ph.D., I've been at Economists,

13  Incorporated the entire time.

14  Q.    When did you start there?

15  A.    1990.

16  Q.    What position did you have when you first began?

17  A.    Senior economist.

18  Q.    What kind of work did you do?

19  A.    I generally supported other economists in their work, and

20  that would include analyzing mergers and acquisitions to

21  understand the implications for antitrust and social welfare,

22  proposed mergers and acquisitions.  This is part of the

23  regulatory process of mergers and acquisitions, antitrust

24  regulation.

25              Supporting other economists in the context of

1  litigation to understand the impact on consumers from corporate

2  conduct that was challenged.  On the plaintiff's side, that

3  would be determining whether or not consumers are likely to be

4  harmed.  On the defendant's side -- well, it's the same

5  question on either side.  The plaintiffs would be concerned

6  about whether or not -- would suggest there would be harm.

7  Defendants generally want to be able to see whether or not

8  that's not the case.  Those would be the main things that I was

9  doing, was supporting other people.

10  **Q.**    Then what was the next position that you held?

11  **A.**    Vice president.  Over time, I developed clients of my own

12  and work of my own, not only on mergers and acquisitions and

13  antitrust-related matters, but also other matters that

14  concerned economics, in litigation, and occasionally in

15  consulting, private consulting in a nonlitigation context.

16  **Q.**    Then what was the next position that you held after vice

17  president?

18  **A.**    Senior vice president.  And throughout this progression,

19  what's really going on is not so much a change in my duties as

20  a change in my role within projects so that, to an increasing

21  degree, as I progressed from senior economist to vice president

22  and senior vice president and principal, I was involved more

23  and more in cases where I was leading an engagement.

24  **Q.**    We'll get into specific engagements.  Let me ask you, sir:

25  Have you been engaged by our law firm on behalf of the Big Lots

1  Corporation to render opinions on various economic and
2  statistical issues related to this litigation?
3  **A.**   Yes, I have.
4  **Q.**   Have you brought with you to the witness stand any
5  documents?
6  **A.**   Yes, I have.
7  **Q.**   Can you tell the Court what those are.
8  **A.**   Yes.  I prepared two reports in this case, and that's what
9  I have brought.
10 **Q.**   You can refer to those, if you need to, to refresh your
11 memory.  Let me ask you, sir:  What have you been asked to do
12 in the scope of this engagement?
13 **A.**   I was asked to consider whether certain theories regarding
14 Big Lots' conduct and motives were economically sensible,
15 specifically:  Whether Big Lots would be motivated by profit to
16 create an ASM position with its actual pay grades for the
17 primary purpose of securing workers to perform the same routine
18 tasks performed by the store's lowest paid employees; whether
19 it's reasonable to assume that store managers would be
20 independently motivated, in general, to hire ASMs at the
21 Big Lots pay grades to substitute for the store's lowest paid
22 workers; and to consider whether exempt or nonexempt status
23 would be expected to affect workers' starting annual pay or
24 annual pay thereafter relative to the point in time when the
25 job was created by Big Lots, the job category.

1            I was also asked to review the responses to a survey

2    of opt-in plaintiffs that Dr. Rausser conducted on the

3    plaintiffs' behalf and to consider Dr. Rausser's report

4    concerning those survey responses and, finally, to consider the

5    various statistical and survey methodological considerations

6    and to discuss those considerations and how they affect the

7    interpretation of the survey results.

8    **Q.**   Were you asked to evaluate the data contained in the

9    survey results?

10   **A.**   Yes.

11   **Q.**   In what way?

12   **A.**   Well, in one way, to consider how the data would be

13   affected by various biases that I discussed in some detail

14   later and, in another, just to tabulate the results to show

15   what they actually say.

16   **Q.**   Were you asked to evaluate any damage calculation

17   methodology proposed by Professor Rausser?

18   **A.**   Yes.  I was asked to evaluate the damages discussion that

19   was contained in his expert report and his addendum.

20   **Q.**   So with that scope of assignment, what work did you do to

21   accomplish the tasks that you were provided in the scope of the

22   engagement?

23   **A.**   Well, first I reviewed materials that were created as part

24   of the litigation process to understand what the context of the

25   case was.  I also reviewed deposition transcripts of ASMs and

1    of Big Lots executives to understand the job better and to

2    understand what the respective parties were saying the job

3    entailed.  I reviewed some Court findings, some orders

4    concerning recertification, because they included information

5    about the allegations in the legal context.  I reviewed motions

6    on both sides related to that order to better understand what

7    the different parties believed the issues were.

8            When Professor Rausser produced his report, I

9    reviewed that.  It came along with the responses to the survey

10   that he had conducted or had conducted.  I reviewed the survey

11   responses.  I had people working under my direction and

12   supervision to enter the survey responses into a

13   computer-readable format, and I conducted various analyses

14   related to those.  I reviewed the literature on surveys, survey

15   methodology.  I reviewed the literature that Dr. Rausser cited

16   in his report.  I prepared a report myself summarizing my

17   findings, and I submitted to a deposition concerning that.

18   Q.   Among the pleadings that you indicated that you reviewed

19   or read to prepare to do your work, did you review the

20   pleadings on the decertification issue?

21   A.   Yes, I did.

22   Q.   Included in those pleadings, did you review any of the

23   declarations either submitted by plaintiffs' counsel or by

24   defense counsel?

25   A.   Yes, I did.

1    **Q.**   Now, let me ask you:  With respect to the first task in

2    the scope of your engagement, were you asked to opine whether

3    it would be economically beneficial to Big Lots to

4    intentionally misclassify as exempt assistant store managers

5    who would perform almost entirely nonexempt menial tasks in the

6    stores?

7    **A.**   Yes, I did.

8    **Q.**   Could you tell the Court what in your education, training,

9    experience, and background qualifies you to conduct this

10   analysis.

11   **A.**   Well, industrial organization concerns corporate conduct

12   and how and why corporations do what they do, and one of the

13   issues there is whether or not this would be consistent with my

14   understanding of corporate conduct.  And corporations tend to

15   exist to maximize profits, so one way to look at the

16   sensibility of this conduct is to consider whether or not it's

17   consistent with proper maximization.

18           Another area of study that I specialize in is labor

19   economics and how wages get set and how people get allocated to

20   different jobs within the broader economy, and this is relevant

21   to that.

22   **Q.**   In doing your work on this first area of your engagement,

23   did you review the complaint that was filed in this case, sir?

24   **A.**   Yes, I did.

25           **MR. GILLIGAN:**   If we could put up paragraphs 9 and 10

1  of the complaint.

2  **BY MR. GILLIGAN:**

3  **Q.**   In particular, did you review paragraphs 9 and 10 of the
4  complaint?

5  **A.**   Yes, I did.

6  **Q.**   Did you understand that the plaintiffs were alleging that
7  the job duties of the assistant manager requires the assistant
8  managers spend a majority of their time in physical labor
9  pursuits, such as stocking shelves, operating the cash
10  registers, unloading trucks, placing stock in the storeroom,
11  straightening the merchandise, assisting customers in
12  merchandise handling, and cleaning the bathroom?

13  **A.**   Yes, I did.

14  **Q.**   And that, as alleged in paragraph 10, the plaintiffs'
15  actual managerial duties, if any, were diminimus and
16  constituted less than 10 percent of their workday, did you see
17  that, sir?

18  **A.**   Yes, I did.

19  **Q.**   Did you take that into account in forming the opinion that
20  you have reached on this matter?

21  **A.**   Yes, I did.

22  **Q.**   Did you obtain information from Big Lots regarding payment
23  or compensation paid to assistant store managers at Big Lots?

24  **A.**   Yes, I did.

25  **Q.**   What did you receive?

A.   I received an Excel file that included pay information for all of the opt-in plaintiffs that were on the payroll at any time during 2006.

Q.   What, if anything, did you do with that Excel file in order to reach the opinions that you've reached on this matter?

A.   Well, I sorted through the file to try to eliminate from the file persons whose pay would not necessarily reflect a full year's pay in the assistant store manager position.  So there were people in the file whose title was store manager, for example, and I was concerned that their pay may reflect pay for a higher pay level, higher-paid job, so I excluded from the data people whose title was something other than assistant store manager.

        I also excluded from the data people whose pay was less than the Big Lots minimum pay for an assistant store manager in order to exclude people that would not have been at the job for a full year.

        So what I was left with was approximately 200 -- I have an exact number here -- people.  If you'll bear with me, I can find the exact number.  I was left with 184 opt-in plaintiffs with 2006 pay and job titles that are consistent with them having been full-time ASMs over the entire year, and so I calculated the average pay for that group of 184 persons, and then I estimated the value of benefits for that group of people.

1  **Q.**   Did you obtain information about the benefit package
2  available to Big Lots' assistant managers?
3  **A.**   Yes, I did.
4          **MR. GILLIGAN:**   If we could put on the screen
5  Demonstrative 1.
6  **BY MR. GILLIGAN:**
7  **Q.**   Did you receive information that the benefits package
8  included, among other things, the items that are listed in
9  Demonstrative 1?
10 **A.**   Yes.  Demonstrative 1 lists benefits that are available to
11 full-time ASMs that are not available to part-time store
12 associates.
13 **Q.**   Did you evaluate the economic value of the benefits
14 package to the Big Lots assistant store managers?
15 **A.**   Yes, I did.
16 **Q.**   How did you do that, sir?
17 **A.**   Well, first I contacted Big Lots to see whether they had
18 estimates for the value of those benefits.  They told me that
19 their rule of thumb was 30 percent benefits as a ratio of
20 benefits to cash compensation and that, in their experience,
21 that was a fairly accurate number.
22          To validate that number, I looked to publicly
23 available information from the Bureau of Labor Statistics
24 concerning the value of benefits more generally in the economy,
25 and I found that Big Lots' estimate was somewhat below what you

1   saw for private businesses in general.

2            **MR. GILLIGAN:**  If you would put on the screen

3   Defendant's Exhibit 1400, which is a table, private

4   industry-by-industry group in full-time and part-time status,

5   United States Department of Labor.

6   **BY MR. GILLIGAN:**

7   **Q.**   Do you recognize that document, sir?

8   **A.**   Yes, I do.

9   **Q.**   I guess the first thing I should have asked you is:  Can

10  you see it?

11  **A.**   I can, yes.

12  **Q.**   What is that?

13  **A.**   This is a printout of a document that's available from the

14  Bureau of Labor Statistics concerning the costs of various

15  benefits as of whatever date that was printed.  I can't really

16  see, but it's September 2007.

17  **Q.**   For what purpose did you obtain that information, sir?

18  **A.**   One is to validate the estimate that I received from

19  Big Lots.  On the first line there, you see all full-time

20  workers in private industry.  The second column, $20.57 is an

21  estimate of wages and salaries on average.  Then the column

22  beside that, $9.03 is an estimate of the value of benefits.

23  $9.03 divided by $20.57 is significantly more than 30 percent.

24            **THE COURT:**  What is it?

25            **THE WITNESS:**  It's roughly 45, 50 percent.

1    BY MR. GILLIGAN:

2    Q.   Using the salary information that you obtained on the

3    assistant store managers for 2006 and the value of the benefits

4    package, did you calculate the average salary paid to an opt-in

5    ASM in 2006 who worked for the entire year?

6    A.   Including benefits, yes.

7              THE COURT:  The benefit costs include legally

8    required benefits?

9              THE WITNESS:  Yes, they do.  If you were to --

10             THE COURT:  So how much of that number is legally

11   required?

12             THE WITNESS:  $2.42.

13             THE COURT:  The other stuff is --

14             THE WITNESS:  Retirement and savings, insurance,

15   supplemental pay, paid leave.

16             THE COURT:  That's all optional?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.

19   BY MR. GILLIGAN:

20   Q.   So you calculated the salary and benefits for the

21   assistant store manager for 2006; is that correct?

22   A.   Yes, I did.

23             MR. GILLIGAN:  If we could have Demonstrative 2.

24   BY MR. GILLIGAN:

25   Q.   If you could explain to the Court, Dr. Walker, what this

1    demonstrative shows of your calculations.

2         **MR. BOHRER:**  Your Honor, I don't mean to interrupt,

3    but the witness, I'm sure, is well qualified but has not been

4    tendered as an expert, and I'm not exactly sure in what field

5    he's going to be giving opinions on.  I didn't want to waive my

6    objection.  I didn't know whether --

7         **THE COURT:**  Are you going to tender him before you

8    start?

9         **MR. GILLIGAN:**  Yes, Your Honor, we would tender him

10   as an expert with respect to --

11        **THE COURT:**  In the field of what?

12        **MR. GILLIGAN:**  Economics with respect to the

13   calculation of wages and comparison of salary and benefits.

14        **MR. BOHRER:**  I have no doubt that Dr. Walker is an

15   expert in the field of economics, and I'm not exactly sure of

16   what opinions he's going to be expressing.  I just want to know

17   the scope of what his expected field of expertise would be for

18   purposes of this litigation.  If it's limited to discussion of

19   these economic benefits, I have no objection to that, but

20   beyond that --

21        **THE COURT:**  I think you know what he said in his

22   report.  Are you saying that he doesn't have the expertise to

23   give the opinions he gave in his report?

24        **MR. BOHRER:**  No, not necessarily, Judge.  I'm not

25   exactly sure what opinions he's going to give.  I think there

1    are some opinions expressed in his report that he may not be

2    qualified to render opinions on, but clearly --

3           **THE COURT:**  Why don't you tell me when you get to

4    that.  So what are you tendering him in, then?

5           **MR. GILLIGAN:**  Your Honor, what I wanted to do was to

6    tender him on each of these individual items so that he could

7    direct his background qualifications.

8           **THE COURT:**  Typically, when someone offers an expert

9    in the field -- are you offering him in labor economics?

10          **MR. GILLIGAN:**  Certainly, we would offer him in labor

11   economics, in statistics, and surveys.

12          **THE COURT:**  He's admitted as an expert in the field

13   of labor economics, statistics, and surveys.

**DIRECT EXAMINATION**

15   BY MR. GILLIGAN:

16   **Q.**   Dr. Walker, could you explain to the Court what

17   calculation you have done with respect to the calculation of

18   compensation to opt-in plaintiffs.

19   **A.**   Yes.  The top line, average 2006 pay for opt-in

20   plaintiffs, was the average pay from Big Lots' pay information

21   for the 184 opt-in plaintiffs whose job titles and pay

22   indicated that they were full-time ASMs for the entire year,

23   and that's $33,994.

24          The second line, estimated benefits, is the estimate

25   of the value of benefits as a percentage of cash pay, and

1   that's 30 percent.

2          The average cost to employ an ASM would then be

3   130 percent of $33,994 or $44,192 per year on average.

4          The next line concerns the maximum pay for ASMs

5   included in the dataset, and that was $42,675 for salary and

6   wages.  Adding in 30 percent for benefits implies a total

7   compensation package of $55,478.

8   **Q.**   Dr. Walker, did you then obtain information about the

9   compensation paid to hourly employees at Big Lots?

10  **A.**   Yes, I did.

11  **Q.**   What was the information you obtained?

12  **A.**   Documents which showed pay ranges for different job

13  titles.

14          **THE COURT:**  Why didn't you compare it to full-time

15  people?  Why are you comparing it to -- did you say part-time

16  or did you say hourly?

17          **MR. GILLIGAN:**  I simply asked the question about

18  hourly, Your Honor.  I was going to ask him which specific

19  kinds of hourly employees he selected and why.  So I want to

20  anticipate --

21          **THE COURT:**  Okay.  Get to that because I think I'm

22  jumping ahead of something I read.  Go ahead.

23  **BY MR. GILLIGAN:**

24  **Q.**   So you obtained information about compensation paid to

25  hourly employees at Big Lots; is that correct?

1    A.    Yes, that's correct.

2    Q.    What kind of hourly employees did you obtain compensation

3    information for?

4    A.    Well, it's my understanding that the compensation

5    information pertaining to store associates, regardless of

6    whether they were part-time or full-time, it was the pay ranges

7    by hour for store associates.  Store associates are people

8    whose jobs are explicitly to -- from reading the depositions

9    and from reading other documents in the discovery record, it

10   was my understanding that store associates' jobs are explicitly

11   the manual activities that were listed in the complaint.

12   Q.    Why did you want compensation information for those

13   associates whose time was devoted entirely to manual tasks at

14   the stores?

15   A.    Because what I was trying to do was trying to determine

16   what Big Lots' costs would be to get that job done.  I was

17   addressing what I understood to be the allegation that the

18   assistant store managers were being hired for the primary

19   purpose of engaging in those activities.  So to get an estimate

20   of Big Lots' costs to get those jobs done, those tasks done,

21   you need to look to see what it costs for people whose jobs are

22   to do just that thing.

23          The other job categories within the store include

24   other sorts of responsibilities and you can't disentangle,

25   merely by looking at that salary information, why it is that

1    the salary is what it is if it includes multiple tasks.

2         **THE COURT:**  I'm not clear what he's looking at.  Are

3    you looking at certain job classifications and excluding others

4    or are you including everybody under an ASM in that

5    calculation?

6         **THE WITNESS:**  I was looking at a specific job

7    category; it's called store associate.  This term *associate*,

8    it's used a lot within Big Lots, but there's a specific job

9    category called store associate.

10        **THE COURT:**  I have no idea what that is based on the

11   testimony I've heard.  Would you help me with that.

12   **BY MR. GILLIGAN:**

13   **Q.**   Regardless of the title for the person, what were the

14   tasks of the people for whom you were trying to get this

15   compensation information?

16   **A.**   The specific tasks that are identified in the complaint of

17   retrieving carts, sweeping the floors, cleaning the bathrooms,

18   restocking shelves, loading/unloading trucks.

19        **THE COURT:**  Look, I've heard testimony for days on

20   the names and the jobs in all these stores.  Which jobs did he

21   come up with numbers for?  Surely, somebody knows that.

22   **BY MR. GILLIGAN:**

23   **Q.**   Did you obtain information for, for example, those

24   associates who were hired to be stockers?

25   **A.**   Yes.

1   **Q.**    Stocking the shelves?

2   **A.**    Yes.

3   **Q.**    For those employees who were hired to do recovery work in

4   the store?

5   **A.**    Yes.

6   **Q.**    For those who were hired to run the cash register?

7   **A.**    Yes.

8           **THE COURT:**  I'm still not clear.  Who determined who

9   these people were that you looked at?  Did you ask Big Lots to

10  "Give me all your stockers, give me all your recovery people,

11  give me your" --

12          **THE WITNESS:**  I see what you're saying.  No, I did

13  not have actual pay information.  What I had were the Big Lots

14  documents which lay out pay ranges for job categories.  So I

15  had a job category, which is called store associate, and that

16  job category is for the specific purpose of being an all-around

17  person that does these various tasks.  So I had this document,

18  which lays out the entire pay ranges.  Actually, I think there

19  were three or four because there are different pages for

20  different parts of the country.  I think there's like an urban

21  page and semi-urban, but this laid out the pay ranges for that

22  job category.  So I ultimately compared the numbers of the ASM

23  to all the pay ranges, all the entire pay range.

24          **THE COURT:**  Thank you.

25          **THE WITNESS:**  Thank you.

1    BY MR. GILLIGAN:

2    **Q.**    Dr. Walker, I want you to assume that the Department of

3    Labor Regulation 541.102, which was in effect before August of

4    2004, talked about the relationship between his salary and the

5    wages paid other employees for the kind of nonexempt work

6    performed by the supervisor.  Right?

7    **A.**    Yes.

8    **Q.**    Let me ask you:  Did you attempt to obtain from Big Lots

9    information about the salary or wages paid to employees who

10   were performing nonexempt work that would be performed by the

11   supervisor?

12   **A.**    Yes.  Specifically, persons who were hired specifically

13   and exclusively for that purpose.

14            **MR. GILLIGAN:**  I think we can go back to the ELMO

15   again.

16   BY MR. GILLIGAN:

17   **Q.**    Let me ask you to assume, Dr. Walker, that the regulation

18   which is applicable to the Department of Labor after August of

19   2004, Section 541.700(a), talked about the relationship between

20   the employee's salary and the wages paid to other employees for

21   the kind of nonexempt work performed by the employee.  Was that

22   the kind of compensation information that you were trying to

23   obtain from Big Lots about the nonexempt employees?

24   **A.**    Yes.  I mean, specifically, it was that phrase "for the

25   kind of nonexempt work" that I was trying to identify; not

1    wages paid to people who happened to do that work while doing
2    other things, but wages paid apparently and specifically for
3    the purpose of doing that nonexempt work.
4    **Q.**   Did you calculate a rate of compensation for a nonexempt
5    hourly associate who would do the kind of work at Big Lots such
6    as retrieving carts, stocking shelves, unloading the trucks,
7    doing recovery?
8              **THE COURT:**  Stop.  There's an objection.
9              **MR. BOHRER:**   Your Honor, I have an objection based on
10   relevancy.  According to Dr. Walker's addendum report, in
11   paragraph 13, the calculation he performed was precisely a
12   calculation of two part-time store associates earning minimum
13   wage, and that is the comparison that he seeks to draw.  That
14   is not relevant under the applicable regulations as just cited
15   by counsel.
16             **THE COURT:**  I'm going to reserve ruling on that
17   objection until I understand what it is -- I still don't know
18   what he's comparing this to.  You keep talking about people who
19   were just hired to do this, and I want to know specifically:
20   What job in Big Lots are you comparing this to?  Is it a
21   part-time hourly employee?  Is that what we're comparing this
22   to?
23   **BY MR. GILLIGAN:**
24   **Q.**   Dr. Walker, were you making the comparison between the
25   compensation paid to an assistant store manager and a part-time

1   hourly employee or to a full-time hourly employee or to both?

2   **A.**   I ultimately made the comparison to two or more part-time

3   employees who were employed for up to 59 hours per week

4   combined of work.

5   **Q.**   Why did you use part-time employees for the comparison?

6   **A.**   Because that would be the cheapest way, the least

7   expensive way for Big Lots to get the work done because they

8   offer a more expensive benefits package to full-time employees;

9   and, also, because if they hired one full-time employee to do

10  59 hours of work, they would pay substantially more in

11  overtime.  The cheapest way for them to get the work done would

12  be to hire two part-time employees to do it, and it's been my

13  experience that businesses attempt to minimize costs.

14        **THE COURT:**  All right.  That's okay.  I'm going to

15  overrule the objection and listen to the testimony.  So this

16  next number he's going to give me is based on the computation

17  with the two part-timers?

18        **MR. GILLIGAN:**  I believe that's correct, Your Honor.

19        **THE COURT:**  Why was this so hard for me to find out?

20  Why can't we get this laid out?  I've been trying to ask this

21  question for about five minutes now.  Why is it so hard for me

22  to find out?

23        **MR. GILLIGAN:**  I'm sorry, Your Honor.

24              If you would put Demonstrative 3 on the screen,

25  please.

1        **MR. BOHRER:**  Your Honor, just to protect the record,

2   I assume I can make that continuing objection to this entire

3   line of questioning?

4        **THE COURT:**  You may.

5        **MR. BOHRER:**  Thank you.

6        **THE COURT:**  It's overruled.  Go ahead.

7   BY MR. GILLIGAN:

8   Q.   Dr. Walker, does the demonstrative on the screen show the

9   results of your calculation?

10  A.   Yes, it does.

11  Q.   Can you explain to the Court what it is that you've

12  calculated.

13  A.   Sure.  This chart shows the average cost for an assistant

14  store manager, which we discussed earlier, the $44,192, and

15  that's based on the 184 opt-in plaintiffs that were employed at

16  Big Lots for a full calendar year, 2006.

17       The second bar, $55,478, shows the maximum cost to

18  Big Lots from having employed those ASMs in 2006 inclusive of

19  benefits.

20       The third column, $17,933, is an estimate of the

21  costs to Big Lots to hire part-time store associates or

22  stockers, whatever their title might be, to conduct 59 hours

23  worth of work per week for 52 weeks at $5.15 per hour, adding

24  in an additional 13.5 percent for legally required benefits as

25  defined by the Bureau of Labor Statistics.  This is an estimate

1  of the benefits costs for part-time workers.

2       **THE COURT:**  This is the cost to hire one or to hire

3  two?

4       **THE WITNESS:**  It's the total cost for the two.

5       **THE COURT:**  The two?

6       **THE WITNESS:**  It's the total cost to get 59 hours of

7  work done for 52 weeks in the lowest-cost fashion.

8  **BY MR. GILLIGAN:**

9  **Q.**  So if the primary purpose for Big Lots was to hire

10  employees to retrieve carts, stock shelves, sweep the floors,

11  clean the bathrooms, what would be the most economical way for

12  them to accomplish that purpose?

13  **A.**  In those jurisdictions where the $5.15 is their lowest pay

14  offered for this job, the lowest -- the amount would be

15  $17,933.

16  **Q.**  Why did you use the figure of $5.15 per hour?  Where did

17  you get that?

18  **A.**  From Big Lots' pay-range documents.  Big Lots has

19  documents which show the pay ranges for different job

20  categories.  There is a job category called store associate,

21  which is all of the people that do these particular activities,

22  and the bottom of that range is $5.15.  But I also conducted

23  this with other figures.

24  **Q.**  What other figures did you use in making this comparison?

25  **A.**  I also used the top end of the range, which was $10.31.

1    **Q.**    What was the result of that calculation?

2              **MR. BOHRER:**   Your Honor, I object because although

3    that is referenced in Dr. Walker's report, there is no opinion

4    with respect to what that dollar figure would be.   The only

5    conclusions he drew and the only calculations contained in his

6    report are using the $5.15-per-hour rate.   He makes reference

7    to two other numbers, but no calculations, no analysis;

8    therefore, this testimony is outside the scope of his report.

9    I'm referring to paragraph 13 of his --

10             **THE COURT:**   Let me see the report.

11             **MR. GILLIGAN:**   Your Honor, Mr. Bohrer had the report.

12   He had the addendum.   He had the opportunity in the deposition

13   to ask any questions about those calculations at the time.

14   There can't be --

15             **THE COURT:**   Counsel, let me see the report.

16             **MR. BOHRER:**   Excuse my notes.   He makes reference to

17   two other numbers, but does absolutely no calculation.

18             **THE COURT:**   Which paragraph?

19             **MR. BOHRER:**   13.

20             **THE COURT:**   I'm going to let this in.   You may

21   answer.

22             **THE WITNESS:**   I'm sorry.   Could you repeat the

23   question, please.

24   **BY MR. GILLIGAN:**

25   **Q.**    You had indicated that you had used a higher end of the

1  pay range --

2  **A.**    Yes.

3  **Q.**    -- to do a similar calculation.  What was the higher pay

4  range that you used?

5  **A.**    $10.31 per hour, which is the maximum 2006 store associate

6  pay level.

7  **Q.**    What was the result of that calculation?

8  **A.**    The result was that it was still significantly below the

9  $44,192.  So if one were to take $10.31, multiply it by 59,

10  take that number and multiply it by 52, take that number and

11  multiply it by 1.135, you would end up with a number that is

12  significantly less than $44,192.

13  **Q.**    Dr. Walker --

14        **MR. BOHRER:**  Your Honor, this is where it crosses the

15  line.  I can understand Your Honor's ruling that it would be

16  significantly higher because that's what's in his report, but

17  every case I've ever been in, if you're going to do

18  calculations, you have to do them in your report, and they're

19  not done.  I didn't do anything to prepare to respond to this

20  because I've relied on his report.  So he can reach the -- I'm

21  sorry, Your Honor.

22        **THE COURT:**  I understand what you're saying.

23            What are you getting ready to do?

24        **MR. GILLIGAN:**  I was simply going to ask him to do

25  the calculation.

1          **THE COURT:**  That's all right.  Just move on to

2    something else.

3    **BY MR. GILLIGAN:**

4    **Q.**   Dr. Walker, did you indicate that one of your fields of

5    concentration is labor economics?

6    **A.**   Yes, I did.

7    **Q.**   In that field of economics, do you study how labor markets

8    work?

9    **A.**   Yes, I did.

10   **Q.**   What are the factors that determine what an employer must

11   pay to attract qualified employees for a given position, sir?

12   **A.**   The primary determinants of pay levels are going to be the

13   alternatives that are available to workers in the general area;

14   the characteristics of the job in question and the pay of the

15   job and of the alternatives; what other job opportunities are

16   available to persons that would apply for the ASM job; what do

17   they tend to pay; what are the job characteristics of the ASM

18   job, including how many hours do you have to work and how many

19   per day, per week; how much vacation time do you get.  All of

20   those would be the considerations that would then determine

21   what sort of pay level Big Lots would have to offer in order to

22   attract a qualified workforce.

23   **Q.**   Do you have an opinion whether the classification of a job

24   as exempt or nonexempt would have any impact on what an

25   employer must pay to fill a particular position with a

1  qualified person?

2  **A.**   Yes, I have an opinion.

3  **Q.**   What is your opinion, sir?

4  **A.**   That the status isn't going to affect what the ultimate

5  annual pay has to be.  Given a certain amount of work, if it's

6  59 hours or 55 hours or 45 hours per week, over the course of a

7  year, you're going to have to pay workers an amount that makes

8  the job more attractive than their alternatives.  It isn't

9  particularly important whether the pay is quoted in terms of an

10  hourly wage that then is going to be subject to overtime such

11  that it leads to the same annual pay, or if it's quoted just in

12  terms of the salary.  If the total pay is the same for the

13  total amount of work, whether it's quoted in hourly terms

14  subject to an overtime amount or not isn't going to be

15  relevant.

16  **Q.**   Would it benefit the employer to misstate the working

17  conditions for a salaried position?

18  **A.**   Purposely?

19  **Q.**   Yes, sir.

20  **A.**   No, it would not.

21  **Q.**   Why not?

22  **A.**   Well, the worker's going to find out virtually immediately

23  what the working conditions really are.  If the workers have

24  alternatives, they will leave.  If they didn't have

25  alternatives, there was no reason or purpose in misleading

1    them; you could just state what the working conditions are and
2    set the wage appropriately.
3    Q.   Did you do an examination of the duration of the tenure of
4    opt-in associate store managers at Big Lots?
5    A.   Yes, I did.
6    Q.   What is the information that you used for that analysis,
7    sir?
8    A.   I had the same information concerning pay to let me know
9    when those workers started and whether they were still on the
10   payroll by November of 2007, when the dataset was created.
11           MR. GILLIGAN:   If you would pull up Demonstrative 4.
12   BY MR. GILLIGAN:
13   Q.   Dr. Walker, what is it that you learned from this
14   analysis?
15   A.   That 239 of the opt-in plaintiffs were on the payroll at
16   some time in 2006; and, of those, 208 were still on the payroll
17   as of November 1, 2007.
18   Q.   Did you determine the median tenure with Big Lots for the
19   opt-in assistant store managers that you analyzed?
20   A.   Yes.
21           MR. GILLIGAN:   If we could see Screen 5, please.
22   BY MR. GILLIGAN:
23   Q.   Could you explain to the Court what you learned from this
24   analysis.
25   A.   Yes.  Of those 239 opt-in plaintiffs that were on the

1    payroll in 2006, the median amount of time that they had spent

2    with Big Lots was 7.4 years.  So that means that half of them

3    had spent 7.3 years or more at Big Lots and half had been 7.4

4    years or less.

5           In the case of those 208 who were still on the

6    payroll as of November 1, 2007, the tenure's actually still

7    growing, but I don't have data concerning when they will

8    ultimately leave, so I don't know ultimately what their tenure

9    will be.  The maximum tenure for those 239 was 26.8 years.

10          Of the 239, 61 of them had been rehired to Big Lots,

11   so they had worked at Big Lots, gone away and come back.  And

12   the relevance of this is that workers, or a large percentage of

13   them as ASMs, were aware of what the job conditions were.  They

14   were with Big Lots for a substantial period of time.  They

15   stayed with Big Lots for a substantial period of time.  Many of

16   them, 61 of these 239, went away and came back again.

17   **Q.**    Now, before we leave this topic, let me just go to the

18   ELMO for a second.  Judge Vance had asked earlier, with your

19   wage and compensation comparison, what specific position you

20   were comparing the ASM salary and benefits to.  I put on the

21   screen here the job title for associate at Big Lots, which

22   would be wage grade 7.  Was this the position that you had

23   obtained the compensation information for?

24   **A.**    Yes.  I need to clarify slightly because you said

25   *associate*, and that's the problem with that term.  *Associate* by

1    itself I understand means any hourly worker regardless of their
2    specific title or job, but this store associate is a specific
3    job, and this is the one that I was analyzing.
4              **MR. GILLIGAN:**  This is Plaintiffs' Exhibit 96,
5    Your Honor.
6    **BY MR. GILLIGAN:**
7    **Q.**   Were you asked to review the survey instrument prepared by
8    OnPoint?
9    **A.**   Yes, I was.
10   **Q.**   Were you asked to review the data compiled by OnPoint?
11   **A.**   Yes, I was.
12   **Q.**   Before we get into your analysis and opinions in this
13   area, can you tell the Court about your education, training,
14   and experience that qualifies you to provide expert opinions
15   with respect to surveys and the valid inferences to be drawn
16   from the survey data.
17   **A.**   Yes.  As part of my graduate training and my undergraduate
18   training, I took courses in statistics at both the University
19   of California, Berkeley, and MIT.  My dissertation was an
20   empirical analysis, which included the application of
21   statistical principles.
22              As a professional economist, I have conducted
23   statistical analyses, and I have reviewed statistical analyses
24   within labor economics.  As a graduate student and as a
25   professional, I have reviewed studies that are based upon the

1   major surveys of the U.S. workforce population.

