UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN JOHNSON, *ET AL.*                    CIVIL ACTION

VERSUS                                    NO: 04-3201 c/w
                                              05-6627

BIG LOTS STORES, INC.                     SECTION: R(1)

## ORDER AND REASONS

From January 26-27, 2009, the Court conducted a bench trial
in this overtime pay and misclassification collective action
brought under the Fair Labor Standards Act (FLSA), 29 U.S.C. §
201, *et seq.*  After considering all the evidence presented at
trial and deposition testimony that the Court reviewed after the
live trial concluded, the Court rules as follows.  To the extent
a finding of fact constitutes a conclusion of law, the Court
adopts it as such.  To the extent a conclusion of law constitutes
a finding of fact, the Court adopts it as such.

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    PROCEDURAL AND FACTUAL BACKGROUND

Defendant Big Lots Stores, Inc. is a nationwide retailer of
"closeout" and "overstock" merchandise.  It operates
approximately 1,400 stores in 46 states across the country.  Big
Lots sells consumer goods ranging from futons to food and
utilizes second- and third-generation retail space.

At each store, Big Lots typically employs a salaried store
manager, at least one salaried assistant store manager (ASM), an
hourly associate store manager, a customer service specialist
(CSS), associate hourly employees such as cashiers and stockers,
and an office manager or bookkeeper.  Depending on a store
location's size, sales volume, number of employees, and
performance history, two ASMs and only one associate manager may
be employed, or the store will employ only one ASM and two
associate managers.  Some stores also include furniture
departments and employ a furniture sales manager.  Big Lots
classifies both store managers and ASMs as exempt executive

employees for purposes of the overtime pay provisions of the FLSA. Thus ASMs do not receive overtime pay when they work more than 40 hours in a week. ASMs are eligible for quarterly and annual bonuses based on store sales, the average amount of a purchase within their store, and controllable profit. With the exception of the furniture sales manager, none of Big Lots' non-exempt associates is eligible for bonuses.

Big Lots' formal description of the ASM job position states that ASMs are responsible for interviewing and hiring hourly associate employees, supervising the work of hourly associates, and providing for the safety of persons in the store and security of Big Lots' property. Depending on whether someone is an ASM for Merchandising or Operations, that individual's job description also includes either overseeing freight delivery and the unloading and stocking of merchandise known as the "Dock-to-Stock" (DTS) process, or supervising the work of hourly associates in the store and the cashiering operation, respectively. Big Lots stores are supposed to operate on a management model in which there is always a member of management in the store, known as the manager on duty, and in which the managers work in overlapping shifts. Big Lots' model management schedule provides that ASMs are to work a minimum of five, nine-

hour shifts per week, opening and closing the store depending on the hours of their shifts.

On November 23, 2004, a group of plaintiffs sued Big Lots, asserting that it misclassified ASMs as executive employees and thereby unlawfully denied them overtime pay in violation of § 207(a)(1) of the FLSA. Plaintiffs styled their complaint as a collective action under § 216(b) of the FLSA and brought their overtime pay and misclassification claims on behalf of themselves and all other similarly situated individuals.[1] (*See* R. Doc. 1). Plaintiffs specifically contended that although their formal job descriptions included managerial responsibilities, their actual managerial duties were *de minimis* and did not meet the criteria for exempt executive employees. Plaintiffs asserted that in reality they consistently worked more than 40 hours per week and that they spent the vast majority of their time performing, under strict corporate guidelines, nonexempt tasks that had little to do with managing the store, such as unloading merchandise from delivery trucks, organizing storerooms, stocking merchandise on shelves, operating cash registers, and cleaning their stores.

---

[1] A little more than a year after Johnson and Burden filed suit, a second set of plaintiffs brought identical claims against Big Lots in Civil Action No. 05-6627. The plaintiffs in this suit missed the deadline to join the initial suit as opt-in plaintiffs. The Court later consolidated these two actions. One of the plaintiffs in the instant case, James Alford, was originally a plaintiff in case No. 05-6627.

Utilizing the two-stage certification approach employed by the majority of courts in determining whether to certify a case as a collective action under § 216(b) of the FLSA, the Court conditionally certified the matter as collective action on July 5, 2005. (R. Doc. 36). The parties then sent notices to individuals employed by Big Lots as ASMs on or after November 23, 2001. In response, roughly 1,200 plaintiffs consented to join the litigation as opt-in plaintiffs. The nationwide class of plaintiffs was later reduced to 936 current and former Big Lots ASMs. A little over two years later on June 1, 2007, Big Lots moved to decertify the class. Based on the evidence before it at the time and in light of plaintiffs' claim that Big Lots maintained a *de facto* policy and practice of misclassifying the ASM job position, the Court denied Big Lots' motion to decertify. (R. Doc. 113). The Court first conducted a bench trial in this matter on May 7, 2008. The Court heard evidence about Big Lots' national operation and the operations of some individual stores. It became clear at trial that Big Lots did not maintain a nationwide *de facto* policy of misclassifying ASMs and that an ASM's duties often varied from store to store. After considering all of the evidence, the Court determined that the matter was not fit for adjudication as a nationwide collective action and issued an order decertifying the class. (R. Doc. 401).

The Court then had to determine how to proceed with the named plaintiffs still remaining in the case. The Court and the parties identified the plaintiffs who would proceed to trial individually. Plaintiffs John Johnson, Robert Burden, and James Alford were selected for trial on January 26, 2009. Each of the three plaintiffs worked as an assistant manager at various Big Lots stores in Florida. Johnson worked as an assistant manager at Big Lots stores in Venice, Port Charlotte, and Fort Myers, Florida. Burden worked as an assistant manager at a Big Lots store in Port Charlotte, Florida. Alford worked at Big Lots stores in Hollywood, Lauderdale Lakes, Coconut Creek, and Fort Lauderdale, Florida.

The Court limited the number of witnesses for each plaintiff's case to three on each side and also allowed the parties to incorporate the trial testimony of Big Lots' corporate representative Brad Waite. After hearing 43 hours of testimony about Big Lots' corporate operation and the operation of some of the individual stores in the first bench trial, it became clear that an individual case could be tried fairly if the Court heard seven witnesses per case, since the universe of relevant witnesses seemed to consist of the plaintiff, his supervisor, and coworkers. Although Big Lots objected, the Court has not been shown that this prejudiced either party. Big Lots did not even

use the allotted three witnesses in Burden's case.  Nor did it attempt to make any demonstration of prejudice.  At no time before trial did Big Lots file a motion with the Court to have the numerical limitation lifted.

The Court held a bench trial on plaintiffs' claims on January 26-27, 2009.  After trial, plaintiff Alford moved to be dismissed from the case because he no longer sought to prosecute his claims against Big Lots. (R. Doc. 497).  The Court granted his motion and will only consider the claims of Johnson and Burden in this opinion.

### B.    The Executive Exemption

The FLSA requires that employers pay their employees at a rate of at least one and one-half times their regular rate for the hours an employee works in excess of a 40-hour workweek. 29 U.S.C. § 207(a)(1).  But employers do not have to pay time-and-a-half to individuals "employed in a *bona fide* executive, administrative, or professional capacity." *Id.* § 213(a)(1).  The FLSA itself does not further define these "white-collar" exemptions.  Instead it delegates authority to the Secretary of Labor to promulgate rules that define these exemptions. *Id.*  The white-collar exemptions are affirmative defenses to overtime pay claims.  The employer bears the burden of proving that a plaintiff is properly classified as an exempt employee. *See*

*Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974);
*Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 209 (1966);
*Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990); *Kastor
v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 865 (N.D. Tex.
2001).

Two sets of regulations are pertinent to this case: those in
effect before August 23, 2004 (the "pre-2004 regulations" or "old
regulations"), and those that went into effect on August 23, 2004
(the "post-2004 regulations" or "current regulations").  Under
the so-called "short test" of the old regulations, an employee
who was paid a salary of at least $250 per week (which was true
of both remaining plaintiffs) qualified as an executive if his
primary job duties (1) consisted of the management of the
enterprise and (2) included the customary and regular direction
of the work of two or more other employees. 29 C.F.R. 541.1(f)
(pre-2004).  In 2004, the Secretary of Labor revised the criteria
for the executive exemption.  Now, to qualify as an executive, an
employee must (1) be paid on a salaried basis at least $455 per
week (which was true of both remaining plaintiffs); (2) have
management of the enterprise as his or her primary duty; (3)
"customarily and regularly" direct the work of two or more other
employees; and (4) have the authority to hire or fire other
employees or make recommendations about the hiring, firing,

8

advancement, promotion or any other change of status of other employees that are given "particular weight." 29 C.F.R. § 541.100(a).

The Secretary of Labor has also promulgated regulations that define the terms used in the executive criteria. The definitions identify numerous, non-exclusive factors that courts should consider in analyzing whether an employee qualifies as an exempt executive. Several courts have observed that any determination about whether an employee's job duties satisfy the regulatory criteria is a highly fact-intensive inquiry that must be made on a case-by-case basis in light of the totality of the circumstances. *See, e.g., Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008); *Poseley v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1306 (S.D. Fla. 2006); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271-72 (M.D. Ala. 2004); *Mike v. Safeco Ins. Co. of America*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003). As the ultimate issue here is whether plaintiffs are misclassified, a fact-intensive inquiry into their respective employment experiences is required.

    *1. Management as primary duty.*

The current regulations include the following illustrative list of management activities:

interviewing, selecting, and training of employees; setting
and adjusting their rates of pay and hours of work;
directing the work of employees; maintaining production or
sales records for use in supervision or control; appraising
employees' productivity and efficiency for the purposes of
recommending promotions or other changes in status; handling
employee complaints and grievances; disciplining employees;
planning the work; determining the techniques to be used;
apportioning the work among the employees; determining the
type of materials, supplies, machinery, equipment or tools
to be used or merchandise to be bought, stocked and sold;
controlling the flow and distribution of materials or
merchandise and supplies; providing for the safety and
security of the employees or the property; planning and
controlling the budget; and monitoring or implementing legal
compliance measures.