2            I'm familiar with the methods of implementation of

3   those surveys.  I have been retained on other occasions to

4   criticize and critique survey methodology.  I have been

5   retained, prior to joining Economists, Incorporated, to conduct

6   surveys for commercial purposes outside of litigation.  I've

7   given testimony to courts the courts relied upon -- or to a

8   court that I know of that has relied upon to evaluate the

9   statistical validity of data.

10  **Q.**   What do you mean by the term *survey*?  What is that?

11  **A.**   A survey is information that is derived from people, as

12  opposed to from direct observation, by asking them questions

13  about their experiences or their knowledge.  And then the data

14  that I use when I'm seeking surveys are subject to statistical

15  analyses and compilation.

16  **Q.**   What makes the collection of survey data different from

17  other scientific collections of data?

18  **A.**   The major difference is that you're not observing directly

19  the thing that you're trying to measure.  It's being filtered

20  through the perceptions and recall of the survey taker, of the

21  respondent.  So rather than being able to measure directly the

22  height or weight of a subject, or rather than being able to

23  measure directly how much money is spent on something or how

24  much is being paid, you're getting what people say happened,

25  and that's going to be affected by how they perceive the event,

1  their recall of the event, and their understanding of what it
2  is that you're trying to ask them.

3  **Q.**   What can cause a survey to give inaccurate results?

4  **A.**   There are various kind of biases that are specifically
5  discussed in the literature.  One is what's called coverage
6  error, and that occurs when the survey population is, in a
7  systematic way, different from the population about which
8  you're trying to draw inferences.

9       The second is nonresponse bias, and that occurs when
10  the people that actually send you responses to your survey, or
11  the people who you're actually able to get to take the survey,
12  is something less than 100 percent of the people that you tried
13  to survey.  There, it doesn't matter whether you're dealing
14  with a sample or a census; nonresponse would lead to bias in
15  either case.

16       A third problem is what's called a systematic
17  measurement error, that there are lots of reasons why the
18  responses that you get will be different from the thing that
19  you're trying to measure.

20       Types of measurement error include demand effects,
21  which is when either the respondent has some information about
22  the sponsor or purpose of a survey, they will tend to change
23  their answers; not purposefully, necessarily, but it's been
24  documented in case after case of surveys where it's been
25  tested.

1          Another type of demand effect is if there's a

2     self-interest.  If the person giving the survey response has a

3     self-interest, that will affect the way that they answer the

4     questions.  So those are demand effects.

5          A second type of measurement effect is recall bias.

6     People don't remember accurately.  There's certain types of

7     things that they misremember in systematic ways time and again.

8     They tend to undercount when they're asked to cite lists or

9     recite how often things happen.

10          There are other types of recall biases that will just

11     vary from circumstance to circumstance, but we know that it's

12     not the case that you just can expect on average that people's

13     recall is 100 percent accurate.

14          Another type of measurement error, or source of

15     measurement error, is misunderstanding and miscommunication

16     between the researcher and the respondents, and that can occur

17     when the respondents interpret words differently than the

18     researcher intends.  So, for example, in this case -- I think

19     we're going to get to it -- what does *regularly* mean to the

20     respondent, and what was *regularly* intended to mean by the

21     researcher?

22          The final type of error is random error, and that

23     would occur when you take a survey of a sample of something

24     less than the entire population.  There are various types of

25     random errors that will affect the data.  This is something

1    that affects not only surveys but all types of data that for
2    various random features don't tend to result in bias.  It will
3    tend, over repeated numbers of applications, to cancel
4    themselves out.  There's this error.
5            That type of error, random measurement error, is the
6    only type of error that is corrected by increasing the -- or
7    managed by increasing the sample size.  That's the one of these
8    errors that you can actually measure just by looking at the
9    data, and that is the only one of these types of errors that is
10   accounted for in confidence intervals and other statistics that
11   you usually see published along with well-done research.
12   Q.   You used the term a *sample survey* and a *census*.
13   A.   Yes.
14   Q.   Could you tell the Court what's the difference between the
15   two.
16   A.   Yes.  A census is a survey that seeks, at least at its
17   outset, to enumerate everyone.  So the United States Decennial
18   Census is the most well-known example in the United States, at
19   least, of a census, and that's where the government goes out
20   and the purpose is to try to collect information on everybody.
21           A sample survey is a survey that's sent out to some
22   subset, on purpose, of the entire population.  A random sample
23   would be representative of the population for which it's drawn,
24   as a statistical matter.
25           So in certain circumstances it could be more

1   efficient and more informative to try to sample or survey or

2   understand a smaller group because that will allow you, then,

3   to address these other errors more carefully.  But as I said,

4   even a census is subject to all of these other errors.

5           There are articles written about undercounts in the

6   U.S. Census, and that's nonresponse bias.  The inability to

7   reach people in certain neighborhoods, the tendency of certain

8   demographic groups not to answer the survey, that's nonresponse

9   bias, and it applies just as well to censuses, including the

10  most well-known, highly-financed census in the world, as it

11  does to sample surveys.

12          The other potential errors are also equally

13  applicable to censuses, meaning the other errors other than

14  measurement error, as they are to sample surveys.

15  Q.   The survey that was conducted by OnPoint in this case, was

16  it a sample survey or a census?

17  A.   It was a sample survey.

18  Q.   Why do you say that?

19  A.   Well, it's my understanding that the purpose of the survey

20  is to understand all ASMs.  It's to understand the experiences

21  of ASMs in general.  So if that's the purpose, then all opt-ins

22  represent a sample.  They are a subset of all ASMs.  The survey

23  was directed at the opt-ins.  So the survey was directed at a

24  sample of all ASMs, and a sample that was not randomly

25  selected, and that leads to other statistical problems.

1  **Q.**   Let's assume that the purpose of the survey was only to
2  survey the opt-in plaintiffs.  The survey that was conducted,
3  was that a sample survey or a census?
4  **A.**   It would be a census of the opt-ins.
5  **Q.**   The potential bias of nonresponse, does that apply to a
6  census survey as well as to a sample survey?
7  **A.**   Yes, it does.
8  **Q.**   Why is that?
9  **A.**   The nonresponse is a failure of everybody that you sent
10  the survey to or everybody whose door you knocked on or
11  everybody that you called to respond.  At some stage, whether
12  it be a census or a sample survey, you're going to try to
13  generalize from the people that answered to this larger group,
14  be it to this larger group that you set out to study in the
15  first place.

16         The problem when people don't respond is that you are
17  basing your conclusions on these respondents, who are
18  themselves a sample of a sample, and you don't have any
19  statistical basis to assert that they are representative.  The
20  only statistical basis for samples to be representative is
21  randomness, that they are selected randomly.  So if I were to
22  select a group of five people randomly from this court, then I
23  would have a statistical basis to say that those five people
24  are representative of the whole court, and I could measure how
25  precisely or how confident I could be of my conclusions.

1          If I picked them some other way, if I picked the
2     first five people that seemed to consider me to be a friendly
3     person, or I just picked the first five people that I see, I
4     don't have a statistical basis for that to say that those five
5     people are representative.
6          To go back to censuses and sample surveys, the
7     respondents are a nonrandom sample of the group about which you
8     are trying to draw inferences, and so you just have no
9     statistical basis to say they're representative.  Instead, you
10    can just look at how big are they as a percentage of the
11    population you care about.
12         For example, in the United States Census, for many
13    things, it's A-okay that we ultimately got data for, say,
14    95 percent of the people, because when you think about how much
15    different the 5 percent could possibly be, they can't really
16    change what we care about.  So at the extreme we still can draw
17    inferences that we can rely upon for the purposes we rely upon,
18    just with 95 percent.  But the smaller that percentage is, the
19    more we need to be concerned that there may be significant
20    differences between the people we don't measure and the people
21    that we do.
22         So for nonresponse bias the two things you need to
23    care about are:  What percentage of the people are these
24    nonrespondents, which you can measure, and how much different
25    are those nonrespondents than the people that you know about,

1    which you may or may not be able to measure.

2    **Q.**   We'll get back to nonresponse bias in a minute.

3            Let me ask you:  With respect to measurement bias,

4    which you had indicated were possible demand effects, recall

5    bias, recency bias, miscommunication between the researcher and

6    the respondents, is that a concern in this case to you, sir?

7    **A.**   Yes, it is.

8    **Q.**   Why is that?

9    **A.**   Because demand effects are always there.  You're always

10   worried with about them.  That is why there's such a thing as

11   double-blind protocols because there is an expectation that if

12   survey participants or people that are in experiments or people

13   getting drugs as part of drug trials, that if they know "What

14   is the survey about?" and "What is it that's a good answer?"

15   that will affect what they say.  More importantly for this

16   case, there is a huge financial incentive to affect how you're

17   going to answer these survey questions.

18           I think, as we'll get to later, there are

19   opportunities for the respondent to tailor their answers

20   without necessarily lying.  There are choices to be made about

21   how to answer and interpret the questions.  Whenever there's

22   such a huge financial incentive, we economists expect it to be

23   acted upon.  As I said, in this case it's tens of thousands of

24   dollars.

25           We see from literature on surveys, we see from some

1  of the studies that Dr. Rausser provided, that much smaller

2  financial incentives have a statistically significant impact on

3  the results.  So incentives on the order of $5 a month could

4  have a statistically significant impact on the results.  Here,

5  we're talking about, as I say, tens of thousands of dollars, so

6  the demand effects are going to be something to take into

7  account in this case.

8          We care and need to care about measurement error in

9  this case because we're asking respondents to tell us what's

10  happened over the course of many years.  There's no, for

11  example, evidence that Dr. Rausser provided that people will

12  remember accurately.  The only evidence I have seen about the

13  accuracy of people's responses concerning their hours worked in

14  the past was in some of the material that Dr. Rausser provided

15  to support his *Daubert* declaration and it indicated --

16          **MR. BOHRER:**  I'm sorry.  I was going to wait for him

17  to finish.  This is getting to be pretty much a narrative,

18  Judge, and there are some parts to this I'd like to object to.

19  So I guess my objection is to the narrative form of the

20  testimony of Dr. Walker.

21          **THE COURT:**  Would you break this up, please, with

22  more question and answer.

23          **MR. GILLIGAN:**  Yes, Your Honor.

24  BY MR. GILLIGAN:

25  Q.   You were making a reference, Dr. Walker, to a text or

1   study that was cited by Dr. Rausser about the ability of

2   workers to recall their historical hours worked and wages paid.

3   What is the study that you were referring to, sir?

4   **A.**   There's a textbook by Groves that Professor Rausser cited,

5   and within that textbook there's a reference to a study by

6   Duncan and Hill, who are labor economists, of steelworkers.

7   The authors were testing to see whether surveys of people's

8   hours tend to give accurate data concerning the hours they

9   actually worked.

10  **Q.**   What did that study conclude?

11  **A.**   It concluded that they do not, that surveys do not give

12  accurate information; that the surveys will tend to be biased

13  upwards; that workers will tend to report that they worked more

14  hours than they actually did when compared to contemporaneous

15  documents demonstrating actual hours worked.

16          **THE COURT:**  Did you tell that to Big Lots?  I'm just

17  kidding.

18          **MR. TUSA:**  It was a joke, John.

19          **MR. GILLIGAN:**  I am laughing.  This is me laughing.

20  I was looking at my outline.  I'm trying to multitask.  I

21  apologize.

22  **BY MR. GILLIGAN:**

23  **Q.**   The Groves text that you were referring to, that was cited

24  by Dr. Rausser, is *Survey Errors and Survey Costs*; is that

25  right?

1    **A.**    Yes, it is.

2    **Q.**    Is that recognized to be an authoritative treatise?

3    **A.**    It is a very good textbook written by a very knowledgeable

4    author in the field, yes.

5    **Q.**    The description of the study to which you were referring,

6    is it page 428 through 430?  Is that right?

7    **A.**    This appears to be, yes, a reproduction of results from

8    that study.

9    **Q.**    Now, in your discussion about measurement error, you used

10   the term *double-blind* for a survey.  What does that mean?

11   **A.**    *Double-blind* means that the people that are actually

12   involved in the collection of the data, neither of them knows

13   the purpose or sponsor of the work, the ultimate purpose of the

14   work.  So, certainly, the respondent is not supposed to know

15   exactly what is the research issue, exactly, you know, how is

16   it that they can affect the outcome.  The person that's

17   involved in answering questions or administering the exam, they

18   are not supposed to know what the ultimate purpose and sponsor

19   of the research is.

20   **Q.**    What is a blind survey?

21   **A.**    Well, that would be just where the respondent doesn't know

22   but the interviewer does.

23   **Q.**    The survey conducted by OnPoint, was it either a

24   double-blind or a blind survey?

25   **A.**    No, it was not.

1   **Q.**   Did you understand that the participants in the survey
2   were told about the source of this survey?
3   **A.**   Yes.   They were told that it was -- they were told the
4   source; they were told the sponsor; they were told this is very
5   important for their litigation against Big Lots.
6   **Q.**   What concern does that cause?
7   **A.**   Well, it alerts them to how their responses or their
8   decision to respond may affect them personally, and it gives
9   them information about what a good answer is.   Textbooks on
10  certain methodology and articles on certain methodology all
11  highlight that that shouldn't be the case because in study
12  after study there is yea-saying, which is an effort to tell
13  researchers what they want to hear rather than that which is
14  accurate.
15  **Q.**   What can a researcher do to avoid measurement error or
16  limit measurement error?
17  **A.**   Well, that's broader than just the demand effects, but one
18  is to conduct double-blind studies.   Another is to conduct
19  pretesting because another type of measurement error that we
20  talked about is miscommunication, misunderstanding.   Pretesting
21  is --
22          **MR. BOHRER:**   Your Honor, I'm sorry.   I do not believe
23  that Dr. Walker addressed pretesting in his report.
24          **THE COURT:**   Is that in the report?
25          **MR. GILLIGAN:**   I'm not really sure without looking at

 1    it, Your Honor.  I'm sorry.

 2             **MR. BOHRER:**  With all due respect, my recollection is

 3    that it is not.  And, in fact, I think that there's a passage

 4    in Dr. Walker's deposition recognizing that pretesting is

 5    not --

 6             **THE COURT:**  If it's not in the report, move on to

 7    something else.

 8             **MR. BOHRER:**  Of course, I can always stand corrected.

 9             **THE COURT:**  Well, if somebody can show me where it is

10    in the report, I'll be happy to look at it, and nobody has done

11    that so far.  The representation has been that it's not in the

12    report.

13             **MR. GILLIGAN:**  Let me move on, Your Honor, to other

14    topics.  If it's there, we'll come back to it.

15    **BY MR. GILLIGAN:**

16    **Q.**   Leaving aside the pretesting, what other methods can a

17    researcher do to avoid or limit measurement error?

18    **A.**   Measurement error in particular or was this --

19    **Q.**   Measurement error.

20    **A.**   Measurement error.  The main thing, as I said, is to

21    conduct the study in a way that's double-blind, to minimize

22    cues to the participants about what's expected, to minimize

23    cues to the participants about ways in which they may

24    personally be affected by the outcome of the research.

25             A second way is to try to take some sort of effort to

1  ensure that the survey respondent is answering the question
2  that the survey researcher intended, and there are various ways
3  to do that.  Those are the two that come to mind.
4  **Q.**   Dr. Rausser said that you have not proven that there is
5  measurement error in this case.  In the academic literature, is
6  it accepted methodology to assume measurements are accurate
7  until proven otherwise?
8  **A.**   No.
9  **Q.**   Why not?
10  **A.**   It's incumbent upon the researcher, the person putting
11  forward analyses and asserting that valid conclusions can be
12  drawn from it, that the process is a reliable process, and that
13  the inferences are reliable inferences, and that all potential
14  concerns that are reasonable have been taken into account.
15       It's not incumbent upon the reader or a referee for
16  an article to demonstrate that the answer is wrong when the
17  answer comes from an unreliable and invalid method.  That's
18  just not the way it's done.
19  **Q.**   Now, we had talked earlier about demand effects, and you
20  made reference to studies that were cited by Dr. Rausser with
21  respect to demand effects.  Do the studies which he has cited
22  indicate that there are no demand effects present in this
23  survey?
24  **A.**   No, they do not.
25  **Q.**   What are the two studies that he has referenced?

1  A.   Well, he referenced several studies that related to what's
2  called a contingent valuation.
3  Q.   What does that mean, *contingent valuation*?
4  A.   Those are studies that are trying to value things for
5  which there's no market.  So these are studies that are trying
6  to determine what people would pay if they had to pay.  So, for
7  example, what they would be willing to pay if they had to pay,
8  the one example that's, I think, the common one, the one that I
9  think of is:  How much would you be willing to pay to know the
10 Alaskan Wilderness areas are being kept in a pristine fashion?
11          So it's not something you're actually being asked to
12 pay for directly.  One way that people try to estimate that is
13 by surveying people about what it is they would be willing to
14 pay.  These surveys are also used to try to ascertain the value
15 of public activities that may be used for the public good.
16          So what would you be willing to pay to cordon off
17 part of Louisiana for a wildlife refuge, for example, and a
18 contingent valuation study would be a way to value that.  That
19 would be a purpose of a contingent valuation study.
20 Q.   How does a contingent valuation study relate, if at all,
21 to the survey that was conducted here?
22 A.   Well, it's possible that respondents may perceive --
23          **MR. BOHRER:**  Your Honor, if he's going to speculate
24 as to what's possible, I object.
25          **THE COURT:**  Overruled.  You can answer that.

1          **THE WITNESS:**  In the literature, the concern is that

2    respondents may perceive that their survey responses can change

3    public policy so that something that they want happens, so that

4    the local wildlife area that they would like to have occurs;

5    it's brought into being.  They may perceive that they will only

6    have to pay whatever the average tax burden is for that, yet

7    they can overstate their willingness to pay in order to make

8    that happen.  It's my understanding that that is why and how

9    Dr. Rausser was saying that these contingent valuation studies

10   are relevant to this case.

11   **BY MR. GILLIGAN:**

12   **Q.**   Do any of the studies say that you can ignore the

13   potential self-interest bias or the potential that respondents

14   may just try to tell the researcher what they want to hear?

15   **A.**   No, none of them say that.

16   **Q.**   Do any of the studies cited by Dr. Rausser actually test

17   to see whether the contingent valuation studies yielded biased

18   results?

19   **A.**   Yes.  They actually tested to see whether it happened.

20   **Q.**   How did they do that?

21   **A.**   They had data.  This was one study that he submitted

22   concerning curbside recycling that had a contingent valuation

23   estimate of what people would be willing to pay, I mean, what

24   did they tell people, and then there was data on what people

25   actually paid, and then there were several different types of

1   comparisons that the researchers did.  Some were with the same

2   people:  What did they say and then ultimately what did they

3   do?  Then some were comparing to different groups of people.

4   What did people say and what did similarly situated people

5   ultimately do?  The researchers found that the contingent

6   valuation method yielded statistically significantly biased

7   results.

8   Q.   Based on your review of Dr. Rausser's initial report, his

9   addendum report, his *Daubert* declaration, and having attended

10  his deposition, has he done any similar work to determine

11  whether his study yields biased results?

12  A.   No.

13  Q.   Do any of these studies validate or endorse the research

14  protocol that Dr. Rausser has applied in this case?

15  A.   I guess I'd like to change that last answer slightly

16  because you had asked whether he did any study to determine

17  whether or not he had biased results.  I think we're going to

18  get to it later.  He did do a study that was addressed to

19  nonresponse, but he didn't do anything that was addressed to

20  measurement error or demand effects.

21          I'm sorry, I have now forgotten your follow-up

22  question.

23  Q.   Do any of the studies that were cited by Dr. Rausser in

24  his *Daubert* declaration or in his earlier report validate or

25  endorse the research protocol that he applied in this case?

1   **A.**   No, they do not.

2   **Q.**   Are you familiar with the National Oceanographic and

3   Atmospheric Administration report?

4   **A.**   Yes.  There was an NOAA panel report that Dr. Rausser

5   cited in his *Daubert* declaration.

6   **Q.**   Is that recognized as an authoritative report or article?

7   **A.**   Yes, it is.

8   **Q.**   Does the blue-ribbon panel in that report lay out a

9   protocol for conducting surveys?

10   **A.**   Yes.  As you said, it was a blue-ribbon panel headed by

11   two Nobel Prize winning economists, and it laid out a protocol

12   for contingent valuation studies to yield reliable results.

13   The panel was convened for the specific purpose of ascertaining

14   whether these studies could ever yield reliable information for

15   any purpose whatsoever, and they laid out a protocol for

16   studies to follow in order to yield results that could be used

17   in a reliable way for anything at all, for any specific

18   purpose; not for anyone, meaning anything, but at least for the

19   specific purposes that they defined.

20   **Q.**   The survey that was conducted by Dr. Rausser at OnPoint,

21   in what way did it differ from the protocol that was laid out

22   in the blue-ribbon panel report?

23   **A.**   Well, for one thing, the panel said they didn't think that

24   mail surveys could ever yield reliable information.  They said

25   that the ideal mode would be face-to-face interviews and that

1    telephone interviews might be acceptable.  But as I say, the
2    mail surveys, they thought -- they were doubtful that they
3    could ever yield reliable information.
4            The panel also called for pretesting and pilot
5    studies, and that was not done here.  The panel called for
6    *ex post* debriefings to make sure that respondents were actually
7    responding to the questions that were intended by the
8    researchers.  They actually had a specific quote that people
9    will answer questions even though they don't understand what
10   the question really means.  Those are the ones that come to
11   mind that are grossly violated in this case.
12   **Q.**   In Dr. Rausser's declaration, did he also cite to an
13   article by a Professor Haneman?
14   **A.**   Yes.
15   **Q.**   What was that article?
16   **A.**   That article was part of a -- I don't remember the title.
17   It was part of a *Journal of Economics Perspectives* special
18   issue on contingent valuation and whether or not contingent
19   valuation studies could ever yield information that was useful
20   for anything.  Professor Haneman thought that they could yield
21   useful information for some purposes if they were reliably
22   done.
23   **Q.**   Did Professor Haneman indicate a protocol for how a survey
24   of that type could be reliably done?
25   **A.**   Yes, he did.

1  **Q.**   Did the survey conducted by OnPoint in this case comply

2  with the protocol set out in the Haneman article?

3  **A.**   No, it did not.

4  **Q.**   In what ways did the OnPoint survey differ?

5  **A.**   Well, once again, Professor Haneman called for pretesting.

6  He specifically referred to instances where there were bad

7  contingent valuation studies done and that he attributed to the

8  lack of pretesting.  He also endorsed the use of phone surveys

9  and person-to-person surveys and reiterated that mail surveys

10 were unreliable.

11         He also said that it was essential to have

12 debriefings with survey respondents after the fact to ensure

13 that the survey respondents were actually answering the

14 questions and interpreting the questions in the way that the

15 researcher intended.

16 **Q.**   Was any of that done in this particular case?

17 **A.**   No, it was not.

18 **Q.**   Do any of these studies assert that the responses from

19 surveys can be used for precise estimates of willingness to pay

20 or anything else without further analysis and adjustments to

21 detect and adjust for biases?

22 **A.**   No.  In fact, the NOAA study specifically says that the

23 results for the contingent valuation studies should not be used

24 for precise estimates of damages in judicial proceedings.  It

25 says that, at best, they are a starting point for further, more

1  nuanced analysis by trained researchers.

2          **THE COURT:**  When they're talking about damages in

3  that way, are they talking about efforts for people to say how

4  much would it ask a jury "How much would you pay if you lose

5  your arm or lose your child?" that kind of argumentation?  Is

6  that what they're talking about there?

7          **THE WITNESS:**  They were talking about how much to

8  fine Exxon for spilling oil in the Valdez disaster or how much

9  damages should be for some other conduct, but more generally to

10  determine what damages are.  So if precise calculations are

11  necessary in a judicial proceeding, they're saying do not rely

12  upon contingent valuation studies.  Those are examples that

13  come to my mind where it had been proposed for use in other

14  circumstances.

15  **BY MR. GILLIGAN:**

16  **Q.**   When you say "they," you're talking about the blue-ribbon

17  panel?

18  **A.**   Yes.  I'm talking about -- I think it was Ken Arrow and

19  Robert Solow, two Nobel Prize winners, who were the head

20  researchers behind this panel.

21          **MR. GILLIGAN:**  Could we put up the section from the

22  NOAA blue-ribbon study, pages 43 and 44.

23  **BY MR. GILLIGAN:**

24  **Q.**   Again, sir, you have indicated that this is an

25  authoritative treatise or article within this field?

A.    Yes.  Most of the contingent valuation studies that I've seen have made reference to this, those that have occurred after its publication.  Kenneth Arrow and Robert Solow are two of the greatest economists ever.

MR. GILLIGAN:  Your Honor, I would like to read into the record this section:

"Thus the panel concludes that CV studies can produce estimates reliable enough to be the starting point of a judicial process of damage assessment, including loss of passive use values.  To be acceptable for this purpose, such studies should follow the guidelines proscribed in Section IV above.

"The phrase *be the starting point* is meant to emphasize that the panel does not suggest that CV estimates can be taken as automatically defining the range of compensable damages within narrow limits.  Rather, we have in mind the following considerations:  The panel is persuaded that hypothetical markets tend to overstate willingness to pay for private as well as public goods.  The same bias must be expected to occur in CV studies."

MR. BOHRER:  What page?

MR. GILLIGAN:  It's pages 43 and 44.

BY MR. GILLIGAN:

Q.    The guidelines that are referenced in Section IV above, those are the protocols that you've previously described to the

1   Court?

2   **A.**   Yes.  It's no mail surveys, pretesting, debriefing after

3   the fact, and pilot studies, among other things.

4   **Q.**   Dr. Walker, you say that the OnPoint survey violated

5   the -- or didn't follow the methodological guidelines of the

6   blue-ribbon panel set forth for reliable studies to be used in

7   judicial proceedings.  Are there other articles or papers cited

8   either by you or Dr. Rausser, setting forth guidelines for

9   reliable methodology for surveys to be used in judicial

10  proceedings?

11  **A.**   Yes.

12  **Q.**   What are those, sir?

13  **A.**   My reports made reference to the *Reference Manual on*

14  *Scientific Evidence*; and Dr. Rausser's reports made reference

15  to an article by Morgan.  The title escapes me.  It's something

16  like surveys in judicial proceedings, or something like that.

17  I don't recall exactly.

18  **Q.**   Did the OnPoint survey in this case meet the standards and

19  guidelines discussed in either of those articles?

20  **A.**   No, it did not.

21  **Q.**   Can you explain to the Court how the OnPoint survey failed

22  to meet the guidelines in the *Reference Manual on Scientific*

23  *Evidence*?

24  **A.**   Well, for one thing, the *Reference Manual* says

25  specifically that there should be pretesting of the survey

1   instrument with members of the target population, meaning

2   potential respondents, and that didn't occur here.

3           For another, the *Reference Manual* says that the

4   survey should be conducted in a double-blind format, meaning

5   that the respondents certainly do not know the purposes of the

6   survey, and that didn't happen here.  And that attorneys should

7   not be involved in the administration of the survey, yet in

8   this case members of counsel, according to Dr. Rausser's

9   report, were supposed to call and remind people to submit their

10  surveys.  There's some information in some e-mails that it was

11  counsel who were supposed to field questions from respondents

12  about surveys.  Both of those activities are administration of

13  the report, so they could constitute violation of those

14  guidelines.

15  **Q.**   Let's talk for a minute about coverage error.  Is that a

16  matter of concern to you, in this case, about the OnPoint

17  survey?

18  **A.**   Yes.

19  **Q.**   Why is that?

20  **A.**   Because, again, there's this huge financial incentive.  We

21  know from the surveys and from depositions that there is a wide

22  range of experiences by the ASMs, and you would expect there to

23  be a wide range, even if they were subject to the same

24  policies, just because there are lots of other differences

25  about their experiences.

1          You would also expect there to be a wide range of
2     potential answers to a well-done survey because of these
3     differences in how people perceive things happening to them in
4     realtime and also differences in their recall of how their work
5     life went.
6          You have to then juxtapose that with, again, the
7     financial incentive in this case, and that would lead to what
8     economists call selection bias, that there is a large amount of
9     money potentially at stake.  You would expect that the people
10    that expect that they have the highest financial incentive
11    would be the most likely to opt in.  So the people that, for
12    whatever reason, perceive they are on the extreme in terms of
13    overtime or perceive that they're on the low extreme in terms
14    of management would have a stronger incentive to opt into the
15    litigation than the average person.
16         So the expectation would be that the opt-ins would be
17    a nonrepresentative sample of the ASMs on a whole and in a
18    particular direction.  The nonrepresentativeness is a
19    statistical fact that there is a filter and it is opting in and
20    it is not a random filter.  So we know there is coverage error.
21    The financial incentive tells us which direction we can expect
22    the error to be in.
23 Q.   Well, if you assume that the opt-ins and the non-opt-in
24    ASMs in this case were subject to the same corporate policies
25    and procedures and guidelines, would that eliminate or reduce

1   your concern about coverage error in this case?

2   **A.**   No.

3   **Q.**   Why not?

4   **A.**   Because even with the same policies, there's still going

5   to be differences in experiences.  Even if the experiences were

6   the same, there would be differences in the perceptions because

7   all people are different.  Even if the perceptions were the

8   same, there would be differences in recall, again, because

9   people just think differently.

10  **Q.**   Now, can the concern about coverage error diminish merely

11  because there's a larger sample?

12  **A.**   No.

13  **Q.**   Why not?

14  **A.**   Sample size doesn't diminish coverage error.  Coverage

15  error is caused by the fact that you're picking from a group

16  that doesn't represent the entire population.  An example would

17  be if I were to try to estimate the average degree of support

18  among the average person in the United States for the Hornets

19  and I conducted the survey by going outside here in downtown

20  New Orleans and asking people.  I would not eliminate coverage

21  error if I were to get that sample up to 1,000 or 2,000, 3,000,

22  4,000, 5,000 or 6,000 because the problem is that I'm not

23  sampling from the entire population in a random way.

24          So making the sample bigger doesn't fix coverage

25  error.  Coverage error can only be fixed by sampling from the

1   entire population or adjusting the results *ex post* to take
2   account of the problems on the design end.
3   **Q.**   We're going to switch topics a little bit back to the
4   nonresponse bias.  You talked to the Court of your concern in
5   that area.
6           Would all of the opt-ins have to be aware of the
7   incentives, financial issues or financial incentives, for
8   nonresponse bias to be of concern to you?
9           **MR. BOHRER:**  Your Honor, this is just so far afield
10  that I object because I believe that that question crosses the
11  line into some psychological evaluation or determination.
12          **THE COURT:**  Let me look at the question again.
13          I don't understand the question.  I don't
14  understand what it's asking, so I'm not going to understand the
15  answer either.
16          **MR. GILLIGAN:**  Let me move on to a different
17  question, Your Honor.  I apologize.
18  **BY MR. GILLIGAN:**
19  **Q.**   Dr. Rausser argues that certain of the biases that you've
20  discussed can be corrected by making the survey a sworn
21  declaration.  Does that address your concern about these
22  biases?
23  **A.**   No, it does not.
24  **Q.**   Why not?
25  **A.**   All that that could address would be lying, you know,

1    purposeful lying.  I don't know how effective it would be, but

2    that's all that it really would get to.  There are other

3    problems that are not addressed at all by making this a sworn

4    declaration.  One of them would be nonresponse.  The concern

5    there is that there is a financial incentive to just not

6    respond.  If you know that your response diminishes the

7    likelihood of success, you have a financial incentive to not

8    respond.  That's not lying.  It's not violating any sworn

9    statements.  So the fact that it's a sworn statement doesn't

10   alleviate that concern.

11           Another concern, which I'm sure we will get to when

12   we get to the survey, is that there --

13           THE COURT:  Are you saying that if somebody doesn't

14   respond because they think their answers are going to hurt --

15   why wouldn't it work the other way around, where they will

16   respond if they think it will help?

17           THE WITNESS:  I think both factors happen, and both

18   of them are sources of a nonresponse bias.  When there's

19   overrepresentation of one group because they think they have a

20   particularly strong case, that leads to nonresponse bias

21   because the people that responded are not the same as the

22   people that do.  They're not average.  So it works in

23   both directions, I think.

24           But in either case, making it a sworn statement

25   doesn't alleviate the statistical problem, and the problem is

1    that you're not getting a group of people that's representative

2    of the whole; you're getting a group of people that is

3    overstocked with people that perceive they have a lot of

4    overtime or minimal management activity.

5            **THE COURT:**  Okay.

6    **BY MR. GILLIGAN:**

7    **Q.**    Now, is there any way for you or Big Lots to measure the

8    impact of nonresponse bias on the survey data here to actually

9    measure what the nonresponse bias might be?

10   **A.**    Not in a reliable way, no.

11   **Q.**    Why not?

12   **A.**    Because the only reliable way that I know about doing that

13   is to adopt a statistically valid study of the nonrespondents;

14   to go back to the nonrespondents, collect either information

15   from all of them, or a random sample, a representative random

16   sample of those people, and to conduct a more intensive

17   follow-up to get answers to the survey.  You don't have to do

18   it to all of them, but you can do it to a random sample in

19   order to validate that the people that are missing really are

20   similar to the people that you have information for.  So it

21   would involve calling them or going to their doors and knocking

22   on the door, and I'm not allowed to do that.

23   **Q.**    Did Dr. Rausser or anyone from OnPoint do those analyses

24   to determine the impact of nonresponse bias on the survey data?

25   **A.**    They have not reported having done any such, no.

1   **Q.**   How is it that Professor Rausser addressed his concern

2   about nonresponse bias?

3   **A.**   He did his late responder/early responder analysis.

4   **Q.**   Tell the Court what that is.