29 C.F.R. § 541.102 (post-2004). The old regulations contained a

similar list. *See* 29 C.F.R. § 541.102(b) (pre-2004). Under the

regulations, management entails performing tasks included in the

other executive exemption criteria, *i.e.*, directing the work of

other employees and having the authority to hire or fire and make

influential recommendations that affect others' employment

status.

An employee's "primary duty" is management if it is the

"principal, main, major or most important duty that the employee

performs." 29 C.F.R. § 541.700(a) (post-2004). Both the old and

the current regulations make clear that the determination of an

employee's primary duty must be based on the totality of the

circumstances. As the current regulations put it, the

determination of an employee's primary duty "must be based on all

the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id. See also* 29 C.F.R. § 541.103(pre-2004). The old regulations set forth five non-exclusive factors to consider: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid other employees for nonexempt work performed. 29 C.F.R. § 541.103 (2003). The current regulations set forth only four factors: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a) (post-2004). Both the old and current versions recognize that "the amount of time spent performing exempt work can be a useful guide in determining whether exempt work" is an employee's primary duty, and that, as a general rule, if an employee spends a majority of her time on management activities, then management is her primary duty. 29

C.F.R. § 541.700(b) (post-2004); 29 C.F.R. § 541.103 (pre-2004).
But they also stress that "nothing . . . requires that exempt
employees spend more than 50 percent of their time performing
exempt work," 29 C.F.R. § 541.700(b)(post-2004). Rather, "[t]ime
alone . . . is not the sole test, and in situations where the
employee does not spend over 50 percent of his time in managerial
duties, he might nevertheless have management as his primary duty
if the other pertinent factors support such a conclusion." 29
C.F.R. § 541.103 (pre-2004).

The current regulations also explicitly recognize that an
employee may perform exempt and nonexempt duties concurrently.
Although the old regulations did not address the concept of
concurrent duties specifically, courts that interpreted the
earlier version acknowledged that an employee could have
management as his primary duty even if he concurrently performed
nonexempt duties. *See, e.g., Thomas v. Speedway SuperAmerica*,
*LLC*, 506 F.3d 496, 504-05 (6th Cir. 2007); *Jones v. Virginia Oil
Co.*, 2003 WL 21699882, at *4 (4th Cir. 2003); *Murray v.
Stuckey's, Inc.*, 939 F.2d 614, 619-20 (8th Cir. 1991); *Donovan v.
Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (*Burger King
I*); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir.
1982) (*Burger King II*). Indeed, in the preamble to the 2004
version, the Secretary commented that the new regulations "are

12

consistent with current case law which makes clear that the performance of both exempt and nonexempt duties concurrently or simultaneously does not preclude an employee from qualifying for the executive exemption." 69 Fed. Reg. 22136 (Apr. 23, 2004). That view is now codified in the regulations: "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the [other regulatory criteria] are otherwise met." 29 C.F.R. § 541.106(a).

"Whether an employee meets the [executive exemption criteria] when the employee performs concurrent duties is determined on a case-by-case basis." *Id.* The regulations distinguish between exempt and nonexempt employees who both perform nonexempt work based on whether the exempt employee retains supervisory and managerial responsibility even while performing nonexempt work: "Generally, exempt executives . . . [decide] when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined periods." *Id.* To illustrate how an employee may retain her exempt status while concurrently performing exempt and nonexempt

duties, the regulations specifically point to the multitasking of

an assistant manager in a retail establishment.  Such an employee

> may perform work such as serving customers, cooking food,
> stocking shelves and cleaning the establishment, but
> performance of such nonexempt work does not preclude the
> exemption if the assistant manager's primary duty is
> management.  An assistant manager can supervise employees
> and serve customers at the same time without losing the
> exemption.  An exempt employee can also simultaneously
> direct the work of other employees and stock shelves.

29 C.F.R. § 541.106(b) (post-2004).  Thus, even though an

assistant retail manager might "not spend more than 50 percent of

[her] time performing exempt duties [she] may nonetheless meet

the primary duty requirement if the other factors support such a

conclusion." 29 C.F.R. § 541.700(b) (post-2004). *See also* 29

C.F.R. § 541.700(c) (post-2004) (An assistant retail manager who

"perform[s] exempt executive work such as supervising and

directing the work of other employees, ordering merchandise,

managing the budget and authorizing payment of bills may have

management as [her] primary duty," even if a majority of her time

is spent on nonexempt work).  Factors to consider in determining

whether management is still an employee's *primary duty* when that

individual is, say, stocking shelves alongside the employees whom

she simultaneously supervises include to what extent the

assistant manager herself is closely supervised and what the pay

difference is between the assistant manager and the nonexempt hourly employees. 29 C.F.R. § 541.700(c).

2. *Directing the work of at least two other employees.*

Under both the old, short test and the current test, an employee must "customarily and regularly direct[ ] the work of two or more other employees" in order to qualify as an exempt executive. 29 C.F.R. 541.100(a)(3) (post-2004); 29 C.F.R. § 541.1(b) (pre-2004). The old regulations did not define "customarily and regularly." The current regulations explain that the phrase means "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' include work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701 (post-2004).

Determining whether someone directs the work of at least two employees is more complicated than just counting heads. An individual qualifies as an executive only if she customarily and regularly supervises the work of two or more "full-time employees or their equivalent." 29 C.F.R. § 541.104(a) (post-2004); 29 C.F.R. § 541.105(a) (pre-2004). Of particular importance here are the terms "full-time" and "equivalent." The regulations do not expressly define what "full-time" means. But with certain

exceptions that apply to the financial and banking industries
where so-called "banker's hours" sometimes apply, full-time
generally means 40 hours per week. *See Sec'y of Labor v. Daylight
Dairy Prods., Inc.*, 779 F.2d 784, 787 (1st Cir. 1985),
*disapproved of on other grounds by McLaughlin v. Richland Shoe
Co.*, 486 U.S. 128 (1988); *Perez v. Radioshack Corp.*, 552 F. Supp.
2d 731, 738 (N.D. Ill. 2005). The regulations also account for
the supervision of full-time and part-time employees, clarifying
that "[o]ne full-time and two half-time employees, for example
are equivalent to two full-time employees" and that "[f]our half-
time employees are also equivalent" to two full-time employees.
29 C.F.R. § 541.104(a) (post-2004). *See also* 29 C.F.R. §
541.105(a) (pre-2004). The regulations do not require that an
employee supervise the work of the same employees day in and day
out to qualify as exempt, and they contemplate situations in
which supervisors might share or split the supervision of
subordinate employees. *See* 29 C.F.R. § 541.104(b) (post-2004).
But the rules prohibit double-counting of employee-hours for
supervision purposes. *See* 29 C.F.R. § 541.104(d). Perhaps the
clearest way to make sense of these rules is the Department of
Labor's "80-hour" rule, which generally requires an exempt
supervisor to "direct a total of 80 employee-hours of work each
week." 69 Fed. Reg. 22135.

3.    *The authority to hire or fire or make recommendations
that are given particular weight.*

Whether an employer gives "particular weight" to an employee's recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees depends on "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105 (post-2004).  The Department of Labor further recognizes that a court's determination as to whether a particular employee's recommendations are given particular weight may rest on evidence that is extrinsic to the employee's testimony.  In the Preamble to the regulations enacted in 2004, the Secretary explained that evidence of "particular weight" could include "witness testimony that recommendations were made and considered; the exempt employee's job description listing responsibilities in this area; the exempt employee's performance reviews documenting the employee's activities in this area; and other documents regarding promotions, demotions or other change of status that reveal the employee's role in this area." 69 Fed. Reg. 22135.

In general, "an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs." 29 C.F.R. § 541.105 (post-2004). An "occasional suggestion" does not qualify. *Id.* But an employee's recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decisions as to the employee's change in status." *Id.*

Neither the pre- nor post-2004 regulations define "change of status." But the Secretary of Labor explains in the Preamble that this phrase should "be given the same meaning as that given by the Supreme Court in defining the term 'tangible employment action' for purposes of Title VII liability." 69 Fed. Reg. 22131. The Supreme Court has explained that a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). And generally speaking, "only a supervisor, or other person acting with the authority of the company" can effect a tangible employment action. *Id.* at 762. It is also recognized that an individual may still effect a tangible

18

employment action even if the decision or recommendation is
"subject to review by higher level supervisors." *Id.* (citing
*Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)
(explaining that even if a human resources committee, not an
immediate supervisor, directly fired a subordinate employee, the
immediate supervisor could still have procured the discharge if
the committee acted as his "cat's-paw" and was "apt to defer to
the judgment of the man on the spot")).  With these regulatory
criteria and illustrative, multi-factor definitions in mind, the
Court now turns to analyzing whether Big Lots properly classified
the plaintiffs as exempt.

### C.    John Johnson

Johnson began working at Big Lots on July 28, 2002 and
worked for the company for about two years.  For the first 11
months of his employment, Johnson worked for Big Lots' Store 529
in Venice, Florida, which employed between 16 to 24 workers
during the non-holiday season. (Hecker deposition, 43:1-3).
During Johnson's tenure as an ASM at Store 529, the store
employed Ken Williams as the Store Manager and Patti Hecker as a
second ASM.  In June 2003, Williams left and a new store manager
was brought in to Store 529.  Johnson then transferred to Store
561 in Port Charlotte, Florida, which employed about 14 to 25
workers during the non-holiday season.  There, Johnson worked

with Store Manager Cliff Baer and ASM Robert Burden, his co-plaintiff.  Blanca Lopez, who testified for Big Lots in this case, was the District Manager for both stores.  Johnson worked at Store 561 until he suffered a heart attack on July 21, 2004.  After returning from medical leave in November 2004, Johnson worked for about two weeks at Store 1545 in Fort Myers, Florida.  Big Lots formally terminated Johnson's employment on February 12, 2005 after he exhausted the amount of time Big Lots allows for a leave of absence. (Def.'s Ex. 12).