5   **A.**   If you assume that the people who respond late to the

6   survey -- well, in the literature -- I'm having problems

7   because there's what did Dr. Rausser do and then there's what

8   is this late responder/early responder generally.

9   **Q.**   Let me ask, first of all:  What is the theory that

10   underlies this notion of late responders, nonresponders?

11   **A.**   That in certain circumstances it may be the case that

12   people that only respond after continual prodding are more

13   representative of the nonrespondents than the average

14   respondent is representative of the nonrespondents.  So the

15   theory is that in certain circumstances you can look to the

16   group that only responded after getting three letters, or that

17   only responded after getting three letters and a phone call,

18   and you can use them as a proxy for the people that didn't ever

19   respond at all.

20   **Q.**   Is that a generally accepted theory within the survey or

21   statistical community?

22   **A.**   In the sense that it occasionally is true, yes; in the

23   sense that it's always the case, no.  There's generally no

24   evidence that the people who are late responders are

25   necessarily anything like the people that are nonresponders.

1    There may be hardcore nonrespondents who are just different.

2    **Q.**    Now, Dr. Rausser cited to some literature articles to

3    support this early/late responder analysis.  Have you reviewed

4    those articles, sir?

5    **A.**    Yes, I have.

6    **Q.**    Do they support his early/late responder analysis?

7    **A.**    That it's a valid way to determine there's a nonresponse

8    bias, no.

9    **Q.**    Why not?

10   **A.**    Because they make the exact point that I did; that all

11   you're doing is assuming that the late respondents and the

12   nonrespondents are the same.  In this case my concern is that

13   the nonrespondents are not responding, not that they're taking

14   a long time to do it, and that they are purposefully not

15   responding.

16          In the literature we see studies that have shown that

17   it's not always the case that late responders and nonresponders

18   are the same.  In fact, the cases that talk about late

19   responders and nonresponders being the same, that I know about,

20   are talking about cases where there's a very homogeneous

21   population of responders, of people being surveyed, and there's

22   generally no nonresponse bias for them at all.  Specifically,

23   there was a study of physicians, where the surveyors found that

24   late responders and nonresponders were similar to responders.

25          **MR. BOHRER:**  Your Honor, this is a study that's not

1    cited in any report.  I would object to any reference to it.

2              THE COURT:  If it is --

3              MR. BOHRER:  I don't know what it is because it's

4    vaguely referenced, but I don't believe that that is a study

5    cited either by Dr. Rausser in his declaration or by --

6              THE COURT:  Is it cited in any of the permissible

7    citeable materials?

8              THE WITNESS:  Yes.

9    BY MR. GILLIGAN:

10   Q.   The study that you just referenced, what is the name of

11   the study?

12   A.   I don't remember the name -- you should have it -- but it

13   was one of the studies in Dr. Rausser's *Daubert* declaration.

14   It was a study of physicians.

15   Q.   Is that the study covered in the article by -- I'm not

16   sure I'm pronouncing this right -- Lahaut?

17   A.   I don't remember whether Lahaut covers that study or not,

18   but it was identified specifically in Dr. Rausser's

19   declaration.  It was included in the materials that Dr. Rausser

20   sent us.

21             THE COURT:  The study or the reference?

22             THE WITNESS:  The study itself was cited in

23   Dr. Rausser's declaration.

24             MR. BOHRER:  What's the name of it?

25             THE WITNESS:  If you give me his report, I could

1    identify it.  I think it was Kellerman, but I don't know for

2    sure.

3              **THE COURT:**  That's good enough.

4    **BY MR. GILLIGAN:**

5    **Q.**   Did you review the article that Dr. Rausser cited that was

6    written by Lahaut?

7    **A.**   Yes, I did.

8    **Q.**   Does that article support his early/late responder

9    analysis, in your opinion?

10   **A.**   No, it does not.

11   **Q.**   In the Lahaut article, is there an abstract of various

12   articles or studies that have been done on the early/late

13   responder hypothesis?

14   **A.**   Yes.  There was a summary of various studies that other

15   people had done on that hypothesis.

16             **MR. GILLIGAN:**  Could we put on the screen the Lahaut

17   article.  I think it's "Estimating Nonresponse Bias in a Sample

18   Survey on Alcohol Consumption: Comparison of Response Waves."

19   **BY MR. GILLIGAN:**

20   **Q.**   This was an article that was cited by Professor Rausser in

21   support of his early/late responder analysis; is that right?

22   **A.**   Yes.

23   **Q.**   In the abstract, the article says, "The hypothesis that

24   late respondents are more similar to nonrespondents than early

25   respondents could not be confirmed or rejected."  Is that

1  right?

2  **A.**   Yes, that's right.

3  **Q.**   If we go to page 128, I believe, of the -- excuse me.  I'm

4  looking for the page with the -- the survey of the articles is

5  on page 129.

6          In the article, is there a table of literature

7  reviewed?

8  **A.**   Yes, there is.

9  **Q.**   What is being reviewed in the article?

10 **A.**   These are various studies that have actually tested to see

11 whether the late/early hypothesis is valid.

12 **Q.**   Some of the articles have been highlighted.  Who

13 highlighted those?

14 **A.**   I did.

15 **Q.**   Why?  For what purpose did you highlight them?

16 **A.**   These are, of those various articles, articles that don't

17 support the theory.  These are articles in which late

18 responders were not found to be suitable proxies or equivalent

19 to nonresponders.

20         **MR. GILLIGAN:**  If we could go to the last page of the

21 article.

22 **BY MR. GILLIGAN:**

23 **Q.**   Does the article indicate, in the final paragraph, a

24 suggestion about how to estimate nonresponse bias?

25 **A.**   Yes.

1    **Q.**    Are you able to read that into the record, sir?

2    **A.**    Yes.

3                "To estimate nonresponse bias, it is advisable to do

4    an intensive nonresponse follow-up on a small representative

5    sample of nonrespondents to allow more time for each individual

6    subject rather than an extensive follow-up on a large sample of

7    nonrespondents."

8    **Q.**    Was that done in this case, sir?

9    **A.**    No, it was not.

10   **Q.**    Now, did you review the material from Dr. Rausser's

11   report, the attachments to his report, regarding the data on

12   early and late respondents?

13   **A.**    Well, we had received a logbook.  I don't know that it was

14   attached to his report, but we received a file before his first

15   deposition that -- or his deposition -- that was titled Survey

16   Logbook.

17   **Q.**    What did you understand the Survey Logbook to include?

18   **A.**    I understood that it was a listing of the respondents and

19   the date, according to OnPoint, when they received responses

20   from the respondents.

21   **Q.**    When did you understand that the survey in this case was

22   mailed out?

23   **A.**    November 30, 2007.

24                **THE COURT:**  We're going to stop here for lunch.  We

25   will come back at 1:30.

1          THE DEPUTY CLERK:  All rise, please.

2                    (LUNCHEON RECESS)

1    **AFTERNOON SESSION**

2    **(May 12, 2008)**

3         **THE DEPUTY CLERK:**  All rise, please.

4              Court is in session.  Please be seated.

5              (WHEREUPON **Jonathan Walker**, having been duly sworn,

6    testified as follows.)

7    **DIRECT EXAMINATION**

8    BY MR. GILLIGAN:

9    **Q.**   Dr. Walker, before the lunch break, you were going through

10   the analysis of the actual application of the late responder

11   analysis to the facts in this case.  When did you understand

12   that the survey was sent out?

13   **A.**   November 30, 2007.

14   **Q.**   When was the survey to be returned?

15   **A.**   December 7, I think, of 2007.

16   **Q.**   So approximately one week later?

17   **A.**   Yes.

18   **Q.**   You had indicated that you had reviewed a log that was

19   compiled by OnPoint of when they received the responses; is

20   that right?

21   **A.**   Yes.  An Excel file titled Survey Logbook.

22   **Q.**   Did you look at the surveys that were actually counted as

23   late responders on the Survey Logbook?

24   **A.**   I did look at surveys that would be late based on the

25   information in the Survey Logbook.

1   **Q.**   Can you tell the Court whether or not there were surveys

2   that were counted by Dr. Rausser as late surveys that had

3   actually been signed by the respondent earlier than December 7?

4   **A.**   Yes, there were.

5   **Q.**   Were there surveys that were counted as early surveys that

6   had actually been signed by the respondent later than

7   December 7?

8   **A.**   Yes, there were.

9   **Q.**   Based on when the surveys at least indicated they were

10   signed, do you have an opinion as to whether the facts in this

11   case are consistent with the late/early responder hypothesis

12   that has been applied by Dr. Rausser?

13   **A.**   Well, I have an opinion that's unrelated to those dates.

14   **Q.**   Okay.

15           **THE COURT:**  Well, your answer has to relate to his

16   question, sir.

17           **MR. GILLIGAN:**  Let me see if I can do it a little

18   better, Your Honor.

19   **BY MR. GILLIGAN:**

20   **Q.**   Given the facts that you learned from the log of when the

21   responses were received by OnPoint, do you think those facts

22   support the application by Dr. Rausser of the late/early

23   responder dichotomy?

24   **A.**   No.

25   **Q.**   Why not?

A.    He just didn't have the data to test the late/early
responder theory here.  So even if it were the case and you
knew beforehand that this continuum of response theory were
applicable in this case -- and there's no way to test that,
that I know of, other than look and see, you know, what happens
to the nonresponders.

          But even if he knew somehow that was the case, he
just doesn't have the data because the theory requires
comparison of people who got more prompting, required more
attention in order to get them to respond.  Those are the late
responders, not people who just happened to respond 11 days
after Dr. Rausser mailed versus 10.

          So the data just aren't there to actually implement
this early/late responder model in a valid way because his late
responders, one, they didn't get incremental prodding.  They
got one letter just like everybody else.  And, two, the window
was so narrow, the time, between when Dr. Rausser mailed the
surveys in the first place and when someone became a late
responder.  The window was so narrow that it isn't measuring
people's responses so much as it's measuring postal delays.

          November 30 is the holiday season, and people may not
have gotten their surveys in the mail in time to respond or get
them back to Dr. Rausser by December 10 or even December 7, the
date that he asked for them.  Even if they did get them from
Dr. Rausser and put them in the mail, the mail delays could

1    cause them to reach Dr. Rausser after December 10.

2              One of the reasons that mail surveys are often

3    disfavored is because there's an expectation that you will need

4    a long time to get a reasonable response rate, partially due to

5    the postal delays.

6    **Q.**   You had mentioned, earlier in your testimony, the

7    *Reference Manual on Scientific Evidence*.  Does the *Reference*

8    *Manual* indicate the kind of response rates that a surveyor

9    should obtain?

10             **MR. BOHRER:**  Your Honor, I object.  I believe that's

11   a legal issue for Your Honor to rule on.  I don't think that

12   it's within the province of an expert in the field of labor

13   economics to render an advisory legal opinion with respect to

14   what the *Reference Manual on Scientific Evidence* provides for

15   admissibility of surveys.

16             **THE COURT:**  I don't think it's being offered to tell

17   me whether it's admissible.  It's just offered as what they say

18   you should look for in evaluating surveys, so I'm going to

19   admit the question and overrule the objection.

20   **BY MR. GILLIGAN:**

21   **Q.**   Do you need the question back or --

22   **A.**   Yes, please.

23   **Q.**   Did the *Reference Manual on Scientific Evidence* address

24   the response rates that should be obtained in the survey?

25   **A.**   Yes.

1    **Q.**    What did it say with respect to survey responses?

2    **A.**    Well, it said that there should be increasing degrees of

3    certainty -- I'm sorry, scrutiny applied to surveys as the

4    response rate fell below certain thresholds.  So it's not that

5    it's just necessarily useless if it's below a threshold, but

6    rather these thresholds raise the probability of significant

7    nonresponse bias, so there should be enhanced efforts to

8    investigate that possibility as the nonresponse rate falls

9    below 75 percent for a heightened level -- and I don't recall

10   their exact adjectives.  And then when it falls below 50,

11   there's even more.  There might have been some reference to

12   some number even below that.  I don't recall.

13           **THE COURT:**  As the nonresponse rate or the response

14   rate?

15           **THE WITNESS:**  I'm sorry.  You're absolutely right,

16   Your Honor.  It's the response rate.

17           **MR. GILLIGAN:**  Could I ask you to put the

18   *Reference Manual*, page 245 on the screen, please.

19   **BY MR. GILLIGAN:**

20   **Q.**    First of all, Doctor, you've already, I believe, testified

21   that this is an authoritative treatise in the field of surveys.

22   **A.**    Yes, it is.

23   **Q.**    The *Reference Manual* states:

24           "One suggested formula for quantifying a tolerable

25   level of nonresponse in a probability sample is based on the

1   guidelines for statistical surveys issued by the former

2   U.S. Office of Statistical Standards.

3               "According to these guidelines, response rates of

4   90 percent or more are reliable and generally can be treated as

5   random samples of the overall population.  Response rates

6   between 75 percent and 90 percent usually yield reliable

7   results, but the researcher should conduct some check on the

8   representativeness of the sample.

9               "Potential bias should receive greater scrutiny when

10  the response rate drops below 75 percent.  If the response rate

11  drops below 50 percent, the survey should be regarded with

12  significant caution as a basis for precise quantitative

13  statements about the population from which the sample was

14  drawn."

15              Doctor, do you understand that the manual is talking

16  about the overall response rate for the survey?

17  **A.**   When I read "response rates," ultimately, I think that the

18  issue is the response rate relative to a question that's being

19  asked.  So it would refer not just to unit nonresponse, which

20  is not returning a survey at all; we would also refer to item

21  nonresponse.

22              So a survey could have everybody return the survey,

23  get 100 percent unit response, but only half of them answer a

24  specific question, so any analysis based on that question would

25  have a 50 percent response rate.

1  **Q.**    So in order to apply the standards set out in the

2  *Reference Manual*, you'd have to look at the response rate for

3  each individual question?

4  **A.**    From which you're trying to draw inferences, yes.

5  **Q.**    The first sentence in the manual in this quoted paragraph

6  talks about a probability sample.

7  **A.**    Yes.

8  **Q.**    You understand that Dr. Rausser has taken the position

9  that that doesn't apply to this particular survey because this

10 is a type of census survey that has been sent to the entire

11 population?

12 **A.**    Yes.

13 **Q.**    Do you agree with Dr. Rausser or not?

14 **A.**    No.

15 **Q.**    Why not?

16 **A.**    Well, two things.  One, first and foremost, we're

17 ultimately interested in the ASMs as a group, and the opt-ins

18 are not 100 percent of the ASMs.  They are a sample of the

19 ASMs.  They are, in fact, a nonrandom sample of the ASMs.

20         Second, the statistical issues at play have nothing

21 to do with whether you call your sample frame, which is the

22 people that you send these surveys to -- whether you call your

23 sample population on an entire population or you think of them

24 as some subset of a smaller population.

25         Think of the U.S. Census.  Clearly, nonresponse bias

1   is an issue.  It's a census, but you have the same problems if
2   95 percent of the people respond, and you're ultimately going
3   to draw inferences about the whole world in terms of
4   nonresponse bias as if 95 percent of the people respond and
5   you're going to draw inferences about the United States.
6           There are other problems that have to do with
7   coverage error if you're dealing with a probability sample
8   versus a census, but nonresponse is -- it doesn't matter.  The
9   problem is that you're trying to draw inferences based on the
10  respondents and extend them to the nonrespondents.  It doesn't
11  matter whether the nonrespondents plus the respondents can be
12  called all of something.  It's an entirely incorrect and
13  invalid statement.
14  **Q.**    Now, did Dr. Rausser's or OnPoint's response rate fall
15  below the level for greater scrutiny that is specified in the
16  *Reference Manual*?
17  **A.**    Yes.
18  **Q.**    Did Dr. Rausser or OnPoint conduct any analysis to
19  understand the causes for nonresponse biases directed by the
20  *Reference Manual*?
21  **A.**    No, they did not.
22  **Q.**    Were there specific problems in this survey with item
23  nonresponse, for example, with Question III(3)?
24  **A.**    Yes, there were.
25  **Q.**    What were those problems?

1    **A.**   Approximately 100, a little over 100 of the respondents

2    failed to follow Dr. Rausser's direction that they allocate

3    their time among the tasks so that the total equaled

4    100 percent.

5            **MR. GILLIGAN:**  Could you put up Demonstrative 5-A.

6    **BY MR. GILLIGAN:**

7    **Q.**   Have you shown, in this demonstrative, the item

8    nonresponse for a particular question in roman numeral III of

9    the OnPoint survey?

10   **A.**   Yes.  This shows that there were 431 usable responses to

11   the question concerning what percentage of time ASMs spent on

12   different tasks.  And from those 431, Dr. Rausser would like to

13   extrapolate to the group of 936 opt-in plaintiffs to whom he

14   sent surveys.  431 divided by 936 is a 46 percent response rate

15   to that question.

16           **THE COURT:**  Let me ask you something about that.

17   These are people who didn't answer the question or it didn't

18   total up to 100 and he threw out some of the answers?  What are

19   we talking about?

20           **THE WITNESS:**  This is the net after the throwing out

21   of the answers.

22           **THE COURT:**  After the throwing out.  So are you

23   saying that you measure nonresponse bias after you -- for want

24   of another word -- adjust for answers that obviously misread

25   the question or that for some reason something is wrong with

1  them?

2         **THE WITNESS:**  Right.  There's item nonresponse.  So

3  they didn't respond to that question, so there's a specific

4  response rate applicable to that question, and that would be

5  you throw out people who didn't return their surveys at all.

6  But you also don't have any information from these people that

7  either didn't answer or they didn't add up to 100 in his case.

8  It will vary by question what causes the item nonresponse, but

9  it's a nonusable response.

10         **THE COURT:**  Is that something different from the unit

11  response rate?

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  The unit response rate is just did you

14  answer or didn't you; right?

15         **THE WITNESS:**  Did you send in your survey.  If you

16  sent in a blank survey, I think you would call it nonresponse

17  too.

18         **THE COURT:**  Okay.

19  **BY MR. GILLIGAN:**

20  **Q.**   Was there a problem with item nonresponse for Question 5

21  in the OnPoint survey?

22  **A.**   Yes, there was.

23  **Q.**   What was that?

24  **A.**   There are a large number of respondents that didn't answer

25  the second part of 5(a) and 5(b).  5(a) was how many full-time

1  people do you supervise, one, two three, four, or more.  The

2  second part of 5(a) said something like did anyone else

3  supervise those people during your shift.  Then the options

4  were "yes" and "no."  A large number of respondents just didn't

5  answer "yes" or "no," or some of them wrote "yes" and "no," and

6  some of them wrote in by hand "sometimes."  So all of those are

7  item nonresponse.

8  **Q.**   What does the *Reference Manual* suggest as a means of

9  addressing item nonresponse?

10 **A.**   You call them up and you ask them what they meant, or you

11 try to estimate what the response would have been based on the

12 respondent's answers to other questions.

13 **Q.**   How would you do that?

14 **A.**   How would one do that in this case?

15 **Q.**   Yes.  Obviously, we know how you would call them up, but

16 how would you go about trying to estimate what their responses

17 would be to a question on which they have not responded based

18 upon their answers to other questions?

19 **A.**   Well, Question III, you have information that tells you

20 what an answer could be for -- based on 5(a) and 5(c), but that

21 method, I think, is generally inapplicable in this case because

22 there are other types of surveys where there's information on

23 the survey, depending on what the questions are, such that you

24 can interpolate.  You know the person said they got -- I'm

25 trying to come up with an example, but I can't.

1          There are instances where you ask questions such that
2     you know from Question 1 and 2 what the answer to Question 3
3     has to be, and that's what the manual is talking about.  I
4     don't see that that's possible in this case.
5     **Q.**   Did Dr. Rausser do either of the two things that were
6     suggested by the *Reference Manual*?
7     **A.**   No.
8     **Q.**   Did the *Reference Manual* suggest other research protocols
9     that Dr. Rausser did not apply in this particular survey?
10    **A.**   Yes.
11    **Q.**   Can you tell the Court what those are.
12    **A.**   I don't mean to be redundant.  I'm not sure whether we've
13    covered them all, but they talk about pretesting of the survey
14    of the target population, members of the target population.  It
15    talks about double-blind protocol.  It talks about ordering,
16    changing the order of the questions, because there are order
17    effects in surveys.  The thing at the top of the list gets the
18    most answers, so one way to deal with that is to distribute
19    different versions of the survey with the questions ordered
20    differently.  All of Dr. Rausser's had, like, manually
21    retrieving carts as the number one choice.
22          I don't know whether I covered them all, but I'm
23    still doing this from memory.
24    **Q.**   One of the publications that Dr. Rausser cited in his
25    declaration was an article by Fred Morgan, "Judicial Standards

1   for Survey Research."  Have you read that, sir?

2   **A.**    Yes, I have.

3   **Q.**    Was Dr. Rausser's methodology consistent with the

4   methodology prescribed in Mr. Morgan's publication?

5   **A.**    No, it was not.

6   **Q.**    In what way?

7   **A.**    For one, the publication directs the researcher to

8   specifically and explicitly instruct respondents not to guess,

9   and suggests that surveys that don't do that oughtn't be relied

10  upon.  It also talks about pretesting and suggests that that is

11  mandatory.  It also suggests that attorneys should not be

12  involved at all, or it should be kept to a minimum in the

13  design of the survey.

14  **Q.**    Were those methodologies followed by OnPoint here?

15  **A.**    No, they were not.

16  **Q.**    Dr. Walker, what is the net result of your concerns about

17  coverage error, nonresponse error, and measurement error as it

18  applies to this case?

19  **A.**    The net result is that I would expect there to be

20  significant biases, particularly in light of this huge

21  financial incentive.  You know that these biases will exist in

22  a statistical manner, at least to some degree.  And then when

23  you throw in this huge financial incentive, tens of thousands

24  of dollars, you would expect that it would go in a particular

25  direction, namely, that management activities would be

1    minimized and overtime would be maximized.  That's the
2    direction of the bias.
3    **Q.**    Dr. Rausser says that the specific cases of bias that we
4    might see in deposition testimony or in responses to individual
5    surveys are nonsystematic or random.  Do you agree with that?
6    **A.**    No.
7    **Q.**    Why not?
8    **A.**    Well, there are examples we can come up with.  And it's
9    difficult without getting in somebody's mind to ascertain
10   exactly what causes it, but the things that we're looking for
11   are not random at all.  There is no offsetting sort of
12   anti-management -- I'm sorry, pro-management, anti-overtime
13   force at work here.  There's a force going in one direction.
14   When we see --
15           **THE COURT:**  What about fear of losing your job or
16   fear of perjury, would those be counter incentives?
17           **THE WITNESS:**  The fear of losing your job -- if it's
18   the case that somebody responded to Dr. Rausser's survey, that
19   would be a counter incentive.  The perjury is just -- to the
20   extent it has an effect, it should have an effect of forcing
21   the respondent or having the respondent answer truthfully,
22   which it's not a counter incentive.  It's something that, if
23   it's effective, will make it more accurate.  There's no reason
24   to expect that it would make someone understate their overtime.
25   It would have the same effect of preventing that as it would of

1    preventing them from --

2            **THE COURT:**  I see what you are saying.

3    **BY MR. GILLIGAN:**

4    **Q.**   By the time the survey was distributed at the end of

5    November 2007, do you know what percentage of the opt-ins were

6    still employed by Big Lots?

7    **A.**   It was some small minority of the opt-ins.  I don't

8    remember the exact number.  I think that Dr. Rausser, in his

9    analysis, asserted that 11 percent of the opt-ins were still

10   employed by Big Lots.  The other 89 percent would have no

11   concerns about losing their jobs with Big Lots because they're

12   not working there.

13   **Q.**   Well, Dr. Walker, if there's no statistical basis to

14   measure the size of the biases that you believe are present in

15   this survey, is it mere speculation to discuss these biases and

16   methodological problems in this case?

17   **A.**   No.

18   **Q.**   Why not?

19   **A.**   Because the way that science works is that you consider

20   what these forces are and you consider that information

21   sceptically.  To accept Dr. Rausser's conclusions is actually

22   to assume affirmatively that there is no impact of the various

23   biases that we've talked about; it's to assume that, without

24   any basis whatsoever, that people's recollections tend to be

25   accurate on average about what their hours used to be and what

1   their management responsibilities were.  That's directly

2   contrary to that one piece of information in the survey, which

3   showed -- in the article from Groves, which showed that workers

4   tended to overstate their hours by 100 hours per year.

5          It would be to assume that people remember, that the

6   recollection bias which tends to have the effect in other

7   studies of reducing people's stated list of things that happen

8   versus what actually happened -- it would be to assume that it

9   doesn't happen here.

10          It would be to assume that there is no effect of the

11  financial incentive on people's tendencies to respond, although

12  the articles that Dr. Rausser attached to his *Daubert*

13  declaration showed that financial incentives of $25 can triple

14  response rates.  Yet in this case we have financial incentives

15  of tens of thousands of dollars, and to accept his analyses

16  would be to assume that the tens of thousands have no effect,

17  notwithstanding the economic research indicating that as little

18  as $25 or a dollar can have a significant effect.

19          So to accept Dr. Rausser's results as valid, you have

20  to assume that all of these things are not there.  That, to me,

21  is speculative.  What seems to me to be nonspeculative is to

22  try to ascertain at least what direction these sorts of forces

23  would have and to keep that in mind as you interpret these

24  results.

25          The results are what they are, and we have reason to

1  believe that the results will tend to be biased against

2  management activities and in favor of overtime.  All that you

3  can do, that I think you can do within the realm of science, is

4  recognize that that's there and recognize that you can't say

5  exactly how powerful an effect those forces would have without

6  further analysis that's been done here.

7  **Q.**   What further analysis would need to be done?

8  **A.**   Well, in the case of nonresponse bias, contact the

9  respondents -- the nonrespondents, I'm sorry, or a random

10  sample of them, and conduct a statistically valid analysis of

11  their responses upon further intensive review.

12       In some cases, I don't think that there's anything

13  you can do, because one of the basic tenets of survey

14  methodology is that results can be inaccurate without the

15  researcher knowing.  So the major focus of a lot of survey

16  methodological research is on creating a valid protocol, a

17  valid design.  Once it's done, it's in the can, and you just

18  can't do anything because the data may incorporate inaccuracies

19  and demand effects and faulty recall, and you can't tell by

20  looking at the data that it's there.

21       So what you need to do beforehand is you need to:

22  Make it double-blind so that you have as little demand effect

23  as you can; conduct the pretests so that you know beforehand do

24  people seem to understand what you're asking; do the *ex post*

25  interviews so that you can be sure the people are answering the

1    questions and interpreting them the way that you plan to

2    interpret it; and just follow these various protocols that are

3    laid forth in these various articles.

4             Your only certainty in the output is the process;

5    because even with a good process, at the end of the day, there

6    could be inaccuracies you don't know about.  So you really need

7    to rely on the process.

8    **Q.**   Let's turn our attention to the survey instrument itself.

9    In your review of the survey instrument and the responses

10   received by OnPoint, did you reach any opinion about the

11   clarity of the design of the survey?

12   **A.**   Yes.

13   **Q.**   What is your opinion, sir?

14   **A.**   That it was vague and ambiguous in many different ways.

15   **Q.**   In order to assist you and the Court in understanding --

16   your being able to explain what your views are on the survey

17   instrument, what I'd like to do is to walk through a survey

18   response of Annette Hovenic.  This is one of the survey

19   instruments that has been offered.

20             **THE COURT:**  My question is:  Do you know what exhibit

21   it is?

22             **MR. GILLIGAN:**  1300.

23             **THE COURT:**  What's the Bates number?

24             **MR. GILLIGAN:**  The Bates number on this particular

25   one, Your Honor, is Rausser 145.

1   BY MR. GILLIGAN:

2   Q.   So let me ask you, Dr. Walker -- we're going to go through

3   section by section of the survey instrument -- for you to tell

4   the Court what are the concerns you have about the design of

5   the survey instrument.  The first roman numeral section is

6   basic information.  Any there concerns about that?

7   A.   No.

8   Q.   The survey does call for a telephone number and e-mail so

9   that there could be follow-up by the surveyor; is that right?

10  A.   Yes.

11  Q.   Let's look at employment history.  What, if any, concerns

12  do you have about the design of the survey instrument in roman

13  numeral II?

14  A.   This, it actually works in conjunction with the rest of

15  the survey.  You see for Ms. Hovenic and you see for a large

16  number of other respondents that they worked at multiple

17  stores.  You see they worked at multiple stores, and you see

18  that their work span predates the liability period.

19          There are no instructions in the survey anywhere

20  about what store you're supposed to refer to when you're

21  filling out the survey, and there's no instruction that you're

22  supposed to base your survey responses on conduct and activity

23  that occurred within the liability period.

24          So in Ms. Hovenic's case, she began work at Big Lots

25  in September of 1993, so there's, you know, ten years or so of

1   time prior to the liability period in this case where she was

2   accruing ASM experience.  There's no way to tell from her

3   survey response exactly how much weight the experiences that

4   predate the liability period had on her responses.

5           More generally, there's this ambiguity, which, again,

6   works in conjunction with the financial incentive that the

7   respondent can choose.  There's no direction, so it's not

8   perjury.  They can choose which store or which store manager,

9   what period of time to think about, when they're filling out

10  their survey response.

11  **Q.**   Let's go to roman numeral III.  There are a series of

12  subquestions under roman numeral III, "Duties and Activities -

13  Assistant Store Manager."  Let's focus on subquestion 1.  Do

14  you have any concerns or problems with the design of this

15  question?

16  **A.**   Yes.  Starting with the question itself:  "Please indicate

17  which job duties you regularly performed as an assistant store

18  manager," there's no definition of *regularly*.  So some people

19  may think *regularly* means every day.  Some people may think

20  *regularly* means every week.  Some people may think *regularly*

21  means when it happens.  But there's no definition of *regularly*,

22  so you don't know what the respondents are thinking when

23  they're answering this question.

24          Then you can see in Ms. Hovenic's case, apparently,

25  and based on these margin notes that she has given, she wasn't

1   sure how to answer the question given that her experiences
2   varied certainly by store.  You see there for the first line,
3   "hire employees," there's an open paren -- first of all, she
4   says "yes" and "no" to this question and to a couple others,
5   and then she has a parenthetical where she tries to explain.
6          If you have to explain, then you can't answer the
7   question "yes" or "no."  There's some uncertainty about what
8   you're supposed to say, and this was Ms. Hovenic's effort to
9   resolve the uncertainty.  What this should do to the researcher
10  is alert him to the potential for other people to have similar
11  problems and then just try to resolve them themselves in some
12  unspecified way.
13         Another concern about this question is the third
14  column of the table:  "For duties you regularly performed, did
15  you perform without receiving direction, instruction, or
16  guidance?"
17         My personal interpretation of that would have me
18  saying "no" for everything, notwithstanding that I'm an
19  executive at a business, because I don't do things without
20  trying to get some guidance.  As a general rule, I try to
21  confer with other people.  This doesn't say, "Did you perform
22  without receiving direction, instruction, guidance ever?" or
23  "Did you perform these when you regularly performed these
24  duties?"  "Did you always have to receive direction,
25  instruction, or guidance?"

1        It's just unclear what's meant by the question.  So
2    the uncertainty, once again -- first of all, it makes it
3    difficult to interpret what people mean when they answer that
4    particular question.  Secondly, it gives respondents an
5    opportunity to decide how they want their survey to end up.  Do
6    they want a survey that reflects a lack of management activity?
7    Well, if so, there you can interpret the question in a way that
8    that happens.
9    Q.   What does the "yes" mean in the third column?  Does "yes"
10    mean that you did it without receiving direction or that you
11    did it with direction, guidance, and instruction?
12    A.   "Yes" means "no."  So "yes" means without, which is
13    something that articles about survey methodology instruct you
14    not do because it leads to confusion.  So to ask, "Did you
15    perform without receiving direction, instruction, or guidance?"
16    and then ask for "yes" or "no," there's potential for confusion
17    by the respondents.  It just increases the confusion of the
18    question.  That works in conjunction, as I said, with the
19    financial incentive, in that the people that have the greater
20    financial incentive could be expected to take the time to work
21    through confusing questions.
22        Confusion leads to item nonresponse.  You would
23    expect the people that are most motivated to spend the time and
24    the mental effort to resolve the confusion.  That is what the
25    textbooks tell us to expect.

1    **Q.**   There is no definition or instruction with respect to the

2    meaning of *direction, instruction, or guidance*.  Does that

3    cause you any concern or problem?

4    **A.**   Yes.  That's what I was trying to say before.  What does

5    this mean?  Now, what does it mean to get direction or

6    instruction or guidance?  What does it mean, and how frequently

7    do you mean do I get instruction, direction, or guidance?

8    **Q.**   So if we look at the line on discipline employees and we

9    see a series of answers, "no/yes/four times a week," then in

10   the third column "no/yes" -- it looks like maybe a paren when

11   no manager was there -- can you tell me whether or not that

12   indicates any confusion to you or not?

13   **A.**   Yeah.  I mean, as someone who's trying to even interpret

14   the answers, I don't know what that means.  It suggests to me

15   that the respondent was unable to say a simple "yes" or a "no,"

16   that this respondent was trying to answer -- it appears she was

17   trying to answer truthfully, but there's some uncertainty and

18   confusion because her circumstances were different at different

19   times.  So they varied from store to store, they varied from

20   manager to manager, and they varied even within a store with a

21   manager over time depending upon what was happening.

22          So there's no simple "yes" or "no" for her to

23   respond.  This is the sort of thing that's uncovered by

24   pretesting actual members of the population because they would

25   experience that sort of thing, and they could alert the

1    researcher to these sorts of problems.