While employed with Big Lots, Johnson's annual salary ranged from $29,000 to $30,866 a year. (Def.'s Ex. 10).  Johnson also received 10 bonuses during his tenure of employment, ranging from $125 to $500 each. (Def.'s Ex. 11).  Johnson was never paid any overtime.

Johnson testified that he usually worked Monday through Saturday, between 10 to 12 hours a day, which would result in a 60-72 hour workweek.  Johnson's schedule varied, but he typically closed the store four days a week and opened the store two days a week.  Johnson testified that when he opened or closed, other managers, like the furniture manager, associate manager or another ASM, might be present.  At times the Store Manager worked from open to close.  When Johnson was the only salaried manager in the store, between six to eight hourly employees, including

20

hourly managers such as customer service specialists (CSS's),
associate managers, and bookkeepers, would also be working.

D.   **Primary duty**

As discussed, *supra*, the former and current regulations,
both of which apply here, set forth several factors to consider
in deciding whether management is an employee's primary duty.
Under both sets of regulations, the Court considers: the relative
importance of the exempt duties as compared with other types of
duties; the amount of time the employee spends performing exempt
work; the employee's relative freedom from direct supervision;
and the relationship between the employee's salary and the wages
paid to other employees for the kind of nonexempt work performed
by the employee. *See* 29 C.F.R. § 541.103 (2003); 29 C.F.R. §
541.700(a).  Under the old regulations, courts also look to the
frequency with which the employee exercises discretionary powers.

Because the executive exemption is an affirmative defense to
an overtime action, Big Lots has the burden of proving that the
exemption applies. *See Morgan v. Family Dollar Stores, Inc.*, 551
F.3d 1233, 1269 (11th Cir. 2008); *Vela v. City of Houston*, 276
F.3d 659, 666 (5th Cir. 2001).  The Court has considered all of
the factors, and for the following reasons finds that Big Lots
has not shown that management was Johnson's primary duty.

*1.   The amount of time spent performing exempt work*

In most cases, an employee has management as his primary duty if he spends over 50% of his time performing exempt work. *Murray v. Stuckey's Inc.*, 939 F.2d 614, 618 (8th Cir. 1991).  No circuit courts have found management was a primary duty when the employee spent 80 to 90% of his time performing nonexempt tasks. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1272 (11th Cir. 2008).  But "time alone . . . is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." *Murray*, 939 F.2d at 618.

Johnson performed few management activities most days.  On a typical day, although he might briefly perform some managerial duties in opening the store, Johnson spent the majority of his shift stocking shelves with merchandise, and he saw this task as his most important duty.  Johnson also performed janitorial duties daily.  He swept.  He mopped.  He cleaned the bathrooms. Customer service tasks, such as helping customers, retrieving shopping carts from the parking lot, and carrying purchases to customers' cars, were a part of Johnson's daily duties.  On most days, Johnson performed recovery, which is essentially a task where the worker finds out-of-place merchandise and returns it to

its proper location.  In addition, he ran the cash register,
sometimes for up to three hours a day.

On "truck day," the day the company truck delivered
merchandise to the store, Johnson's work was similarly non-
managerial.  The stores had one truck day per week, and on that
day, a team of employees unloaded and stocked merchandise under a
highly routinized procedure called "Dock-to-Stock" (DTS).
(Johnson trial testimony).  The DTS process was under the overall
direction of the Store Manager, but Johnson was designated "DTS
Lead." (Johnson trial testimony).  Although, on paper, Johnson's
duties as DTS Lead included training associates on the DTS
process and ensuring that performance standards were met, (Pl.'s
Ex. 21), in reality, Johnson largely did the same work as the
stockers.  He unloaded freight from the truck, working side by
side with the stockers.  He moved the freight from the truck to
pallets.  He moved the pallets from the stockroom to the floor
with a pallet jack.  He moved the merchandise from the pallets to
the shelves.  He ticketed merchandise in accordance with Big
Lots' detailed corporate procedures (*i.e.*, he put the tickets on
the top right corner of the merchandise).

Johnson occasionally told the stockers to "pick up the
pace," move a pallet, or build an endcap. (Vellenkamp trial
testimony).  But as Big Lots' witness Gary Vellenkamp testified,

these instructions were "rarely" given because the stockers generally knew how to do their jobs. This is corroborated by the fact that each step in the DTS process was described in the minutest detail in Big Lots' DTS manual and DTS checklist. (Pl.'s Ex. 21). Ultimately, Johnson was the "Lead" in name only. The highly routinized DTS process needed little management, and thus Johnson spent the vast majority of his truck days performing the same manual labor as the rest of the DTS crew.

Johnson never performed many common managerial duties. Johnson testified that he never set hours or created schedules for other employees. He did not regularly direct the work of other employees. He did not conduct huddle meetings with employees. He did not regularly hire, fire, or promote employees. He did not approve vacations or sick leave. He did not interview potential employees or evaluate employment applications. He did not order merchandise. He did not have any discretionary authority over prices, advertising, or where merchandise was placed in the store. He did not plan or control the store's budget or administer payroll. He was not consulted about the store's operations. (Johnson trial testimony).

Johnson did open and close the store regularly, using the procedures outlined in Big Lots' detailed opening and closing checklists. The other managerial duties Johnson performed were

done rarely or often amounted to little more than filling out forms at the direction of a supervisor. (Johnson trial testimony). Big Lots produced three employee appraisals signed by Johnson. (Def.'s Ex. 8). Johnson filled out the forms, in which the managers rated four different aspects of employee performance on a scale of 0-3, with the help of Williams or Lopez. These three forms were the only ones he completed during his two years at Big Lots. (Johnson trial testimony). The ratings on the performance appraisals determined whether an employee was entitled to a raise, and if the employee was to receive the raise, a member of management had to fill out an Action Request Form. Big Lots produced eight Action Request Forms signed by Johnson. (Def.'s Ex. 7). Lopez testified that these forms took no more than a minute to fill out. (Lopez trial testimony). Johnson also was involved in disciplining employees through Big Lots' Progressive Counseling program. Big Lots produced ten Progressive Counseling forms signed by Johnson, and the forms showed that Johnson disciplined employees for various reasons, such as being short on their tills, failing to show up, or insubordination. (Def.'s Ex. 9). Johnson explained that, for most of the counseling, Williams directed him to fill out the forms and told him what to write. (Johnson trial testimony).

Johnson did not do any Progressive Counseling at Store 561. (Johnson trial testimony).

Big Lots concedes that Johnson spent the majority of his time performing nonexempt work, but contends that management was still his primary duty since he performed his nonexempt duties concurrently with his exempt ones. The Court rejects this argument for a number of reasons. For one, the evidence that Johnson directed and supervised the work of other employees is scant. Big Lots' witness Vellenkamp described the frequency with which Johnson gave him instructions as "rarely" and "seldomly." He admitted that he and Johnson generally performed the same tasks most days. Further, Johnson's ability to supervise was limited by his non-managerial work, which mostly consisted of manual labor. Johnson could not easily stock shelves and simultaneously supervise employees in all parts of the 30,000 square-foot store. *See Morgan*, 551 F.3d at 1272-73 (explaining that a manager unloading a truck and stocking shelves could not concurrently supervise the store cashiers). Cleaning the bathrooms would similarly impede Johnson from supervising the work of others. The mere title of "assistant manager" coupled with manual labor does not show that Johnson was concurrently supervising other employees. Because there is only the thinnest of evidence that Johnson actually supervised other employees, the

Court finds that he was not performing exempt duties concurrently with his nonexempt tasks.

Even if the Court found that Johnson concurrently performed managerial and non-managerial duties, the analysis would not end. The regulations provide that, "[w]hen an employee performs exempt and nonexempt work concurrently, whether the exemption is met is determined on a case-by-case basis." 29 C.F.R. § 541.106(a). Exempt executives typically decide when to perform nonexempt duties, while nonexempt employees are directed by a supervisor to perform exempt work. *Id.* If an assistant manager in a retail establishment is closely supervised and earns little more than nonexempt employees, the assistant manager generally does not satisfy the primary duty requirement. 29 C.F.R. § 541.700(c).[2] The Court will consider these factors, *infra*, under the freedom from supervision prong of the regulations.

Further, that Johnson was the "manager on duty" a portion of his time does not affect this factor. First, the courts are split as to whether a manager on duty of the store necessarily has management as her primary duty. The First Circuit has held that "the person 'in charge' of a store has management as his

_____

[2]While this subsection of the regulation became effective in 2004 and is thus applicable only to a brief period of the plaintiffs' employment, the Court nevertheless finds it instructive as to whether management was their primary duty.

primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions." *Donovan v. Burger King Corp. (I)*, 672 F.2d 221, 227 (1st Cir. 1982); *see also, Donovan v. Burger King Corp. (II)*, 675 F.2d 516, 522 (2d. Cir. 1982) (assistant managers that are "solely in charge" of their restaurants for the great bulk of their working time are relatively free from supervision). But other courts have held that the title "manager on duty" is not a talisman for finding management a primary duty. *See Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 691 (6th Cir. 2001) ("The words 'in charge' are not a magical incantation that render an employee a *bona fide* executive regardless of his actual duties."). As explained by the Eleventh Circuit, "[C]ourts cannot rely solely on whether an employee was 'in charge' of the store. Rather, they must evaluate the employee's actual job duties." *Morgan*, 551 F.3d at 1272 n.60; *see also Thomas*, 506 F.3d at 503 (the court cannot rely solely upon plaintiff's statements that she was "the person ultimately in charge of [her] store," and must instead look to her actual job duties). This Court agrees with the Sixth and Eleventh Circuits that an inquiry into what the "manager in charge" actually did during his shift is required. Here, Johnson was not free to decide when to perform nonexempt work because the amount of nonexempt work required of him took up the vast majority of his

28

time, and the nominal amount of exempt work he performed was tightly controlled from above.