2    **Q.**   Question 1, I believe there are ten different activities

3    that are listed there, or job duties.  Would it matter in the

4    design of the survey instrument that not all of the job duties

5    that are considered to be management activities are listed?

6    Would that have any impact?

7    **A.**   Yes.  Yes.

8    **Q.**   What is your opinion as to what the impact would be of not

9    listing all of them?

10   **A.**   If you're going to use your response to this question as a

11   measure of the management activities by ASMs, you'd have to

12   include all the management activities that they may be

13   participating in.  You specifically have to include the

14   management activities, in a litigation case such as this, that

15   the defendant says they're hired for.

16             You don't see "supervise employees" at all.  You

17   don't see "be responsible for the safety of the physical plant

18   and employees" at all.  So the specific supervisory activities

19   that the defendant points to aren't listed.  If you're going to

20   measure management activities based on the number of yeses from

21   this question, then you need to include all of the management

22   activities in order to get a more accurate count.

23   **Q.**   Did you actually make a list of management activities that

24   are excluded from the Question 1?

25   **A.**   I made a list of the management activities that are

1   identified in regs that are not on the list, yes.

2            **THE COURT:**  That are identified where?

3            **THE WITNESS:**  That are identified specifically in the

4   regulation.

5   **BY MR. GILLIGAN:**

6   **Q.**   The regulations from the Department of Labor?

7   **A.**   Yes.

8            **MR. GILLIGAN:**  Could I ask that we switch gears here

9   for a second and put up Demonstrative 7, followed by 8.

10  **BY MR. GILLIGAN:**

11  **Q.**   Dr. Walker, is this a portion of the list of management

12  activities that were omitted from Question III(1) of the

13  OnPoint survey?

14  **A.**   Yes.  These are specific management activities that are

15  discussed in the regulations that were not on the list.

16           **MR. GILLIGAN:**  If you could, put up the next

17  demonstrative, part 2 of 2.

18  **BY MR. GILLIGAN:**

19  **Q.**   Again, Dr. Walker, did you prepare this list?

20  **A.**   Yes, I did.

21  **Q.**   These are additional management activities not listed on

22  the survey?

23  **A.**   Yes, they are.

24  **Q.**   Dr. Rausser would, no doubt, say, "Well, we can't have a

25  15-page survey."

1              **MR. BOHRER:**  (STANDING)

2              **THE COURT:**  Sustained.

3              **MR. GILLIGAN:**  We'll hear from Dr. Rausser later.

4              **MR. BOHRER:**  Assume hypothetically.

5    BY MR. GILLIGAN:

6    **Q.**   Let me ask you to assume that Dr. Rausser were to say, "If

7    I listed all these activities on a survey, the survey would be

8    15 or 20 pages long.  Therefore, we would reduce the response

9    rate even further, so I had to make a choice."  Do you think

10   that that is a proper way of designing a survey?

11   **A.**   Well, yes and no.  I think that burden is a legitimate

12   concern in designing a survey.  If the survey is overly

13   burdensome, there will be a more limited response.

14              On the other hand, you have to design a survey to

15   elicit the information reliably that you're trying to get at.

16   So if you're trying to determine how much management activity

17   people engage in and you're going to do that by counting up the

18   number of activities from a list that they check "yes" to, then

19   you have to include all of the potential activities in order to

20   ensure that you're measuring properly.  If you're going to

21   exclude activities, you would exclude activities that you have

22   some reason to believe are irrelevant.  You wouldn't just

23   exclude activities for no reason.

24              **MR. GILLIGAN:**  Let me ask that we turn back to

25   Ms. Hovenic's survey to Question 2 on the second page.

1   **BY MR. GILLIGAN:**

2   **Q.**   Let me ask you, Dr. Walker:  Do you have any concerns or

3   criticisms about the design of Question 2?

4   **A.**   Yes, I do.

5   **Q.**   What are those?

6   **A.**   Well, the question is asking the respondent to indicate

7   how much weight the respondent believes her recommendation was

8   given by a store manager or other higher authority.  So the

9   question -- rather than being instructed not to guess this

10  question is explicitly designed to have the respondent guess

11  because it's impossible for someone to know what's going on in

12  somebody else's mind.

13          It doesn't ask for specific objective factors that

14  may be relevant to an issue of weight that may allow an

15  outsider to draw an opinion.  It just says, "How much weight do

16  you believe your recommendation, as an assistant store manager,

17  was given?"  That's speculation.

18          Second, it says, "If the store manager or higher

19  authority did not ask you for a recommendation, mark the box 'I

20  was not consulted,' and do not mark any another boxes for that

21  job duty."

22          So if a respondent perceived that his or her job was

23  to give a recommendation and did so on a regular basis without

24  being asked, this, to me, seems as though they may interpret

25  this question as saying, "I'm supposed to mark down I was not

1   consulted," notwithstanding that it's part of their job and

2   they make recommendations all the time.  So those are the

3   problems that I have with the question itself.

4           The other problem that I have -- I don't know whether

5   it's here or later -- is that these answers are then translated

6   into particular weight, where *particular weight* has some legal

7   meaning; yet the respondents never say that their

8   recommendation were given a particular weight, and they're

9   never told what *particular weight* means in a legal sense.

10          Dr. Rausser translates the respondent's speculation

11  about how much weight their opinion was given into particular

12  weight according to his own formula, which I believe "given

13  large amount of weight" or "almost always followed" was called

14  *particular weight* sometimes.  Then he did another analysis

15  where he said, well, if you answered "given some weight," I

16  will also count it as particular weight.

17  **Q.**   Let's go on to Question 3.

18  **A.**   I'm sorry.  There was another problem with Question 2.

19  **Q.**   I'm sorry.  What is the additional problem with the design

20  of Question III(2)?

21  **A.**   It's related to Question III(1) and burden.  Question 2

22  requires the respondents to give information about their

23  recommendations concerning approving or creating advertising,

24  determining merchandise prices, determining merchandise

25  location, whether those were given weight.  This was for the

 1   purpose of determining whether or not they were given

 2   particular weight.

 3          So these are extraneous questions that are not,

 4   apparently, relevant to the issues.  So if you're going to try

 5   to reduce the burden on respondents, the way to do that is to

 6   try to streamline and eliminate information that's not going to

 7   be used or is not relevant to the task at hand.  The protocols

 8   that we went through earlier about survey research say

 9   specifically to limit the research to the legal questions at

10   hand.

11          **THE COURT:**  On what basis are you saying that's

12   irrelevant?

13          **THE WITNESS:**  Well, my understanding of the regs is

14   that *particular weight* has to do with hiring and firing and

15   promoting and not -- as far as recommendations and whether the

16   recommendations are given particular weight has to do with

17   whether or not the hiring or firing, promoting recommendations

18   were given particular weight for one of the specific

19   requirements of the regulation.

20          **THE COURT:**  So all that advertising and

21   merchandising, you're saying that what weight was given to

22   those recommendations is not relevant?

23          **THE WITNESS:**  It's my understanding, but obviously I

24   stand corrected.  I'm sorry, Your Honor, if I stepped out of

25   line.

1      **THE COURT:**  No.  I'm just asking.

2      **THE WITNESS:**  That's what I meant, but it's my

3  understanding that it's got no bearing on any of the

4  regulations.

5  **BY MR. GILLIGAN:**

6  **Q.**   Let's move on to Question 3.  This is the question that

7  deals with the allocation of the amount of time that the

8  assistant store manager is spending in different activities.

9  Do you have any concerns or problems with the design of this

10  question?

11  **A.**   Yes, I do.

12  **Q.**   What are those?

13  **A.**   Well, first, starting with the second sentence, "The total

14  percent for all activities must add up to 100 percent."  Then

15  at the very bottom of the table it says again, "Total must

16  equal 100 percent."  And, actually, at the end of the text, it

17  says again, "Please ensure that the total adds up to

18  100 percent."

19      What this does is it rules out multitasking.  If it's

20  the case that the regulations say you get credit for management

21  time even if the managing is occurring while you're doing

22  something else, if that's what the regulations say, then either

23  you've got to change that direction saying "must add up to

24  100 percent" or you have to instruct the respondent

25  specifically that, to the extent there are concurrent

1    activities, that you are to allocate your time to the
2    management tasks, and you need to define what those are.  The
3    way this is written, if you are engaged in multiple activities
4    at the same time, the respondent has to divide the time in some
5    way among the different activities.

6            The way I would have answered this, if someone were
7    to ask me to proportion it to this, I would allocate some of
8    the time to some thing and some of the time to the other.
9    That's also what Dr. Rausser said he would do.  Either of those
10   would be wrong if what you were trying to do was get a complete
11   measure of the percentage of time spent on management activity.
12   So this question will bias any sorts of analyses that are meant
13   to measure time spent managing downward because you will not
14   get a complete count of time spent concurrently managing and
15   doing other things.
16   Q.   Are there any other design problems with this question?
17   A.   Yes.  You would expect inaccuracies.  People don't tend to
18   know off the top of their head, to the percentage point, how
19   their time over the past year has been allocated.  As someone
20   who keeps track of his time, I don't know exactly what
21   percentage of my time is spent on different activities.  I
22   don't think it's reasonable to assume that these numbers are
23   anything more than rough guesses as to the way that people are
24   actually spending their time.

25           What we found when we looked at different responses

1    is that large numbers of respondents were clearly confused.  As

2    I said, Dr. Rausser himself added up, I think, something like

3    100 or 110 responses where the totals did not add up to

4    100 percent.  And many of those were not off by one point or

5    two points or three points; they were off significantly.  Some

6    of them included margin notes telling Dr. Rausser, "Well, we

7    just do too many things at the same time to make this work."

8    Q.   Did you actually review the survey responses to look to

9    see whether there were problems --

10   A.   Yes, sir.

11   Q.   -- by the respondents in answering this allocation of

12   time?

13   A.   Yes, I did.

14           MR. GILLIGAN:   Your Honor, I'm going to put on the

15   ELMO the survey response of Apalda -- it looks like

16   S-E-M-N-I-N-I-A Tunda, T-U-N-D-A.  It's Rausser 501.  I'm

17   actually going to turn to Rausser 502.

18   BY MR. GILLIGAN:

19   Q.   Dr. Walker, reviewing the answers to Question III(3) by

20   Apalda Tunda, can you tell the Court whether or not this

21   reflects your concern with the clarity of the question.

22   A.   Yes.  Clearly, Ms. Tunda was confused.  These responses

23   are nothing like what was called for.  It adds up to hundreds

24   of percent.

25           THE COURT:   Do you understand how anybody could have

1  read that question and put that on there?

2          **THE WITNESS:**  No, but there --

3          **THE COURT:**  What interpretation would reasonably

4  result from that question to come up with an answer like that?

5          **THE WITNESS:**  In that one, I don't know.

6          **THE COURT:**  I just didn't know if that could be

7  systematically misread to come up with an answer like that or

8  she just was off in la-la land.

9          **THE WITNESS:**  There are many of them like that.  I

10  think there are some that add to more than 100 percent, where

11  it appears as though, to me, they're attempting to account for

12  concurrent activities.  That one had 100 percent on too many

13  things that couldn't happen at the same time.  But some of them

14  had 100 percent on things where other people have written in

15  words, "We do this all the time."  And that's an explanation.

16          You don't really know for certain without asking

17  them.  The only real way to follow up on this is to call them.

18  It's speculative, I think, to say exactly what they meant, but

19  that's one theory that I'm aware of for some of them, of the

20  responses.

21  **BY MR. GILLIGAN:**

22  **Q.**  Next, Doctor, I want to show you the survey response of

23  Elizabeth -- looks like Spamley, S-P-A-M-L-E-Y, Rausser 1528,

24  and I'm going to turn to page 1529.

25          Dr. Walker, directing your attention to the response

1   of Ms. Spamley to Question III(3), does this cause you concern
2   about the design of the survey?
3   A.   Yes.  This is another example where it's clear that
4   there's confusion about what you're supposed to do and what
5   this question is supposed to be getting at.  To me, even more
6   bothersome than the confusion that's expressed here is that we
7   don't know exactly what the confusion is, so there's absolutely
8   no valid reason to assume that you do see it adding up -- that
9   if you do see it adding up to 100 that the person must have
10  understood.
11         When you have a large percentage of the people
12  expressing confusion in a clear and obvious way, it's not
13  reliable to assume that when you don't see clear and obvious
14  signs of confusion that everybody else must know what's going
15  on and must really be following the instructions the way you
16  want them to.  So this, to me, is a very loud signal that the
17  researcher should make some effort to make sure that even the
18  people that made this add up to 100 percent really understood
19  what the question was asking.
20  Q.   Let me show you the response of Mary Kay Light, L-I-G-H-T,
21  which is Rausser 1131, and we're going to turn to page 1132.
22         Doctor, does the response of Mary Kay Light indicate
23  to you that there is any problem with the design of this
24  question?
25  A.   Yes.  If you look at the margin notes, I can't quite make

1    that out.  I think it's "minimum two days a week."  I'm not

2    sure what that says at the top.  Down at the bottom it says,

3    "There's no way this would only equal 100 percent.  We open and

4    close store 100 percent of the time we were there."

5            Again, we're just trying to figure out what is this

6    person trying to communicate to us.  It seems to me that he or

7    she is trying to say, "Well, when it happens, I do it 100

8    percent of the time," as opposed to "100 percent of my time is

9    spent on this activity."  This is speculating.  I don't deny

10   that.

11           But that's the problem, is that, clearly, there are

12   respondents that don't understand this question.  If it's the

13   case that that's the way she's interpreting it or he's

14   interpreting it, there could be similar problems with people

15   that made it add up to 100 percent.  They just were told it has

16   to add up to 100 percent, and they adjusted their numbers

17   accordingly, but it may not reflect the percentage of their

18   time spent on activities.

19           We know from these responses not everybody was

20   interpreting this question properly.  Once again, we were just

21   going through a few, but there are over 100 of them where they

22   don't add up to 100 percent.

23   Q.   Time doesn't permit us to go through all 100, so let's

24   move on.

25           Were there any other concerns with the design of

1    Question III(3) that we have not already covered?

2    **A.**    I don't recall any, and it's not up anymore.

3    **Q.**    If we could, turn to Question 5, which would be on the

4    third page, 3 of 4.  Let's look at Question 5(a).  Do you have

5    any concerns about the design of this question, sir?

6    **A.**    Yes, I do.

7    **Q.**    What are they?

8    **A.**    Well, first, 5(a) asks, "How many full-time employees

9    (employees who worked 40 hours or more per week) did you

10   regularly and customarily supervise?"

11          It's my understanding that full-time at Big Lots is

12   not 40 hours per week, and so one might cross out "zero"

13   because there are no 40-hour-per-week people, notwithstanding

14   that there are full-time people that respond to the supervisor.

15   There actually is a respondent, Karen Driver, who wrote on the

16   response, "Full-time is 32 hours per week.  I have three of

17   those," or something like that, and checked "zero," as I

18   recall, to the answer to the question.  She's included in the

19   calculations as though she doesn't supervise any full-time

20   employees.  So one problem is that full-time doesn't correspond

21   to what full-time is at Big Lots in the question.

22          The question goes on to ask, "If you did not

23   supervise any full-time employees, continue to Part B.  If you

24   supervised at least one employee, then answer the following

25   question:  Did anyone else supervise these employees during

1   your shift?"

2          This person, Ms. Hovenic, has written down the

3   problem with this:  "Rarely two managers on the same shift."

4   In her case she answered "no," but the vast majority of

5   respondents answered "yes."  Notwithstanding that they said

6   that they'd supervised one or two or more full-time employees,

7   they wrote "yes."  Sometimes, they also wrote:  "There are

8   overlapping shifts."

9          But the explanation that is consistent with their

10  answers to 5(c), which we'll get to, is that there's an

11  overlap.  It's not that they never supervise anyone who's not

12  being supervised by other people but that during a shift there

13  are periods of time when there are other managers in the

14  building and the employees are being supervised by more than

15  just the respondent.

16          But there are other periods of time when the relevant

17  employees are being supervised exclusively by the respondent.

18  In fact, some other respondents wrote in "sometimes" as opposed

19  to answering "yes" or "no."  So, clearly, there was some

20  confusion by those employees, or those respondents, who wrote

21  in "sometimes."  Writing in "sometimes" is an expression of

22  confusion, an inability to answer the question as directed.

23  Q.   I don't think you've covered this.  There is a term used

24  in Question 5(a), in the first question, "Did you *regularly and*

25  *customarily supervise*...."  That term is not defined in the

1  survey instrument.  Does that cause you any concern or problem?

2  **A.**   Yes.  Once again, it introduces ambiguity.

3        **MR. GILLIGAN:**   If we could turn to the next page.

4  **BY MR. GILLIGAN:**

5  **Q.**   At the top of the page, we have what is Question 5(b),

6  which is in two subparts.  Are there the same or different

7  issues?  This has to deal with part-time employees.

8  **A.**   This is the same problem but with part-time employees.  In

9  this case we see that Ms. Hovenic didn't even answer the "Did

10  anyone else supervise these employees during your shift?"  So

11  this is an example of item nonresponse.  Dr. Rausser

12  interpreted that as "yes."

13        So for all of the respondents who didn't answer, he

14  assumed that meant yes, there was someone else that supervised

15  those employees during his shift.  In all of his calculations

16  where he reports the number of respondents that supervise

17  people and supervised two or more full-time employees, if you

18  answered "yes" or you don't answer at all, you're counted as

19  not supervising any part-time employees.

20        On 5(a), the part that we went through before, where

21  he asked about full-time employees, if you answered "yes,"

22  somebody else supervised those employees during your shift, or

23  you didn't answer at all, or you answered "yes" and "no," or

24  you wrote in "sometimes," you get counted as not supervising at

25  all, notwithstanding your answer that you did actually

1  supervise employees during your shift on a regular and

2  customary basis and notwithstanding 5(c), which we see here,

3  where he asks the next question:  "Approximately how many total

4  hours each week, if any, did you spend supervising full-time

5  and part-time employees that no one else supervised during your

6  shift?"

7          Most everyone wrote in some positive number there,

8  yet they were counted as not supervising employees who were not

9  simultaneously supervised at all.  So there are respondents who

10 wrote in large numbers, 75 hours a week supervising people who

11 were not being supervised by someone else; yet for all his

12 calculations, Dr. Rausser counts them as though they never

13 supervised anyone because in 5(a) and 5(b) they either answered

14 "yes," or they didn't answer at all, or they answered "yes" and

15 "no," or they wrote in "sometimes."

16 Q.   What impact, if any, would there be on the limitation in

17 Question 5(b), as there is in 5(a), if the last item is four or

18 more, rather than having the respondent write down the actual

19 number of associates who were supervised?

20 A.   Well, it's capped.  You're unable to tell how many.  There

21 were examples of respondents who did write in, and they wrote

22 in in large numbers, in the 10 to 20 range, but you can't tell

23 from the question asked how many people were the survey

24 respondents actually supervising because there's a limitation.

25 Q.   Would capping the question tend to undercount or overcount

1   the amount of associates being supervised?

2   **A.**   Well, it's just capped so you can only tell that it's four

3   or more full-time.  You don't know how many more.  And with

4   part-time, you'll just know that it -- I'm sorry.  With four or

5   more part-time, it's capped, and it was capped at two or more

6   full-time.

7   **Q.**   Let's go down to page 2, Question 6.  Question III(6), "As

8   an assistant store manager, approximately how many hours on

9   average did you work per week during..." and there are three

10  different categories here.  Do you have any concerns or

11  problems with the design of this question?

12  **A.**   Yes.

13  **Q.**   What are those?

14  **A.**   There's no basis to assume, either from the literature or

15  from general knowledge of what you see in other surveys, that

16  people are going to remember accurately how many hours they

17  were working in the past.  The typical inventory week, even for

18  employees that are currently employed, could have been months

19  in the past.  Many of the respondents were no longer at

20  Big Lots, so they may be responding about time spent on a

21  weekly basis years ago.

22          Under a normal workweek, we know from the Duncan and

23  Hill study that when steelworkers were asked to do this just

24  for the most recent two years, they overstated their hours

25  worked on average by 100 hours per year.  So there's just no

1    basis to assume that you're going to get valid and reliable

2    responses from these questions.

3    **Q.**    Do the instructions to the question indicate what year is

4    to be included?

5    **A.**    No.  I mean, this goes, again, to that overarching problem

6    upfront where these survey responses cover experiences over

7    multiple stores, over multiple years, many of them occurring

8    prior to the liability period.  There's no direction as to

9    whether or not the answer is supposed to pertain on average for

10   their entire employment, for their current store, for their

11   most recent store, to the store that would tend to have the

12   most overtime.

13          There's no direction, and there's nothing on the

14   survey to indicate how the respondent interpreted the question.

15   We're just left to assume that he or she responded in some way

16   that is consistent with whatever Dr. Rausser or we try to do

17   with the data on an *ex post* basis.

18   **Q.**    Let me put up some examples of responses on Question 5.

19          **MR. GILLIGAN:**  The first one, Your Honor, would be

20   the survey response of Karen Driver, D-R-I-V-E-R, which would

21   be Rausser 1985.  I am going to turn to page 1988.

22   **BY MR. GILLIGAN:**

23   **Q.**    With respect to the answer to Question 5(c), are you able

24   to read, Dr. Walker, the marginal note that Ms. Driver has

25   written there?

A.   Yes.  She says, "We are responsible for supervising all
associates all the time; however, we are simultaneously
required to do the activities listed.  There is little peer
supervision.  I don't know whether to put 1 hour or 45 hours."

Q.   Does that response indicate whether or not there was
confusion by Ms. Driver in her response?

A.   Yes.  She says specifically, "I am not sure how to answer
this question."

Q.   Next, I would like to show the survey response of Jordan
Emmanuel Coleman, C-O-L-E-M-A-N, which would be Rausser 1436.
Look on page 1439, the fourth page of the survey, the answer to
Questions 5(b) and 5(c).

     Dr. Walker, have you reviewed this survey response as
part of your work?

A.   Yes.

Q.   In response to 5(c), Mr. Coleman has indicated that he
spent 75 hours per week supervising employees when there's
nobody else supervising them during his shift.

A.   Yes.

Q.   At the same time, he indicates that, in response to
Question 5(b) -- and if we looked on the prior page, on 5(a),
"Did anyone else supervise these employees during your shift?"
he answers "yes."

     What do you understand that Dr. Rausser did with the
response of 75 hours per week in his calculation of management

1    time or supervision time?

2    **A.**    Assuming that 5(a) is "yes" as well?

3    **Q.**    Let's not assume that.  Let's just show it, if I could.

4    **A.**    Yes.  You see that the respondent said that he supervised

5    two or more full-time employees, but then he marked "yes."  On

6    the next page, he said he supervised four or more part-time

7    employees, which is the maximum, but then he wrote "yes."  Then

8    he said he spends 75 hours per week supervising people that are

9    not simultaneously being supervised by anybody else.  That

10   response counts as a zero in Dr. Rausser's analysis.  That

11   response counts as no time supervising people that are not

12   simultaneously supervised by somebody else.

13   **Q.**    Let me do one more of these.  Delbert Begay, B-E-G-G-Y --

14   or maybe it's Begay, B-E-G-A-Y.  Rausser 1050.  If we look at

15   page 1052, at the bottom of page 1052 is the response to

16   Question 5(a), in which she is -- excuse me.  I guess he has

17   indicated he supervises two or more full-time employees?

18   **A.**    Yes.

19   **Q.**    Yet, in the second part of Question 5(a), he's left that

20   blank.

21   **A.**    That's right.

22   **Q.**    What did you understand the impact of leaving

23   Question 5(a) blank in the tabulations of Professor Rausser?

24   **A.**    Professor Rausser counted a blank as a "yes."  So

25   notwithstanding that the respondent said that he supervised, on

1   a regular and customary basis, two or more full-time employees,

2   and he didn't say one way or the other whether anyone else

3   supervised them during his shift, Dr. Rausser counts that as

4   though he didn't supervise any full-time employees.

5   Q.   Let's look at the next page, which would be Rausser 1053,

6   Question 5(b).  He indicates that he supervised four or more

7   part-time workers.  He answers "yes," that somebody else

8   supervised these employees during his shift, and his

9   approximate hours of supervision are 60.

10         With that combination of answers, how would that be

11  tabulated by Professor Rausser in his tabulation of supervisory

12  time?

13  A.   Well, it would be a zero, and it's not just that he said

14  his supervisory time was zero.  He didn't say that.  The

15  respondent said that he spent 60 hours supervising people that

16  were not simultaneously supervised by someone else.  I don't

17  know what the total would be if you were to ask him.  He said

18  60 hours spending time supervising people that were not

19  simultaneously supervised by someone else, and he would count

20  as a zero, notwithstanding that he said two or more

21  full-time -- I think it was four or more part-time and 60 hours

22  supervising people that are not being supervised by someone

23  else.

24         MR. GILLIGAN:  Can you put up the response of Tina

25  Griffin.

1           I'm sorry.  Your Honor, are you able to see

2    that, or do you want to have a paper copy?

3           This is Rausser 726, and if we would highlight

4    Question III(1).

5    **BY MR. GILLIGAN:**

6    **Q.**   There are, in addition to some answers, some marginal

7    notes here.  Do you see those, Dr. Walker?

8    **A.**   Yes.

9    **Q.**   What do those indicate to you, if anything?

10   **A.**   There is sort of an ambiguity as to what the answer is

11   supposed to indicate.  For the "yes, instruction," I'm not sure

12   what that's supposed to mean.  The question is, "Did you

13   regularly hire employees?"  "Yes."

14          "For duties you regularly performed, did you perform

15   without receiving direction, instruction, or guidance?"  "Yes,

16   instruction."  So I don't know if that means that she did it

17   without instruction, or if whether that means she did it with

18   instruction.  I don't really know what it means.

19          If we go down to "discipline employees," "Did you

20   regularly perform duty as assistant manager?"  "Yes" or "no."

21   Well, "no," I understand that.

22          The next column is the one where the confusion

23   enters.  "For duties you regularly performed, did you perform

24   without receiving instruction, direction, or guidance?" and

25   then she answers it, although she's not supposed to answer it

1   at all since the question only applies if the first question

2   answer was "yes."

3          **MR. GILLIGAN:**   If we could turn to the last page of

4   the survey response of Ms. Griffin.

5   **BY MR. GILLIGAN:**

6   **Q.**   You can look at the signature box here for the

7   verification.  This survey was not signed or verified; is that

8   right?

9   **A.**   That's correct.

10  **Q.**   Is there any indication in Dr. Rausser's materials that he

11  did or did not count survey responses that were not signed or

12  verified?

13  **A.**   There's no indication that he excluded such surveys.

14  **Q.**   Dr. Walker, we covered your notions of recall bias, in

15  that a survey measures what respondents say they did, not what

16  they actually may have done.  How can you determine that the

17  survey responses accurately reflect the respondent's actual

18  experiences?

19  **A.**   How can we determine that from these surveys?

20  **Q.**   Yes, sir.

21  **A.**   I don't know any way to do that.

22  **Q.**   I mean, is there some statistical analysis that can be run

23  to determine that the answers actually accurately reflect the

24  experience of the respondent?

25  **A.**   No.  All that you can try to do is compare it with

1    external data, and we don't have that, whether there are any

2    that cover all of these different topics.  You certainly cannot

3    merely look at the data themselves to determine that they're

4    actually accurate.

5    Q.    Could the survey results be impacted by a dishonest

6    response?

7    A.    Yes.

8    Q.    Could the survey results be impacted by honest but

9    inaccurate responses?

10   A.    Yes.

11   Q.    Would everyone have to be dishonest to impact the results?

12   A.    No.

13   Q.    Would everyone have to be inaccurate to impact the

14   results?

15   A.    No.  I mean, you could get significant discrepancies

16   between the survey results and the truth if there are a few

17   people that are off by a lot, or if there are a lot of people

18   that are off by a little, or anything in between.

19   Q.    Is there any statistical basis to infer that the responses

20   to the OnPoint survey reflect the actual experience of the

21   respondents within any specific margin of error?

22   A.    No.

23   Q.    Why not?

24   A.    There are various types of error that are unmeasured in

25   this case.  Nonresponse error is unmeasured.  Measurement

1   error, meaning error related to demand effects, recall bias,

2   and confusion are unmeasured. The impact of those on the

3   inferences that Dr. Rausser wants to draw and on the actual

4   measures themselves are without any measurement.

5        The only measurements are these confidence intervals,

6   and they only measure error related to randomness; randomness

7   that's related to the fact that you chose a sample or got data

8   for a sample rather than an entire population.  Even those

9   confidence intervals are wrong because they are based upon

10  statistical assumptions that do not hold in this case; namely,

11  that there is zero percent nonresponse and that the things

12  being measured are measured with 100 percent measurement

13  accuracy.  Neither of those is true in this case, so the

14  underlying assumption behind those confidence intervals, that

15  the averages are statistically unbiased, is not met.

16  Consequently, the measure, even of random error, is wrong.

17  **Q.**   Is there any statistical basis to infer that the responses

18  reflect the actual experiences of the nonresponding opt-ins

19  with any specific margin of error?

20  **A.**   No.

21  **Q.**   Are the reasons the same or are the reasons different?

22  **A.**   I may have answered both the other time.  I may have

23  misunderstood your question.  There is no statistical basis

24  upon which one can draw inferences based on a nonrandom sample.

25  The respondents represent a nonrandom sample of the opt-ins,

1   the people that got the survey, so there's no statistical basis

2   to assume that the nonrespondents must be equal to the

3   respondents on average.  There's just no basis for it.  It's an

4   assumption.

5           That's why nonresponse rates or response rates are

6   what you focus on, because the higher the response rate, the

7   less concern you have.  At least if you get a sufficiently high

8   response rate, you can get to a level where, even if there are

9   substantial differences between the nonrespondents and the

10  respondents, the mere fact that the nonrespondents are such a

11  small minority makes you less concerned about nonresponse bias.

12          Once you get 10 or 20 or 30 or 40 percent

13  nonresponse, the potential error can be quite large.  The other

14  factor that determines how big that error is, the true average

15  response that you would have gotten from the nonrespondents, if

16  you were to ask them, is unknown.  You just don't know what

17  they would say based on what the other people said.

18  Q.   Now, in the survey by OnPoint, Dr. Rausser has indicated

19  that there were nine issues addressed in the survey that are

20  relevant to the application of the executive exemption under

21  both the old and current regulations.

22          **MR. GILLIGAN:**  If you would turn on the ELMO for a

23  second here.

24  **BY MR. GILLIGAN:**

25  Q.   Issue 1 is the percentage of time assistant store managers

1    devoted to management as opposed to nonmanagement-related

2    duties.  The OnPoint survey, does it collect information to

3    answer that issue?

4    **A.**   It does collect some information to answer that issue, and

5    I have created some documents related to that that are relevant

6    to the issue.  You can't answer it fully, the percentage of

7    time devoted to management duties, and the Rausser reports do

8    not get to this at all because they are based on that

9    Question 2, I think the number was, based on the time

10   allocations that added up to 100 that don't allow for

11   concurrent duties.

12          So, in Dr. Rausser's report, all of his estimates of

13   percentage of time spent on management versus nonmanagement

14   duties are derived from that question that disallows concurrent

15   activities and also was subject to huge confusion by the

16   respondents.  So you cannot get to that from the results that

17   were reported by Dr. Rausser in his reports or in his addenda.

18   **Q.**   The next issue which Professor Rausser indicates is

19   addressed by the survey data that he's collected, Issue 2, the

20   extent to which assistant store managers could regularly and

21   customarily perform management duties independently, without

22   receiving direction, instruction, or guidance from more senior

23   Big Lots employees, store managers, district managers, or

24   others, is there information or data collected from the survey

25   which would address this issue?

1   A.   Only as a floor, but it can't tell you the full extent to
2   which they could because it doesn't ask whether they could.
3   The survey never asks about authority, and Dr. Rausser was
4   adamant at his deposition that it wasn't meant to ask about
5   authority.  It asks whether people regularly did things, and it
6   didn't concern whether or not they had the authority to do so.
7   So it doesn't get to the issue of whether they could regularly
8   and customarily perform management duties.  It talked about
9   what they regularly did.
10  Q.   Issue 3, whether assistant store managers' recommendations
11  regarding management-related duties were given particular
12  weight by store managers or district managers, does the survey
13  gather information that could address that issue?
14  A.   No.  Once again -- first of all, the question this is
15  based upon asks the respondents to speculate about other
16  people's weighting of recommendations that were received from
17  the respondents.
18          Second, it doesn't ask about particular weight.  It
19  asks whether the recommendations were given a little weight,
20  which is highly subjective, not only speculative -- some
21  weight.  I don't remember the exact term -- a lot of weight.
22  But the respondents were asked first to speculate and then to
23  apply a subjective and individualized standard, none of which
24  related to any sort of objective phenomena.
25  Q.   Issue 4, the extent to which assistant store managers

1  performed duties similar to those of their subordinate

2  employees, was there information in the survey that would

3  address this issue?

4  **A.**    There was information, but the information was not

5  reported fully in Dr. Rausser's reports.

6  **Q.**    Issue 5, whether assistant store managers regularly and

7  customarily directed the work of two or more full-time

8  equivalent employees that no other Big Lots employee

9  simultaneously supervised, were you able to answer that issue

10  or address that issue with the data gathered in the survey?

11  **A.**    The data in the survey suggests strongly the answer is

12  "yes," but you have to draw some inferences based upon more

13  information than is just in the survey.  The survey never asks

14  specifically, "While you're supervising people who are not

15  simultaneously supervised by someone else, how many people are

16  you supervising?"  So you can't tell whether it's two or three

17  or four directly from that question.