But even if management was Johnson's primary duty when he was "in charge" of the store, he was not manager on duty for the majority of his workweek. Johnson testified that he was "manager in charge" for only 10-12 hours of his 70-hour workweek, thus roughly 15 to 18 percent of the week. Even using Big Lots' witness Patti Hecker's estimate that Johnson was manager on duty 40% of the week (Hecker Depo. 52:8-16), Johnson was still below a 50% threshold.

In the other cases where the courts found that the "manager in charge" had management as his primary duty, the plaintiffs were "managers in charge" for all or the great majority of their workweek. *See Burger King I,* 672 F.2d at 227; *Burger King II*, 675 F.2d at 522; *Murray v. Stuckey's Inc.*, 939 F.2d 614, 618 (8th Cir. 1991). That is not the case here. Even if the Court presumes Johnson was performing managerial duties when he was manager on duty, he was not manager on duty for most of his workweek.

In sum, the evidence shows that Johnson spent the great majority of his time performing non-managerial duties. That Johnson performed managerial duties less than 50% of his workweek

is not dispositive, *see Burger King I*, 672 F.2d at 226, but this factor suggests his primary duty was not management.

   2.   *Relative importance of the exempt duties as compared to the nonexempt duties*

Under this factor, the Court weighs the importance of plaintiff's managerial duties with the importance of his non-managerial duties, keeping in mind the overall goal of running a successful company. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 505 (6th Cir. 2007).

Here, Johnson's non-managerial duties included unloading freight, stocking shelves, running the cash register, performing recovery, cleaning up, and assisting customers, while his managerial duties included opening and closing the store and a limited amount of evaluating employee performance and disciplining employees. The evidence does not show that Johnson's managerial duties were more important than his non-managerial duties. *See* 29 C.F.R. § 541.700(a). Johnson's primary value to Big Lots was his job of moving freight from the backroom to the sales floor. District Manager Lopez explained the importance of this task to Johnson in his job interview, when she took him to the back room of a Big Lots Store, showed him the freight, and asked him "if [he] felt that [he] could unload the backroom." Johnson felt that his most important duty was

stocking shelves and making sure all of the freight was placed on sale.  Johnson's disdainful statements in his 2004 performance appraisal further attest that putting out freight was his primary function: "I wished I had known that all I was going to be used for was just 'stocking' only. If that were the case things could have been much easier.  Now that I know where I stand my position is easier, just keep putting out freight." (Def.'s Ex. 4).

Part of the reason Johnson spent so much time stocking and performing other non-managerial tasks was because of Big Lots' policy of avoiding overtime payments to its hourly workers. (Johnson trial testimony).  Big Lots' corporate offices set the number of payroll hours available to the stores, and the stores were not allowed to exceed the budgeted hours.  If the hourly workers could not perform the tasks within the budgeted hours, the tasks fell to salaried workers like Johnson.  Big Lots' policy made it difficult to delegate tasks to associates. (Hecker Depo., 186:14-24).  Because of this policy, Johnson routinely worked 60-plus hours a week to accomplish non-managerial tasks that could have been assigned to hourly workers if Big Lots was willing to pay overtime.  Johnson's completion of these tasks was essential to the functioning of the store. *See Morgan*, 551 F.3d at 1270 (finding that store managers nonexempt duties were more important than their exempt ones when "[a] large amount of manual

labor by store managers was a key to Family Dollar's business model given each store's limited payroll budget").

Further, many of Johnson's "managerial tasks" were also performed by non-salaried employees, such as furniture managers, CSS's, office coordinators, and associate managers, who were also considered part of the management team. For instance, associate managers could open and close the store when a salaried manager was on vacation. (Hecker Depo., 76:6-13). Office coordinators would often open the safe, count the cash inside, prepare the deposit, and take it to the bank. (Hecker Depo., 84: 13-23, 86:11-22). CSS's and associate managers performed balance checks on cash registers. Huddle meetings could be performed by anyone. (Hecker Depo., 89:6-9). And all employees trained other employees in their respective positions (i.e., stockers trained stockers; cashiers trained cashiers).

In sum, the evidence shows that Johnson's primary value to Big Lots was for his performance of non-managerial tasks such as moving and stocking freight. Most of the managerial duties at Johnson's stores were performed by the Store Manager. The few "managerial" duties Johnson performed involved being told exactly what to do by the Store Manager or by Big Lots' corporate policies and checklists. *See infra*. If Johnson failed to perform his managerial duties, Big Lots would still function in much the

same manner because the Store Manager, and even non-salaried managers such as the associate manager or the CSS, could and did perform many of these tasks. *Cf. Thomas*, 506 F.3d at 505 (finding that a Speedway store manager was critical to the gas station's success because if the manager failed to perform her duties of hiring, training, and assigning work schedules, no one else would perform these tasks). If Johnson did not perform his non-managerial tasks, however, operations at the store could suffer because there were not enough payroll hours for hourly associates to accomplish these tasks. Because Johnson's non-managerial duties were relatively more important than his managerial duties, this factor favors a finding that Johnson's primary duty was not management.

> 3. *Freedom from direct supervision and exercise of*
> *discretionary authority*

Both the new and old regulations list "freedom from direct supervision" as a factor to consider in deciding whether management is an employee's primary duty. The old regulations also list "the frequency with which the employee exercises discretionary powers," but the new regulations omit this factor. Because the frequency with which an employee exercises discretionary power is part and parcel of freedom from

33

supervision, the Court will consider these factors jointly. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1270 n.57.

Johnson rarely exercised discretionary authority. Johnson's actions were strictly controlled by corporate directives, emails from the District Manager, and orders from the Store Manager. The Big Lots stores received Weekly Action Plans, Plan-O-Grams, and Plan-O-Guides that dictated which items were to go on sale and where the merchandise was to be placed in the store. (Johnson trial testimony). As Hecker explained, "[Big Lots] tell[s] us what they want, where they want it and how they want it." (Hecker Depo., 117:11-16). A Big Lots checklist governed the procedures in opening and closing the store. (Lopez trial testimony, Pl.'s Ex. 17 & 18). Further, Big Lots' store operating procedures controlled virtually all aspects of the store operations, from the proper way to stock merchandise ("use both hands") to the stretches stockers should perform to warm up, to the specific bills and change to put in the money drawer of the cash register, to the places to put tags on merchandise. (Pl.'s Exs. 83 & 84, Johnson trial testimony).

Johnson's discretion was further cabined by the District Manager and Store Manager. Johnson received instructions on where to place merchandise from the Store Manager, and only the Store Manager would deviate from the Weekly Action Plans.

(Johnson trial testimony).  The instructions Johnson gave to Big Lots' associates were pursuant to the direction of the Store Manager.  Johnson would also receive emails, sometimes daily, from the District Manager that would assign specific tasks to the ASMs.  As Hecker explained, "[Johnson's] management functions were very limited . . . all assistant managers had to ask or be told what to do and when to do it." (Hecker Depo., 83:17-22).

As an ASM, Johnson was also closely supervised.  The Big Lots Store Managers worked nearly every day, at times from open to close, and micromanaged the ASMs when they were both in the store.  Although Johnson was the only salaried manager in the store for some portion of the week, he still had to comply with the written instructions of the Store Managers or emails from the District Manager.  Even when Johnson was the "manager on duty," he had no meaningful supervisory role.  He told associates "good job" or to "hurry up," generally disciplined employees at the behest of others, and had no role in hiring decisions.

As such, Big Lots has not shown that this factor weighs in favor of a finding that management was Johnson's primary duty.

> 4.  *Relationship between the employee's salary and the wages paid to nonexempt employees performing similar work*

Finally, the Court will look to the relationship between Johnson's salary and the wages paid other employees for nonexempt

work.  The parties dispute whether the Court should compare
Johnson's weekly salary to that of his subordinates or Johnson's
effective hourly rate to the hourly rate of his subordinates.
The Sixth Circuit has utilized the comparison of hourly rates
urged by plaintiffs. *See Thomas v. Speedway Super America, Inc.*,
506 F.3d 496, 508-09 (6th Cir. 2007).  There, the Court reduced
the store manager's weekly salary to an hourly rate of pay by
dividing the salary by the number of actual hours worked. *Id.*
The Court then compared that rate to the hourly rate of
subordinate employees. *Id.*  The Eleventh Circuit also used this
method in *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233,
1257-58 (11th Cir. 2008).

The Court holds that the relevant comparison is the
effective hourly wage of Johnson with the hourly wage of his
subordinates.  Plaintiffs have provided evidence that Big Lots
ASMs regularly worked over forty-hour weeks performing the tasks
of hourly workers so that Big Lots could avoid paying hourly
workers overtime compensation.  To compare the wages an hourly
worker earned in a 40-hour workweek with the salary an ASM earned
in a 60- to 70-hour workweek would ignore the huge discrepancy in
work time caused by Big Lots' policy.  The fair comparison is the
effective hourly wage of an ASM with the hourly wage of someone
doing the nonexempt work he regularly performed.  If Johnson

worked 60 hours a week for 50 weeks a year, his initial salary of $29,000 per year, plus an average quarterly bonus of $250, would give him an effective hourly wage of $10 per hour. His later salary of $30,866, plus an average quarterly bonus of $250, would give him an effective hourly wage of $10.62 per hour. Johnson's hourly wage is therefore only about $1 higher than the hourly wages of the associate managers ($8.97-$9.67 per hour) and the highest paid CSS's ($8.70-$9.82 per hour) at Store 529 and Store 561. (Def.'s Ex. 120). Johnson's wage is less than that of the furniture department manager ($10.74-$12.62), an hourly employee, at both stores. (Def.'s Ex. 120). Given the relatively small difference between these hourly rates, this factor is neutral as to whether Johnson's primary duty was management. *See Morgan*, 551 F.3d at 1271 (noting that because the store managers' rate was only $2-$3 higher than that of the assistant managers, this factor was neutral as to whether management was the store managers' primary duty).