18           But you see other questions where they say, "Yes, I

19  supervise four or more people" and "Yes, I supervise four or

20  more part-time and two or more full-time" and "I spend 75 hours

21  supervising people who are not being supervised by someone

22  else," but it leaves open the possibility that somehow during

23  those 75 hours they're only supervising one, I suppose.  If

24  you --

25  **Q.**    I'm sorry.  I thought you were finished.  I didn't mean to

1   interrupt.

2   **A.**   Was the question about what's in the survey or was the

3   question about what's reported in Dr. Rausser's --

4   **Q.**   My question was:  Is there information that is gathered in

5   the survey that will allow you to answer this issue or address

6   this issue?

7   **A.**   Yes, that's the end of my answer.  I'm sorry.

8   **Q.**   Issue 6, the percentage of time assistant store managers

9   devoted in a typical week to the supervision of employees that

10  no other Big Lot employees simultaneously supervised, was the

11  survey instrument designed in a way that would accurately

12  gather this information?

13  **A.**   There are answers to that.  They were not reported in

14  Dr. Rausser's reports.

15  **Q.**   Issue 7, the extent to which assistant store managers

16  could hire or fire other Big Lots employees without receiving

17  direction, instruction, or guidance from store or district

18  managers or others.

19  **A.**   Well, once again, the question doesn't ask whether they

20  could hire or fire.  The question asked whether they regularly

21  hired or fired.  So it asks what did they do, not what did they

22  have the authority to do.  So it could be limited, potentially,

23  by the frequency with which these things came up, so you can't

24  tell from the survey.

25  **Q.**   Issue 8, whether assistant store managers' recommendations

1  regarding hiring, firing, promotion, discipline, other actions
2  affecting employee status were given particular weight.
3  **A.**   You can't get that from the survey because the survey
4  never asks about the objective factors that are specifically
5  identified in the regulations, but rather it asks the
6  respondents to speculate about what the district managers or
7  store managers thought.

8         So the district managers and store managers could
9  give great weight internally to the recommendations that were
10  coming from the respondents; yet the respondents may perceive,
11  by whatever metric they're applying, that it was only given
12  little weight or some weight.  So the information that's
13  available is speculation from the respondents that is then
14  subject to an individualized and subjective scale, but you
15  can't tell really what was going on in district manager's and
16  store manager's heads for the survey, nor is there any
17  information concerning the objective standards that are
18  specifically discussed in the regulations.

19  **Q.**   Issue 9, this is in multiple parts.  The percentage of
20  assistant store managers who met all three of the following
21  conditions devoted at least 50 percent of their time to
22  management-related activities, could you tell that from the
23  survey instrument?

24  **A.**   There are some where you can tell because you can look at
25  Question 5 and you can see the percentage of their time that

1   they say they spend supervising while not -- people who are not

2   simultaneously supervised by someone else.  And you can see

3   their answers from Question 6, where they say how long their

4   typical workweek is, and you can calculate for those people

5   whether or not they're spending more than 50 percent of their

6   time on that one management activity alone.

7            For everyone else, for everyone for whom that

8   percentage is less than 50 percent, you can't tell because you

9   can't really tell how much time they're spending on any other

10  management activities because the only question that goes to

11  that is the question that rules out concurrent activities.

12  Q.   The second part of Issue 9 is regularly and customarily

13  directed to work a two or more full-time employee equivalent.

14  Are you able to determine that from the survey instrument and

15  data collecting?

16  A.   No, you can't.

17  Q.   Regularly and customarily hired or fired employees

18  independently or whose recommendations regarding hiring,

19  firing, promotion, or other status change given a particular

20  weight.

21  A.   I'm sorry.  I misspoke.  I thought that it had the "not

22  simultaneously supervised."  You can.  And I think --

23  Q.   So we're going back to bullet 9(2) --

24  A.   Yes.

25  Q.   -- regularly and customarily directed to work a two or

1   more full-time employee equivalent.  Are you able to determine
2   that?
3   **A.**   Yes, based on the definition of full-time employee
4   equivalence that Dr. Rausser used, that I assume underlies this
5   exhibit, you can look at the number or percentage of
6   respondents who said that they supervised enough full-time
7   people and enough part-time people, and you can count the
8   part-time people the way that Dr. Rausser does, where two
9   part-times equals one full-time, and you can determine a
10  percentage of people who say they regularly and customarily
11  directed the work of two or more full-time equivalents.  I
12  think that I did that in my report.  My recollection is that it
13  is a very high percentage.
14  **Q.**   Finally, bullet 9, the third bullet, regularly and
15  customarily hired or fired employees independently or whose
16  recommendations regarding, hiring, firing, promotion, or other
17  status change were given particular weight, are you able to
18  answer that question from the data gathered from the Rausser
19  OnPoint survey?
20  **A.**   No.
21  **Q.**   Why not?
22  **A.**   This is the particular weight.  You don't know how many
23  respondents' recommendations were given particular weight.
24  That's because of the subjectivity and the speculation.  It's
25  also because respondents who gave opinions and recommendations

1    without having those recommendations being actively solicited
2    count as zeros.  So even if the respondent perceived that the
3    supervisor, the store manager, or district manager was giving
4    his or her opinion a lot of weight -- whatever that means -- if
5    the district manager or store manager didn't actively solicit
6    the recommendations, they may have written down, "I was not
7    consulted," because that's what they were directed to do on the
8    survey instrument.
9    Q.   In the interpretation of the survey data expressed in his
10   report and his addenda, is Dr. Rausser engaged in certain
11   assumptions with respect to the survey data?
12   A.   Yes.
13   Q.   What are those assumptions?
14   A.   I identified them specifically.  If you wait a minute, so
15   I can get a complete list, I'll try to find it here.
16   Q.   I believe if I can refer you to page 32 of your addendum,
17   it would help to refresh your memory.
18   A.   Yes.  In order to reach the conclusions, Dr. Rausser has
19   to assume all of the following:
20           First, that respondents are not affected in
21   responding to the survey by the potential financial gain
22   related to the outcome of this litigation.  That means that
23   it's not the case that some people chose not to respond because
24   they thought it might diminish their chance of success in this
25   litigation.  It cannot be the case that the people who thought

1    they had the most to gain were even more likely to respond.

2            Second, that respondents who felt that they had the

3    most to gain or felt most strongly that their own personal

4    experiences were particular nonsupervisorial were no more

5    likely than other opt-ins to respond to the survey.  This is --

6    actually, I just said that one.

7            The first one has to do with the fact that he has to

8    assume that the responses themselves -- among the people that

9    responded, the responses themselves were not affected in any

10   way by potential financial gain.  So when people had an

11   opportunity to interpret the question differently, the

12   potential financial gain had no impact on the choices that they

13   made; that their knowledge of what the purpose of the survey

14   was about had no impact on the responses; that respondents who

15   felt their answers would dampen the plaintiffs' litigation

16   prospects to the detriment of their fellow opt-in plaintiffs

17   were nonetheless equally likely to answer questions accurately

18   and submit their surveys anyway; that the people who took the

19   time to parse through confusing questions were not

20   systematically different from the average opt-in plaintiff in

21   any way; that none of the other biases that we talked about

22   before concerning recall or concerning confusion actually

23   affected any of the survey responses.

24           All of those have to be true in order for

25   Dr. Rausser's various conclusions to follow.  If he's wrong

1    about any one of them, then his statistical analysis is without

2    foundation.

3    **Q.**   In your opinion, Dr. Walker, does the survey instrument

4    accurately measure the percent of time spent by the responding

5    assistant store managers in management tasks?

6    **A.**   No, it does not.

7    **Q.**   Why not?

8    **A.**   My expectation would be that it's affected by all of these

9    biases, that the responses in general -- I would interpret them

10   as being sort of a lower bound, a floor on the percentage of

11   time devoted towards management activities or supervision

12   activities for the opt-in plaintiffs as a whole.

13   **Q.**   Does the survey instrument direct the respondents how to

14   deal with multitasking or concurrent duties?

15            **THE COURT:**  I think you've asked him that already.

16            **MR. GILLIGAN:**  Excuse me, Your Honor?

17            **THE COURT:**  He's testified about that already.

18            **MR. GILLIGAN:**  I'm sorry.  I still can't hear you.

19            **THE COURT:**  He has testified about that already.

20            **MR. GILLIGAN:**  Excuse me, Your Honor.

21   BY MR. GILLIGAN:

22   **Q.**   Let me go to some specific survey responses on the

23   measurement of management activities.

24            **MR. GILLIGAN:**  Can we put up the survey of Deborah

25   Knosp-Murray?

1      **THE COURT:**  Do you have a page?

2      **MR. GILLIGAN:**  Your Honor, it will be Rausser 141.

3  BY MR. GILLIGAN:

4  Q.   Specifically, let me ask you to turn to the second page.

5  Question 3, which is to tabulate the amount or percentage of

6  time spent in management and nonmanagement activities,

7  Ms. Knosp-Murray has attempted to fill out the percentage of

8  time and then has written a marginal note at the bottom.  Are

9  you able to read that, Dr. Walker?

10 A.   Yes.

11 Q.   Is there an indication in her response that she is having

12 difficulty allocating the time among the various activities?

13 A.   Yes.

14 Q.   What is your basis for that opinion, sir?

15 A.   Well, what she says in response to the percentage of time

16 on other supervision of employees, she says "all day long."

17 That's consistent with her being a supervisor and being

18 responsible for supervising people all day long.  That's what

19 she says.

20      Then at the bottom she writes:  "I did all of these

21 things every day.  Many weekdays, I worked 7 days a week, 10 to

22 12 hours a day or more."  But she says "all day long" about

23 other supervision of employees, and that's the one place you

24 would put your supervisory responsibilities on this chart.  She

25 also put "always" for handling employee grievances.

1      **MR. GILLIGAN:**  If we could look at the survey of
2  Cheryl Cole, C-O-L-E.
3  **BY MR. GILLIGAN:**
4  **Q.**   This would be Rausser 1054.  On the first page, on
5  response to roman numeral II, she has written:  "Ten years
6  total.  Worked five different locations.  Don't remember the
7  store numbers."  What, if any, significance does that response
8  have for you, Dr. Walker?
9  **A.**   Two big ones:
10      One is this is a reiteration of the problem we talked
11  about before, that these survey responses may reflect
12  activities and conduct that predates the liability period; that
13  there's a lot of flexibility that's afforded to the respondent
14  in answering because there are a lot of different store
15  managers, a lot of different stores.
16      The second is that this points up the frailty of
17  memory.  If you don't remember the store number, which
18  presumably is a pretty significant piece of information as an
19  employee, how confident can you be in all this other stuff
20  that's submitted in the form of the survey, about other things?
21  It just points out the frailty of recall.
22  **Q.**   If we look on page 2 again, the allocation of percentage
23  of time spent in various activities, can you tell the Court
24  whether or not the written response indicates to you any
25  confusion by Ms. Cole in answering this question.

1   **A.**   Sure.  She's writing that she can't force it down

2   100 percent the way that she's been instructed.  She says

3   specifically, "Over 100 percent.  I pretty much did everything.

4   I cut it down as much as possible."

5          **MR. GILLIGAN:**  Could we look at the survey response

6   of Jeff Neff (phonetic).  No, we don't have that one.

7   **BY MR. GILLIGAN:**

8   **Q.**   Is there more than one question that seeks to identify

9   management responsibilities in the survey instrument?

10  **A.**   I'm not sure I understand the question.

11  **Q.**   Does Question III(3) attempt to identify management versus

12  nonmanagement activities?

13  **A.**   I'm not sure of the question.

14  **Q.**   Let's see if we can get to it by looking at a specific

15  survey, Anna Marie Jameson.

16          **THE COURT:**  Do you have a number?

17          **MR. GILLIGAN:**  Your Honor, it's 1620.  Jameson is

18  J-A-M-E-S-O-N.

19  **BY MR. GILLIGAN:**

20  **Q.**   If you look at the answer to Question III(1), Ms. Jameson

21  indicates that she regularly hires employees; is that right?

22  **A.**   Yes.

23  **Q.**   Without receiving direction, instruction, or guidance.

24  Does the "yes" mean that she gets instruction or she doesn't?

25  **A.**   That she does not.

1   Q.   Firing employees, does she indicate whether she regularly
2   performs that?
3   A.   Yes, she does.
4   Q.   With or without direction?
5   A.   She says "without direction, instruction, or guidance."
6   Q.   Disciplining employees?
7   A.   Yes.  She says she does that; she says she does it without
8   direction, instruction, or guidance.
9   Q.   If you look at page 2, the percentage of times on the
10  grid 3, firing employees is listed as zero?
11  A.   As a percentage of time, yes.
12  Q.   Hiring, zero?
13  A.   Yes.
14  Q.   Disciplining employees, zero?
15  A.   Yes.
16  Q.   Then if you look over at Question 5(c), she indicates that
17  she works 45 to 50 hours supervising full-time and part-time
18  employees that no one else supervised during her shift; is that
19  right?
20  A.   That's correct.
21  Q.   Do these responses appear to be consistent or
22  inconsistent?
23  A.   Well, on their face there's an inconsistency.  I can see
24  from here -- it's not highlighted, but on Question 6, where she
25  says her normal workweek is 45 to 50 hours -- so, taken

1  together, those answers indicate that she's spending
2  100 percent of her time supervising people that no one else is
3  supervising.  If you go back to Question 3, if you tried to
4  rely on Question 3 to determine what percentage of her time was
5  spent on managing, you would end up with something very small.
6  I don't remember what they all add up to.  They might add up to
7  zero for all I know.

8          So on its face that's inconsistent.  I think they are
9  consistent if one takes into account concurrent activities,
10  because she may very well have allocated all of that time to
11  the activities that were occurring simultaneously.  So even
12  though she's spending 100 percent of her time, according to
13  Question 5, supervising people who aren't being supervised by
14  anyone else, she may be engaged in other activity
15  simultaneously.  So, in answering Question 3, she might
16  allocate zero percent of her time to management.

17  Q.   Let me ask you, Dr. Walker:  Is the result of the survey
18  that was conducted by OnPoint -- let me ask you to assume that
19  Dr. Rausser has made a calculation the average hours worked by
20  opt-in assistant store managers is 59 hours a week.  Do you
21  have an opinion as to whether or not that calculation is
22  accurate?

23  A.   Yes, I do.

24  Q.   What is that opinion, sir?

25  A.   I think that it certainly has no basis, and my expectation

1    is that it is inaccurate.

2    **Q.**   When you say it has no basis, what does that mean?

3    **A.**   That the calculation he arrived at it by accepting as true

4    these survey responses, yet there's no statistical reason to

5    assume that these survey responses about historical hours

6    worked will be accurate.  The only external information I am

7    aware of concerning the accuracy of people's recall as a

8    measure of the hours they worked in the past suggests it's

9    inaccurate.  There's a direct study -- we've talked about it a

10   few times -- where workers tended to overstate their hours by

11   about 100 hours per year in that particular study.

12             In order to be accurate, there could not be any

13   demand effects in this case.  It cannot be that the people who

14   realized that by submitting their response they may be pulling

15   down the average, that there were no people that realized that

16   and no people that decided because of that not to submit

17   responses to the survey.  It can't be that, as a general

18   matter, the people that had high overtime hours are overly

19   represented among the respondents and underrepresented among

20   the nonrespondents.  That seems to me to be implausible.  Given

21   what we know from other studies about the potential effect on

22   response rates of very small financial incentives, it seems

23   implausible to me that there would not be some effect from a

24   10, 20, 30, $40,000 incentive in this case.

25             Second, Dr. Rausser's calculation doesn't come

1    directly from the survey responses in the sense of just

2    averaging up responses to a specific question.  What he did is

3    he took the questions that concerned hours during inventory

4    periods, and he took the responses to questions concerning

5    hours during holiday periods, and he adjusted up the answer

6    about the normal hours.

7            If it's the case -- we don't know one way or the

8    other because there have not been any valid random studies of

9    the respondents in the form of pretest or debriefing.  But if

10   it were the case that there were respondents that failed to

11   answer that question about their hours correctly, and when they

12   were reporting their normal hours they reported an average for

13   the year rather than an average for the year excluding holidays

14   and inventories, then that would bias his calculations further.

15           Finally, there are respondents that weren't working

16   for a full year.  There are respondents who didn't work during

17   a holiday season or during an inventory season, so it will bias

18   the results to apply to them an average hourly figure that's

19   based upon a year that includes inventory and holiday periods.

20   **Q.**   Question 5 of the survey was directed to the amount of

21   supervision by respondents.  Do you have an opinion whether

22   Professor Rausser's analysis of the data from Question 5

23   accurately counts the amount of supervision by the responding

24   assistant store managers?

25   **A.**   Yes, I have an opinion.

1    Q.    What is the opinion?

2    A.    That he's undercounting.

3    Q.    What is the basis of that opinion, sir?

4    A.    His interpretation of an answer of "yes" to the second

5    part of 5(a) or 5(b), that he is excluding people who said that

6    they supervised for sometimes 75 or 90 hours per week, who said

7    that they were supervising people who weren't being supervised

8    by others.  He's counting them as zero because they answered

9    "yes," or because they failed to answer, or because they

10   answered "yes" and "no," or because they said "sometimes" to

11   that second question, notwithstanding that there's marginalia

12   indicating that respondents were interpreting that question as

13   meaning:  "Did anybody else supervise those people during your

14   shift?"  And they said, "Well, there were overlapping shifts,"

15   or the one person who said "no" said, "We don't have

16   overlapping shifts."  So he interpreted that question to mean

17   they never supervised, notwithstanding that Question 5(c) was

18   totally inconsistent with that interpretation and inconsistent

19   with certainly the depositions I read before my report was

20   written.

21   Q.    Dr. Walker, let me turn to your analysis of the data from

22   the opt-in survey.  Did you do an analysis of the data to

23   determine the management tasks performed by the responding

24   assistant store managers?

25   A.    I did an analysis of -- yes.  I counted the number of

1   respondents who said they regularly performed various

2   activities, without limiting it to the people who said, then,

3   "I did so without instruction, supervision, or guidance."

4   **Q.**   Did you tabulate your calculations, sir?

5   **A.**   Yes, I did.

6          **MR. GILLIGAN:**   If we could put up Demonstrative 9.

7   **BY MR. GILLIGAN:**

8   **Q.**   What is the analysis of the data that you did to determine

9   the number of assistant store managers, percentage of assistant

10  store managers performing management tasks?

11  **A.**   Well, I looked at the question which asked, "Did you

12  regularly perform these various activities?" and I counted the

13  number who said that they regularly performed at least one of

14  the management tasks that were listed.  99 percent of them

15  performed at least one of the management tasks on a regular

16  basis.

17  **Q.**   Did you do a tabulation of the number of responding

18  assistant store managers who had performed at least five of the

19  management tasks listed in the survey?

20  **A.**   Yes, I did.

21          **MR. GILLIGAN:**   If we could put up Demonstrative 10.

22  **BY MR. GILLIGAN:**

23  **Q.**   What is the percentage of responding assistant store

24  managers who had performed at least five of the management

25  tasks listed in the survey?

1   **A.**   73 percent of the respondents said that they performed at

2   least five of the management tasks listed on the survey.

3   **Q.**   Did you calculate the percentage of responding assistant

4   store managers who indicated in the survey that they had

5   performed at least eight of the management tasks listed in the

6   survey?

7   **A.**   I'm sorry.  I was getting these confused with later

8   responses, later exhibits, and I'd like to go back and correct.

9   **Q.**   Okay.  Let's go back to 9.

10  **A.**   This was derived from two questions.  There's the question

11  asking whether the respondent conducted certain -- performed

12  certain activities.  The following question on the survey asks

13  who else in the store does certain activities.  This is the

14  percentage of respondents saying either that they themselves

15  performed one of the management tasks or that the other ASMs in

16  the store performed that management task.

17           **THE COURT:**  Wait.  I'm confused.  What is this?

18           **THE WITNESS:**  I don't have a survey in front of me,

19  Your Honor.

20           **THE COURT:**  Why don't you look at this.

21           **MR. GILLIGAN:**  Your Honor, I'm going to put on

22  Rausser 2164.

23           **THE COURT:**  Just a sample of any of them.

24           **MR. GILLIGAN:**  Put on Question III(4).

25

1    BY MR. GILLIGAN:

2    Q.   Dr. Walker, is that the information in the survey from

3    which you derived this material?

4    A.   Yes, that's right.  So you can take Questions 3 and 4 --

5    Question 3 tells you whether they said they performed an

6    activity.  Question 4 asks who else in the store does

7    something, and it asks you to identify whether other assistant

8    store managers are engaged in certain activities, whether store

9    or district managers also perform that activity, or whether

10   associates -- the more general definition of all hourly workers

11   is how I would interpret it, but it just says "associates" --

12   whether they perform these various activities.

13          So the 99 percent is the percentage of respondents

14   who either said that they themselves perform an activity or on

15   this Question 4 said that other ASMs perform an activity.  So

16   the 99 percent is a measure of the involvement of ASMs in a

17   management activity, but it isn't specifically the respondent,

18   necessarily.

19   Q.   Did you do a similar calculation with respect to the

20   percentage of ASMs who reported either they or other assistant

21   store managers performed at least five of the management tasks

22   listed in the survey?

23   A.   Yes.

24   Q.   What was the percentage who reported that assistant store

25   managers were involved in -- performed at least five of the

1  management tasks?

2  **A.**    73 percent.

3  **Q.**    Did you also do a calculation of the percentage of

4  respondents who said either they or other assistant store

5  managers performed at least eight of the management tasks

6  listed in the survey?  The management tasks that you were

7  counting are the ones listed that are listed in Question 4; is

8  that correct?

9  **A.**    That's correct.

10 **Q.**    Okay.

11 **A.**    It's 47 percent said that they or other assistant store

12 managers performed at least eight of the nine tasks.

13 **Q.**    Did you focus on which tasks were the tasks that were most

14 commonly performed by the assistant store managers or reported

15 that other assistant store managers performed them?

16 **A.**    I'm looking to see whether it's in my report.  I don't

17 recall all of the things specifically that I tabulated.   I

18 think that I did.

19            **MR. GILLIGAN:**   If you would put Demonstrative 12 on

20 the screen, it might help to refresh Dr. Walker's memory.

21 **BY MR. GILLIGAN:**

22 **Q.**    Did you determine which were the tasks most reported as

23 having been performed by the assistant store managers?

24 **A.**    Yes.  Just to avoid confusion, this is based upon the

25 respondent's answers to Question 1 about what the respondent

1    did himself or herself.

2    **Q.**    Okay.

3    **A.**    And, yes, for five of the ten management activities, more

4    than half of the respondents reported that they regularly

5    performed it.  The most common were determining merchandise

6    location, order merchandise, discipline employees, and schedule

7    employees.  For each of these, over 62 percent of the surveyed

8    store managers reported that they regularly performed the

9    activity.

10   **Q.**   So the information for this analysis was taken from

11   Question 1?

12           **THE COURT:**  It's III(1); right?

13           **THE WITNESS:**  Yes, Your Honor.

14   **BY MR. GILLIGAN:**

15   **Q.**   Did you also do a tabulation of the assistant store

16   managers who said they either performed or were consulted on

17   management tasks?

18   **A.**   Yes, I did.

19   **Q.**   Where did you derive that information, sir?

20   **A.**   That would be from Section III, Question 1 and 2.

21           **MR. GILLIGAN:**  If you would put Demonstrative 13.

22   **BY MR. GILLIGAN:**

23   **Q.**   What is the total number of responses that were analyzed

24   in calculating this information?

25   **A.**   553.

1    **Q.**   So there were, what, 406 of the 553 that indicated that
2    they were involved in or were consulted on hiring of employees?
3    **A.**   Yes, that's correct.
4    **Q.**   For disciplining employees, 433 out of 533; is that right?
5    **A.**   Yes.  Subject, again, to all of the caveats that we talked
6    about before, that "consult" is people that wrote something
7    other than, "I was not consulted," on the survey response,
8    which means that someone asked their opinion or they said they
9    regularly performed the task.
10   **Q.**   You have a task listed on the far right-hand side:  448
11   assistant store managers involved in "determine location."  To
12   what does that refer?
13   **A.**   Determine merchandise location.
14   **Q.**   From where did you get that information?
15   **A.**   It's all from Questions 1 and 2.
16   **Q.**   In analyzing the data from the OnPoint survey, did you do
17   an analysis of the respondents to the survey, comparing the
18   responses of those assistant store managers who had a longer
19   tenure of service at Big Lots to those who had a shorter tenure
20   of service?
21   **A.**   Yes, I did.
22   **Q.**   Why did you do that?
23   **A.**   Many of the questions asked whether you actually did
24   something, and the respondents had various tenures.  So I would
25   have expected that the people that had been there a while would

1   more frequently report that they had regularly conducted

2   various activities because they would have had more

3   opportunities for these things to come up, and also because you

4   would expect that there is a defacto probationary period for

5   most new employees.

6   Q.   Did you find whether or not the length of service an ASM

7   had with Big Lots was statistically significant on the

8   respondent's involvement in management activity?

9            THE COURT:   What was the distinction you drew between

10  longer and shorter?

11           THE WITNESS:   I just cut it in half.

12           THE COURT:   So who went into Pile 1, and who went

13  into Pile 2?

14           THE WITNESS:   I have the numbers in here somewhere.

15  But I just cut it in half, and I will tell you when I find it.

16  The top half, meaning the ones with the most tenure, ranged

17  from three years and one month to a little over 19 years.  The

18  bottom half was from 32 days to three years.

19  BY MR. GILLIGAN:

20  Q.   Why did you select three years?

21  A.   I just cut it in half.

22  Q.   Okay.

23  A.   There was a one-person difference because of the cutoff

24  point.

25  Q.   That's just what the length of tenure happened to be of

1   50 percent of the group?

2   A.   That's right.  That's right.

3   Q.   Let me try to spit out this question one more time.  Did

4   you find whether or not the length of the service an ASM had

5   was statistically significant on the respondent's involvement

6   in the management activity?

7   A.   Yes.  But whether I wrote it, I don't recall.  You

8   definitely have to take that with a grain of salt because all

9   of these statistical tests are based upon the assumption that

10  there's none of the various errors that we talked about.  If

11  the errors are present, then the statistical validity is

12  compromised.  But what this does tell me is that, to the extent

13  that you see these differences, it's not due to just random

14  error.

15  Q.   Did you prepare a chart indicating your findings on the

16  tasks performed by the two different groups, the more senior

17  assistant store managers and the shorter-tenured assistant

18  store managers?

19  A.   Yes.

20       MR. GILLIGAN:  If you'd put up 14.

21  BY MR. GILLIGAN:

22  Q.   The number of observations for the more senior group was

23  what, Dr. Walker?

24  A.   227.

25  Q.   For the more junior group?

A.    225.

Q.    What did you find in terms of the participation by the more senior compared to the more junior in management activity?

A.    That on every activity the more senior group reported more frequently that they either performed or consulted on these management tasks.

Q.    If we would look at Demonstrative 15, is this a further continuation of your analysis or tabulation?

A.    Yes.  And you see the one task where it doesn't hold is approve advertising, which is roughly the same; 57 for the more-tenured group, but 59 for the less-tenured group.  Other than that one task, for every other task the more-tenured group just reported being involved in these management activities more frequently.

Q.    What was the significance, if any, to you of that analysis?

A.    I think that there are two things it indicates:

        One, that the various tallies may be impacted by people that weren't around long enough to regularly participate in various activities; and

        Two, that if there really is statistical basis to accept what Dr. Rausser has done and if there's no measurement error, then this shows that there still are distinctions among opt-ins; that you know if the underlying statistical basis is correct for his analysis -- that there is no measurement

1    error -- and this shows you that there are differences within

2    the opt-in group, that higher-tenured people are statistically

3    different than lower-tenured people, you would still have to be

4    concerned about nonresponse bias because the nonrespondents may

5    be different, in terms of their tenure, than the respondents.

6    **Q.**   Have you done an analysis of the data in the OnPoint

7    survey to compare any difference between the management work

8    performed by the responding assistant store managers and

9    associates?

10   **A.**   Yes, I have.

11   **Q.**   What did you do in order to make that determination or

12   analysis?

13   **A.**   I referred, again, to the question that we talked about a

14   minute ago, Question 4, where Dr. Rausser/OnPoint asked survey

15   respondents about the participation of other job categories and

16   specific tasks.  So I compared what the respondent said

17   associates were doing in terms of management to what they said

18   ASMs were doing in terms of management.

19           **MR. GILLIGAN:**  If we would put up Demonstrative 16.

20   **BY MR. GILLIGAN:**

21   **Q.**   Is this a chart that you prepared of the results of the

22   analysis of the data?

23   **A.**   Yes.

24   **Q.**   What does that show, sir?

25   **A.**   The blue bar shows the number of respondents who said that

1    ASMs performed at least different numbers of management tasks.
2    So 545 of the respondents indicated that ASMs perform at least
3    one management task, yet only 240 respondents indicated that
4    associates performed at least one management task.  So it's
5    nearly 100 percent versus something well under 50 percent for
6    associates.

7          521 of the respondents indicated that ASMs perform at
8    least two of the management tasks versus only 91 associates who
9    were reported as having performed at least two management
10   tasks.

11         For three management tasks, the number of associates
12   that are involved has fallen to 31.  While there's still 483,
13   the vast majority of the respondents indicated that ASMs
14   perform at least three.

15         You can see that by the time you get to four
16   management tasks, the number of associates that are reported as
17   being involved is trivial; it's 17.

18   Q.   Did you compile any data about the amount of associate
19   work that respondents reported that store managers and district
20   managers performed?

21   A.   Yes, I did.

22   Q.   Where did you get that information?

23   A.   Again, from Question 4 of Dr. Rausser's survey.

24         MR. GILLIGAN:   If you could put up Demonstrative 17,
25   which is styled "Tasks Respondents Say Store or District

1  Managers Perform."

2  **BY MR. GILLIGAN:**

3  **Q.**   Again, where did you get this data, sir?

4  **A.**   This is from Question 4 of Dr. Rausser's survey.

5  **Q.**   The blue signifies what?

6  **A.**   The percentage of respondents indicating that

7  store/district managers perform a task.  So 47.7 percent of the

8  respondents indicated that store/district managers stock

9  shelves.  63.7 percent said that store/district managers make

10 sales.  35.4 percent said store/district managers clean the

11 stores.  55 percent said store/district managers unload trucks.

12 16.4 percent said store/district managers set up displays.

13 76 percent said store/district managers perform inventory.

14 **Q.**   What, if any, significance does this analysis have?

15 **A.**   Well, it says to me that mere activity -- well, I assumed,

16 personally, that store and district managers were managers.  It

17 just says to me that merely being a manager doesn't mean that

18 you're not going to engage in these sorts of more exempt type

19 of work.  It also shows that engaging in this sort of exempt

20 type of work, in and of itself, doesn't disprove somebody that

21 I would consider to be engaged in the management activities at

22 other times.

23 **Q.**   Does the OnPoint survey provide information about the

24 respondents, responding assistant store managers, and their

25 supervision of associates?

1  A.   Yes, it does.

2  Q.   Does the survey indicate the percentage of assistant store

3  managers who say they supervise two or more full-time

4  employees?

5  A.   If you accept the way to translate part-time to full-time,

6  yes, it does.

7  Q.   Where did you get information to compute the percentages

8  for that particular issue?

9  A.   In Questions 5, 5(a) and 5(b), Dr. Rausser asked in the

10  first part of those questions:  "How many full-time employees

11  did you regularly and customarily supervise:  Zero, one, two,

12  or more?"  In 5(b), just in the first part, he asked:  "How

13  many part-time employees did you regularly and customarily

14  supervise:  Zero, one, two, three, four, or more?"

15           So you can take the answers to those questions and

16  you can calculate whether or not they supervised two or more

17  full-time equivalents when you count a part-time employee as a

18  half-time employee, which is the methodology that Dr. Rausser

19  used in his report.

20  Q.   Did you do that calculation, sir?

21  A.   Yes, I did.

22           MR. GILLIGAN:  If you would put up Demonstrative 18.

23  BY MR. GILLIGAN:

24  Q.   What is depicted in Demonstrative 18, Dr. Walker?

25  A.   This refers exclusively to 5(a), wherein the respondents

1    were asked:  "While you worked as an assistant store manager,
2    how many full-time employees (employees who worked 40 hours or
3    more per week) did you regularly and customarily supervise?"
4    Then it gave three response options:  Zero, one, two, or more.
5              85 percent of the respondents said that they
6    supervised two or more on a regular and customary basis.  5
7    percent more said that they supervised one on a regular and
8    customary basis.  Only 10 percent said that they supervised
9    zero full-time employees on a regular and customary basis.
10   Q.   Did you tabulate information about the number of
11   responding assistant store managers who reported regularly and
12   customarily supervising part-time employees for 40 hours or
13   more a week?
14   A.   I don't think that it was the question --
15            THE COURT:  40 hours a week for part-time; is that
16   what you mean?
17            MR. GILLIGAN:  Yes.
18   BY MR. GILLIGAN:
19   Q.   Did you tabulate the number of assistant store managers
20   responding to the survey who indicated that they supervised
21   four or more part-time employees regularly and customarily?
22   A.   Yes, I did.
23   Q.   Did you prepare a chart or graph to show the results of
24   your tabulations, sir?
25   A.   Yes, I did.

1        **MR. GILLIGAN:**  If you could put up Demonstrative 19.

2   BY MR. GILLIGAN:

3   **Q.**   Dr. Walker, if you could describe this calculation, what

4   the demonstrative shows of your calculation, to the Court.