   5.   *Witness credibility*

   The Court finds that overall, Johnson was a credible witness. This is true despite his apparent overestimations of the number of hours he worked or the time he spent performing various tasks. The time spent performing daily tasks is difficult to quantify after the fact, and the Court is not

37

surprised that, after five years, Johnson cannot remember
precisely how many hours each day he spent performing certain
duties.  Further, much of Johnson's testimony was corroborated by
Hecker and Vellenkamp.  For instance, Vellenkamp testified that
when he worked with Johnson, they both "basically stocked
shelves," corroborating the major point in Johnson's testimony.
Hecker similarly testified that Johnson's most important duty was
processing freight (Hecker Depo., 81:17-20) and that they were
only managers "on paper." (Hecker Depo., 29:19-23).  She also
confirmed the existence of Big Lots' no overtime policy. (Hecker
Depo., 167:21-168:4).  The Court therefore finds that the
substance of Johnson's testimony, *i.e.,* that he spent the great
majority of his time on nonexempt tasks and a comparatively
inconsequential amount of time performing management duties, is
more probably true than not true.

The Court did not find the testimony of Lopez, Big Lots'
most favorable witness, to be particularly relevant to Johnson's
daily duties.  As District Manager, Lopez oversaw 15 stores,
which would mean 15 Store Managers, 30 ASMs, and about 300-500
total employees depending on the time of year. (Lopez trial
testimony).  Lopez did not work with Johnson on a daily basis.
Her testimony was largely based on the general duties of Big Lots
ASMs.  She testified that she did not know how many hours Johnson

worked a week and that she did not know what he did on a daily basis.  She was present for one truck day when Johnson worked at the Venice store and could not recall if she saw Johnson unloading freight from the truck. (Lopez trial testimony).  That the duties of Johnson and other ASMs ran together in Lopez's mind is apparent from her testimony about whether she recalled seeing Johnson in the truck: "it seems like yes, I could see him in the back of [the truck], but -- you understand what I mean? I see so many of them." (Lopez trial testimony).  Further, Lopez did not appear to know what was actually happening at the stores on truck day.  Although Lopez testified that the DTS Lead was supposed to be supervising, not unloading freight, Johnson and Vellenkamp[3] testified that ASMs and Store Managers regularly helped unload freight from the truck.  Because Lopez's testimony largely was not based on her direct experience with Johnson, the Court finds Lopez's testimony only minimally relevant to whether Johnson's primary duty was management.

   *6. Summary*

   Taken together, the factors suggest that management was not Johnson's primary duty.  Since Big Lots must establish each

_____

   [3]Lopez was also the District Manager over the Port Charlotte store where Burden and Johnson worked under Cliff Baer, the Store Manager.  Burden and Baer likewise contradicted Lopez on this point.

element, Big Lots has failed to meet its burden of proving that Johnson meets the executive exemption. Because the Court finds that management was not Johnson's primary duty, the Court will not consider the other requirements of the executive exemption.

**E.   Robert Burden**

Like John Johnson, Robert Burden worked at Big Lots Store 561 in Port Charlotte, Florida. On May 24, 1997, he began his tenure at Big Lots as a part-time, entry-level employee making an hourly wage of $5.00 an hour. (Def.'s Ex. 23). He was promoted to ASM and began working in that position on July 27, 1997. (Def.'s Ex. 24). Burden worked as an ASM until September, 25 2004[4] (Pl.'s Ex. 75), making between $24,000 and $27,884 year during the relevant period. (Def.'s Ex. 109). On top of his salary, Burden received bonuses. He received $726.15 in bonus payments in 1999, $6,497.16 in 2000, $4,818.65 in 2001, $2,170.68 in 2002, and $1,625.00 in 2003. (Def.'s Ex. 121). Burden estimates that he worked 60-70 hours per week in the Port Charlotte store.

---

[4]The Fair Labor Standards Act has a two-year statute of limitations for overtime pay actions, except in cases of willful violations, in which there is a three-year statute of limitations. *See* 29 U.S.C.A. §255(a). Thus the relevant period of Burden's employment is from, at the earliest, November 23, 2001 (if the Court finds a willful violation) until his termination in September 2004.

**F.   Primary duty**

The Court turns to the factors in the regulation to see if Big Lots has shown that management was Burden's primary duty.

*1.   The amount of time spent performing exempt work*

Like Johnson, Burden performed manual labor for most of his workweek.  He testified that he spent 70% his time performing manual labor and 95% of his time performing the same tasks as nonexempt employees. (Burden trial testimony).  Burden's responses to a survey of Big Lots ASMs corroborate these estimates.  In the survey, Burden said he spent 50% of his time stocking shelves and recovering merchandise, 13% of his time manually cleaning the store or retrieving buggies, and 7% of his time manually unloading trucks and moving merchandise to the floor, for a total of 70% of his time performing manual labor. (Def.'s Ex. 30).  Burden's nonexempt tasks were not limited to manual labor.  He also spent 10% of his time making sales and 7% of his time setting up displays according to Plan-O-Grams and Plan-O-Guides. (Def.'s Ex. 30).

Like Johnson, Burden never performed certain managerial duties.  He did not regularly hire or fire employees.  He did not train employees. He did not maintain production or sales records. He did not plan employee work or apportion work among employees. He did not determine the type of merchandise to be bought,

stocked or sold, or when merchandise would go on sale.  He did
not determine where to put the merchandise or how to display it.
He did not plan and control the budget.

The managerial duties he did perform were done rarely, and
they took up only a fraction of his time.  Burden spent 5% of his
time opening and closing the store, 1% of his time hiring
employees, 1% of his time disciplining employees, 1% of his time
handling employee grievances, 1% of his time writing performance
evaluations, 1% of his time training employees, 1% of his time
supervising employees, and 1% of his time running employee
"huddle meetings" and/or responding to or initiating corporate
communications. (Def.'s Ex. 30).  Of these managerial activities,
Burden performed only one[5] — disciplining employees — regularly,
and even this was not performed without receiving direction,
instruction or guidance, as discussed *infra*. (Burden trial
testimony, Def.'s Ex. 30).  Ultimately, Burden's days were
similar to Johnson's — he mostly moved freight and stocked
shelves.

Still, time spent performing managerial duties is not the
sole test and may be misleading when the employee's managerial

---

[5]Although Burden's survey indicated that he also regularly
set the schedules for hourly employees, he explained at trial
that he scheduled hourly employees only when the Store Manager
was on vacation, which the Store Manager took "regularly" each
August.

duties overlap with his non-managerial duties. *See Thomas v.*
*Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007).
As noted, when an employee performs exempt and nonexempt work
concurrently, whether the exemption is met is "determined on a
case-by-case basis." 29 C.F.R. § 541.106(a). As mentioned,
*supra*, exempt executives typically decide when to perform
nonexempt duties, while nonexempt employees are directed by a
supervisor to perform exempt work. *Id.* If an assistant manager
in a retail establishment is closely supervised and earns little
more than nonexempt employees, the assistant manager generally
does not satisfy the primary duty requirement. 29 C.F.R. §
541.700(c). Thus the Court will look to the other factors to
determine whether management was Burden's primary duty.

> 2.   *Relative importance of the exempt duties as compared to*
>      *the nonexempt duties*

The evidence shows that Burden's primary value to Big Lots
was not as a manager. Like Johnson, Burden testified that his
most important duty was moving the stock from the backroom to the
sales floor. Lopez constantly pushed the ASMs to keep the
backroom empty, and at a time when Burden was working six-and-a-
half days a week, Lopez even threatened to take away Burden's
half-day off if he did not "get this backroom under control."
(Burden trial testimony). Because of Big Lots' no overtime
policy, *see supra*, Burden spent much of his time performing the

manual labor necessary to clear out the backroom.  As Lopez put it, when the payroll hours ran out, the ASMs had to "pick up the slack because it [was their] job to do it."

Big Lots and Lopez created a climate in which ASMs, armed with the title of "manager" but little else, were forced to do the tasks of hourly workers so that Big Lots could increase its bottom line.  As long as Big Lots paid the ASMs the smallest amount over $455 per week, it could have them, in addition to their relatively insignificant management duties, perform manual labor for long hours so that it could avoid either paying overtime or hiring more associates to perform the work.  This policy shows that Big Lots valued Burden not for his management skills, but rather, for his performance of nonexempt tasks at little extra cost to the company.  Thus this factor weighs against Big Lots.

### 3.    *Freedom from direct supervision and exercise of discretionary authority*

To the extent he performed managerial duties, Burden was closely supervised by his store manager and constrained by the corporate directives in the Weekly Action Plans and Plan-O-Grams. Baer, a "hands on," "micromanager," was generally in the store six to seven days a week. (Baer Depo. 23:3-8). *Cf. Langley v. Gymboree Operations, Inc.*, 530 F. Supp. 2d 1297, 1303 (S.D. Fla. 2008) (store manager was relatively free from supervision because

44

the district manager was physically removed from the store and did not regularly visit the store).  Baer always worked on truck day and was in charge of the DTS process.  He constantly instructed Burden on his duties.  As Burden explained, "Cliff had directions for everything.  He wanted to know what everybody was doing and he wanted to direct their work almost to the minute." More specifically, he told Burden where to place merchandise and the topics to discuss at huddle meetings.  He told Burden which assignments to give to hourly associates.  He told Burden how to handle employee complaints.  He told Burden to walk the store every fifteen minutes to pick up any dropped merchandise, sweep up spills, and check on employees.  Baer's tight control of the store was not confined to when he was present.  Burden talked to Baer "every single day" that Baer was out, and Baer always left Burden detailed written instructions on what to do.  In addition, Burden was instructed to call Baer if certain situations arose, such as when employees complained to him about other employees. (Burden trial testimony).

Baer admitted that some of Burden's ostensible management duties existed on paper only.  Although Big Lots required two managers to sign performance appraisals and progressive counseling forms, Baer always performed these assessments.  He admitted that the decisions were his, and Burden needed to sign

the forms only as a formality. (Baer Depo., 121:8-17).