5   **A.**   Yes.  This is similar to the slide we just saw, but this

6   one concerns Question 5(b), once again only the first part,

7   where they asked:  "How many part-time employees (employees who

8   worked less than 40 hours per week) did you regularly and

9   customarily supervise?"

10       85 percent of the respondents indicated that they

11  regularly and customarily supervised four or more.  9 percent

12  said that they regularly and customarily supervised three or

13  more.  3 percent said that they regularly and customarily

14  supervised two or more.  1 percent said they regularly and

15  customarily supervised one or more.  Only 2 percent said that

16  they did not regularly and customarily supervise any.

17  **Q.**   Does the survey provide information about the amount of

18  time that the responding assistant store managers supervised

19  associates when they were the only manager on duty?

20  **A.**   Yes.

21  **Q.**   Where is that information contained in the survey results?

22  **A.**   5(c) asks:  "Approximately how many total hours each week,

23  if any, did you spend supervising full-time and part-time

24  employees that no one else supervised during your shift?"

25       **MR. GILLIGAN:**  That's Question 5(c) in

1  Demonstrative 20.
2  **BY MR. GILLIGAN:**
3  Q.  What data did you understand this question was attempting
4  to gather, sir?
5  A.  I think it's attempting to gather the time spent
6  supervising while no one else was supervising.
7  Q.  Does it fully account for the amount of supervision by a
8  assistant store manager?
9  A.  I would expect not.
10  Q.  Why not?
11  A.  Well, again, based on the depositions that I read before
12  my report was written and based upon some of the marginalia
13  there are periods of time when there are multiple managers on a
14  shift, yet assistant store managers may have management
15  responsibilities.  So this would be limited to the time when
16  there was no other manager around so that no one else was also
17  supervising those employees.
18  Q.  From your analysis of the survey responses to Question
19  5(c), what did you learn about the amount of time that the
20  responding assistant store managers spent as the sole manager
21  on duty?
22  A.  I'm sorry.  I didn't complete my answer before.
23        In addition to the time supervising -- I'm sorry.  I
24  answered it as though you'd asked me about supervising, but I
25  understand that you asked me on management.  Is that correct?

1  Q.   Yes, sir.

2  A.   The other reason that it would be an understated measure

3  of time spent managing is because there are other types of

4  management tasks besides just supervising while no one else is

5  supervising at the same time.  So there were various other

6  management tasks which may occur at any time other than

7  concurrently with the supervising and they would not be fully

8  accounted for.

9  Q.   Have you answered the question with respect to does

10 Question 5(c), or the response to Question 5(c), fully account

11 for the amount of supervision by the responding assistant store

12 managers?

13 A.   I would think that it would not do that either because of

14 the potential for supervising while someone else was in the

15 store.

16 Q.   So let me go back to this question:  What did the

17 responses to Question 5(c) tell you about the amount of time

18 that the responding assistant store managers spent as the sole

19 manager on duty in their store?

20 A.   I have an exact number, if you can refer me to a paragraph

21 that will refresh my recollection.

22 Q.   Let me ask her to put Demonstrative 21 on the board and

23 see if you can identify that.  Is this a --

24 A.   Yes.  This is a summary of the information that's in my

25 report.  The average was 26 hours spent in this

1   sole-supervisory capacity.  That 26, on average, represented

2   51 percent of normal working hours.  The highest response in

3   hours was 90 hours per week spent supervising employees who no

4   one else was simultaneously supervising.  The highest response

5   is a percentage of normal working hours for a person that was

6   100 percent, so people who reported that they spent all of

7   their time in that capacity.  The number of people who said

8   that they spent some time supervising people who were not

9   simultaneously supervised by someone else, some time at all,

10  was 485 out of the 553 respondents.

11  Q.   So from the data in response to 5(c), the average of the

12  responses was 26 hours spent as the only manager present in the

13  store?

14  A.   Yes, that's right.

15  Q.   You then compared the hours spent as the sole manager

16  with, what, the total number of hours that they reported that

17  they worked that week?

18  A.   Well, in Question 6 OnPoint asked:  "As an assistant store

19  manager, approximately how many hours on average did you work

20  per week during a normal workweek?"  So I used that as the

21  denominator for those calculations.

22  Q.   So that 51 percent of the average respondents' workweek

23  was spent as the sole manager on duty at the store?

24  A.   That's correct.

25  Q.   Did you also do a tabulation from the survey responses

1  showing the number of hourly associates supervised by the
2  responding assistant store managers?
3  **A.**   I did calculations based upon 5(a) and 5(b).  You can't
4  get to the average number because it's capped.  The question
5  only asks up to four part-time and up to two full-time.
6  **Q.**   Were you able to calculate, from the information from the
7  survey, the percentage of the responding assistant store
8  managers who supervised two or more full-time employees?
9  **A.**   I was able to calculate the percentage of respondents who
10  said that they supervised two or more full-time equivalents
11  when you count part-time as one half of a full-time equivalent,
12  yes.
13            **MR. GILLIGAN:**  If you would put up
14  Demonstrative 22-A.
15            **THE WITNESS:**  This shows that, of the respondents,
16  85 percent said they supervised two or more full-time
17  employees, 85 percent said they supervised four or more
18  part-time employees, 96 percent said that they supervised two
19  or more full-time equivalent employees, when half of a
20  part-time -- I'm sorry, part-time counts as half of a full-time
21  equivalent.
22  **BY MR. GILLIGAN:**
23  **Q.**   These numbers, again, were derived from what questions of
24  the survey, sir?
25  **A.**   This comes from Questions 5(a) and 5(b) of Dr. Rausser's

1  survey, but excluding and not taking into account the second

2  part, where he asks them:  "Did anyone else supervise these

3  employees during your shift?"

4          **MR. GILLIGAN:**  Could I have a moment, Your Honor?

5          **THE COURT:**  Sure.

6  BY MR. GILLIGAN:

7  Q.   Dr. Walker, I'm not sure if I covered this earlier.  What

8  is your understanding of the information that was sent

9  accompanying the survey to the opt-in member?

10 A.   My understanding is there was a cover letter telling the

11 respondents that:  "This survey is necessary for this lawsuit.

12 Please respond as quickly as possible to Big Lots litigation."

13 Q.   Was the letter on the stationery of OnPoint or addressed

14 from a lawyer, or do you remember?

15 A.   My recollection is that it was on attorney stationery from

16 counsel for the plaintiffs.

17 Q.   This is from Defendant's Exhibit 1505.  Are you able to --

18 there's no date on the letter, but -- again, it's an urgent

19 attorney-client communication; is that right?

20 A.   Yes.

21 Q.   It identifies it as related to the Big Lots lawsuit?

22 A.   Yes.

23 Q.   "Your help is needed immediately"?

24 A.   Yes.

25 Q.   It's addressed from Mr. Philip Bohrer?

1   A.   Yes.

2   Q.   Distinguished counsel from the state of Louisiana?

3   A.   Yes.

4   Q.   What, if any, concern would you have that the survey came

5   enclosed in a letter from plaintiffs' counsel?  What impact

6   would that have on the survey?

7   A.   Well, the whole letter is a reminder about the

8   circumstances surrounding the survey and the context of the

9   survey.  It's everything that you don't want to bring to the

10  survey respondents' minds if you're trying to get an unbiased

11  reflection of their recollections.  By that, I don't mean

12  biased in a pejorative way; I mean in a statistical way.

13            In particular, there's a sentence:  "Your response

14  will be used by our expert at trial to show what your actual

15  job duties were as an assistant store manager."  As far as I

16  know, there's absolutely no reason to include that sentence

17  other than to direct the respondents to the context in which

18  the responses will be used.

19            MR. GILLIGAN:  Those are all the questions I have,

20  Your Honor.

21            THE COURT:  All right.  We'll take the afternoon

22  break and come back at 4:26.

23            THE DEPUTY CLERK:  All rise, please.

24            (WHEREUPON the Court took a brief recess.)

25

1                        **CROSS-EXAMINATION**

2     BY MR. BOHRER:

3     Q.    Dr. Walker, how are you doing today?

4     A.    I'm fine.

5     Q.    Hanging in there?

6     A.    I'm good.  Thank you.

7     Q.    I just wanted to go over a few things preliminarily.  When

8     I took your deposition, I think I asked you when was the last

9     time that you had actually been involved in a situation where

10    you, yourself, devised or drafted a survey, and my recollection

11    is that it was sometime in the '80s.  Is that correct?

12    A.    That's correct.

13    Q.    Since then, I think you had input in one other survey

14    involving some aircraft issues about three or four or five

15    years ago.

16    A.    On the design end, yes, that's correct.

17    Q.    Now, when I was out in California to take your deposition,

18    I asked you at that point what were your billings as of the

19    date of your deposition, and you gave me a document that showed

20    that you had billed Big Lots $331,458.98 as of February of

21    2008; is that correct?

22    A.    I don't remember the number.  I take your word for it.

23    Q.    Can you tell me what your billing has been as of today for

24    the work you've done and the work that your company has done in

25    this case?

1   **A.**   I haven't conducted -- no, I can't.

2   **Q.**   Well, the bill that you gave me was through February, and

3   I know that since February you've done some additional work in

4   this case; correct?

5   **A.**   Yes.

6   **Q.**   You've done an addendum report; right?  Which was dated

7   March 31, to help you.

8   **A.**   Yes.

9   **Q.**   Obviously, you've done some trial preparations.

10   **A.**   Yes.

11   **Q.**   Can you tell the Court what your billings have been as of

12   today for the work you've done in this case?

13   **A.**   I can't.  I'm sure that it's significant because I know I

14   put a lot of time into this case, but I can't give you a

15   number.

16   **Q.**   You would agree with me it would certainly be in excess of

17   what you billed in February, which was $331,458.98?

18   **A.**   It would certainly be well in excess of what I billed in

19   February, yes -- through February, yes.

20   **Q.**   Now, you've talked a lot today about your opinions with

21   respect to Dr. Rausser and OnPoint Analytics' work; is that a

22   fair statement?

23   **A.**   Yes, it is.

24   **Q.**   What I want to talk to you about is some of your

25   background information and then the things that you, yourself,

1    have done other than evaluate Dr. Rausser's work.

2              Have you ever analyzed the executive exemption under

3    the Fair Labor Standards Act in any case or situation other

4    than this one?

5    **A.**   No.

6    **Q.**   You have never been retained to do an evaluation of an

7    exemption issue under any state or federal law except for this

8    case; correct?

9    **A.**   An FLSA exemption issue, that's correct.

10   **Q.**   You've never published on the Fair Labor Standards Act or

11   any state wage or hour law; is that correct?

12   **A.**   That's correct.

13   **Q.**   You've never been retained to determine whether or not any

14   federal or state wage and hour law has been complied with other

15   than, perhaps, this case?

16   **A.**   That's correct.

17   **Q.**   You've never performed or designed a survey that was used

18   to calculate the number of hours an employee or a group of

19   employees worked; is that correct?

20   **A.**   That's correct.

21   **Q.**   Now, you were retained in this case by Big Lots' counsel;

22   correct?

23   **A.**   Yes.

24   **Q.**   If I remember correctly, your retention letter indicated

25   that you were going to provide expert services to Big Lots, as

1  directed by their counsel; is that correct?

2  A.   I don't remember exactly what the letter says.  If you

3  have it, I need to see it.

4  Q.   Yes, I do.

5         My question to you, Dr. Walker, is:  Were you,

6  yourself, ever asked to go perform any type of survey, conduct

7  any type of analysis, or do anything that would be considered

8  any type of study either opt-in ASMs or ASM population in

9  general?

10  A.   Well, I think I just spent several hours discussing the

11  results of the studies of the opt-ins that I've done.

12  Q.   The studies of opt-ins that you've done other than your

13  analysis of Dr. Rausser's work.

14  A.   And other than the analysis of pay for ASMs and whether it

15  would be sensible for the ASM position to exist, given their

16  pay scales.  Other than the work that we've talked about this

17  morning, I have not done anything else.

18  Q.   Fair enough.

19         You were never asked to draw up a survey yourself

20  that was going to be submitted to any component of either the

21  opt-in ASM population or the non-opt-in ASMs; correct?

22  A.   That's correct.

23  Q.   Now, you would agree with me, would you not, that a survey

24  could have been drafted that would have yielded relevant

25  information with respect to the job duties and functions of the

1    ASMs?

2    **A.**    That's probably true, yes.

3    **Q.**    You would agree with me, would you not, that as an

4    economist you like to look at things that have some empirical

5    evidence of credibility and accuracy?

6    **A.**    If I'm going to draw conclusions about facts, I'd like

7    there to be some factual support.

8    **Q.**    In fact, when I took your deposition, you gave me several

9    examples of accessing documents, to review documents, because

10   sometimes documents can be insightful with respect to whatever

11   it is that you're studying?

12   **A.**    I think that sometimes documents can be insightful

13   regarding what you're studying.

14   **Q.**    Now, in this situation is it your opinion that the only

15   way to really find out what ASMs do or don't do is to do an

16   individualized inquiry for each and every one of them?

17   **A.**    If you want to know what each and every one of them does,

18   yes.

19   **Q.**    You would agree with me, would you not, that there are

20   documents in this case that exist, that you could have had

21   access to, that would have been relevant for purposes of

22   analyzing and studying certain job functions of ASMs?

23   **A.**    I don't know what all exists in the discovery record.  I

24   assume that that's true, but it's an assumption.

25   **Q.**    Well, you pretty much have had unfettered access to

1  Big Lots' documents or personnel or corporate policies or

2  procedures; is that a fair statement?

3  A.    No, I haven't had unfettered access to all of Big Lots'

4  documents and corporate procedures.  No one has told me "no"

5  when I've asked for something that seemed relevant to the tasks

6  that I was asked to address.  But, no, I have not had

7  unfettered access to all of Big Lots' documents.

8  Q.    It was a poor question on my part.  You have not asked for

9  something that Big Lots has said you can't have?

10  A.    That's correct.

11  Q.    Now, my understanding is that there are certain documents

12  that you've reviewed; correct?

13  A.    Yes.

14  Q.    And you made a list of those documents; is that a fair

15  statement?

16  A.    As of the time of my first report, I created a

17  documents-considered list, yes.

18  Q.    You did not, at that point and as of today, have the

19  chance to go review the Big Lots' policies and procedures

20  dealing with certain store activities?

21  A.    Well, my recollection is that there were some policies --

22  depending on how you define a policy and how you define a

23  procedure -- that were attachments to some depositions.  I

24  assume, without reviewing documents, that concerns things as

25  wage regions.  I consider that something that's relevant to a

1   Big Lots' policy or procedure.  There were other similar
2   Big Lots' documents that I reviewed that were produced in the
3   ordinary course of business.  I consider those to be policies
4   and procedures.
5   **Q.**   For example, do you know what an I-9 form is?
6   **A.**   Yes.
7   **Q.**   Do you know, in the Big Lots jargon, what an Action
8   Request Form is?
9   **A.**   Not sitting here, no.
10  **Q.**   Again, this is Big Lots jargon:   Handbook Acknowledgment
11  Form?
12  **A.**   No.
13  **Q.**   How about a Progressive Counseling or Discipline Form?
14  **A.**   No.
15  **Q.**   How about a Training Checklist?
16  **A.**   No.
17  **Q.**   How about a Training Checklist Certification?
18  **A.**   No.
19  **Q.**   How about an Employee Evaluation?
20  **A.**   Again, always in saying "no," and I can guess for some of
21  them the answer's no.  I don't know in particular.
22  **Q.**   My point is that you haven't reviewed any grouping of
23  documents with those titles; correct?
24  **A.**   That's correct.
25  **Q.**   Those documents were not in any of the documents that you

1    considered in that list that you gave me; correct?

2    A.    They shouldn't be.  I don't recall seeing them.

3    Q.    Do you have any appreciation or understanding as to

4    whether or not those documents that I just described for you

5    are documents that assistant store managers in this case,

6    according to Big Lots, fill out on a regular basis?

7    A.    Well, not knowing what they are, I can't answer your

8    question.

9    Q.    Would you agree with me, Dr. Walker, that certainly you

10   could have asked for a statistically significant and/or random

11   sample of documents from stores across the country if you

12   wanted to have something to look at to determine whether ASMs

13   execute those documents?

14   A.    If I wanted to know whether ASMs execute, meaning sign,

15   the specific documents you talked about, I certainly could have

16   asked to get all of them and counted them.

17   Q.    You understand that this is a collective action under the

18   Fair Labor Standards Act; right?

19   A.    Yes.

20   Q.    This is the first one that you've been involved in as an

21   expert; is that correct?

22   A.    Yes, that's correct.

23   Q.    Do you understand in this case that Big Lots has the

24   burden of proof with respect to this exemption?

25   A.    That's my understanding, yes.

1    Q.   With that in mind, would you agree with me that there are

2    things that could have been done by Big Lots to gather

3    information, with respect to the ASM job as a whole, to be

4    informative and maybe even probative regarding the job

5    activities that the ASMs perform?

6    A.   There's steps they could have done to collect documents,

7    or are you asking me whether there are documents, or are you

8    asking me both?

9    Q.   Well, I'm asking you:  Are there things that, in your area

10   of expertise, Big Lots could have done to gather information

11   from which an inference can be made regarding the job duties

12   and functions of the ASM job as a whole?

13   A.   They certainly could have collected documents they

14   anticipated might be relevant.  I'm not a lawyer, and I don't

15   know what all personnel documents Big Lots has.  I don't know,

16   at the end of the day, whether the answer is that they got

17   documents or not.  Certainly, Big Lots can make an effort to

18   collect documents, and I would assume that that happened in

19   this case; whether or not those documents are significant in a

20   legal sense, I don't know.  I'm not a lawyer.  I don't know

21   that.  I don't know what documents they've got.

22   Q.   Well, are you aware of the fact that Brad Waite in this

23   case testified that Big Lots has 15,000 hiring acts for store

24   personnel per year?

25   A.   I'm not aware of what Mr. Waite has testified to on that

1  subject.

2  **Q.**   You would agree with me, would you not, that it certainly

3  would be possible for someone such as yourself to go do an

4  analysis of the documents associated with those 15,000 acts of

5  hiring if you wanted to find out how many of those documents

6  are actually signed by ASMs?

7  **A.**   Sure.  If there are 15,000 documents and you want someone

8  to count up how many of them are signed by ASMs, I could do

9  that.

10  **Q.**   Now, do you know what the corporate structure of Big Lots

11  is?

12  **A.**   I don't have a very good idea of that, no.

13  **Q.**   Do you know how many district managers Big Lots employs?

14  **A.**   No, I don't know the answer to that.

15  **Q.**   In this case we've had two district managers that have

16  testified that they go to stores, they observe ASMs, they

17  observe their activities, they hire ASMs.  Would you agree with

18  me that you could conduct a random sample survey of 159

19  district managers and try to get some reliable information

20  about what goes on in the ASM job position company-wide?

21  **A.**   Certainly, one can conduct a survey, a survey of a random

22  sample of district managers, and ask them questions about, you

23  know, what do you think they know.

24  **Q.**   Can you tell me, if you can, what a statistically

25  significant sample size would be of 159 district managers?

1   A.   I hope this doesn't go the way our deposition did, because
2   this question kept coming up.  The answer is statistical
3   significance is not defined based upon the number of elements
4   in the population.  I can tell you if you had 159 it would be
5   statistically significant; but short of that, statistically
6   significance is defined based upon how precise you want your
7   answers to be and how variable the responses are.  So I can't
8   answer that question.
9   Q.   Well, certainly, you would agree with me, would you not,
10  that two district managers is probably not enough of a sample
11  size to draw any inferences at all?
12  A.   I don't know.  As a matter of statistics, if the purpose
13  is to calculate averages and to have tight confidence
14  intervals, I think the answer is no.  If it's more practical,
15  which is, can you derive any information from the experiences
16  of two people, the answer's yes.  We do that all the time.  You
17  do it in economics.  You do it in law.  You do it in life.
18  Q.   Right.  Your point is that you can certainly get some
19  information from one person; correct?
20  A.   Yes.
21  Q.   The question is whether or not that's a reliable amount of
22  information and a reliable source of information to draw
23  inferences or conclusions about a broader spectrum; correct?
24  A.   Yes.  Right.
25  Q.   I understand -- you educated me well out in California --

1    that there is no mechanical method for calculating an

2    appropriate or definitive statistical sample; correct?

3    **A.**   Well, it was more that you can't say beforehand, without

4    knowing a lot more information, what a statistically

5    significant sample size -- what sample size will yield

6    statistically significant results.  That's what I said.  The

7    other part of this is that learning is not limited to

8    statistics --

9    **Q.**   I understand.

10   **A.**   -- and that there's -- a lot of times, we can get a lot of

11   information from one observation or from two, and you see it

12   all the time.

13   **Q.**   Well, nothing prevented you in this case from interviewing

14   all 159 district managers to ask them in an interview setting

15   their observations and experiences with respect to the job

16   duties of ASMs; correct?

17   **A.**   That's correct.

18   **Q.**   That's something that you were not directed by Big Lots to

19   do in this case?

20   **A.**   That's correct.

21   **Q.**   Do you know how many store managers are currently employed

22   by Big Lots?

23   **A.**   No, I don't.

24   **Q.**   Do you know how many stores Big Lots has?

25   **A.**   I don't know the exact number, no.

1    **Q.**    Was there anything in this case that prevented you from

2    conducting some type of interview or survey of the store

3    managers?

4    **A.**    No.

5    **Q.**    Was that something that you were directed to do?

6    **A.**    No, it was not.

7    **Q.**    Was that something that you requested to do?

8    **A.**    That I asked to do?

9    **Q.**    Yes.

10   **A.**    No.

11   **Q.**    Do you know that store managers work with ASMs?

12   **A.**    Yes.

13   **Q.**    And, obviously, observe ASMs and interact with ASMs?

14   **A.**    Yes.

15   **Q.**    For the record, when I say "ASM," I'm referring to an

16   assistant store manager.  I just want to make sure we're on the

17   same page.

18              Were you ever asked to devise a survey of the store

19   managers?

20   **A.**    No, I was not.

21   **Q.**    In fact, in this case, Dr. Walker, you did not actually

22   even go to a Big Lots store until about a week before I took

23   your deposition in April of 2008; correct?

24   **A.**    That's correct.

25   **Q.**    You went there for 20 minutes?

1    A.    I don't know the exact amount of time.  It was not a lot

2    of time.  Certainly, less than an hour.

3    Q.    You went as a member of the public?

4    A.    That's correct.

5    Q.    In no official capacity?

6    A.    That's correct.

7    Q.    You were unable to determine which person was what

8    employee; correct?

9    A.    Well, I made no effort to determine who was who.

10   Q.    There was nothing, with respect to your observations, that

11   gave you any insight into what the job duty of an ASM was at

12   your one visit for less than an hour?

13   A.    Well, that's a little too far, in that I wanted to see

14   what a store was, and certainly just going into the store gives

15   you some idea about what the job is for anybody that works in

16   that store.

17   Q.    Fair enough.

18   A.    I don't consider myself to be an expert on the ASM's job

19   duties.  I know what I've read in depositions.  I know what

20   I've seen in the survey responses.  I know what one would

21   expect about the job from the pay scales and from the job

22   requirements that are set forth in the documents we discussed

23   this morning, but I don't know more than that.  I certainly

24   didn't learn more than that from my one visit.

25   Q.    In fact, you do not have an opinion as to whether or not

1  the ASM job category is properly classified as exempt or

2  nonexempt; correct?

3  **A.**   That's correct.  I consider that to be a legal opinion.  I

4  don't have such a legal opinion.

5  **Q.**   You did not conduct any interviews, yourself or your

6  staff; correct?

7  **A.**   That's correct.

8  **Q.**   You did not conduct any analysis of any type, Dr. Walker,

9  of the manager-on-duty duties that are performed by ASMs;

10  correct?

11  **A.**   That's correct.

12  **Q.**   You did not perform any time studies; correct?

13  **A.**   That's right.

14  **Q.**   You did not go out and field-test the job description to

15  see if it's accurate?

16  **A.**   That's right.

17  **Q.**   You readily admit that there may very well be ASMs who are

18  misclassified; correct?

19  **A.**   There very well may be.

20  **Q.**   You have no opinion one way or the other with respect to

21  whether there are ASMs who have opted into this lawsuit who may

22  be misclassified?

23  **A.**   That's correct.  That's a legal conclusion.

24  **Q.**   You have not done anything to quantify the amount of time

25  that ASMs spend in any particular activity other than reviewing

1  Dr. Rausser's survey; correct?

2  **A.**   What was that question again?  Not done anything to

3  ascertain the amount of time that any ASM spent an any

4  activity?

5  **Q.**   To quantify the ASM's job activities other what's in the

6  Rausser surveys.

7  **A.**   There's no tabulation; but, certainly, I've read

8  depositions that talk about what ASMs do, and in some instances

9  they talk about time spent on various activities.  There may be

10  other documents that talk about such.  I have not actually

11  tabulated anything other than what we've talked about already

12  or things that may be in my report that were not talked about.

13  **Q.**   You do not have an expert opinion as to whether any ASMs

14  perform jobs that are management under the Code of Federal

15  Regulations; correct?

16  **A.**   Yeah.  Once again, that seems to me to be -- I'm sorry.  I

17  take that back.  Could you repeat that question.

18  **Q.**   Yeah.  You have no expert opinion whether any ASMs

19  performed jobs that are management under the Code of Federal

20  Regulations?

21  **A.**   Well, I guess an expert opinion would be legal opinion, so

22  I guess the answer to that is, yeah, I don't have any such

23  opinion.

24  **Q.**   Are you familiar with the concept of a work study or job

25  analysis?

1  **A.**   In some context.  I don't know whether it's the same in
2  the FLSA context.
3  **Q.**   What is your understanding of what those terms mean?
4  **A.**   I've heard of it being used in the context of studying the
5  actual activities that are performed in a certain job.
6  **Q.**   You have not performed any of those?
7  **A.**   No.
8  **Q.**   You have not requested to perform any such study?
9  **A.**   That's correct.
10 **Q.**   You haven't reviewed any such study?
11 **A.**   That's correct.
12 **Q.**   As far as you know, no such study has ever been done?
13 **A.**   I don't know one way or the other.
14 **Q.**   Now, there obviously are ASMs who have not opted into this
15 lawsuit; correct?
16 **A.**   Yes.
17 **Q.**   My understanding is that there's probably about 4,000 or
18 so that fit that category of what we'll call non-opt-in ASMs.
19 Is that consistent with your understanding of the numbers?
20 **A.**   Yes, it is.
21 **Q.**   Many of those individuals are still employed by Big Lots;
22 correct?
23 **A.**   Yes.
24 **Q.**   Have you done anything to access those individuals to
25 conduct any type of analysis or survey or interview of any

1    non-opt-in ASMs?

2    **A.**    No, I have not.

3    **Q.**    Certainly, there was nothing that restricted your access

4    to that group of individuals; correct?

5    **A.**    I assume the answer's no, but I don't know.

6    **Q.**    Now, you did some calculations -- well, let's talk about

7    this.  You did some calculations earlier this morning with

8    respect to the economic feasibility or economic motivation for

9    misclassifying ASMs; correct?

10   **A.**    Yes.

11   **Q.**    It was your testimony that -- you did some math and you

12   calculated that the average 2006 pay for opt-in plaintiffs was

13   $33,994; correct?

14   **A.**    Yes.

15   **Q.**    You used an estimate of 30 percent, which is consistent

16   with the U.S. Department of Labor for percentage of wages for

17   benefits; correct?

18   **A.**    Yes.

19   **Q.**    You calculated the average cost to employ an ASM at

20   $44,192; correct?

21   **A.**    Yes.

22   **Q.**    Can you tell me how many individuals were at the maximum

23   pay of, pre-benefits, $42,675?

24   **A.**    That is the maximum for the group of individuals that I

25   had.  There was one person at that particular level.  This is

1   the range.

2   **Q.**   What you did was calculate the average for all opt-in

3   ASMs, which included some folks -- or one person, at least, at

4   the very high end; correct?

5   **A.**   Yes.

6   **Q.**   Did you calculate the mean or the median or just the

7   average?

8   **A.**   The average is the mean.  That's what I calculated.

9          **THE COURT:**  You didn't do the median?

10         **THE WITNESS:**  I did not do the median, no.

11  **BY MR. BOHRER:**

12  **Q.**   Do you know what the median pay was?

13  **A.**   Not sitting here, no.

14  **Q.**   Do you know what the distribution of pay was?

15  **A.**   Not sitting here, other than we know that it's capped from

16  below at $24,000 and we know that it went up to $44,000.

17  **Q.**   Well, do you know how many people were above the

18  average --

19  **A.**   Excuse me.  $42,000.

20         That would be the same thing as -- well, above and

21  below the average, no, I don't know.  Sitting here, I don't

22  know the number.

23  **Q.**   The reason I ask, obviously, is because, like you said, a

24  few people at the very end would have a disproportionate effect

25  in making the average higher than it would be, depending on the

1   distribution of pay rates; correct?

2   A.   Within this range, there would not be a significant impact

3   between the median and the mean.

4   Q.   But you haven't calculated the median and the mean?

5   A.   That's correct, but the median is typically used when

6   there can be outliers that are significantly higher than

7   everyone else.

8   Q.   I understand.

9   A.   And in this case it's not very far away.

10  Q.   What you used as a comparison was not the actual pay of

11  the store associate but the minimum wage; correct?

12  A.   The lowest -- well, actually, I used the range of pay that

13  is applicable for store associates.

14  Q.   I understand.

15  A.   I went through the arithmetic for the bottom end of the

16  range and I explained that, if you go through the arithmetic

17  for the top end of the range, you end up with the same

18  conclusion.

19  Q.   You picked 2006; correct?

20  A.   Yes.

21  Q.   Did you have a reason not to pick 2003 or 2004 or 2005?

22  A.   Because 2006 was the most recent year for which there was

23  data available for full calendar years at the time I was

24  conducting the analysis.

25  Q.   Well, you understand, don't you, Dr. Walker, that this

1   case goes back as far back as maybe 2002; correct?

2   **A.**   Yes.

3   **Q.**   As I understand your testimony, you believe this is

4   relevant for two reasons:  One, on the willfulness issue

5   because economic feasibility is part of a decision-making

6   matrix that companies use; correct?  And it may also be

7   relevant for purposes of determining the comparison between pay

8   of exempt and nonexempt individuals; is that a fair statement?

9   **A.**   Sort of.  I mean, you asked me at my deposition:  Why is

10  this relevant legally?  I told you I don't have an opinion

11  because it's legal, and then I guessed, and I said I'm guessing

12  it would be relevant to several issues.  Whether those are the

13  ones that I guessed at the time, I don't know.

14          It seems relevant to me for those reasons; but,

15  again, I'm guessing.  It seems to me -- and the reason that I

16  did it was it went to the real reason why you have an ASM, that

17  if I read -- that the whole idea is what's the primary purpose,

18  meaning why did the company go about hiring these people.  What

19  is it that they were trying to do by hiring them?  And it

20  seemed to me to go to that issue.

21  **Q.**   You don't know, sitting here today, whether or not your

22  economic feasibility evaluation is relevant for purposes of

23  misclassification under the Fair Labor Standards Act?

24  **A.**   I don't know what the law is.  I would assume that, given

25  that I wasn't able to say it, that it's got some legal

1  relevance because I know that you asked to get it out, I know
2  that I'm here, so I assume that that disposes of that issue.
3  **Q.**   You've been in a courtroom too many times.
4        Now, when you did the comparison, you took the pay
5  grades and not actual wages of store associates for your
6  comparison; correct?
7  **A.**   That's correct.
8  **Q.**   Now, do you have any information at all with respect to
9  pay ranges for ASMs or other employees in years prior to 2006?
10 **A.**   I have seen some documents that have pay ranges for prior
11 years.  My recollection is that they were similar format as the
12 documents that I have for 2006.
13 **Q.**   All right.
14 **A.**   I also know from work that you don't see huge changes in
15 pay ranges between job categories from year to year.
16 **Q.**   You don't know what the actual wages were for opt-in ASMs
17 in 2003, do you?
18 **A.**   I don't have the average pay information for 2003 that I
19 have for 2006, that's correct.
20 **Q.**   You don't have the average 2004 or 2005 pay for opt-in
21 plaintiffs; is that correct?
22 **A.**   That's correct.
23 **Q.**   Are you aware of the fact that, according to the testimony
24 in this case, Big Lots implemented a plan beginning in 2006 to
25 migrate from two ASMs to one in certain stores?

1   A.   Yes.  That's my understanding.

2   Q.   Are you aware of the fact that there was a pay raise

3   because of this in 2006?

4   A.   I was not aware of a pay raise in 2006 that was related to

5   this migration, no.

6   Q.   You would agree with me, would you not, that the

7   conclusions that you seek to make are relevant and applicable

8   only for that year; and that if the underlying data is

9   different in previous years, perhaps your calculations would be

10  different?

11  A.   As a theoretical matter, yes; but as a practical matter,

12  there would have to be a significant change from year to year

13  in order to make up these huge gaps.

14  Q.   Huge gaps.  All right.

15           Now, you did some math, and you would agree with me

16  that the middle figure, the maximum 2006 cost to employ an ASM,

17  is, for lack of a better phrase, an *outlier*?

18  A.   It's the high, yes.

19  Q.   Did you calculate the low?

20  A.   The low is $24,000.

21  Q.   I don't see that on your chart.  Did you not do it?

22  A.   Well, we know what the number is.  I mean, I discussed it

23  in my report.  That's how we were eliminating and why we were

24  eliminating people who had annual pay of less than $24,000.  I

25  also discussed in the report that, if you included those

1   people, the ultimate results were the same.