Further, Burden was continually reprimanded when he attempted to exercise his supposed discretion. For instance, when Burden was covering a cash register for a CSS on break, he told a cashier she could take a bathroom break. When the CSS came back, Burden was called into Baer's office. Baer admonished him and said, "You don't tell these people what to do. Let the CSS do her job." In another incident, Burden explained to an employee that she was doing something wrong and was subsequently reprimanded by Baer for talking to the employee without first discussing the issue with Baer. Burden was again reprimanded after instructing an employee to clean up a bathroom during a "Code Brown." And Baer was not the only one who reprimanded Burden for exercising his discretion. One night when Burden was manager on duty, he was called up front for a price check on an area rug that was mislabeled as $0.99. After Burden changed the price to $9.99, the price of other similar rugs, the customer got angry. The customer called Lopez, and she changed the price to $0.99 and reprimanded Burden for his decision. These incidents led Burden to "stop trying" to exercise any discretion. (Burden trial testimony).

Burden's decisions that were not controlled by Baer or Lopez were dictated in the smallest detail by corporate policy. Big

Lots' Weekly Action Plans and Plan-O-Grams contained directions about what activities were to take place each week. ASMs never deviated from Plan-O-Grams. (Baer Depo., 34:9-11). Big Lots also had specific, detailed instructions for performing DTS, opening and closing, counting the tills, ordering merchandise, and conducting huddle meetings. (Baer Depo., 93:22-25, 110:10-23, 113:23-114:10). For instance, the DTS process was governed by both a manual and a checklist. The manual outlined the five main tasks of DTS: (1) prep, (2) unload and sort, (3) high priority ticketing and stocking, (4) lower priority merchandise ticketing, and (5) lower priority stocking. (Pl.'s Ex. 21). For each task, the manual outlined the specific responsibilities of the employees and the time necessary to perform the task. (Pl.'s Ex. 21). The instructions for performing the tasks were precise. For example, the manual stated that "[b]oxes are loaded lengthwise onto conveyor with labels facing up" and "[t]icket in teams of two, making sure there is five to eight feet in between each team." (Pl.'s Ex. 21). The manual even mandated that employees stock the merchandise with both hands. (Pl.'s Ex. 21). Big Lots' other policies were similarly detailed. Between these directives and Baer's supervision, Burden had little room to make any decisions.

Although Big Lots avers that Burden performed management duties concurrently with his nonexempt tasks, the evidence shows that these management duties were in no sense meaningful, as Burden was closely supervised and could not exercise discretion without being disciplined for his actions. Burden's few management activities were performed when authorized by Baer and for defined periods. *See* 29 C.F.R. § 541.106(a) ("the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time period."). He did not choose when to perform nonexempt tasks, and he was certainly not responsible for the success or failure of Big Lots' operation when he was performing nonexempt work. *See id.* This factor thus weighs against a finding that management was his primary duty.

4. *Relationship between the employee's salary and the wages paid to nonexempt employees performing similar work*

The evidence also shows that there was a relatively small difference between Burden's effective hourly wage and the hourly wage of nonexempt employees. As the Court did with Johnson, the Court will calculate Burden's hourly wage by dividing Burden's salary, including bonuses, by the number of hours Burden worked, assuming 50 weeks of work a year. The Court finds that Burden averaged about a 60-hour workweek. If Burden worked 60 hours a

week for 50 weeks a year, his highest salary within the relevant time period, $27,884 in 2002, plus his highest bonus during the relevant period, $2,170.68, would give him an effective hourly wage of $10.02 per hour. This wage is lower than the hourly rate of one of the nonexempt associate managers in Store 561 ($10.71-$11.11 per hour) and some of the nonexempt furniture department managers in the store ($11.87-$12.62). (Def.'s Ex. 109). As such, this factor weighs in his favor.

   5.   *Burden's credibility*

Big Lots emphasized Burden's self-evaluations, which focus almost entirely on his managerial skills. The Court does not find this evidence compelling either on the merits or as to credibility. Burden was given evaluation forms that asked him to evaluate himself on certain "management" activities. These forms were like leading questions — they suggested their own answers. And the answers were not always Burden's. Burden testified that Baer helped him fill the forms out and would tell him positive things to write since Burden "would always put down all the negative." The Court finds Burden to be a sincere, credible witness. Burden was young, ambitious, and unsophisticated, having started out at Big Lots as a part-time stocker. That he puffed himself up on evaluation forms does not change the Court's conclusion about his overall credibility or about the nature of

his job as an ASM.

*6. Summary*

The evidence shows that Burden spent a small portion of his workweek on management tasks, that his management skills were not his primary value to Big Lots, that he was closely supervised, and that he earned little more than nonexempt employees. Given the character of Burden's job as a whole, the Court finds that Big Lots has not shown that Burden's primary duty was management. The Court thus will not consider the other requirements of the executive exemption.

### G. Willfulness

Now that the Court has determined plaintiffs were misclassified as exempt executives, the Court must determine the damages. The statute of limitations under FLSA is two years, except in cases of willful violations, in which the statute of limitations is three years. 29 U.S.C. § 255(a). Johnson and Burden filed this lawsuit on November 23, 2004 (R. Doc. 1). If the two-year statute of limitations applies, Johnson and Burden can only recover the unpaid overtime they accrued after November 23, 2002. If the three-year statute of limitations applies, Johnson can recover all of his unpaid overtime, and Burden can recover the overtime he accrued after November 23, 2001. The Court will thus consider whether the violation was willful.

To establish willfulness, the plaintiff must show that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The Supreme Court explicitly rejected a standard that would require merely "an awareness of the possible application of the FLSA." *Id.* at 130. A negligent violation of the statute is not a willful violation. *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990) (citing *McLaughlin*, 486 U.S. at 135)). Nor is a good faith but incorrect assumption that a pay plan complied with the FLSA. *McLaughlin*, 486 U.S. at 135. Even unreasonableness is not sufficient to establish a willful violation. *See id.* at 135 n.13.

Plaintiff bears the burden of proving willfulness. *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990) (citing *McLaughlin*, 486 U.S. at 135)). A willful violation may be established by showing that management knew they were violating the FLSA. *See Singer v. City of Waco, Texas*, 324 F.3d 813, 821-22 (5th Cir. 2003). Evidence that a company continued its overtime practices after being informed by the Wage and Hour office that the practices violated the FLSA may also establish a willful violation. *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994). The failure to seek legal advice does not itself establish reckless disregard. *Mireles*, 899 F.2d at 1416. But consulting

with an attorney about the classifications may preclude a finding of willfulness. *See Halferty v. Pulse Drug Co., Inc.*, 826 F.2d 2, 3 (5th Cir. 1987).

Plaintiffs rely on the testimony of three Big Lots corporate representatives — Brad Waite, Peter Schnorf, and William Coney — for its contention that the FLSA violation was willful. None of the testimony shows that Big Lots *knew* that Big Lots' classification of ASMs violated the FLSA. The only issue is whether the testimony establishes that Big Lots showed reckless disregard for whether its classification violated the FLSA. Specifically, plaintiff contends that Big Lots' failure to use studies or job duty analyses of the ASM position shows that Big Lots acted willfully in misclassifying the position as exempt.

The regulations define "reckless disregard" as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. But the regulations are secondary to the standard stated by the Supreme Court in *McLaughlin*. *See Moreno v. United States*, 82 Fed. Cl. 387, 397 n.24 (Fed. Cl. 2008) (explaining that the Supreme Court's interpretation of a statute trumps a subsequent agency interpretation inconsistent with the Court's precedent). The Court will accordingly follow the Supreme Court's slightly more lenient standard.

The Court finds that plaintiffs have not shown that Big Lots willfully violated the FLSA.  Brad Waite, Big Lots' Executive Vice-President responsible for Human Resources, testified that the Big Lots ASM position had been classified as exempt since before he began working at Big Lots in 1988. (Waite trial testimony, p.35).  He stated that the store carefully reconsidered the classification of ASMs when a lawsuit was filed in California in 2000 concerning the classification of ASMs under federal and California state law. (Waite trial testimony, p. 40).  Waite explained that during the lawsuit the company looked into what ASMs outside of California were doing and based its decision not to reclassify those ASMs on the FLSA:

> The way I understand the federal FLSA, the requirements are that the primary duty of the position be management; and it's qualitative, not quantitative.  So if the reason that assistant manager position exists is to manage the enterprise or a portion of that enterprise, then that's a condition that qualifies it as exempt as long as that individual is also, then, regularly supervising two or more associates.  That's why I made the decision.

(Waite trial testimony, p. 43).  Waite relied on the advice of both inside and outside counsel in making this decision (Waite trial testimony, p. 43).  One of Big Lots' inside counsel, Mike Schlonsky, also testified that, in conjunction with the California litigation, he discussed the classification of the ASM position nationally with both Waite and outside counsel.

(Schlonsky Depo., 49:1-15, 51:10-15). Waite's 20 years of experience, including his personal interactions with ASMs, also influenced his decision not to reclassify the position. (Waite trial testimony, p. 44). He further explained:

> I understand why the position exists. I understand if we didn't have the position that we couldn't open a store in the morning. I understand what I observe. I understand, when I'm talking with these assistant managers, what they're doing, what kind of stuff they're doing, and what kind of issues they're dealing with.

(Waite trial testimony, p. 45).

The Court finds that Big Lots did not act with reckless disregard. Although Big Lots did not conduct a study or job duty analysis of all of its ASMs, Big Lots made its decision to classify the position as exempt based on the advice of attorneys and its understanding of an ASM's duties, based on the experience of its corporate representatives. Further, in the June 20, 2008 Order decertifying the class of ASMs, this Court found that there was no evidence suggesting an overarching corporate policy to deny ASMs managerial responsibilities. *Johnson v. Big Lots Store, Inc.*, 561 F. Supp. 2d 567, 579 (E.D. La. 2008). The Court found that "ASMs' job responsibilities vary along the critically important axis of exempt managerial duties recognized by the regulations." *Id.* at 582. The diverse experiences of ASMs suggested that some ASMs were probably properly classified. This

shows that Big Lots' decision, while incorrect with regard to the two plaintiffs here, was not made with the "reckless disregard" necessary for a finding of willfulness. Because plaintiffs have not shown that Big Lots acted willfully, plaintiffs' claims are governed by the two-year statute of limitations.