2   **Q.**   Well, the fact is, though, you did not do a calculation at

3   the lowest quartile of ASM pay.  You chose to do one with the

4   average pay; correct?

5   **A.**   Yes, that's right.

6   **Q.**   There was nothing that prevented you from doing a

7   store-by-store analysis or plaintiff-by-plaintiff analysis of

8   the pay differential in a particular plaintiff's store?

9   **A.**   I don't know that it would address the issue that I was

10   addressing; but I suppose that, yeah, I was physically capable

11   of doing it.  The point of my analysis was to look at,

12   corporate-wide, a justification for a job category with an

13   average cost of $44,000.  If you do store by store, that

14   doesn't tell you anything.  If you do person by person, it

15   doesn't tell you anything about what's going on on a

16   corporate-wide basis.

17   **Q.**   Now, for your calculations you used 59 hours of work a

18   week?

19   **A.**   Yes, I did.

20   **Q.**   So you accepted the Rausser survey, even though I know you

21   have some criticism of it, for purposes of this calculation?

22   **A.**   For purposes of the calculation, I didn't want to be

23   fighting over what the appropriate number of hours was, that's

24   correct.

25   **Q.**   Fair enough.

1          You would agree with me that the ASMs are there for,
2  in this case, 59 hours a week because they have to work 59
3  hours a week to get the job done?
4  A.    That sort of goes against what we just said.  No, I don't
5  agree that they are there 59 hours a week.  My estimate would
6  be substantially less because of all the biases we talked about
7  before.
8  Q.    For purposes of your calculation, hypothetically, I guess
9  my point is, Dr. Walker:  The ASMs, however many hours they
10 work, they work because it's necessary for them to be there for
11 however many hours they work to get their jobs done?
12 A.    Yes, that would be my answer.
13 Q.    Whatever it is; right?  I mean, they're not there for
14 nothing; correct?  So what you're really looking at is how many
15 manhours are involved in this process; correct?
16 A.    Yes.
17 Q.    Now, you decided to use in this calculation, to arrive at
18 your $17,933, a formula whereby you calculated a cost without
19 benefits of two minimum-wage, hourly store associates; correct?
20 A.    Not quite.
21 Q.    Well, maybe I misunderstood.  How did you get to the
22 $17,933?
23 A.    I took the $5.15 an hour 52 weeks a year and 59 hours per
24 week, and I added 13 and a half percent for benefits.  13 and a
25 half percent overstates, I think, the value of the benefits

1    that are available at Big Lots for a number of reasons we can
2    talk about if you like, but it's not zero benefits.
3    **Q.**    Okay.  Do you know what Big Lots considers full-time for
4    purposes of providing company benefits, how many hours a week?
5    **A.**    I think that full-time is 32 hours, but I'm not exactly
6    certain, and the number's in the record.
7    **Q.**    There's been testimony in this case that, if you work 30
8    hours a week or more, you're entitled to, in essence, the same
9    benefits as an ASM, even if you are an hourly associate.  Were
10   you aware of that?
11   **A.**    Well, I know that I've seen documents indicating that
12   there are certain benefits that are not available to hourly
13   workers regardless of whether they're full-time or part-time.
14   The 30-hour number that you just came up with, I'm not aware of
15   that.  If it's 30, then it's 30.
16   **Q.**    It's okay to say, "I don't know."  It goes quick that way.
17            There are other job classifications within the
18   Big Lots stores other than store associates; is that a fair
19   statement?
20   **A.**    Yes, that's correct.
21   **Q.**    Are you aware of what those are?
22   **A.**    Some of them.  Customer service specialist comes to mind.
23   Associate store manager comes to mind.  I'm not sure about
24   others.
25   **Q.**    Did you compare, for example, the rates of pay of an

1   associate store manager with an assistant store manager?

2   **A.**   No, I did not.

3   **Q.**   Did you compare the rates of pay, for example, of a CSS,

4   or customer service specialist, with an assistant store

5   manager?

6   **A.**   No.  And I guess another category, the bookkeeper, I

7   didn't do that either.

8   **Q.**   I forgot about the bookkeeper.  Was that information

9   available to you?

10  **A.**   I would assume that I could have gotten that information,

11  yes.  I could have gotten similar pay-range information.

12  **Q.**   So your calculations, again, are based on the cheapest way

13  possible or the least expensive way to get manhours for 59

14  hours a week, and that is the hiring of two part-time store

15  associates at minimum wage?

16  **A.**   Well, first, I don't recall what minimum wage is for the

17  country; but, yeah, for the lowest pay range available that

18  Big Lots would pay for the particular tasks that we're talking

19  about.  It seems to me to be pretty unimportant and irrelevant

20  to the question about what do you pay bookkeepers because

21  bookkeepers aren't hired to go retrieve carts or stock shelves.

22  It doesn't seem to me to be relevant what other job categories

23  are if those job categories included other tasks and those

24  other tasks have influence on the pay.

25          So if what I want to know is how much does Big Lots

1    pay for this job, for this task, to get this particular task

2    done, you look to people whose jobs are exclusively to do that,

3    and that's what I did.

4    **Q.**    Two points on that.  What you looked at is someone who

5    does the most menial jobs of all at Big Lots, gets buggies,

6    cleans the floors; right?

7    **A.**    If I've used *menial* before, I shouldn't because I don't

8    think it's appropriate of me to do that; but, certainly, the

9    manual tasks that require the least amount of experience and

10   the least amount of training because those are the type -- I

11   looked for the tasks that were specifically identified in the

12   complaint, and I wanted to know whether it made any economic

13   sense to hire people at the assistant store manager salary

14   range to get those tasks done.

15   **Q.**    Right.  That's my point.  Your whole analysis was based on

16   that one paragraph that Mr. Gilligan showed up on this ELMO

17   system about what the plaintiffs allege in their complaint;

18   that, basically, they get buggies and clean the floors.  Is

19   that the basis of your analysis?

20   **A.**    The purpose was driven by that and also by having read --

21   I think it was the magistrate's order characterizing that as a

22   key component of the case.  I read those documents and I came

23   to the conclusion that this is a significant factor in the

24   case, and I thought I would address it.  I talked about it with

25   the attorneys for Big Lots and they decided, yes, this is an

1   analysis they would like done.

2   **Q.**   Now, have you ever read the job description of an

3   associate store manager?

4   **A.**   I may have.

5   **Q.**   You don't remember it today; right?

6   **A.**   No, I don't.

7   **Q.**   Do you recall, sitting here today, the job description of

8   the CSS?

9   **A.**   No.  I'm pretty sure I've not read that.

10  **Q.**   Or bookkeeper?

11  **A.**   No.

12  **Q.**   Or any of the other job descriptions?

13  **A.**   I certainly don't recall reading them.  Whether I read

14  them or not, I can't say for certain.

15  **Q.**   Dr. Walker, in all honesty, you don't know what the

16  appropriate comparison is, whether it should be with the

17  low-paid, buggy-retrieving store associate, entry level, or the

18  associate manager?

19  **A.**   No, that's not true.  I've actually read several

20  depositions concerning what these jobs are and -- from

21  Big Lots' corporate representatives and also from deponents

22  themselves about what this job is and why it exists.  My

23  understanding of the associate manager job is that the job

24  exists to fill in when the assistant store managers aren't

25  available and to carry keys.  So it's described as the reason

1  for the job.

2  **Q.**   Well, you don't know -- sorry.

3  **A.**   If that's true, then that means that it wouldn't be

4  appropriate to look to associate managers to determine what it

5  is that Big Lots pays to get that job done of retrieving carts.

6  These people may just as well retrieve carts and stock shelves,

7  but it doesn't explain what their salaries are.

8  **Q.**   Are you finished?

9  **A.**   Yes.

10 **Q.**   You don't know, from a legal standpoint, what the

11 appropriate comparison is?

12 **A.**   Right.  I'm not here to give legal opinions.  My analysis

13 was trying to determine whether or not it made economic sense

14 to do it.

15 **Q.**   Of course, the higher up the pay scale you go, the less of

16 a gap there is between the right-hand calculations you've done

17 and the left-hand calculations you've done; correct?

18 **A.**   Well, no.  This calculation is a calculation of average

19 costs to pay ranges.  What you described is some individual

20 climbing the hierarchy.  I don't really see that the two go

21 together.  Certainly, the more you're paid, starting at $5.15

22 an hour, the less of a gap there is between your pay and

23 $42,000 an hour [*sic*].

24 **Q.**   Right.

25 **A.**   But that has nothing to do with what Big Lots' costs are

1  to get the work done.

2  Q.   If you have 59 hours of manpower that's necessary and

3  Big Lots classifies full-time, entitled to full benefits, at

4  30, is it realistic to hire two part-time associates to cover

5  59 hours a week and not have one of them work 30 hours?

6  A.   They would have to hire three in order to get this done,

7  to have this done at the minimum cost way.

8  Q.   So the way you would deal with that would be you wouldn't

9  change your calculations; you would just, say, hire three

10  people, each of whom collectively worked totally 59 hours?

11  A.   Yeah.  I don't recall.  We can read this.  I know that

12  earlier today I talked about two to explain the calculation

13  point, but the idea is, 59 hours worth of work, how do you get

14  that done?  Well, you hire enough part-time people to get it

15  done.

16  Q.   Okay.  Now, would you agree with me, Dr. Walker, that

17  there are other costs, intangible costs, associated with

18  part-time work?

19  A.   What kinds of cost do you have in mind?

20  Q.   Well, turnover costs?

21  A.   There are turnover costs associated with just being an

22  employer.  I don't know whether -- and I've never seen any

23  studies indicating that they're different for part-timers as

24  full-time.

25  Q.   Do you know in this case, for example, that there's been

1    testimony that, with respect to the hourly store associates,

2    the turnover rate is between 70 and 100 percent per year?

3    A.    I don't recall that particular number.

4    Q.    In fact, Mr. Schnorf testified in this case that, with

5    respect to store associates, there was a 100 percent turnover

6    of hourly workers per year.  Were you aware of that?

7    A.    I don't recall that particular number, but I may have read

8    it.  If you tell me, I don't disbelieve it.

9    Q.    All right.  Again, that accounts for, as I understand the

10   testimony thus far in this case, the 15,000 annual hiring acts

11   within the store.  Now, you're not telling me that there's no

12   costs associated with those transactions, are you?

13   A.    No.  What I said was that I'm not aware of turnover costs

14   necessarily being higher or lower for full-time versus

15   part-time employees.  Part of the assessment of turnover costs

16   is identification of what the costs are and the frequency of

17   turnover, and I just don't know that the total turnover costs

18   for part-time employees are going to be significantly higher

19   than full-time.  You need to know what the costs are and

20   whether they vary between the part-time and the full-time and

21   then you need to apply frequencies.

22          I've never seen any studies done -- I don't recall

23   ever seeing any studies in the academic literature that say

24   that part-timers -- or using part-time workers is going to lead

25   to higher turnover cost on a corporate basis.  I just don't

1  know, and I don't have an opinion one way or the other.

2  Q.   I understand.

3        Are you aware of the testimony in this case that the

4  turnover rate for assistant store managers is, according to

5  Brad Waite, 15 percent per year?

6  A.   I have not heard Mr. Waite's testimony about that.

7  Q.   Because I think what's been established thus far in this

8  case is that there's obviously much less turnover for assistant

9  store managers than there are for either full-time or part-time

10  hourly associates at Big Lots.

11  A.   I wouldn't be surprised by that, but once again you

12  need -- to calculate cost of turnover, you need to know what

13  the costs are, meaning the cost categories.

14  Q.   That's what we're going to talk about.

15        So do you know what the costs are for turnover of

16  hourly workers at a retail establishment like Big Lots?

17  A.   I do not know.

18  Q.   Would you agree with me that there are certainly

19  recognized turnover costs?

20  A.   There are costs associated with replacing workers.

21  Q.   Yeah.  Let me see if you agree with just a few of these

22  that I learned about.  Number one is:  Under your scenario, if

23  you hire two people -- and this is not a turnover cost, but if

24  you hire two, you're doubling your worker's comp exposure?

25  A.   Well, that's included in the benefits, yes.

1  **Q.**   Okay.

2          **THE COURT:**  I don't understand how -- what are you

3  saying?

4          **THE WITNESS:**  Well, there's already a calculation,

5  the $17,000.

6          **THE COURT:**  Oh, okay.

7          **THE WITNESS:**  Yeah.  It's included in the --

8  **BY MR. BOHRER:**

9  **Q.**   The 13 percent?

10 **A.**   It's included on the associate side.  It is not included

11 on the assistant store manager side because the assistant store

12 manager side is an estimate of the benefits that are called

13 such by Big Lots; while on the associate side I used the

14 legally required minimum benefits as a proxy because I knew

15 that would exceed the benefits that are actually offered, but

16 it would include that workers' comp.

17 **Q.**   There are some efficiency issues with turnover?

18 **A.**   Once again, that's the problem with the comparison of

19 assistant store managers, of these management responsibilities,

20 with --

21         **THE COURT:**  The question was:  Are there efficiency

22 costs associated with turnover?

23         **THE WITNESS:**  There may be and there may not be; it

24 would depend upon the job.

25

BY MR. BOHRER:

Q.   Are there productivity costs associated with turnover?

A.   There may be or may not be; it depends on the job.

Q.   Are there training costs associated with turnover?

A.   There will be some training costs.

Q.   Or is there productivity because you have unfilled jobs?

A.   I don't understand the question.

Q.   Well, if it takes 59 hours and you have 100 percent turnover and you have periods of time in which you have not enough manhours because you have not enough employees, that reduces your productivity?

A.   No.

Q.   No?  Well, you know there's been testimony in this case that when you don't have enough people, work doesn't get done?

A.   Productivity is output per hour, so I don't really see the connection between the things that you are putting together.

Q.   Well, are you aware of any literature anywhere, sir, that quantifies, from a dollar standpoint, the cost of turnover?

A.   I, sitting here, don't recall any reliable academic studies.  You occasionally see -- I know that I've occasionally seen articles in the popular press, but I don't recall seeing any reliable academic studies.

Q.   Are you familiar with an article entitled "The Cost of Turnover:  Putting a Price on the Learning Curve" by Timothy R. Hinkin and Jay Bruce Tracey published by Cornell?

1   **A.**   No.

2   **Q.**   Are you familiar with a study by Wayne Cascio entitled

3   "Costing Human Resources," published by Kent Publishing Company

4   in 1982, or a study by Woods and McCauley on the same topic?

5   **A.**   I don't recall those, but -- I just don't recall them.

6   **Q.**   Are you familiar with any study or any literature anywhere

7   that attempts to quantify, from a dollar standpoint, the

8   turnover costs that a business would incur because of turnover?

9   **A.**   Once again, I don't recall seeing anything in the academic

10   literature, anything reliable that estimates turnover costs.  I

11   just don't recall seeing any such.  I know that there certainly

12   are such in the popular press, but I don't know how reliable

13   they are.

14   **Q.**   Well, this is the Cornell study or article, and it says,

15   "Using the model adapted from Cascio, Wasmuth and Davis

16   estimated that the average cost of replacing an hourly line

17   employee was $1,500, while that amount jumped to $3,000 for a

18   salaried member," and that was back in the late '80s.  They

19   estimated turnover costs to be about $2,500 for an hourly

20   employee.  Are you familiar with any statistics or other

21   information that would speak to this?

22           **THE COURT:**  $2,500 or $1,500?

23           **MR. BOHRER:**  Pardon me, Judge?

24           **THE COURT:**  Just read it.  I can't see it.  Read what

25   it says.

1    BY MR. BOHRER:

2    **Q.**   "Using the model adapted from Cascio, Wasmuth and Davis

3    estimated that the average cost of replacing an hourly line

4    employee was $1,500, while that amount jumped to $3,000 for a

5    salaried staff member in the late '80s.  In the late '80s, the

6    study estimated turnover costs to be about $2,500 for an hourly

7    employee.  Neither of these estimates focused on specific

8    positions; however, instead the researchers developed averages

9    across managerial (salaried and hourly staff members)."

10              This is talking about a hospital.

11              **MR. GILLIGAN:**  Your Honor, I would object to the use

12   of this article.  If he's asking him whether he's familiar with

13   it, that's one thing; but to read it into the record, he has

14   not qualified it under the learned treatise exception because

15   it has not been established as a learned treatise by a witness.

16              **THE COURT:**  Why don't you lay a foundation.

17              **MR. BOHRER:**  I read it because she asked me to.

18              **MR. GILLIGAN:**  I appreciate that, but to be read into

19   the record, it needs to be a learned treatise, and there has to

20   be some vouching for it by an expert.

21              **THE COURT:**  Let's move on to something else.

22              **MR. BOHRER:**  Well, this is important, Judge, and I'd

23   like to continue.

24              **THE COURT:**  Well, if you want to lay a foundation.

25              **MR. BOHRER:**  I will.  It's important for two reasons.

1          **THE COURT:**  I don't need all that.

2     **BY MR. BOHRER:**

3     **Q.**   Do you know who Timothy Hinkin and Jay Bruce Tracey are?

4     **A.**   No.

5     **Q.**   Do you know consider Cornell University School of Hotel

6     Administration an entity that has experience in the field of

7     costs associated with labor and employment issues?

8     **A.**   I don't know anything about the Cornell University School

9     of Hotel Administration.

10    **Q.**   Have you ever read or are you familiar with the

11    publication "Costing Human Resources" published by Kent

12    Publishing Company?

13    **A.**   It sounds like a magazine, but, no, I've never heard of

14    it.

15    **Q.**   Are you familiar with the Employment Policy Foundation?

16    **A.**   No.

17    **Q.**   Are you familiar with the publication "Employee Turnover:

18    A Critical Human Resources Benchmark," published on December 3,

19    2002?

20    **A.**   No.

21    **Q.**   No?  Now, do you have any ability yourself to put a dollar

22    figure on what it costs -- what the turnover costs are for

23    Big Lots?

24    **A.**   I have not estimated the turnover costs for Big Lots.

25    **Q.**   Well, then you're unable to quantity the turnover costs

1    when you do your comparison; is that correct?

2    **A.**    Yes, that's correct.  There's no estimate of the potential

3    turnover costs from hiring an ASM or from hiring part-timers to

4    do the work, but there is a potential turnover cost regardless

5    of what you do.

6    **Q.**    Well, if the turnover cost was $1,000 per hourly employee

7    and they did 15,000 hourly hires a year, how much is that?

8    **A.**    If it were the case that it was $1,000 per employee and

9    they did 15,000, it would be $15 million, which is one of the

10   many reasons I find that to be somewhat implausible.

11   **Q.**    Do you know or are you aware of any information with

12   respect to the percentage of an hourly employee's rate of pay

13   that can be attributable to turnover costs?

14   **A.**    If you're asking me what turnover costs per employee,

15   divided by hourly wage is, no, I don't know what the answer to

16   that is.

17   **Q.**    Would you agree with me, Dr. Walker, that there are costs

18   associated with new hires because they have a learning curve?

19   **A.**    Yes.

20   **Q.**    Are you able to quantify that cost?

21   **A.**    Am I, sitting here today?

22   **Q.**    Yes.

23   **A.**    No.

24   **Q.**    Did you consider that in your calculation of the actual

25   costs?

1   A.   Yes, I did.

2   Q.   Yeah?  Well, what percentage of the $17,000 is associated

3   with learning curve costs?

4   A.   I did not quantify the specific number, but I considered

5   what sorts of costs might there be in addition to salaries.

6   And I considered that those costs don't apply just to the

7   $17,000, but they also apply to the $44,000, because there's

8   also a potential that you'll have to replace the assistant

9   store manager, as well there's a potential you would have to

10  replace any part-timers.  So it is not as though you can look

11  at just one of these as a comparison and assert that there's

12  only one way we might end up having to replace someone and

13  that's only if we hire part-timers.

14            I considered what would go into these sorts of costs.

15  For retrieving carts and for cleaning up the store and for

16  sweeping up the bathroom and returning items to their shelves,

17  it seemed to me that there was much less training involved than

18  there would be for a position that's a management position, as

19  described by Big Lots.  So my expectation is that the amount of

20  time spent on training and the amount of costs per replaced

21  worker would be significantly higher for the assistant store

22  managers than they would be for the store associates.  It

23  seemed implausible to me, given what you would expect these

24  turnover costs to be, that you could see enough turnover costs

25  to make up that gap, given that the left sidebars were going to

1  have to rise and the gap that exists already is so substantial.

2  **Q.**    I understand.

3          Did you consider peer disruption as an intangible

4  cost?

5  **A.**    No.  It did not occur to me or as something reasonable to

6  assume that there would be a significant cost associated with

7  peer disruption from turnover in a retail establishment.

8  **Q.**    Did you consider supervisor disruption as an additional

9  cost?

10  **A.**    Well, it depends on what you mean.  Again, when I said

11  "consider," yeah, I considered it and rejected it.  As far as

12  supervisor disruption, I do think that it is disruptive for a

13  supervisor to have to be replaced, and it's a cost associated

14  with hiring an ASM and not one that's associated with hiring a

15  part-time store associate.

16  **Q.**    Well, did you consider recruitment costs, the cost to go

17  out and recruit a replacement hourly worker?

18  **A.**    Yes.  And I can see how that's likely to be done, and it's

19  likely to be done by posting a sign in the store or taking out

20  ads in local newspapers.  Once again, all of these costs

21  combined cannot add up to a significant amount of money when

22  you think about what they could possibly be.

23  **Q.**    Well, you don't know what the amount of money is, do you,

24  because you've not done any studies or any analysis of the

25  turnover cost associated with hourly employee turnover at

1   Big Lots; is that a fair statement?

2   **A.**   The second half, that I've not done a formal study, is a

3   fair statement; that you don't know anything about it is not,

4   because I considered what these costs are, and I have some

5   notion of what costs are associated with putting a sign up in a

6   store window or taking out an ad in the local newspaper.   I

7   have some knowledge and some informed information about what

8   sort of training one would expect for someone whose job is

9   primarily to retrieve carts or sweep up floors or replace items

10  on shelves.   It would be minimal.   So it's not the case I have

11  no knowledge about it; but, no, I did not do a formal study.

12  **Q.**   You can't put a dollar figure on the turnover cost for

13  Big Lots to replace hourly workers?

14  **A.**   That's correct.

15  **Q.**   Again, just on straight mathematics, hourly workers are

16  replaced every year 100 percent.   All right?   That's

17  significantly greater than the 15 percent turnover rate that

18  exists for ASMs.   So your calculation of $17,933 doesn't

19  include the turnover cost that you have not quantified in a

20  dollar amount that would be incurred by Big Lots if they were,

21  in fact, to go out and hire two or maybe three store associates

22  for every ASM; is that correct?

23  **A.**   It does not include turnover costs related to hiring

24  either store associates or ASMs, that's correct.   It's only

25  wage and benefit costs.

1  **Q.**  Now, you talked about some of the biases that you believed

2  exist in the Rausser survey.  There's demand effects in every

3  survey; is that correct?

4  **A.**  Yes.

5  **Q.**  There's demand effects when Mr. Brad Waite, who owns

6  $1 million of stock in Big Lots, gets on that witness stand and

7  testifies; right?

8  **A.**  Usually demand effects refers to experiments and surveys.

9  Certainly, he has a perspective, if that's what you mean.

10          **THE COURT:**  He means testimonial bias.

11          **MR. BOHRER:**  Thank you, Judge.  Sometimes a direct

12  approach is the best.

13  **BY MR. BOHRER:**

14  **Q.**  But that's an example of a bias; right?

15  **A.**  We're sort of mixing everyday use of that term and

16  statistical use of that term and it's confusing me.  Yeah, I

17  would imagine that people who testify have their own

18  perspective.  You need to take that into account when you

19  listen to them, but I don't know that it's quite the same

20  thing.  That's why I'm having a problem answering the question

21  that way.

22  **Q.**  Well, you've said several times on direct examination that

23  you believed the demand effect creates such a horrible bias

24  because everyone that responded to that survey has some

25  financial interest at stake, they have some self-interest or

1    some gain; correct?

2    A.    Yeah.

3    Q.    Yeah.

4    A.    I said that it makes a survey invalid when you have that.

5    Q.    Right.  You would agree that perhaps Mr. Waite might be

6    biased because, if his stock goes down, he may lose some money

7    in this case, himself personally; correct?

8    A.    Again, you're sort of mixing up sort of -- is it the case

9    that people bring this perspective and it may effect what he

10   has to say?  Yes?

11   Q.    All right.

12   A.    But I was talking about a survey.

13   Q.    I understand.

14   A.    And I was talking about the huge literature that people's

15   answers to surveys are affected by a knowledge about the

16   ultimate purpose of the survey and that their answers and their

17   conduct is affected by their financial gain.  I just don't see

18   them as quite the same thing, so I'm having problems putting

19   them together and saying this is the same.

20   Q.    Well, there is no such thing as a survey that has zero

21   demand effect or zero bias potential?

22   A.    That's correct.

23   Q.    You, yourself, have not done any analysis of this survey

24   to come to this Court with any empirical objective evidence

25   that any of these biases actually exist, as I understand it.

1   What you've done is identify in the literature certain things
2   that you think have the potential to create bias or other
3   demand effects in the survey?
4   **A.**   Yeah, I can't say empirically how much the survey
5   responses are affected by the circumstances under which the
6   survey was administered.  All I can talk about is what's a
7   reliable method and what do you worry about if you're trying to
8   interpret survey data?
9   **Q.**   Fair enough, and that's the point.  We could go through
10   each and every one of the biases, but it's easier for you just
11   to say -- or for me to ask you, I should say, that what you're
12   talking about are some methodology issues, but no empirical
13   objective evidence that any of these various criticisms exist
14   with respect to this survey?
15   **A.**   Well, no.  We know they exist.  A nonresponse bias exists
16   in all surveys with nonresponse.  The question is how big is it
17   and in what direction.  I can't tell you that without a valid
18   study of nonrespondents.
19   **Q.**   Okay.
20   **A.**   Coverage error exists, and we know it exists.  It's a
21   statistical fact.  It's just a question of how big and in what
22   direction.  No, I can't tell you that without doing an exact
23   enumeration of all of the survey respondents, at least for
24   those pieces of information where you could get the information
25   by doing that.  So, no, I can do more than what you said.

1  **Q.**   I understand.   You're smarter than me, and your answer was

2  better than my question was.   What you're saying, I understand;

3  and that is that you believe that these biases may exist, but

4  you have no empirical objective evidence that they have made

5  the survey flawed or that they have affected the answers

6  outside of your testimony with regard to methodology?

7  **A.**   Well, except that the methodology is what makes a survey

8  flawed because demand effects do exist.   And it is because the

9  survey does not follow acceptable procedure that it is flawed,

10  because we know these factors are out there.   We know that

11  *ex post*, you can't measure for them.

12       So when you ask somebody who uses survey data, "Is

13  this reliable data?" you don't figure that out by trying to

14  compare all the data to the right answer because you never have

15  that.   The purpose of the data are to tell you what the right

16  answer is.   If the data were derived from some method that's

17  unreliable, that means they're unreliable.

18       But, no, I can't tell you what the exact number is.

19  All I can tell you is that you're speculating if you say that

20  the number is the number that comes out of Dr. Rausser's

21  survey.

22  **Q.**   Well, would you agree with me that in some surveys, if the

23  responder is aware of the purpose of the survey and it's no

24  secret, okay, that that might actually make that person have a

25  more honest response?

1  A.   Honest?

2  Q.   Yes.

3  A.   I suppose one could imagine some hypothetical where

4  there's dishonesty that somehow gets fixed by telling someone

5  the purpose of the survey.

6  Q.   I'm sorry.  I didn't mean to interrupt you.  Were you

7  finished?

8  A.   Sure.

9  Q.   This is something that you've cited.  It's Dr. Martin Orne

10 from Harvard Medical School, and it was the study you talked

11 about earlier today.  This is page 780 of that study.

12         Dr. Walker, it's no secret in this case that I wrote

13 these people a letter and sent them a survey, and it's no

14 secret in this case that all of these people are opt-in

15 plaintiffs.  You understand that; right?

16 A.   I understand they are all opt-in plaintiffs and that your

17 signature is on the cover letter.

18 Q.   Sure.  Absolutely.

19         And there's absolutely no secret that there was a

20 trial coming up because I put that in my letter; right?

21 A.   Yes.

22 Q.   Yeah?  There's clearly, absolutely no secret that these

23 individuals have some interest in the outcome of this

24 litigation -- I hope anyway -- right?

25 A.   That's correct.

1    **Q.**    So the survey didn't try to hide that; right?

2    **A.**    That's correct, it did not.

3    **Q.**    So Dr. Orne says that, "If, on the other hand, the demand

4    characteristics are so obvious that the subject becomes fully

5    conscious of the expectations of the experimenter, there is a

6    tendency to lean over backwards to be honest."  Do you have any

7    proof that that's not our dynamic here?

8    **A.**    Well, I have read the article, and I know that you are

9    misinterpreting and misquoting the article.  I know that, if

10   you put the whole article up, Dr. Orne is talking about a

11   situation in which college students participate in experiments

12   for the purposes of advancing science and that he talks in some

13   detail about the fact that their own personal motivation is to

14   advance science.  So in his mind he's hypothesizing that those

15   people, in order to advance their own personal interests to

16   advance science, will make sure or try to make sure that they

17   don't contaminate the results by negative demand effects and

18   consequently end up contaminating the results by positive

19   demand effects.

20           If you were to read that entire passage, what

21   Mr. Orne is saying is that, in his mind, in these particular

22   circumstances, you're worse off by having them know exactly

23   what's going on than you are with them guessing.  But he's not

24   talking about honesty in the sense of sincerity because he

25   wasn't talking about people that are motivated to lie.  He's

1   using the term *honest* in the sense of not trying to bias their
2   answers in favor of a positive experimental outcome because
3   they have a personal interest in promoting science.

4           So it's not the case that telling them the purposes
5   of the survey will make them honest in a sincere sense.  And,
6   in fact, a couple of paragraphs after that, Dr. Orne says on
7   that exact same page that it's, I think he said, inconceivable
8   to create a survey that doesn't have demand effects, so what
9   you need to do is try to control the demand effects through
10  proper procedures and protocol at all times.

11  **Q.**   Well, in this particular situation, given the unique
12  circumstances of there being a group of opt-in plaintiffs who
13  have opted into a Fair Labor Standards Act collective action,
14  you would agree with me, would you not, sir, that there is
15  simply no way to eliminate demand effects from any survey
16  addressed to those individuals?

17  **A.**   I don't think that there is a way to eliminate demand
18  effects from any survey.  That's what we just said, that it's
19  the nature of human beings to try to figure out what it is that
20  they're being asked questions about.

21          There are ways to mitigate demand effects.  One way
22  is to try to conduct the survey as close to double-blind as you
23  can probably get.  That means you don't send them letters on
24  counsel stationery.  You don't say that this is for use by our
25  expert at trial.  You don't have participants in the process be

1    anybody other than neutral observers.  So there are things you

2    can do to minimize demand effects, which did not occur in this

3    case.

4              **THE COURT:**  The last thing you said is:  You don't

5    have participants who are not neutral observers?

6              **THE WITNESS:**  I meant to say neutral.

7              **THE COURT:**  That's what I heard you say.  I

8    understand what you said.

9    **BY MR. BOHRER:**

10   **Q.**   I want to jump back to your analysis on the costs.  You

11   would agree with me, would you not, Dr. Walker, that with

12   respect to the ASMs, at whatever rate of pay they receive, the

13   labor costs for Big Lots are fixed at that rate of pay?

14   **A.**   You're talking about turnover costs?

15   **Q.**   No.  I'll be happy to rephrase it.

16            ASMs, according to Big Lots, get paid salary; right?

17   **A.**   Yes.

18   **Q.**   Without regard to the number of hours they work?

19   **A.**   Yes, that's my understanding.

20   **Q.**   It could be 80, it could be 40, it could be 90.  Whatever

21   it is, they are going to get the same pay?

22   **A.**   My understanding is they get a salary that doesn't change

23   with their weekly hours.

24   **Q.**   So Big Lots knows that their labor costs for that service

25   are fixed at whatever that ASM salary is?

1   **A.**    With respect to hours worked by that ASM?

2   **Q.**    No, with respect to rates of pay, what they are going to

3   pay that ASM without regard to hours worked.

4   **A.**    Yeah, the amount that they're going to pay an ASM is fixed

5   with respect to the hours that that ASM puts in on a weekly

6   basis.

7   **Q.**    Whatever they may be?

8   **A.**    I think that's right, yes.

9   **Q.**    So Big Lots knows it can budget, it can forecast -- it

10  knows that no matter how many hours that segment of its

11  employees work, they can forecast their labor costs with pretty

12  much certainty for that fiscal period?

13  **A.**    I think that they can get an accurate -- a more accurate

14  assessment of that cost, maybe, than some other types of costs.

15  There's no certainty.  There are other reasons why that cost

16  could vary.  You mentioned turnover costs.  Certainly, higher

17  turnover would lead to higher costs for employing ASMs.

18  **Q.**    Now, you talked about nonresponse bias, and you cite the

19  *Reference Manual*, correct, for the proposition that surveys

20  with response rates below a certain percent deserves scrutiny;

21  correct?

22  **A.**    That's one of the sources says that, yes.

23  **Q.**    You agree, though, that the *Reference Manual* addresses a

24  sampling of a population, and that's the intent of that

25  document?