### H. Good faith

Any employer who violates the overtime pay provisions is liable for "unpaid overtime compensation . . . and [] an additional equal amount as liquidated damages." 29 U.S.C.A. § 216(b). The Court can, however, use its discretion to deny liquidated damages if the employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C.A. § 260. The purpose of section 260 is to allow the court to lessen the harshness of the liquidated damages provision by imposing merely compensatory damages. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir. 1979).

Although the plaintiff has the burden of proving willfulness in the statute of limitations context, the defendant has the burden of proving good faith and reasonable grounds in the liquidated damages context. *See Lee v. Coahoma County, Miss.*, 937

F.2d 220, 227 (5th Cir. 1991). The Fifth Circuit has emphasized that "an employer faces a substantial burden of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA." *Singer v. City of Waco, Texas*, 324 F.3d 813, 823 (5th Cir. 2003) (internal citations omitted). Good faith cannot be based on ignorance, but instead "requires some duty to investigate potential liability under the FLSA." *Barcellona*, 597 F.3d at 468-69. The employer must show that it "had an honest intention to ascertain what the Act requires and to act in accordance with it." *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991) (internal citations omitted).

A finding that defendant's actions were not willful does not preclude a finding that defendant did not act in good faith and on reasonable grounds. *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008) ("Because the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with a finding that good faith was not present."). A number of courts have found both that a defendant's actions were not willful and that a defendant did not act in good faith and on reasonable grounds. For instance, in *Mireles v. Frio Foods, Inc.*, 899 F.2d 1047, the Fifth Circuit affirmed the trial court's findings as such. There, the trial

court found that an employer who had discussed minimum wage requirements with the Texas Employment Commission, an agency not involved in the enforcement of the FLSA, and reviewed some brochures and pamphlets on FLSA had not acted willfully. *Id.* at 1416. But the court found that the same evidence was insufficient to meet the employer's "substantial burden" in proving that its attempt to comply with the statute was in good faith and reasonable. Similarly, in *Bowrin v. Catholic Guardian Society*, 417 F. Supp. 2d 449, 472-76 (S.D.N.Y. 2006), the Court found that an employer that made "some effort" to determine whether an exemption applied, but did not take "sufficient steps to ensure compliance," had not acted willfully but was also not in good faith. The Court rejected the employer's arguments that it acted in good faith because it relied on industry practice, outdated DOL representations, and an old collective bargaining agreement. *Id.* at 474-75. The Court also found that the employer's discussions with counsel did not establish good faith since the employer did not provide any evidence of specific conversations with counsel that discussed whether the program at issue complied with the FLSA. *Id. at 473.*

Here, the Court finds that defendant has not shown that it acted in good faith and on reasonable grounds in classifying Johnson and Burden as exempt. Because Big Lots made "some

effort" to determine whether ASMs were exempt, by discussing the ASM job with its counsel and relying on the anecdotal observations of Waite, its actions did not amount to reckless disregard. But after the California lawsuit was filed, Big Lots was on notice that its ASM position might be improperly classified. Defendant's failure to conduct studies or surveys to ascertain whether all of its ASMs were actually performing managerial duties left open the distinct possibility that ASMs were misclassified on an individual basis. Furthermore, Big Lots' no overtime policy had a natural tendency to cause District and Store Managers to demand the last bit of extra manual labor from the ASMs, leaving them little time or opportunity to delegate or supervise. As such, Big Lots should have been more proactive in finding out what was actually going on on the ground. Big Lots has not shown that it should be exempted from the liquidated damage award.

## I.  Damage calculation

The Court must now determine the unpaid overtime compensation owed to plaintiffs. Compensation for overtime is "a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C.A. § 207(a)(2). The DOL regulations explain that, for a salaried employee, the "regular hourly rate of pay, on which time and a half must be

paid, is computed by dividing the [weekly] salary by the number of hours [per week] which the salary is intended to compensate."[6] The regulations provide an example:

> If an employee is hired at a salary of $182.70 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employees regular rate of pay is $182.80 divided by 35 hours, or $5.22 an hour, and when he works overtime he is entitled to receive $5.22 for each of the first 40 hours and $7.83 (one and one-half times $5.22) for each hour thereafter.

29 C.F.R. § 778.113. Salaries for periods longer than a week are to be reduced to their workweek equivalent. 29 C.F.R. § 778.113(b).

Before the Court can determine plaintiffs' regular hourly rate, the Court must ascertain the number of hours per week the salary was "intended to compensate." *See* 29 C.F.R. § 778.113. Plaintiffs contend that the ASM salary was intended to compensate a 40-hour workweek. But the evidence suggests that the salary contemplated ASMs would work a 45-hour week. The Big Lots store management schedule contemplates that ASMs will work a five-day, 45-hour workweek. (Pl.'s Ex. 20). In addition, Lopez indicated

---

[6]29 C.F.R. § 778.113. Defendant has not argued that the fluctuating workweek method of calculation, outlined in 29 C.F.R. § 778.114, applies. Nor has defendant shown that the requirements necessary to use this method apply. *Griffin v. Wake County*, 142 F.3d 712, 715 (4th Cir. 1998) (outlining the requirements an employer must meet to pay an employee by this method).

in her testimony that ASMs were expected to work a 45- to 50-hour week. Although plaintiff cites a number of exhibits, none of the evidence actually suggests that the salary was intended to compensate a 40-hour workweek. Accordingly, the Court will use 45 hours as the denominator in the calculation of plaintiffs' regular hourly rate.

The Court will also factor in the bonuses received by plaintiffs in determining their hourly rates. The FLSA defines "regular rate" to include "all remuneration for employment." 29 U.S.C.A. § 207(e). The regular rate does not include certain bonuses or payments outlined in section 207(e). But bonuses not excluded "must be totaled with other earnings to determine the regular rate on which overtime pay must be based." 29 C.F.R. § 778.223. Among those items to be excluded in determining the regular rate are:

> Sums paid in recognition of services performed during a given period if either, (a) both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly.

29 U.S.C.A. § 207(e)(3). The employer bears the burden of demonstrating that certain payments should not be included in determining its employees' regular rate. *See Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 209 (1966).

To be excluded from the regular rate under § 207(e)(3)(a), a payment must meet the following criteria: (1) the employer must retain discretion as to payment; (2) the employer must retain discretion as to amount; (3) the employer must retain discretion with regard to the payment until near the end of the period which it covers; and (4) the payment must not be paid pursuant to any prior contract, agreement or promise causing the employee to expect such payments regularly. *Herman v. Anderson Floor Co., Inc.*, 11 F. Supp. 2d 1038, 1043 (E.D. Wis. 1998); 29 C.F.R. § 778.223(b)-(c).

The bonuses paid to plaintiffs do not meet the exclusion requirements. The bonuses paid to plaintiffs were pursuant to Big Lots' bonus plans for assistant managers, eligibility for which was promised in the plaintiffs' offer of employment. (Def.'s Ex. 2). Big Lots had both quarterly and annual bonus plans for ASMs. (Def.'s Ex. 108). Big Lots described the quarterly plan as follows:

> The [] quarterly bonus program is based upon two components, individual store performance on the Gallup Organization's Customer Engagement Survey (CE[11]), and individual store performance relative to the store Sales Plan. The 2003 bonus payouts will be paid to Assistant Store Managers based upon individual store performance, regardless of overall company performance. The bonus will be paid after the completion of each quarter.

(Def.'s Ex. 108). The annual plan was described as follows:

The [] annual bonus program is based upon achievement
of the store's Controllable Profit Plan and will be
paid after the completion of the 2003 fiscal year.  The
2003 bonus payouts will be paid to Assistant Store
Managers based upon individual store performance,
regardless of overall company performance.  Assistant
Store Managers will be eligible for the following
payout levels based on the individual store's
performance relative to the store's Controllable Profit
Plan.

(Def.'s Ex. 108).  Both plans then explained how the bonuses

would be calculated under the stated criteria.  The plans even

gave examples as to how the bonuses would be calculated.  One

example provided:

Store XYZ scores in the Big Lots' "Top Quartile" for
the CE[11] and exceeds their Sales Plan by 6%.  The
Assistant Store Manager's bonus would be calculated as
follows:

Big Lots' "Top Quartile Payout" + Exceeding Sales Plan
= Total Quarterly Bonus

$250 + $250 = $500

(Def.'s Ex. 108).  Thus under both bonus plans, both the fact of

payment and the amount of payment to be made was spelled out.

Big Lots has not shown that these payments should not be computed

in the regular rate determination, and thus the Court will

consider each plaintiff's bonuses as part of their regular rate.

The Court will now determine each plaintiff's regular hourly

rate.

1.   *Johnson's hourly rate*

As of November 23, 2002, the first relevant date for the

statute of limitations, Johnson's annual salary was $29,000. (Def.'s Ex. 10). This was Johnson's salary until March 29, 2003. During that period, Johnson's weekly salary was $557.69 per week. Johnson then received a merit increase, and from March 30, 2003 until March 27, 2004, his annual salary was $29,967. (Def.'s Ex. 10). His weekly salary during this period was $576.29 per week. Johnson received another merit increase, and from March 28, 2004 until his heart attack caused him to go on disability on July 22, 2004,[7] his annual salary was $30,866. (Def.'s Ex. 10). This resulted in a weekly rate of $593.58.

None of these weekly rates, however, accounts for the bonus earnings Johnson received over his two years at Big Lots. The regulations provide that, for bonus earnings in which "it is impossible to allocate the bonus among the workweeks in proportion to the amount of the bonus actually earned each week," courts may adopt "some other reasonable and equitable method of allocation." 29 C.F.R. § 778.209(b). The regulations explain that "it may be reasonable and equitable to assume that the employee earned an equal amount of bonus each week of the period to which the bonus relates." § 778.209(b). Big Lots provided evidence that Johnson's bonus earnings totaled $250.00 in 2002,

---

[7]The Court will not consider the two weeks Johnson worked at Store 1545 in November 2004 because he did not testify that he worked overtime during that period.