1  A.    That particular document, I think, concerns survey
2  research.
3  Q.    Right.
4  A.    Knowing what nonresponse is, it isn't plausible that's
5  meant to exclude censuses.
6  Q.    Well, it doesn't say "census," does it?
7  A.    No, it does not.  My recollection is it does not say,
8  specifically, "census."
9  Q.    You talked about recency bias; right?
10 A.    I certainly do in my report.  I don't recall whether that
11 got cut or not.
12 Q.    But you agree that there's only about 11 percent of the
13 opt-in ASMs who were still employed at the time the survey was
14 sent?
15 A.    I think that that's approximately right.
16 Q.    You don't believe that late responders can be a proxy for
17 nonresponders in this situation because you don't think
18 contingent valuation methodology applies; correct?
19 A.    No.  You mixed up a couple different concepts.
20 Q.    Well, you don't believe that late responders under these
21 facts can be proxies for nonresponders?
22 A.    Not in this case, that's correct.
23 Q.    Now, you understand that this survey was done in the
24 context of certain deadlines that the Court set; right?
25 A.    Yes.

1    **Q.**    You understand that those deadlines may not be applicable

2    in other survey environments?

3    **A.**    Yes.

4    **Q.**    You understand that, with respect to coverage error in

5    this case, the only access that the plaintiffs had was to,

6    themselves, be opt-in ASMs; right?  Maybe you don't understand.

7    **A.**    Well, I just don't know all of the rules.  I know that

8    there was some fight over those data.

9    **Q.**    Right.

10   **A.**    That, ultimately, they were produced, but it's my

11   understanding that was months ago and that Dr. Rausser's

12   late/early analysis was conducted a few weeks ago.

13   **Q.**    No.  Come on.  You got his addendum report in February of

14   2008.

15   **A.**    His late --

16             **THE COURT:**  We're not going to argue about that

17   stuff.

18             **MR. BOHRER:**  I'm sorry about that, Judge.

19             **THE COURT:**  I don't care about that.

20             Do you understand whether or not the plaintiffs

21   had access to the non-opt-ins?

22             **THE WITNESS:**  My understanding is at some point they

23   didn't and at some point they did.

24   **BY MR. BOHRER:**

25   **Q.**    Are you aware of the fact that the plaintiffs offered to

1   do a joint survey with the defendants in this case?

2   **A.**   I was told that yesterday.

3   **Q.**   Were you consulted on that?

4   **A.**   No, I was not.

5   **Q.**   Now, what was the response rate for this survey, if you

6   know?

7   **A.**   I'm thinking 59 percent, but I need to find it.

8   **Q.**   By the way, it is impressive for you to testify all day

9   without notes.

10   **A.**   By my calculations, it's -- oh, I just don't have a

11   calculator.  I don't see the percentage, but it's 553 divided

12   by 936.  There was a difference between my count and

13   Dr. Rausser's count, that I discussed in my report.  I don't

14   know why it is.  He reported to have 558 usable responses.  So

15   his would be, by his calculations, 558 over 936.

16   **Q.**   Dr. Walker -- and I appreciate that.  The point I want to

17   make to you is this:  You are aware of the fact that there's a

18   certain segment of the opt-in plaintiffs who moved, the mail

19   didn't get delivered to, they never got the survey?

20   **A.**   Yes.

21   **Q.**   You would agree with me, would you not, that for purposes

22   of calculating the response rate, you really can't include, as

23   part of the equation, the individuals that never received the

24   survey?

25   **A.**   No, I would not agree with you.

1    **Q.**   Well, all right.  Fair enough.

2            You are aware of the fact that there were a certain

3    number of individuals who did not ever receive the survey?

4    **A.**   I understand that that's what OnPoint Analytics has said,

5    but I don't know.  I don't find it to be disbelievable in any

6    sense.  It seems plausible, reasonable to me.

7    **Q.**   Again, you've not done anything to study the nonresponders

8    to see if any of your nonresponse bias criticisms are

9    empirically correct?

10   **A.**   That's correct.  It's my understanding I'm not allowed.

11   **Q.**   Well, you keep saying you're not allowed.  Did you make a

12   request?

13   **A.**   Yes.  I've asked the Big Lots attorney if I'm allowed to

14   contact non-opt-in plaintiffs, and they said, "No, you can't do

15   that.  That's not allowed under the rules."

16   **Q.**   Well, did you make a request, with respect to the

17   nonresponders, to go get any of those documents we talked

18   about -- the evaluations, the I-9 forms, or all those other

19   alleged management documents -- to get some information about

20   what they did?

21   **A.**   It never would have crossed my mind that there are

22   documents that address the specific issues that are

23   discussed -- all of the specific issues that are discussed in

24   the Rausser survey.

25   **Q.**   Now, you talked earlier today about this study,

1    "Estimating Nonresponse Bias in a Sample Survey on Alcohol
2    Consumption:  Comparison of Response Waves," and you would
3    agree that there's at least one or two studies cited in the
4    metadata section of this article that find that, yes, late
5    responders can be proxies for nonresponders?
6    **A.**    Yeah.  There are circumstances where the cause of the
7    nonresponse is also a cause for late response, but it's not
8    universal, and you need to understand why the nonresponse is
9    happening.  If you believe that the nonresponse is potentially
10   due to a financial incentive to not respond at all, then the
11   continuing response is not relevant.
12   **Q.**    Again, you don't know why there's nonresponse.  You've
13   done no study, and you don't know whether or not it's because
14   they think they're going to sabotage the case, or you think
15   it's because we selectively sent them letters, or we
16   selectively followed up as lawyers?  You don't know any of
17   that?
18   **A.**    It goes to what you may know.  No, I don't have specific
19   evidence from the opt-in plaintiffs themselves about why they
20   decided not to respond.  I do know what's in the literature.  I
21   know that there are empirical examples of people's response
22   rates being affected by financial incentives, and I know that
23   there's a big financial incentive in this case.  So I don't
24   know that I would say I don't know anything; but, you're right,
25   I don't have any information about the nonrespondents in

1    particular in this litigation.

2    Q.   Now, you also criticized the Rausser survey for hours, but

3    one of your criticisms was there was vagueness and there was

4    confusion.  We saw several examples of things that, you know, I

5    will admit to you looked like people didn't get it.  Right?

6    A.   Yes.

7    Q.   I can stay here for an hour and show you examples of

8    people that did, but instead I'll just ask you:  You would

9    agree with me, would you not, that there are certainly many

10   examples of people who responded to the survey who seemed to

11   answer it correctly and didn't seem to have a problem?

12   A.   Seemed to, yes, that's right.

13   Q.   You would agree with me, would you not, sir, that there

14   were certainly individuals who answered the survey who had very

15   little time for what you might consider to be management duties

16   or management functions?

17   A.   Who wrote down in answer to Question 2 or 3, whatever that

18   was --

19   Q.   Correct.

20   A.   -- a very small percentage of time for management

21   functions?

22   Q.   Right.

23   A.   Yes, there are people who did that.

24   Q.   Again, I know it's late.  It's almost 6:00, and I know you

25   probably want to get out of here.  I don't want to have to go

1   pull 40 examples of people who would offset the 10 or 12 that
2   we looked at today, so you'll agree with me that there are
3   certainly many examples of people who seemed not to have those
4   problems?
5   A.   Well, there are examples of people that do not manifest a
6   problem, yes.  The problem is, as I said, you can't tell.  You
7   can look at a response and see they're confused; you can't look
8   at a response and see that they're not.  So you could pull up
9   40 and all it could show is I can't tell one way or the other.
10  Q.   You can look at the responses of the ones that you showed
11  us and you can opine that they may be confused is what you're
12  saying; right?
13  A.   I'm saying that confusion can manifest itself in ways that
14  you can recognize by looking at a survey response, but you
15  cannot look at a survey response and determine by looking at
16  that response the person was not confused.  You just can't
17  tell.
18  Q.   The opposite side of that is true as well; correct?
19  A.   No.  When somebody writes on a survey, "I'm confused" --
20       **THE COURT:**  No, that's not what he means.  He means
21  on the ones that you can't tell they are confused, you can't
22  tell that they're not.
23  **BY MR. BOHRER:**
24  Q.   For the ones that don't have the margin notes, they may
25  have got it; right?

1  A.    That's absolutely right.

2  Q.    How many people had margin notes?

3  A.    I don't remember.  I don't remember.

4  Q.    Like four or five?

5  A.    No.

6  Q.    Yeah?  Well, how many?

7  A.    I don't know.  I know that there are a lot that, for

8  example, wrote in "sometimes."  There are many that wrote in

9  "shifts overlapped."  I don't know how many.  I haven't counted

10 up all the margin numbers; but, no, it's not four or five.

11 Q.    You would agree with me, would you not, Dr. Walker, that

12 every survey has some anticipated error rate in it?

13 A.    You would expect error in all surveys, yes.  Some amount.

14 Q.    Now, you didn't like the survey; right?

15 A.    I think that the survey is poorly done and unreliable,

16 yes.

17 Q.    That was an underhanded question for you.  A soft-toss;

18 not underhanded.  You don't believe the survey can be used to

19 infer or extrapolate anything?

20 A.    No, I wouldn't quite say that.  I think that certain

21 questions are beyond repair.  I think that you know the

22 direction of the bias, so I think that you can get some

23 informational content from the survey.  I don't think that you

24 can infer a ceiling on the amount of time spent managing

25 because you know which direction the bias runs.  I don't think

1    you can infer a floor on overtime because you know which way

2    the bias runs.

3            So I don't think I would say, well, there's just

4    nothing you can figure out from looking at the survey.  What I

5    think is there are forces that run in a certain direction, and

6    you don't know exactly how powerful they are, and you need to

7    keep that in mind when you're interpreting the results.

8    Q.   You did some calculations based on this survey; correct?

9    A.   Yes, I did.

10   Q.   You drew some conclusions; correct?  Yes?

11   A.   Yes, I did.

12   Q.   You don't think the survey has statistical significance;

13   correct?

14   A.   It's a technical term you just used, which is not quite

15   right.  I don't think that you can calculate confidence

16   intervals from which one could say that the survey results

17   contained the true answer with any specific degree of

18   statistical confidence.  When I talk about statistical

19   significance, that's what I'm generally saying.  To say it has

20   no statistical significance in the way you said it, I'm not

21   sure that you are saying it that way.

22   Q.   Well, what calculations did you do using Question 4?

23   A.   I counted up the numbers of people who -- I used

24   Question 4 partially for counts of the numbers of activities

25   that respondents said either they or other assistant store

1   managers did, and also counts of the numbers of activities that
2   the respondents said that store or district managers did and
3   counts of the numbers of activities that respondents said
4   associates did.
5   **Q.**   Now, do you recall what your counts were?
6   **A.**   There were lots of different ones.
7   **Q.**   Yeah?  Now, you would agree with me, would you not,
8   Dr. Walker, that that question itself has some vagueness or
9   confusion potential to it, or is this a perfect question?
10  **A.**   I don't think any question is perfect.  I'm just reading
11  the question.  I'm sorry.  It's a little hard for me to see
12  from here.
13            Certainly, any question has a potential to confuse.
14  My recollection is that there was some evidence that some
15  people were confused by some of these questions.  As far as the
16  vagueness, a couple of the things in particular that I noticed
17  in other questions aren't here.  The one that comes to mind is
18  using adverbs like *regularly*.  That's just not here, while it
19  did appear in some of the other questions.
20  **Q.**   You did some calculations where you drew some inferences
21  about who else in the store does these activities; right?
22  **A.**   Yes.
23  **Q.**   Now, we talked earlier today about the various other job
24  categories; right?
25  **A.**   Yes.

1   **Q.**   In the Big Lots store?

2   **A.**   Yes.  You said did I draw inferences about what other

3   people -- I think I tried to be careful to say, "This is what

4   respondents say," and I tried to be careful to stop at that.

5   **Q.**   I understand.  You're not drawing an inference; you're

6   reporting data?

7   **A.**   That's right.

8   **Q.**   This Question 4 doesn't list, for example, the CSS

9   position; right?  Trust me, it doesn't.

10   **A.**   Okay.

11   **Q.**   It doesn't list the furniture department manager; correct?

12   **A.**   Associates include but are not limited to furniture

13   associate manager, furniture and associate manager.  I think it

14   does say furniture manager.  It also says customer service

15   specialist.

16   **Q.**   But they're not in the column.

17   **A.**   Well, it says associates include all of these different

18   things, yes.

19   **Q.**   You don't find that there's any confusion with that

20   definition the way it is?

21   **A.**   There may very well be.

22   **Q.**   That's my point.  You don't know whether or not the

23   responses to this question are accurate, just like you don't

24   know that the responses to the other questions are accurate?

25   **A.**   There may be error.  I suspect that there is error in all

1  of these questions.  I just report what the people say.

2  **Q.**    Now, you tried to calculate -- or you expressed an opinion

3  with respect to manager on duty, if I read your report

4  correctly?

5  **A.**    Sole manager on duty.

6  **Q.**    How did you do that math?

7  **A.**    Well, there are some calculations related to 5(c), which

8  asked about hours spent supervising people who were not being

9  supervised by anyone else.  In order for that to happen, there

10  had to be no -- in my interpretation of what sort of people

11  were saying in depositions, there had to be no other managers

12  there.

13  **Q.**    Well, that's your interpretation of that; correct?

14  **A.**    Yes, that's correct.

15  **Q.**    The survey doesn't ask:  How many hours a week were you

16  the manager on duty; right?

17  **A.**    No.  It asks:  How many hours per week did you supervise

18  people who were not simultaneously being supervised by someone

19  else during your shift?  Or something pretty close to that.  If

20  you have the question, we can just read it.

21  **Q.**    But it doesn't ask how many hours a week you were the

22  manager on duty?

23  **A.**    No, it does not.

24  **Q.**    So you're doing some math where you're taking that

25  question to mean you're the manager on duty; right?

1    A.    I interpreted the question to be sole manager on duty, as

2    opposed to this manager-on-duty concept.  But again I think

3    that, if we looked at the exhibits, that I said time spent

4    managing people who were not simultaneously being managed by

5    someone else.  So I tried to hew to the question.  I do believe

6    that that's what it is, but I tried to report what they said.

7    Q.    The point I'm trying to make is that the manager-on-duty

8    concept is not captured by this survey.  That question says

9    what it says.

10   A.    It says what it says.

11   Q.    For example, with respect to that question, you could have

12   an ASM who is doing Dock to Stock who thinks that he is

13   supervising people while the store manager is there; correct?

14   A.    Yes, you could imagine that that happens.

15   Q.    So that question doesn't let you, or anyone else perhaps,

16   infer that there is no shared supervision potential during that

17   time period?

18   A.    Well, they say that there isn't.  I mean, they say

19   specifically, it's the question, time spent supervising

20   someone -- again, I don't have the exact language in front of

21   me, but specifically that's what they say.  If you read the

22   margins from the people that talked about that in particular,

23   they were interpreting that question, the ones who said

24   anything, as the time spent as the sole manager on duty.

25              If you look at the responses to 5(a), 5(b), and (c),

1   the only way to make them all consistent is if the vast

2   majority, if not all, of the respondents are interpreting it

3   that way.  Is it possible that there are respondents who

4   responded in a way that was not, consistent with that

5   consistent with that interpretation, and also just not

6   responsive to the answer?  Sure.  There's noise in a survey,

7   but it isn't plausible that that's what's explaining what's

8   going on.

9   **Q.**   You don't know what the chain of command is, do you, at

10  Big Lots?

11  **A.**   Well, generally, it's my understanding that there's a

12  store manager and two assistant store managers in some types of

13  stores, and a store manager and one assistant store manager and

14  some associates in some stories, if that's what you meant.

15  **Q.**   Well, do you know whether others do supervision in that

16  store?

17  **A.**   I don't know.

18  **Q.**   Do you know if an associate manager supervises?

19  **A.**   It's my understanding that they do.

20  **Q.**   Do you know if the CSS supervises the cashier?

21  **A.**   It's my understanding that that's the case.

22  **Q.**   So with respect to 5(c), there may very well be a

23  situation where you have an ASM in merchandising going in the

24  back of the store -- he may be there by himself -- and he's

25  doing Dock to Stock and his CSS is supervising the cashiers.

1  He's certainly not supervising everyone in the store.  Right?

2  A.   I don't know.  There's a legal question.  First, this is

3  what they said.  They are reporting that they are supervising

4  people who are not being supervised by someone else, is the

5  survey response.  I don't know legally, if you're the senior

6  person in the store with ultimate responsibility, whether that

7  counts for the regs or not.  I'm not a lawyer.

8  Q.   The survey doesn't address the situation of shared

9  responsibility; correct?

10  A.   Well, it asks the question, specifically:  "How many hours

11  per week do you spend supervising people who are not

12  simultaneously being supervised by someone else?"  It doesn't

13  then ask:  "In addition to that, how many hours per week do you

14  spend supervising people who are also being supervised by

15  somebody else?"

16  Q.   Right.  It doesn't ask that.

17  A.   Right.  It doesn't ask for that additional supervision,

18  no.

19  Q.   You don't know, for example, if the survey respondent

20  said, "I'm up front watching the cashiers, but my CSS is there

21  and she also has supervisory capacity?  In other words, you

22  don't know whether that response is actual authority or

23  exercised authority to supervise?

24  A.   I'm not sure where you're going.  I know what the question

25  says and what the responses are, and I reported what they are.

1    **Q.**   Now, you realize in this case that Big Lots has called 19,
2    I think, witnesses and Mr. Waite to the stand -- or through
3    depositions, and I think that the witnesses were comprised of
4    two district managers and eleven opt-ins and six non-opt-in
5    ASMs.  Do you understand that that's what they've brought to
6    court for evidence in this case?
7    **A.**   I don't know what they brought to court.  Nobody has
8    talked to me about that, so I don't know what all has happened.
9    **Q.**   Do you know the manner in which those witnesses were
10   selected?
11   **A.**   I don't know what's been brought.  I don't know what the
12   case was.  Nobody's talked to me about that.  I don't know.
13   **Q.**   Fair enough.
14          You don't know one way or the other about the
15   selection process, what those witnesses said, or what their
16   knowledge is?
17   **A.**   I've been purposely excluded from what's been happening at
18   the trial.  I don't know what happened.
19   **Q.**   So you don't know whether or not that group of witnesses
20   constitutes some type of random sample from which broader
21   inferences can be made?
22   **A.**   I would be surprised to find that there's a group of
23   witnesses that would constitute a random sample, but I don't
24   know whether one can draw inferences, broad inferences, from
25   the deponents or not.  I don't know who they are.  I don't

1   think they're a random sample, but we've talked before about
2   epistemology, the theory of knowledge.
3   Q.   The Rausser survey doesn't quantify the time spent in many
4   of these activities; correct?
5   A.   What activities are you talking about?
6   Q.   Well, hiring or firing.
7   A.   I haven't memorized Dr. Rausser's report.  I don't recall,
8   sitting here.  I don't think that he does report average
9   answers to that question.  There's some information.  I just
10  don't, sitting here, have it on the top of my head what's in
11  Dr. Rausser's report.
12  Q.   Instead of going through each of these activities, would
13  you agree with me that you don't know what the details are of
14  how these activities are performed?
15  A.   You're talking about the ones on the -- the specific
16  categories of activities Dr. Rausser used --
17  Q.   Yes.
18  A.   -- and how it was respondents interpreted these
19  categories?
20  Q.   Well, not how they interpreted it.  I want to know whether
21  you know what is involved in performing these activities at
22  Big Lots.
23  A.   Well, no.  No, I don't.
24  Q.   You've made reference many times today to management
25  activities.

1  A.    Yes.

2  Q.    You don't know which of these activities are legally or

3  factually management activities?

4  A.    That's correct.

5  Q.    You don't know which of these activities are done just

6  by -- or with discretion; correct?

7  A.    I don't know how many are done with discretion?

8  Q.    Right.  In other words, freedom for the ASM to do it

9  without following a policy or following a procedure.

10  A.    Well, I would be surprised if Big Lots wants any of its

11  employees to be engaged in some of these activities without

12  following a policy or procedure.  Some of these are going to be

13  governed by the law, for one thing; hiring and firing, in

14  particular.  When you say I don't know --

15  Q.    No.  I'll make it simpler.  You said, when I first

16  started, that you haven't gone and looked at all these policies

17  and procedures, so you don't really know what policies and

18  procedures these activities are tethered to?

19  A.    Right, that's correct.

20  Q.    An easier question.

21            MR. BOHRER:  Judge, do you mind taking two minutes?

22            THE COURT:  Are you about done?

23            MR. BOHRER:  Probably.

24            THE COURT:  Okay, because I was going to stop in five

25  minutes.  If you want to finish, go ahead.

1          **MR. BOHRER:**  Give me a minute, if you don't mind.

2          **THE COURT:**  Sure.

3          **MR. BOHRER:**  I'll stop if Mr. Gilligan does his

4    redirect right now; otherwise, it's filibuster time.  I can put

5    up something and we'll read it for five minutes.

6          **THE COURT:**  So what does Mr. Gilligan want to do?  He

7    wants to come back tomorrow, I'm sure.

8          **MR. GILLIGAN:**  No, Your Honor.  I'd be happy to do

9    some redirect now, but --

10          **MR. BOHRER:**  Finish your redirect now.

11          **MR. GILLIGAN:**  Do you really want to limit it to five

12   minutes?  I don't think it would be long.

13          **THE COURT:**  How long is it going to be?

14          **MR. GILLIGAN:**  I would think maybe ten.

15          **THE COURT:**  That's okay.  Sure.

16          **MR. GILLIGAN:**  I don't think it's long.

17          **MR. BOHRER:**  Thank you, Dr. Walker.

18          **THE WITNESS:**  Thank you, Mr. Bohrer.

19          **THE COURT:**  Why don't we stand up and stretch.

20                      **REDIRECT EXAMINATION**

21   BY MR. GILLIGAN:

22   **Q.**   Dr. Walker, you were asked some questions about this sole

23   manager on duty, and you were asked a couple of times, though,

24   that you didn't remember what the question was in the survey.

25   Now that you have Question 5(c) in front of you on the monitor,

1    is this the question that you used in order to make the

2    computation about the percentage of time spent as the sole

3    manager on duty?

4    A.   Yes.

5    Q.   What you were looking at is the answers where there was an

6    indication that there was nobody else supervising during that

7    same shift?

8    A.   Or at the same time.

9    Q.   You were asked questions about your knowledge about what

10   activities are management activities and what activities are

11   not management activities.  I understand that you're not giving

12   a legal opinion, but did you -- we looked earlier at the charts

13   of management activities that were excluded from Survey

14   Question 1 -- that's 2 of 2, and this is 1 of 2.  Where did you

15   find these activities?

16   A.   They're from the regulations themselves.

17   Q.   So you actually looked at the regulations to see what was

18   listed in the regulations as a management activity?

19   A.   Yes, that's right.

20   Q.   The ten management activities that were listed in the

21   survey that you indicated the source of that is Rausser

22   Question 1, did you look those up in the regulations as well?

23   A.   No.  These are activities that Dr. Rausser characterized

24   as management activities.

25   Q.   You answered one of Mr. Bohrer's questions about when he

1   was asking you about confusion and when you can tell there's

2   confusion or there's not confusion in the answers to the

3   survey, and you said unless there's a marginal note it seems to

4   answer -- it seemed to answer correctly.

5           Are you able, though, to tell from simply looking at

6   an answer, when there's no marginal note, whether the

7   respondent has properly understood the question or not?

8   **A.**   No, you can't tell.

9   **Q.**   Did you review the deposition of Ms. Pospichel?

10  **A.**   Yes, I did.

11  **Q.**   Did you review her testimony of her interpretation of

12  the --

13          **MR. BOHRER:**  I'm sorry.  I was going to make an

14  objection when you're done.

15          **MR. GILLIGAN:**  Oh.

16          **THE COURT:**  What's the objection?

17          **MR. BOHRER:**  It's not in the list of documents he

18  reviewed, and it wasn't reviewed at the time of his deposition.

19          **THE COURT:**  Sustained.

20  **BY MR. GILLIGAN:**

21  **Q.**   Is that right, Dr. Walker, that you had not reviewed that

22  deposition by the time of your deposition?

23  **A.**   I don't remember.  There were one or two depositions that

24  I had reviewed by the time the addendum was prepared, and my

25  recollection is there was some discussion at the deposition

1  itself -- a couple of those depositions.  I just have to look

2  to see whether it's here; or if you know, you could direct me

3  to where.  I just don't recall.

4  **Q.**   Let me ask the question this way.  Let me ask you to

5  assume that Kelly Foltz testified or filled out a survey in

6  which he indicated that he had worked for a substantially

7  longer period at Big Lots than he had actually worked there.

8  Simply looking at the response on this survey, would you be

9  able to tell whether or not his answer is accurate or not?

10          **MR. BOHRER:**  That's the same objection, Judge.

11  Phrasing it hypothetically doesn't solve the problem.  That's

12  another deposition that Dr. Walker didn't review.  I mean, I've

13  been --

14          **THE COURT:**  He can ask him.

15          **MR. BOHRER:**  He can ask it generically.

16          **THE COURT:**  I get your objection, but he can assume

17  anybody, did some member of this case -- he can answer the

18  question.

19          **MR. BOHRER:**  I'm sorry.

20          **THE COURT:**  That's all right.

21          **THE WITNESS:**  I apologize.

22          **THE COURT:**  I understand the point of the question,

23  and it doesn't matter who testified to what.  He's making a

24  point about what you can determine from the answer.

25

1  BY MR. GILLIGAN:

2  Q.    The question is:  Assume that a respondent filling out the

3  survey had indicated that he had worked at Big Lots for a

4  substantially longer period than he had actually worked there,

5  that he had worked during the holiday season, that he had

6  worked during the inventory season, which turned out from the

7  deposition not to be correct.  Would there be any way from

8  simply looking at the response to the survey to determine

9  whether his answer to the survey was accurate?

10  A.    No.

11  Q.    Assume that a respondent filling out the survey on

12  Question 2, which is the grid about the weight of the

13  consultation, and the boxes are checked, there are no marginal

14  notes, but the respondent's interpretation of this grid is

15  *almost always followed* means "I can do whatever I want.  *I was*

16  *not consulted* means "I have to do what I'm told."  Would there

17  be any way to tell that from simply looking at the checks on

18  the box?

19  A.    No.

20  Q.    Why do you say that those who may not have received the

21  survey in the mail or who have moved -- why would they be

22  included as nonresponders?

23  A.    One is that the most widely accepted method of calculating

24  response rates -- in fact, all that I know of -- include in the

25  denominator all eligible persons to whom the survey was sent.

1   So whether they send it back and don't answer or whether they

2   come back in the mail, nonresponse is nonresponse so long as

3   they're eligible, so long as it's not the case that you found

4   out, for example, that they're no longer in the class.

5          Second, because the issue with nonresponse bias is

6   that you're extrapolating for nonresponse error from the people

7   who did send back responses to the people who didn't,

8   regardless of the reason why they didn't, whether it's because

9   they chose not to, whether it's because they didn't get a

10  survey in the first place.

11  **Q.**   So it wouldn't matter, in determining who's a

12  nonresponder, that the person got the survey and tore it up, or

13  the person got the survey and put it in a drawer and just

14  forgot about it, or the person never got the survey and

15  obviously didn't respond?

16  **A.**   For purposes of calculating the nonresponse rate, that's

17  correct.

18  **Q.**   Mr. Bohrer asked you some questions with respect to the

19  difference between nonresponse bias in a sample survey and a

20  census survey, particularly with respect to the manual and

21  scientific evidence.  Is there nonresponse bias in a census

22  survey?

23  **A.**   Yes, there is.  If not every one responds, yes, there is.

24  **Q.**   Do the same principles apply, in terms of the concern

25  about the rate of nonresponse, to a census survey as to a

1  random sample survey?

2  **A.**   Yes.

3  **Q.**   Mr. Bohrer asked you some questions about bias and made

4  some comments about Mr. Waite and his stockholdings.  As a

5  witness in the lawsuit, Mr. Waite, just as you, as a witness in

6  the lawsuit, is subject to cross-examination; isn't that right?

7  **A.**   That's my understanding.

8  **Q.**   Most of the respondents to the survey were not subject to

9  cross-examination; isn't that right.

10  **A.**   That's correct.

11  **Q.**   Finally, let me ask you a question that I've been waiting

12  all my life to ask of a Ph.D. from MIT.

13         **MR. BOHRER:**  I object, Judge.

14  **BY MR. GILLIGAN:**

15  **Q.**   If you divide 59 hours by 2, what do you get?

16  **A.**   You get 29 and a half.

17  **Q.**   Which would be below the threshold of 30 hours, assuming

18  that Mr. Bohrer's assumptions were correct that 30 hours is the

19  floor for benefits; is that right?

20  **A.**   That's correct.

21         **MR. GILLIGAN:**  That's all I have, Your Honor.

22         **THE COURT:**  I have a couple of questions.

23         Did you make any determination of how many

24  people did not sign the affidavits on the questionnaires?

25         **THE WITNESS:**  No, I didn't.

1          **THE COURT:**  Do you have any idea if it's more than

2    one or two or three or four?

3          **THE WITNESS:**  I think it's more than three or four,

4    but I don't know the number.

5          **THE COURT:**  On the issue of biases, do they operate

6    independently of each other, or does the existence of one

7    complicate or compound the existence of another one?  How do

8    they operate in a survey?

9          **THE WITNESS:**  I think that there is an interaction in

10   this case because the two that concerned me the most are the

11   demand effects and the nonresponse bias.  There are two

12   independent source of biases that can independently -- the

13   demand effect would affect what weight you could put on the

14   answers you actually get, but that those same forces act on the

15   likelihood of getting the response in the first place, but they

16   are independent.  And measurement error that's just due to

17   miscomprehension is just a separate thing; it causes error in

18   and of itself.

19         **THE COURT:**  The question that you relied on, No. 4,

20   shows that at least these respondents said that other members

21   of management were doing these, for want of another term,

22   *menial tasks.*  You saw that?

23         **THE WITNESS:**  Yes.

24         **THE COURT:**  I guess I'm still having a problem with

25   the profit-maximizing analysis.  If it's not in Big Lots'

1   profit-maximizing interest to pay managers to do exempt work,

2   could it be in its profit-maximizing interest to have someone

3   do a small portion or apportionment, some portion of management

4   work and some portion of this menial stuff?  Is there some

5   point where it starts making sense for them to combine those

6   tasks in one person?

7           **THE WITNESS:**  Well, I think it makes sense to combine

8   them because, from my understanding of the ASM job, there's

9   going to be times that they're available to participate in

10  conducting the operations of the store, and most of the stuff

11  that needs to be done is exempt work.  So it makes absolute

12  sense you have to hire this person for whatever reasons that

13  are not related to retrieving carts, but they're there, and so

14  you put them to work.  It makes perfect sense.  It's in your

15  profit interest to utilize the resources that are available

16  once you actually would purchase them, yeah.

17              So if a store manager, for example, could get

18  most of his pure management work done in, I don't know, 20

19  hours a week, yet 45 hours is a full-time job -- or 40,

20  whatever it is you're going to use -- there's time there, and

21  it wouldn't be in Big Lots' financial interest to then go out

22  and hire somebody at any wage to come in and do some stuff when

23  you've got to pay a manager-type salary, too, anyway.

24          **THE COURT:**  All right.  Anybody have any follow-up on

25  what I asked?

1            What are we doing tomorrow?

2           **MS. BARRASSO:**  Judge, we are going to offer our

3    depositions into evidence and exhibits, and we don't have any

4    other witnesses to call.

5           **THE COURT:**  You may step down, sir.  You are free to

6    go.

7           **MS. BARRASSO:**  We'll rest tomorrow after we do that.

8           **MR. BOHRER:**  I know we have our Rule 52 motion that

9    we'll make.  With the Court's permission, we have our remaining

10   witnesses lined up for Wednesday.

11          **THE COURT:**  For Wednesday?  Then why don't we start

12   at 9:30.  We're just going to take the motions and whatever you

13   want to put on the record, and then we'll shut it down for the

14   day and then just start up on Wednesday.

15          **MR. JOSEPHSON:**  Should we just come in and do that on

16   Wednesday morning?

17          **THE COURT:**  It's immaterial to me.

18          **MR. BOHRER:**  Let's do it tomorrow if everybody

19   agrees.  It's just one less thing to do on Wednesday, and

20   that's what we would suggest.

21          **MR. GILLIGAN:**  Your Honor, could I inquire?

22   Dr. Walker is now excused as a witness?

23          **THE COURT:**  Right.

24          **MR. GILLIGAN:**  Would he be able to attend the session

25   on Wednesday since there's no rebuttal and he will not be

1   called back?

2              **THE COURT:**  Sure.  I don't care.

3              **MS. BARRASSO:**  Judge, on the motions, do you have any

4   time limit?

5              **THE COURT:**  I'm not listening to a lot of motions.  I

6   basically told you that I'm listening to all the evidence, so

7   this is going to be a perfunctory motion.  If you think you're

8   coming over here to do some kind of -- don't waste your time

9   tonight.

10             **MS. BARRASSO:**  I appreciate that.

11             **MR. BOHRER:**  Consider them made and denied.

12             **THE COURT:**  9:30 tomorrow.

13             **THE DEPUTY CLERK:**  All rise, Your Honor.

14             (WHEREUPON the Court was in recess.)

15                              * * *

16                         <u>**CERTIFICATE**</u>

17             I, Toni Doyle Tusa, CCR, FCRR, Official Court

18   Reporter for the United States District Court, Eastern District

19   of Louisiana, do hereby certify that the foregoing is a true

20   and correct transcript, to the best of my ability and

21   understanding, from the record of the proceedings in the

22   above-entitled and numbered matter.

23

24
                         <u>s/ Toni Doyle Tusa</u>
25                       Toni Doyle Tusa, CCR, FCRR
                         Official Court Reporter