$1,760.00 in 2003, and $942.31 in 2004. (Def.'s Ex. 109A). The
Court finds that a reasonable and equitable way to account for
Johnson's bonuses is to divide the total bonus earnings Johnson
received by the number of weeks Johnson worked at Big Lots from
2002 to 2004, the period to which the bonus earnings relate.
Johnson's total bonus earnings equal $2,952.31, and the bonuses
were earned over 104 weeks[8] of work. Dividing $2,952.31 by 104
weeks results in a weekly "bonus rate" of $28.39. Adding this
rate to the weekly rates previously calculated results in a
weekly rate of $586.08 from November 23, 2002 until March 29,
2003, a weekly rate of $604.68 from March 30, 2003 until March
27, 2004, and a weekly rate of $621.97 from March 28, 2004 until
July 22, 2004.

To achieve Johnson's regular hourly rate, the Court will
divide these weekly rates by 45 hours, the amount his salary was
intended to compensate him for each week. This results in hourly
rates of $13.02 for November 23, 2002 until March 29, 2003,
$13.44 for March 30, 2003 until March 27, 2004, and $13.82 for
March 28, 2004 until July 22, 2004.

2. *Burden's hourly rate*

Burden's annual rate from November 23, 2002 until March 29,

---

[8]Johnson worked 23 weeks in 2002, 52 weeks in 2003, and 29
weeks in 2004, for a total of 104 weeks.

2003 was $25,590. (Pl.'s Ex. 75). His weekly rate during that period was $492.12. After a merit increase, he received $27,072 from March 30, 2003 until March 27, 2004 (Pl.'s Ex. 75), resulting in a weekly rate of $520.62. Burden received another merit increase, and his rate was $27,884 from March 28, 2004 until his last day of work on September 25, 2004. (Pl.'s Ex. 75). His weekly rate during that time frame was $536.23.

The Court must also account for Burden's bonuses. Big Lots' records indicate that Burden received $2,170.68 in 2002, $1,625.00 in 2003, and $1125.00 in 2004. (Def.'s Exs. 99A and 121). His bonus earnings from 2002 to 2004 total $4,920.68. The Court divides this amount by the 142 weeks[9] he worked during the period in which he accrued these bonuses. This results in a weekly bonus rate of $34.65. This bumps up Burden's weekly rates to $526.77, $555.27, and $570.88 for the respective time frames. Dividing these weekly rates by 45 results in regular hourly rates of $11.71 from November 23, 2002 until March 29, 2003, $12.34 for March 30, 2003 until March 27, 2004, and $12.69 from March 28, 2004 until September 25, 2004.

3. *Hours of overtime*

The Court must next consider the number of overtime hours

---

[9]Burden worked 52 weeks in 2002, 52 weeks in 2003, and 38 weeks in 2004.

for which plaintiffs are owed compensation.  Neither party has set forth a precise account of the hours worked by plaintiffs. Employers generally are required to "maintain and preserve payroll or other records" for employees to whom the overtime provisions apply. 29 C.F.R. § 516.2(a).  Big Lots did not keep records of the actual hours worked by ASMs.  The Court must thus ascertain the number of hours worked from the trial testimony.

Johnson testified that he worked six days a week, and based on his estimate of a 10-hour shift, the Court finds that Johnson averaged a 60-hour workweek. (Johnson trial testimony).  Burden's testimony similarly indicated that he worked about 60 hours a week during the nonholiday season. (Burden trial testimony). Both plaintiffs testified that their hours greatly increased during the holiday-sales season.  Based on plaintiffs' high-end estimates of hours, the Court finds that, during those months, the plaintiffs averaged a 70-hour workweek.  The Court will calculate the number of overtime hours plaintiffs worked that went uncompensated based on these 60- and 70-hour-a-week paradigms.  Because each plaintiff's salary was meant to compensate for 45 hours a week, Big Lots owes plaintiffs *one-and-a-half times* their regular rate for all hours worked over 45, and *one-half* times their regular rate for the other five hours a week for which the straight time was already compensated.

The Court finds that, for the five weeks between November
23, 2002 and December 28, 2002, both Johnson and Burden worked 30
hours of overtime a week (70 minus 40), or 150 hours each over
the five-week period.  For that period, Big Lots owes them one-
and-a-half times their regular rate for 125 hours each, and one-
half times their regular rate for 25 hours each.  From December
28, 2002 until November 1, 2003, plaintiffs were not compensated
for 20 hours of overtime a week (60 minus 40), or 880 hours each
over the 44-week period.  For that period, Big Lots owes them
one-and-a-half times their regular rate for 660 hours each, and
one-half times their regular rate for 220 hours each.  From
November 2, 2003 until December 27, 2003, plaintiffs were not
compensated for 30 hours of overtime a week, or 240 hours each
over the eight-week period.  For that period, Big Lots owes them
one-and-a-half times their regular rate for 200 hours each, and
one-half times their regular rate for 40 hours each. From
December 28, 2003 until July 22, 2004, Johnson was not
compensated for 20 hours of overtime a week, or 600 hours over
the 30-week period. For that period, Big Lots owes Johnson one-
and-a-half times his regular rate for 450 hours, and one-half
times his regular rate for 150 hours.  And finally, from December
28, 2003 until September 25, 2004, Burden was not compensated for
20 hours of overtime a week, or 780 hours over the 39-week

period.  For that period, Big Lots owes Burden one-and-a-half
times his regular rate for 585 hours, and one-half times his
regular rate for 195 hours.

   *4.   Unpaid overtime compensation*

   The Court will now calculate the overtime compensation owed
to each plaintiff.  The Court has set out a chart for each
plaintiff to calculate the compensation owed.  The chart is
divided into time periods that account for the increased hours
during the holiday season and the varying rates of pay.  For each
time period, the chart first calculates the compensation owed at
one-and-a-half times the regular hourly rate by multiplying the
one-and-a-half-time rate by the hours for which plaintiff was not
paid overtime or straight time during that period.  As discussed,
*supra*, plaintiffs are owed both overtime and straight time for 15
hours a week for nonholiday-season weeks and 25 hours a week for
holiday-season weeks.  The hours number is thus the number of
weeks during the period times either 15 or 20.  The next column
in the chart calculates the compensation owed at one-half times
the regular hourly rate by multiplying the half-time rate by the
hours for which plaintiff was paid straight time, but not
overtime.  Because plaintiffs were compensated for 45 hours of
straight time a week, but were not paid overtime for the five
hours over 40, the hours number in this column is five times the

number of weeks during the period.  The last column of the chart represents the total compensation owed for the time period, calculated by adding the compensation owed at the one-and-a-half-time rate and the compensation owed at the half-time rate.

The following chart represents the Court's damage calculation for Johnson:

| Time period | Regular Hourly Rate | Hours * (1.5 * RHR) | Hours * (0.5 * RHR) | Total compensation due for period |
|---|---|---|---|---|
| 11/23/02 to 12/27/02 (holiday) | $13.02 | 125 * $19.53 = $2,441.25 | 25 * $6.51 = $162.75 | $2,604.00 |
| 12/28/02 to 3/29/03 | $13.02 | 195 * $19.53 = $3,808.35 | 65 * $6.51 = $423.15 | $4,231.50 |
| 3/30/03 to 11/01/03 | $13.44 | 465 * $20.16 = $9,374.40 | 155 *$6.72 = $1,041.60 | $10,416.00 |
| 11/02/03 to 12/27/03 (holiday) | $13.44 | 200 * $20.16 = $4,032.00 | 40 * $6.72 = $268.80 | $4,300.80 |
| 12/28/03 to 3/27/04 | $13.44 | 195 * $20.16 = $3,931.20 | 65 * $6.72 = $436.80 | $4,368.00 |
| 3/28/04 to 7/22/04 | $13.82 | 255 * $20.73 = $5,286.15 | 85 * $6.91 = $587.35 | $5,873.50 |

After totaling up the numbers in the last column, the Court finds that Johnson is owed $31,793.80 in unpaid compensation. Factoring in the liquidated damages award, Johnson is entitled to a total of $63,587.60.

69

The following chart represents the Court's damage calculation for Burden:

| Time period | Regular Hourly Rate | Hours * (1.5 * RHR) | Hours * (0.5 * RHR) | Total compensation due for period |
|---|---|---|---|---|
| 11/23/02 to 12/27/02 (holiday) | $11.71 | 125 * $17.57 = $2,196.25 | 25 * $5.86 = $146.50 | $2,342.75 |
| 12/28/02 to 3/29/03 | $11.71 | 195 * $17.57 = $3,426.15 | 65 * $5.86 =$380.90 | $3,807.05 |
| 3/30/03 to 11/01/03 | $12.34 | 465 * $18.51 =$8,607.15 | 155 * $6.17 =$956.35 | $9,563.50 |
| 11/02/03 to 12/27/03 (holiday) | $12.34 | 200 * $18.51 =$3,702.00 | 40 * $6.17 =$246.80 | $3,948.80 |
| 12/28/03 to 3/27/04 | $12.34 | 195 * $18.51 =$3,609.45 | 65 * $6.17 =$401.05 | $4,010.50 |
| 3/28/04 to 9/25/04 | $12.69 | 390 * $19.04 =$7,425.60 | 130 * $6.35 =$825.50 | $8,251.10 |

After totaling up the numbers in the last column, the Court finds that Burden is owed $31,923.70 in unpaid compensation. Factoring in the liquidated damages, Burden is entitled to a total of $63,847.40.

## II. CONCLUSION

For the foregoing reasons, upon considering the evidence and testimony presented by the parties at trial, the Court concludes

that Johnson is entitled to $63,587.60 in damages from Big Lots and that Burden is entitled to $63,847.40.  The parties shall submit to the Court an accounting of attorney's fees and costs.

IT IS SO ORDERED.

New Orleans, Louisiana, this <u>2nd</u> day of April, 2009.

_____
                SARAH S. VANCE
         UNITED STATES DISTRICT JUDGE